UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA, *et al.*,

            Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF STATE,
*et al.*,

            Defendants.

25 Civ. 8566 (AKH)

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:    (212) 637-2663
E-mail: jennifer.jude@usdoj.gov

JENNIFER JUDE
Assistant United States Attorney
– Of Counsel –

**TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ..........................................................................................................................3

    A.    The "Challenged Surveillance Program"....................................................................3

    B.    Plaintiffs and Their Members ...................................................................................9

        1.    Plaintiff UAW ...............................................................................................9

        2.    Plaintiff CWA ............................................................................................10

        3.    Plaintiff AFT .............................................................................................12

        4.    The Alleged Effect of the CSP on Plaintiffs' Missions .............................13

    C.    Plaintiffs' Claims and Requests for Relief..............................................................14

STANDARD OF REVIEW .........................................................................................................15

ARGUMENT...............................................................................................................................15

    I.    The Channeling and Jurisdiction-Stripping Provisions of 8 U.S.C. 1252(b)(9), (g), and (f)(1) Deprive This Court of Subject Matter Jurisdiction .....15

        A.    Section 1252(b)(9) .....................................................................................15

        B.    Section 1252(g)..........................................................................................17

        C.    Section 1252(f)(1).......................................................................................17

    II.    Plaintiffs Lack Standing.........................................................................................18

        A.    Plaintiffs Lack Associational Standing.......................................................19

            1.    Standing of Individual Members ....................................................20

            2.    Germaneness.................................................................................24

        B.    Plaintiffs Lack Organizational Standing.....................................................25

CONCLUSION............................................................................................................................28

# TABLE OF AUTHORITIES

**CASE**                                                                                          **PAGE(s)**

*Aguilar v. ICE*,
    510 F.3d 1 (1st Cir. 2007) .......................................................................................... 16

*Am. Assoc. of Univ. Professors* v. *Rubio*,
    780 F. Supp. 3d 350 (D. Mass. 2025) .............................................................. 20

*Am. Assoc. of Univ. Professors* v. *Rubio*,
    802 F. Supp. 3d 120 (D. Mass. 2025) ....................................................... *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................................... 3

*Bldg. & Const. Trades Council of Buffalo v. Downtown Dev., Inc.*,
    448 F.3d 138 (2d Cir. 2006) .......................................................................... 20, 24

*Brass v. Am. Film Tech., Inc.*,
    987 F.2d 142 (2d Cir. 1993) ..................................................................................... 5

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017) .................................................................................... 25

*Citizens United to Protect Our Neighborhoods v. Village of Chestnut Ridge*,
    98 F.4th 386 (2d Cir. 2024) ..................................................................................... 27

*Conn. Parents Union v. Russell-Tucker*,
    8 F.4th 167 (2d Cir. 2021) ........................................................................... 22, 25, 27

*Do No Harm v. Pfizer*,
    126 F. 4th 109 (2d Cir. 2025) ................................................................................. 20

*Faculty, Alumni, and Students Opposed to Racial Preferences v. New York Univ.*,
    11 F.4th 68 (2d Cir. 2021) .............................................................................. 20, 21

*FDA v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024) .................................................................................................. 25

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022) ........................................................................................... 17, 18

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .................................................................................................. 25

*Humane Soc'y of the U.S. v. Hodel*,
    840 F.2d 45 (D.C. Cir. 1988) ......................................................................................... 24

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ....................................................................................................... 19

*Int'l All. of Theater Stage Emps. Loc. 927 v. Fervier*,
    No. 1:23-CV-04929-JPB, 2025 WL 747513 (N.D. Ga. Mar. 7, 2025) ............................ 24

*Irish Lesbian & Gay Org. v. Giuliani*,
    143 F.3d 638 (2d Cir. 1998) ........................................................................................... 19

*John v. Whole Foods Mkt. Grp., Inc.*,
    858 F.3d 732 (2d Cir. 2017) ........................................................................................... 18

*Khalil v. President*,
    164 F.4th 259 (3d Cir. 2026) .................................................................................... 16, 17

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ....................................................................................................... 18

*Laird v. Tatum*,
    408 U.S. 1 (1972) ........................................................................................................... 20

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ....................................................................................................... 19

*Mahdawi v. Trump*,
    136 F.4th 443 (2d Cir. 2025) ......................................................................................... 17

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000) ........................................................................................... 15

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ............................................................................................. 19, 21, 23

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*,
    684 F.3d 286 (2d Cir. 2012) ........................................................................................... 25

*Nat'l Org. for Marriage, Inc. v. Walsh*,
    714 F.3d 682 (2d Cir. 2013) ........................................................................................... 20

*New York v. DHS*,
    969 F.3d 42 (2d Cir. 2020) ............................................................................................. 25

*Ozturk v. Hyde,*
    136 F.4th 382 (2d Cir. 2025) ................................................................................. 17

*Reno v. Am.-Arab Anti-Discrim. Comm.,*
    525 U.S. 471 (1999) .............................................................................. 16, 17, 18

*Sierra Club v. Morton,*
    405 U.S. 727 (1972) ............................................................................................. 25

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) .......................................................................... 20

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ............................................................................................... 19

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ............................................................................................. 20

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ................................................................................. 19, 20, 21

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.,*
    752 F.3d 239 (2d Cir. 2014) ................................................................................ 15

*Texas State LULAC v. Elfant,*
    52 F.4th 248 (5th Cir. 2022) ............................................................................... 21

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ............................................................................................. 23

*U.S. Dep't of Defense,*
    755 F. Supp. 3d 350 (S.D.N.Y. 2024) ................................................................ 20

*Upsolve, Inc. v. James,*
    155 F.4th 133 (2d Cir. 2025) .............................................................................. 20

**STATUTES**

8 U.S.C. § 1201(i) ........................................................................................................ 18

8 U.S.C. § 1229a ........................................................................................................... 18

8 U.S.C. § 1252 .............................................................................................................. 1

8 U.S.C. § 1252(a)(5) .................................................................................................. 16

8 U.S.C. § 1252(b)(9) .................................................................................................. 15, 16

8 U.S.C. § 1252(f)(1) ....................................................................................................... 17

8 U.S.C. § 1252(g) ........................................................................................................... 17


**RULES**

Federal Rule of Civil Procedure 12(b)(1) ................................................................ 1, 5, 15


**OTHER AUTHORITIES**

*Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed. Reg. 8451 (Jan. 20, 2025)
        Executive Order 14161 ...................................................................................... 3, 4

*Additional Measures to Combat Anti-Semitism*,
        90 Fed. Reg. 8847 (Jan. 29, 2025), Executive Order 14188................................................ 4

Defendants the U.S. Department of State ("State"); the U.S. Department of Homeland Security ("DHS"); United States Citizenship and Immigration Services ("USCIS"); Immigration and Customs Enforcement ("ICE"); the head of each agency; and the United States (collectively, the "Government"); respectfully submit this memorandum of law in support of their motion to dismiss the First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(1).

## PRELIMINARY STATEMENT

Plaintiffs, three labor unions, bring this suit to challenge an assortment of statements and actions by the defendant agencies over the last year, which they allege constitute a coordinated program through which the Government surveils U.S.-based aliens' online speech to detect viewpoints that the Government disfavors and to take adverse immigration action in response. Plaintiffs argue that this alleged program violates the First Amendment and the Administrative Procedure Act and ask the Court to declare it unconstitutional, vacate any agency action implementing it, and enjoin the Government from further using it. Because Plaintiffs lack standing to bring these claims, this Court must dismiss this action for lack of subject-matter jurisdiction.

By asking the Court to enjoin the Government from initiating adverse immigration actions, such as removal proceedings, the FAC runs afoul of the channeling and jurisdiction-stripping provisions of 8 U.S.C. §§ 1252 (b)(9), (g), and (f)(1). These provisions divest district courts of jurisdiction over "all questions of law and fact" related to removal proceedings and any challenge to the Executive's decision to commence removal proceedings, and prohibit district courts from issuing certain types of immigration-related injunctions. Instead, litigants are required to make such challenges and seek such relief through the exclusive remedial scheme provided by Congress, *i.e.*, in immigration court with subsequent judicial review.

1

This Court also lacks jurisdiction over this action because Plaintiffs fail to carry their burden to allege facts that demonstrate that they have either associational standing or organizational standing—the two theories available to them as membership organizations. Plaintiffs do not have associational standing, *i.e.*, standing to assert the rights of their members, because they fail to show they each have at least one member who would have standing in his or her own right. In the FAC, Plaintiffs do not plead facts demonstrating that any member's speech rights were objectively chilled as a result of the alleged government program, but instead present aggregated results of surveys of members that they conducted and brief descriptions of anonymous union members, none of whom faces the type of imminent, credible threat of prosecution required to show standing. Plaintiffs also fail to show that the interests they seek to protect through this litigation are germane to each union's purpose.

Plaintiffs do not have organizational standing because they cannot show that they themselves suffered an injury-in-fact as a result of the surveillance activities that they challenge. Plaintiffs allege that the Government's actions have "silenced" some of their alien members, which in turn has obstructed their mission of adequately representing those members and has required that they divert resources to allay their members' immigration-related concerns. But Plaintiffs' allegations about the effect on their missions are general and conclusory and they fail to plead facts showing that they meet the test to establish an injury through a diversion of resources—that the diversion was both involuntary and created a material burden on their core activities.

Plaintiffs do not have a personal stake in this outcome of this action. Because they lack standing, the Court lacks subject matter jurisdiction, and the FAC must be dismissed.

**BACKGROUND**[1]

**A. The "Challenged Surveillance Program"**

Plaintiffs challenge an alleged "interagency federal program" between DHS and State, which they call the "Challenged Surveillance Program" (the "CSP" or the "Program"). ECF No. 45 ("FAC") ¶ 11. Plaintiffs allege that, through the CSP, the Government "(1) surveils expressive activity documented online of millions of individuals—primarily U.S.-based visa holders and Lawful Permanent Residents—in order to detect disfavored viewpoints and to take adverse immigration action based on those viewpoints, and (2) coerces silence by threatening to engage in such viewpoint-targeted online surveillance and related adverse immigration action." *Id.*

Plaintiffs have sued State, DHS, USCIS, ICE, the heads of each agency or component in their official capacities, and the United States. Each agency has different responsibilities related to aliens present in or seeking entry into the United States. State is responsible for the issuance of visas. *Id.* ¶ 18. DHS is responsible for the administration and enforcement of the Immigration and Nationality Act ("INA"). *Id.* ¶ 20. USCIS, a component of DHS, is responsible for administering applications for the "myriad immigration benefits that noncitizens in the United States may seek, such as work permits, asylum, and naturalization." *Id.* ¶ 22. ICE, another component of DHS, administers INA provisions that govern the removal of aliens from the United States. *Id.* ¶ 24.

In the FAC, Plaintiffs further allege that the CSP is the outgrowth of two Executive Orders ("EOs") that were issued shortly after President Trump's inauguration. *Id.* ¶¶ 60-68. The first is Executive Order 14161, entitled *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed. Reg. 8451 (Jan. 20, 2025) ("EO 14161"). *Id.*

---

[1] This recitation of the facts in the FAC is not intended as an admission that any of these allegations are true but is included because, for the purpose of this motion, all plausibly pleaded factual allegations in the FAC are taken as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

¶¶ 60-64, 68. EO 14161 declares that the United States' policy is to "protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." EO 14161, Sec. 1(a). The EO calls for executive departments and agencies to, among other things, evaluate current programs and recommend any additional actions to further this policy. *Id.*, Secs. 2-3. This EO also states that all actions taken pursuant to the EO must comply with all applicable law. *Id.*, Sec. 4(a)(i)-(ii).

The second is Executive Order 14188, entitled *Additional Measures to Combat Anti-Semitism*, 90 Fed. Reg. 8847 (Jan. 29, 2025) ("EO 14188"). FAC ¶¶ 65-68. This EO calls for stepped up federal law enforcement in response to an "unprecedented wave" of antisemitic "discrimination, vandalism, and violence" against citizens and "especially in our schools and on our campuses." EO 14188, Sec. 1. The EO directs executive agencies to use "all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.*, Sec. 2. Like EO 14161, this EO also states that any actions must be taken "consistent with applicable law." *Id.*, Sec. 4(b).

Plaintiffs allege that after the EOs were issued, officials at State and DHS met with White House staff to begin creating the CSP for the purpose of implementing the EOs. FAC ¶¶ 69-71. They further allege that an "early iteration" of the CSP focused on student visa holders and resulted in the immigration enforcement actions taken against, among others, Mahmoud Khalil, Badar Khan Suri, Yunseo Chung, Momodou Taal, Rümeysa Öztürk, and Mohsen Mahdawi. *Id.* ¶¶ 75-88.

On March 25, 2025, Secretary Rubio sent a cable to consular offices that instructed them to "refer certain student and exchange visitor (F, M, and J) visa applicants . . . for a mandatory social media check." *Id.* ¶¶ 90-91 (citing 25 STATE 26168 (the "March 25 Cable")). The FAC

4

characterizes this cable as stating that certain online posts "might render an applicant ineligible for a visa" and authorizing consular officers to revoke the visas of visa holders in the United States "if new information becomes available that would render them inadmissible in Defendants' view, based on expression of viewpoints that Defendants disfavor." *Id.* ¶¶ 94-95. However, the March 25 Cable in fact states that social media information "may be indicative of ineligibility" under the INA[2] and therefore "may open lines of inquiry regarding the applicant's credibility and purpose of travel" that a consular officer should probe. March 25 Cable.[3] It further explains that revocation of a current visa is only permitted "due to particularized information indicating an ineligibility under specific INA provisions" and "reminds posts that consular officers do not have the authority to revoke a visa based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding." *Id.*

Plaintiffs allege that in or about April 2025, DHS created a task force that "uses dedicated personnel leveraging sophisticated, viewpoint-based online surveillance and related analytical tools" to identify individuals "who express views the administration disfavors." FAC ¶¶ 106-07. On April 9, 2025, USCIS announced that it would "begin considering aliens' antisemitic activity on social media as grounds for denying immigration benefit requests." *Id.* ¶ 107 n.100 (cleaned up). On April 29, 2025, USCIS posted online about its "robust social media vetting program to identify national security & public safety risks." *Id.* ¶ 109 & n.102; *see id.* ¶¶ 110-11. On August

---

[2] Two sections of the INA are specifically cited in the cable, INA § 212(a)(3)(B), which makes inadmissible any alien with certain connections to terrorist activity or a terrorist organization, and INA § 212(a)(3)(A)(ii), which makes inadmissible any alien who is seeking to enter the U.S. to engage in unlawful activity.

[3] While materials outside of the complaint may be considered on a Rule 12(b)(1) motion, the Government also notes that this cable and many other documents cited to or discussed in the FAC should be deemed to be incorporated into it by reference and are documents that Plaintiffs relied on in bringing suit. *See Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citations omitted).

19, 2025, USCIS announced that this program would apply to "all applicants for discretionary USCIS benefits." *Id.* ¶ 109 n.102. USCIS reported that in Fiscal Year 2025, it completed 12,502 individual social media checks. *Id.* ¶ 112.  According to Plaintiffs, these checks were to screen for statements on anti-American ideologies. *Id.* ¶ 112. According to the FAC, USCIS facilitates the alleged CSP by requiring all immigration benefit applicants (and their U.S. citizen petitioners) to submit all social media identifiers used in the past five years. *Id.* ¶¶ 115-16. The FAC contains no factual allegations concerning any denial of immigration benefits that resulted from USCIS's social media vetting program.

State expanded its social media screening and vetting over the next several months, beginning with a pilot program that examined individuals associated with Harvard University, which was announced in a May 30, 2025 cable. *Id.* ¶¶ 117-20 (citing 25 STATE 52014 (May 30, 2025)). That cable instructed consular officers to request that Harvard-affiliated visa applicants make their social media posts "public" and take into consideration whether the absence of an online presence or accounts set to "private" bears on an applicant's credibility. *Id.* ¶ 121. On June 18, 2025, State announced expanded screening of all F, M, and J visa applicants (*i.e.*, student and exchange visitors), "including current visa holders in the U.S. applying or reapplying for a visa," and stated that all such applicants would be instructed to set their social media profiles to "public." *Id.* ¶¶ 122-28.

According to the FAC, by August 21, 2025, State had expanded this program to cover all visa holders, who would be subject to "continuous vetting," which included "data collection" and a review of social media for disfavored expression. *Id.* ¶¶ 129, 132. However, the sources Plaintiffs cite for this allegation, Associated Press and Reuters articles, do not support this broad assertion

as they state only that, as a general matter, all U.S. visa holders are subject to "continuous vetting."[4]

Further undermining Plaintiffs' allegation that State has performed social media vetting on all visa

holders since at least August 2025 is State's December 3, 2025 announcement that it was

expanding such vetting to include H1-B applicants and their dependents.[5] *Id.* ¶ 130.

The CSP supposedly "utilizes automated and 'AI-assisted reviews' of online activity." *Id.*

¶ 139. According to the FAC, DHS, certain of its components, and/or State utilize third-party

online surveillance tools, some of which offer AI-enhanced services, in order to monitor the online

expression of disfavored views. *Id.* ¶¶ 140-51. The FAC also alleges that ICE is also seeking to

use online surveillance tools "to generate leads and create dossiers for ICE enforcement purposes,"

*id.* ¶ 152, but Plaintiffs plead no factual allegations concerning any immigration-related action that

resulted from this.

---

[4] *See* Humeyra Pamuk & Bhargav Acharya, *US Continues Visa Vetting Even After Admission, Official Says*, REUTERS, Aug. 21, 2025, *available at* https://www.reuters.com/world/us-continues-visa-vetting-even-after-admission-official-says-2025-08-21 (last visited Mar. 25, 2026); Matthew Lee, *Trump Administration Is Reviewing All 55 Million Foreigners with U.S. Visas for Any Violations*, ASSOCIATED PRESS, Aug. 21, 2025, *available at* https://apnews.com/article/trump-visas-deportations-068ad6cd5724e7248577f17592327ca4 (last visited Feb. 20, 2026). The Associated Press article further states (incorrectly) that "[o]fficials say the reviews will include all visa holders' social media accounts" and that this review "will include new tools for data collection on past, present and future visa applicants, including a complete scouring of social media sites made possible by new requirements introduced earlier this year." *Id.* However, for each of these assertions, the author cites to other Associated Press articles from months earlier that do not actually support those points. *See* Matthew Lee & Albee Zhang, *U.S. Resumes Visas for Foreign Students But Demands Access to Social Media Account*, ASSOCIATED PRESS, June 18, 2025, *available at* https://apnews.com/article/student-visas-trump-social-media-6632a2c585245edcd6a63594345dd8c7 (last visited Feb. 20, 2026); Barbara Ortutay, *U.S. Immigration Officials Look to Expand Social Media Data Collection*, ASSOCIATED PRESS, March 30, 2025, *available at* https://apnews.com/article/social-media-immigration-applicants-handles-dhs-f67b480abebff7e451056be17572593d (last visited Feb. 20, 2026).

[5] State recently announced that the list of visa categories subject to vetting will expand further on March 30, 2026. *See* U.S. State Department, *Announcement of Expanded Screening and Vetting for Visa Applicants*, Mar. 25, 2026, *available at* https://travel.state.gov/content/travel/en/News/visas-news/announcement-of-expanded-screening-and-vetting-for-visa-applicants.html (last visited Mar. 27, 2026).

Plaintiffs allege that the Government has also waged a "public campaign of intimidation" in which it has "threaten[ed] that all noncitizens' speech documented online will be surveilled for disfavored viewpoints and the possibility of related, adverse immigration consequences in order to coerce noncitizens to cease exercising their First Amendment rights." *Id.* ¶ 156. Plaintiffs assert that, to do this, the Government engaged in a series of high-profile enforcement actions and federal officials made numerous "coercive statements," purportedly in order to "'send a message' . . . to visa holders and Lawful Permanent Residents supportive of Palestinians that they should refrain from expressing those views or suffer similar consequences," *id.* ¶¶ 156, 193; *see id.* ¶¶ 157-201.

Although the FAC defines all of the above actions as part of a single unified program, they are in fact a compilation of various public statements, media reports, and a handful of enforcement actions that concern different defendant agencies with different responsibilities who use different technologies for different purposes. The FAC also conflates categories of aliens without alleging facts that plausibly support doing so. For instance, although the FAC broadly includes all Lawful Permanent Residents ("LPRs") as among those supposedly subject to ongoing surveillance, *see* FAC ¶¶ 3, 5, 8, 11, 30, 41, 76, the facts supporting this allegation are limited to the much narrower category of LPRs applying to USCIS for immigration benefits, *see id.* ¶¶ 40, 107, 116.[6] Similarly, as discussed *supra* note 4, the FAC does not plausibly allege that State's social media screening program has expanded from applicants (including re-applicants) for F, M, J, and certain H visas to *all* U.S. visa holders. *See id.* ¶ 129.

---

[6] Although the FAC describes the immigration actions taken with respect to three LPRs, see FAC ¶¶ 157, 172, 175, these individuals were not identified through the use of any surveillance technology or screening program. *See Am. Assoc. of Univ. Professors v. Rubio* ("*AAUP II*"), 802 F. Supp. 3d 120, 139-42 (D. Mass. 2025).

### B. Plaintiffs and Their Members

Plaintiffs are labor unions whose members include "thousands of people subject to the [CSP]." *Id.* ¶ 6.

#### 1. Plaintiff UAW

Plaintiff the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), is one of the largest unions in North America. *Id.* ¶ 15. Among it members are approximately 120,000 "workers in higher education—graduate students, postdoctoral scientists, researchers, university staff, and faculty"—at various institutions. *Id.* UAW has "substantial numbers of lawfully present, noncitizen members."[7] *Id.* Its mission is to advance the labor interests of its members and would-be members, which requires meeting with them and ensuring that they have "full freedom of speech and can participate meaningfully in decisions affecting their welfare." *Id.* UAW also "participates in advocacy at all levels of government for policies that promote its labor objectives and the interests and well-being of its members and urges its members to do so, as well." *Id.* According to the FAC, "[a]t least some UAW local affiliates consider advocacy on political and social justice issues integral to their core mission of member protection." *Id.* ¶¶ 274-76.

Over 1,000 UAW members responded to a survey about the CSP and whether and how they had changed their behavior in response. *Id.* ¶¶ 208-09. Of the 770 respondents who indicated they had prior knowledge of the alleged CSP, 61.2% (471) reported that they had changed their social media activity as a result. *Id.* ¶ 210. Of the 257 respondents who reported that they were not U.S. citizens, 84.4% (217) reported making such changes. *Id.* ¶ 211. Many of the survey

---

[7] UAW alleges that, of the 257 alien members who responded to its survey, 222 are F or J visa holders, 23 are LPRs, and 5 are H visa holders. *Id.* ¶ 211.

respondents reported making such changes out of fear of "immigration-related scrutiny or targeting." *Id.* The survey respondents reported that the social media changes they had made "reached numerous types of content, including, most commonly, criticism of the Trump administration, its personnel, or its policies . . . and criticism of the Israeli government or expressions of support for the Palestinian people." *Id.* ¶ 215. In addition, some respondents reported that the CSP had caused them to reduce their involvement in union activities, including their attendance at rallies and protests and their association with the union online. *Id.* ¶¶ 215-16. UAW has identified seven anonymous members, UAW Does 1-7, who it alleges have curtailed their speech or otherwise altered their behavior in response to the CSP. *Id.* ¶¶ 218-24.

UAW maintains accounts on various social media sites, which it uses to "associate with and organize its membership," including by updating members on union actions and goals, advertising trainings, meetings, and other events, and providing members with resources. *Id.* ¶¶ 262-64. UAW members follow UAW-affiliated accounts and use social media to communicate and collaborate with the union in private, semi-public, and public channels. *Id.* ¶¶ 267-69, 272. "UAW relies on members' speech about the issues that matter to them in order to effectively advocate for their interests and represent them in their workplaces" and its ability to do so suffers when members "silence themselves." *Id.* ¶ 273.

### 2. Plaintiff CWA

Plaintiff Communications Workers of America ("CWA") is a labor union and association that represents "workers in the communications and information industries, the news media, broadcast and cable television, public service, higher education, health care, manufacturing, video games, and high tech." *Id.* ¶ 16. CWA has "substantial numbers of lawfully present, noncitizen members." *Id.* The union advocates for its members on "workplace issues and other matters that

10

impact [their] lives," which requires the participation of members and would-be members in bargaining units that CWA organizes. *Id.* CWA also represents members who work in higher education and on issues involving academic freedom and campus free speech. *Id.*

The CWA surveyed its members about their reaction, if any, to the alleged CSP and received 223 responses. *Id.* ¶¶ 225, 229. Of the 126 respondents who were previously aware of the CSP, 32.5% (41) reported that they changed their social media activity as a result. *Id.* ¶ 225. Of the nine respondents who reported that they were not U.S. citizens, four (44.4%) reported making such changes, and indicated they did so due to fear of "immigration-related scrutiny or targeting."[8] *Id.* ¶ 226. Of the respondents who reported taking steps to restrict access to their social media content, those steps most commonly related to "content involving criticism of the Trump administration or its policies . . . [or] content involving criticism of the Israeli government." *Id.* ¶ 228. Twelve of the 126 members reported changing or reducing their participation in union activities in response to the CSP, including by reducing posting online, reducing participation in rallies, or obscuring their identity when attending rallies. *Id.* ¶ 231. CWA has identified eight anonymous members, CWA Does 1-8, who it alleges have curtailed their speech or otherwise altered their behavior in response to the CSP. *Id.* ¶¶ 233-40.

CWA maintains several social media accounts that it uses to organize and communicate with its membership and recruit prospective members. *Id.* ¶¶ 277-78. It uses social media to create forums for members to discuss union-related issues and monitors these forums to understand members' needs. *Id.* ¶ 279. "CWA relies on members' speech about the issues that matter to them

---

[8] CWA alleges that nine alien members responded to its survey, four of whom reported changing their behavior in response to the CSP, including two H visa holders, one J visa holder, and one LPR. *Id.* ¶ 226.

in order to effectively advocate for their interests and represent them in their workplaces" and its ability to do so suffers when members "silence themselves." *Id.* ¶ 282.

### 3. Plaintiff AFT

Plaintiff American Federation of Teachers ("AFT") is a national labor organization representing over 1.8 million members, including many higher education faculty, graduate students, and professional staff. *Id.* ¶ 17. AFT has "substantial numbers of lawfully present, noncitizen members." *Id.* "AFT's mission is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for all students, their families, and their communities, in part by advancing the labor interests of its members and would-be members." *Id.* Its core activities include "community engagement, organizing, collective bargaining, and policy advocacy" and it "frequently coordinate[s] public rallies and demonstrations to raise awareness of important issues impacting its members." *Id.*

1,655 AFT members responded to a survey about their reactions to the CSP. *Id.* ¶ 241. Of the 1,008 who stated that they were previously aware of the CSP, 32.9% (332) reported changing their social media activity in response. *Id.* Of the 54 aliens who responded, 79.6% (43) reported having made such changes and that they did so out of fear of "immigration-related scrutiny or targeting."[9] *Id.* ¶ 242. In addition, 81.3% (270) of the 332 respondents who reported changing their behavior indicated that they did so out of fear of such scrutiny or targeting against them or their family members, colleagues, classmates, and other associates, and 45.2% (122) of them reported doing so out of fear of government scrutiny or targeting of "noncitizen international students in their lives." *Id.* ¶ 245. The respondents who reported changing their social media activity indicated

---

[9] AFT reports that 54 members who responded to its survey are aliens, including nine H visa holders, 11 F visa holders, and 30 LPRs. *Id.* ¶ 242.

that their changes most commonly related to content involving "criticism of the Trump administration, its personnel, or its policies . . . and criticism of the Israeli government or expressions of support for the Palestinian people." *Id.* ¶ 246. Finally, some AFT members reported reducing their union involvement online and offline as a result of the CSP, including by attending fewer union-led protests and union meetings, reducing their communications with the union, and declining union leadership roles. *Id.* ¶¶ 247-48. AFT has identified eight anonymous members, AFT Does 1-8, who it alleges have curtailed their speech or otherwise altered their behavior in response to the CSP. *Id.* ¶¶ 250-57.

AFT maintains social media accounts and uses them to communicate with its members and provide them with educational resources and as a "key channel for promoting the[ir] interests" *Id.* ¶¶ 283-85. Local AFT chapters maintain their own separate but affiliated accounts, which share information with members on union-related topics. *Id.* ¶ 286. "AFT relies on members' speech about the issues that matter to them in order to effectively advocate for their interests and represent them in their workplaces" and its ability to do so suffers when members "silence themselves." *Id.* ¶ 288.

#### 4.  The Alleged Effect of the CSP on Plaintiffs' Missions

Plaintiffs allege that the supposed CSP has frustrated their missions by "decreasing member engagement with the unions." *Id.* ¶ 289. Specifically, Plaintiffs contend that union members' reduced use of social media in response to the CSP limits Plaintiffs' ability to organize and communicate with them via Plaintiffs' social media accounts. *Id.* ¶ 290. They further contend that members' unwillingness to appear in union social media posts or webpages harms Plaintiffs' recruiting and outreach efforts. *Id.* ¶ 291. Plaintiffs also allege that members' decreased participation in offline union activity such as protests, union elections, and organizing also harms

13

Plaintiffs' ability to represent their members and fulfill their missions as labor unions. *Id.* ¶ 292. Plaintiffs allege that this has caused them to divert resources from other activities to "sustain engagement, allay member fears, and protect members from the [CSP]." *Id.* ¶ 293. Specifically, UAW has retained an immigration attorney "to resolve immigration-specific issues" and "[a]t least one UAW local affiliate and one UAW graduate student union have diverted resources and substantial staff time to create resources for noncitizen members. *Id.* And AFT has allegedly diverted resources "to the protection of union members on student visas" by "engag[ing] a third-party organization to conduct trainings for noncitizen union members on protecting and modifying their online presence," and creating an online "back-to-campus" resource for its members in higher education. *Id.* ¶ 295. The FAC contains scant allegations concerning the diversion of any resources by CWA, stating only that CWA has "diverted resources . . . in order to protect its noncitizen members" and respond to their concerns. *Id.* ¶ 294.

### C. Plaintiffs' Claims and Requests for Relief

Plaintiffs bring seven claims against the Government—four First Amendment claims and three APA claims. Plaintiffs allege that this supposed Program violates the First Amendment because it is unconstitutional viewpoint discrimination, *id.* ¶¶ 304-14 (Claim 1); the Government's statements about the Program are a "coercive threat to use their authority to surveil and punish noncitizens because of their disfavored views," *id.* ¶¶ 315-23 (Claim 2); the Program's social media account requirements violate their First Amendment rights of association and anonymity, *id.* ¶¶ 324-32 (Claim 3); and the Program infringes on their First Amendment right to receive information, *id.* ¶¶ 333-41 (Claim 4). Plaintiffs also allege that the CSP violates the APA because it is arbitrary and capricious, *id.* ¶¶ 342-47 (Claim 5); exceeds statutory authority, *id.* ¶¶ 348-52 (Claim 6); and is unconstitutional, *id.* ¶¶ 353-57 (Claim 7).

Plaintiffs request that the Court declare that the CSP and the Government's alleged actions to implement it are unlawful, declare that any statutory authority the Government relies on to conduct viewpoint-based surveillance is unconstitutional as applied to Plaintiffs, and vacate any final agency action implementing the CSP. *Id.* at 124-25 (prayer for relief). Plaintiffs also request that the Court enjoin the Government from implementing the CSP, including through conducting viewpoint-based investigation and surveillance, issuing threats to use the Program to silence disfavored views,[10] and "relying on or using all records of individuals created through the [CSP]." *Id.* Plaintiffs also request that the Court order that any such records be purged. *Id.*

## STANDARD OF REVIEW

On a Rule 12(b)(1) motion to dismiss, the party asserting subject-matter jurisdiction bears "the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted). On a Rule 12(b)(1) motion, the Court may consider materials outside of the complaint. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

## ARGUMENT

**I.     The Channeling and Jurisdiction-Stripping Provisions of 8 U.S.C. 1252(b)(9), (g), and (f)(1) Deprive This Court of Subject Matter Jurisdiction**

The Court does not have subject matter jurisdiction over this action because of the channeling and jurisdiction-stripping commands of 8 U.S.C §§ 1252(b)(9), (g), and (f)(1).

**A.  Section 1252(b)(9)**

Congress provided a comprehensive and exclusive remedial scheme over challenges to decisions, actions, and proceedings related to the removal of aliens, that channels all such

---

[10] The Government notes that this specific request is improper because it restricts protected government speech. *See AAUP II*, 802 F. Supp. 3d at 199.

15

challenges through the immigration courts in the first instance. 8 U.S.C. § 1252(b)(9) directs that:

> judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9). And Congress prescribed a single path for judicial review of removal orders: "a petition for review filed with an appropriate court of appeals." 8 U.S.C. § 1252(a)(5). These provisions create "an unmistakable 'zipper' clause" whose "expanse is breathtaking." *Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007) (quoting *Reno v. Am.-Arab Anti-Discrim. Comm.* ("*AAADC*"), 525 U.S. 471, 482-83 (1999)).

Plaintiffs' request that the Court enjoin the Government from imposing "adverse immigration consequences" on aliens in response to "disfavored expression," *see* Compl. ¶¶ 133, 296; *id.* at 124 (prayer for relief), directly conflicts with the command of Section 1252(b)(9) that "*all* questions of law and fact" that "arise from *any* action taken or proceeding brought to remove an alien from the United States . . . shall be available *only* in judicial review of a final order" to the appropriate court of appeals. 8 U.S.C. § 1252(b)(9) (emphasis added); *see id*. § 1252(a)(5).

The Third Circuit in *Khalil v. President*, 164 F.4th 259 (3d Cir. 2026), recently interpreted Section 1252(b)(9) to forbid *exactly* this kind of circumvention of the channeling function. In that case, Khalil filed a habeas petition alleging, among other things, that his detention and DHS efforts to remove him violated the First Amendment. *Id*. at 266-67. That court held that Section 1252(b)(9) divested the district court of subject-matter jurisdiction because it channels all "questions" "arising from" proceedings to remove an alien, so long as

those legal questions can be "meaningfully" reviewed on a petition for review to the relevant court of appeals.[11] *Id.* at 274-75. Similarly, Plaintiffs efforts to forestall possible future removal may not be raised in this forum.

### B.  Section 1252(g)

For similar reasons, this case implicates Section 1252(g)'s directive that "*no court* shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to [1] *commence proceedings*, [2] adjudicate cases, or [3] execute removal orders against any alien under this chapter," except through a petition for review from a final order of removal filed in a court of appeals. 8 U.S.C. § 1252(g) (emphasis added). By its terms, Section 1252(g) prohibits this case:  litigation in district court to "hear" a "cause or claim" challenging the Executive's "decision or action . . . to commence proceedings" against any alien. *Id.*; *see AAADC*, 525 U.S. at 487 ("challenge to the Attorney General's decision to 'commence proceedings' . . . falls squarely within § 1252(g)").

### C.  Section 1252(f)(1)

Finally, Plaintiffs' request for injunctive relief is also barred by the separate provision in 8 U.S.C. § 1252(f)(1) that states that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." As the Supreme Court held in *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), Section 1252(f)(1) "generally prohibits . . . injunctions that order

---

[11] While the *Khalil* court noted disagreement with two recent Second Circuit decisions that concern the scope of Section 1252(b)(9)—*Ozturk v. Hyde*, 136 F.4th 382 (2d Cir. 2025), and *Mahdawi v. Trump*, 136 F.4th 443 (2d Cir. 2025)—that disagreement is not material here because it is limited to whether this provision strips district courts of jurisdiction over unlawful detention claims.

federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the . . . provisions." *Id*. at 544.

There is no question that the INA's provisions under which an alien would be removed—8 U.S.C. §§ 1229a, 1231—are provisions subject to Section 1252(f)(1). Nor are Plaintiffs' claims limited to "a particular alien." *Id*. at 550. And although the State's discretionary authority to revoke visas is provided by 8 U.S.C. § 1201(i), which does not appear in Part IV of the relevant subchapter of the INA, it contains its own limitation on jurisdiction. Specifically, it precludes judicial review of a revocation under the section, "except in the context of a removal proceeding if such revocation provides the sole ground for removal under § 1227(a)(1)(B) of this title," and Section 1227(a)(1)(B) does appear in Part IV.   *See* 8 U.S.C. § 1201(i).  Thus, enjoining the Government from revoking visas under Section 1201(i) would hinder the operation of a covered removal provision, as prohibited by Section 1252(f)(1). *See Aleman Gonzalez*, 596 U.S. at 544.

In sum, "[f]ederal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute . . . which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). This includes jurisdiction to review constitutional issues, which Congress can require to be first adjudicated in other forums. *See AAADC*, 525 U.S. at 482-83.

## II.     Plaintiffs Lack Standing

"To satisfy the irreducible constitutional minimum of standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (quotation marks omitted). The alleged injury in fact must be both "concrete and particularized" and "actual or imminent, not conjectural or

18

hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks omitted). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). "Plaintiffs must demonstrate standing for each claim they press against each defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (cleaned up).

"[T]he party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998). A membership organization may establish standing in two ways. It may "assert the rights of its members under the doctrine of associational standing," *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343-45 (1977)), or it may sue on "its own behalf," under the doctrine of organizational standing, *id.* Here, Plaintiffs cannot establish standing under either theory.

### A. Plaintiffs Lack Associational Standing

A membership organization may establish "associational standing" based on injury to its members by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343; *see Irish Lesbian & Gay Org.*, 143 F.3d at 649. Plaintiffs fail to satisfy the first two prongs of this test.

19

### 1. Standing of Individual Members

To establish associational standing, an organization must include "specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *see Do No Harm v. Pfizer*, 126 F. 4th 109, 118 (2d Cir. 2025); *Bldg. & Const. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006). "Following the Supreme Court's decision in *Summers*, the Second Circuit has cautioned plaintiff-organizations to be 'specific—even if 'naming names' and submitting individual affidavits is not required.'" *Nat'l Org. for Women-N.Y.C. v. U.S. Dep't of Defense*, 755 F. Supp. 3d 350, 362 (S.D.N.Y. 2024) (quoting *Faculty, Alumni, and Students Opposed to Racial Preferences v. New York Univ.* ("*FASORP*"), 11 F.4th 68, 76 (2d Cir. 2021)).

In the context of a pre-enforcement First Amendment challenge, a plaintiff must demonstrate (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest;" (2) "that the intended conduct is 'arguably proscribed by' the challenged regulation"; and (3) "that 'there exists a credible threat of prosecution thereunder' that is 'sufficiently imminent.'" *Upsolve, Inc. v. James*, 155 F.4th 133, 139 (2d Cir. 2025) (quoting *Susan B. Anthony List*, 573 U.S. at 159). "A plaintiff must allege something more than an abstract, subjective fear that his rights are chilled in order to establish a case or controversy." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013) (citing *Laird v. Tatum,* 408 U.S. 1, 13-14 (1972)). Rather, the fear underlying the alleged chilling must be "real and imminent." *Id.* The "fundamental question . . . is whether the challenged policy 'objectively chills' protected expression." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022); *see also Am. Assoc. of Univ. Professors v. Rubio* ("*AAUP I*"), 780 F. Supp. 3d 350, 375-76 (D. Mass. 2025).

Plaintiffs fail to demonstrate that they each have a member facing a credible threat of

20

prosecution or who has been chilled by anything that is objective, real, imminent, and traceable to the CSP. Plaintiffs attempt to do this in two ways: (1) through the aggregated results of member surveys and (2) through several anonymous "Doe" union members. Neither approach succeeds.

Plaintiffs' survey results lack key information about the survey respondents that could show whether they face an objective chilling of First Amendment rights, including their understanding of the nature and scope of the alleged CSP, specific alien status in the U.S., intended speech or other course of conduct (alleged to have been chilled), the specific changes (if any) he or she has made to online or offline behavior, and the reasons for such changes. *See FASORP*, 11 F.4th at 76. As noted above, there is no monolithic government surveillance program. Rather, the FAC describes the statements of different agencies and components over many months concerning actions that pertain to different categories of aliens—applicants for visas (of different types), holders of visas (of different types), and individuals seeking immigration benefits like LPR status. A particular member's understanding of the at-issue government policy is important for determining whether their fear of it is real, imminent, and objectively reasonable, and whether any chilling is traceable to any specific defendant's action. *See Murthy*, 603 U.S. at 61 (plaintiffs must demonstrate standing against each government agency defendant and cannot treat them "as a unified whole"). The survey results also fail to report any individual member's intended "course of conduct." *Susan B. Anthony List*, 573 U.S. at 159. Such conduct may not be "arguably proscribed" by the CSP, in which case there could be no credible threat of prosecution. *See Texas State LULAC v. Elfant*, 52 F.4th 248, 256 (5th Cir. 2022).

Relatedly, an individual member's specific immigration status is relevant to the analysis of

whether or not she possesses a credible fear of prosecution and by which defendant.[12] U.S. citizens and aliens who are in categories not subject to supposed CSP scrutiny could not have a credible fear of prosecution. As noted *supra*, the FAC does not plausibly allege that LPRs or visa holders— as opposed to *applicants* for F, M, J, and certain H visas—are subject to any social media vetting unless they are actively applying for certain immigration benefits. *See Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021). This is particularly significant for standing purposes because Plaintiffs' survey respondents are all either LPRs or holders of F, H, or J visas— none are visa applicants and the FAC does not allege that any of them have applied for immigration benefits. *See* FAC ¶¶ 211, 226, 242. The FAC does allege that re-applicants for F, M, J, and certain H visas (*i.e.*, current visa holders when they re-apply) are subject to the CSP. However, Plaintiffs do not claim to have any M visa holder members, *see id.* And they fail to plead specific facts (such as visa validity dates) demonstrating that any of their F, J, or H visa holder member's re-application is imminent.

Nor do the vignettes of anonymous "Doe" union members establish associational standing. The brief descriptions of these 23 union members do provide some of the particularity lacking in the survey results, listing each member's immigration status and, to varying degrees, their intended allegedly chilled speech or other conduct and the changes in their online or offline behavior they claim to have made in response to the CSP. *See id.* ¶¶ 218-24, 234-40, 250-57. However, these descriptions still lack information essential for discerning whether any member possesses a credible fear of prosecution. None of the vignettes describes with any detail the member's

---

[12] Additionally, the FAC co-mingles certain survey responses from citizens with responses from aliens. *See* FAC ¶¶ 212, 227, 243. Allegations concerning members who are citizens are irrelevant to the standing analysis as the FAC does not allege that the CSP surveils or otherwise applies to U.S. citizens, *see id.* ¶¶ 3-4, nor would a citizen have an objectively reasonable fear of immigration consequences (to himself or alien associates) for certain speech.

understanding of the nature or scope of the supposed CSP.[13] *See id.* ¶¶ 218-24, 234-40, 250-57. And all but two of the 23 members specifically state that they are *not* currently applying (or re-applying) for a visa or for immigration benefits such that their fear of prosecution could be "imminent." Those two members—CWA Doe 6 and AFT Doe 7—are both LPRs with pending immigration benefit applications. *See id.* ¶¶ 238, 256. Neither of them has standing because the FAC does not allege that USCIS's social media vetting of benefit applicants has led to any adverse immigration outcomes such that these two union members' fear of benefit denial would be credible.

As the Supreme Court explained in *Murthy*, standing requires a plaintiff to show "specific causation" (*i.e.*, it must tie a particular act by a particular defendant to an identified personal harm), particularly in a "sprawling suit" like this one that involves different federal agencies taking different actions at different times. *Murthy*, 603 U.S. at 60-62. Plaintiffs do not do this. Again, the "CSP" is an alleged "program" that Plaintiffs infer from a combination of public statements made in the press and on social media by different federal officials and a handful of enforcement actions. Plaintiffs allege that their members have been chilled because of the *sum total* of these disparate actions. But as the *Murthy* court explained in rejecting this very type of "overly broad" theory of standing, *id.* at 60, particularized facts are required because "standing is not dispensed in gross," *id.* at 61 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)).

---

[13] Notably, a sizeable percentage of survey respondents reported having no knowledge of the Program prior to taking the survey. FAC ¶¶ 208, 210, 225, 241. Others appear to have misunderstood the nature of the alleged Program. For example, although the survey defined the CSP as the monitoring of the social media of non-citizens, the majority of survey respondents who indicated that they changed their behavior in response to the CSP were U.S. citizens who were not subject to it. *See, e.g., id.* ¶¶ 210-11 (of the 471 respondents who changed behavior, 254 were citizens and 217 were non-citizens).

### 2. Germaneness

Plaintiffs also fail to satisfy the germaneness requirement of associational standing. To do so, each must show that its "litigation goals [are] pertinent to its special expertise and the grounds that bring its membership together." *Bldg. & Const. Trades Council*, 448 F.3d at 149 (cleaned up).

Plaintiffs are labor unions that represent the interests of their members as workers in particular industries through organizing and advocacy. *See* FAC ¶¶ 15-17. While the FAC alleges that their missions include supporting members' "interests and wellbeing" including their "rights to free speech" and "democratic participation," *see, e.g.*, *id.* ¶ 15, this type of highly general "catchall" interest is insufficient to satisfy the germaneness requirement. *See Int'l All. of Theater Stage Emps. Loc. 927 v. Fervier*, No. 1:23-CV-04929-JPB, 2025 WL 747513, at *4 (N.D. Ga. Mar. 7, 2025) ("[T]he 'just treatment of all its members' interest is a catchall that would essentially render the germaneness requirement a nullity."). The FAC contains no specific allegation that demonstrates that Plaintiffs have expertise in immigrants' rights or civil liberties or that their members joined unions in order to vindicate their First Amendment rights in the context of immigration enforcement.[14] Instead, there is a "wholesale mismatch" between the "litigation topic"—ensuring the First Amendment rights of Plaintiffs' alien members—and the unions' "organizational expertise" in workers' rights. *Id.* at *6 (citing *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 57-58 (D.C. Cir. 1988)); *see id.* ("In short, Plaintiff is a labor union and not a voting organization.").

---

[14] CWA's brief and general assertion that it represents members "on issues involving academic freedom and campus free speech," FAC ¶ 16, does not demonstrate that it has the requisite expertise or that its members joined the union specifically for the protection of their First Amendment rights.

### B. Plaintiffs Lack Organizational Standing

To establish standing on its own behalf, an "organization itself must meet the same standing test that applies to individuals." *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (alterations and quotation marks omitted). An organization must establish "that it was directly injured as an organization." *Conn. Parents*, 8 F.4th at 172. That showing requires "an imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable." *Id.* at 172-73 (citation omitted). "[T]he challenged action" must do more than "merely harm [the organization's] 'abstract social interests.'" *Id.* at 173 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). An injury cannot be based on an entity's "mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

An organization may show injury-in-fact by demonstrating that the challenged action "impede[s] [its] abilit[y] to carry out [its] responsibilities." *New York v. DHS*, 969 F.3d 42, 61 (2d Cir. 2020) (citing *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017)). An organization may also show it has been injured by the need to divert resources to respond to the challenged action, but only if the diversion is "an involuntary material burden on [the organization's] established core activities." *Conn. Parents*, 8 F.4th at 173. "[E]xpenditures or other activities . . . incurred at the organization's own initiative" are insufficient, *id.* at 174, as an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action," *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

Plaintiffs have not demonstrated that they have suffered organizational injuries. Plaintiffs do not claim to be directly regulated by any aspect of the alleged CSP themselves. Rather, their

25

theory appears to be that the CSP has generally decreased some of their members' online and offline engagement, which in turn harms Plaintiffs' ability to effectively represent them. They each allege that they rely on their "members' speech about the issues that matter to them in order to effectively advocate for their interests and represent them in their workplaces" and that their ability to do so suffers when members "silence themselves." FAC ¶¶ 273, 282, 288. Plaintiffs' basis for concluding that members have in fact silenced themselves is the survey results and the testimonials of the Doe union members. *See id.* ¶¶ 205-57. However, as the FAC notes, those members reported that their changes to their online social media use relate primarily to content that is either critical of the Trump administration or related to Israel and Palestine. *Id.* ¶¶ 215, 229, 246; *see, e.g.*, *id.* ¶¶ 222-24, 233, 237-39, 257. Plaintiffs do not plausibly explain how members refraining from posting about these topics harms their ability to "effectively advocate for their [members'] interests and represent them in their workplaces." *See id.* ¶¶ 273, 282, 288. The FAC does not include facts remotely supporting Plaintiffs' sweeping conclusion that, as a result of the CSP, some of their members "do not attend events, do not vote, and do not communicate with the unions," thereby obstructing Plaintiffs' missions.[15] *See id.* ¶ 292. Similarly, Plaintiffs fail to explain how certain members' unwillingness to appear on public union webpages or social media posts necessarily "damages [their] recruiting and outreach efforts." *Id.* ¶ 291. The FAC does not allege that Plaintiffs have been unable to engage in their core labor-related missions, only that the CSP has supposedly "obstruct[ed] their missions to increase the breadth and quality of union representation."[16] *Id.* This is not enough.

---

[15] This is especially the case because Plaintiffs have numerous potential means through which to engage with their members. *See* FAC ¶¶ 267, 272, 281 (discussing existence of public, semi-public, and private social media channels for communicating and collaborating with members).

[16] Plaintiffs even acknowledge that some their members have reported increased engagement with them as a result of the supposed CSP. *See* FAC ¶¶ 215, 247.

Nor have Plaintiffs established organizational standing under a diversion of resources theory. They allege that their members' supposed decreased engagement has required them to divert resources from other activities to "sustain engagement, allay member fears, and protect members from the [CSP]." *Id.* ¶ 293. However, the only examples of such resource diversion given are UAW's retention of an immigration attorney "to resolve immigration-specific issues" and creation of non-specific resources for members traveling internationally, *id.*, and AFT's engagement of "a third-party organization to conduct trainings for noncitizen union members on protecting and modifying their online presence," and creation of a two-page "back-to-campus" resource for its members in higher education, *id.* ¶ 295. (Notably, there are no specific facts concerning the diversion of resources by CWA—just the conclusory statement that CWA has done so. *Id.* ¶ 294.) Plaintiffs plead no facts suggesting that these expenditures were involuntary or that they materially impacted Plaintiffs' core activities. *See Conn. Parents*, 8 F.4th at 174-75; *see id.* at 174 ("[A]n organization's decision to embark on categorically new activities in response to action by a putative defendant will not ordinarily suffice to show an injury for standing purposes, even if the organization's own clients request the change."); *Citizens United to Protect Our Neighborhoods v. Village of Chestnut Ridge*, 98 F.4th 386, 396 (2d Cir. 2024) (no organizational standing based on diverting resources to hire professional planner to help oppose new zoning law and petition village to adopt comprehensive zoning plan); *AAUP II*, 802 F. Supp. 3d at 180 (reduced alien participation in organization's events and a diversion of its resources to "dealing with immigration law" insufficient for organizational standing).

Unable to show that the alleged CSP impairs their organizational mission or caused an involuntary or material diversion of resources, Plaintiffs' attempt to establish standing through an organizational theory fails.

**CONCLUSION**

Based on the foregoing, the Government respectfully requests that the Court grant the motion to dismiss and dismiss this case for lack of jurisdiction.

Dated: March 27, 2026

<div style="margin-left: 50%;">

Respectfully submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York

By:    */s/ Jennifer Jude*
JENNIFER JUDE
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Phone: (212) 637-2663
E-mail: jennifer.jude@usdoj.gov

</div>

28

## Certificate of Compliance

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 8,735 words.