**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| INTERNATIONAL UNION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-cv-8566 (AKH) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Sadaf Hasan
Collin Poirot
MUSLIM ADVOCATES
1032 15th Street N.W. # 362
Washington, D.C. 20005
(202) 655-2969
sadaf@muslimadvocates.org*
collin@muslimadvocates.org

David Greene
Sophia Cope
Elizabeth Femia
Saira Hussain
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
davidg@eff.org
sophia@eff.org
lfemia@eff.org
saira@eff.org

*\*Pro hac vice* application forthcoming

Anthony Cosentino, *student*
Nick Jones, *student*
Raymond Perez, *student*
Tess Solomon, *student*
Grace Chisholm, *student*
Stacy Livingston
John Langford
MEDIA FREEDOM & INFORMATION
ACCESS CLINIC
P.O. Box 208215
New Haven, CT 06511
(203) 432-2366
stacy.livingston@ylsclinics.org
john.langford@ylsclinics.org

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................i

TABLE OF AUTHORITIES................................................................................... iii

INTRODUCTION ........................................................................................................1

STANDARD OF REVIEW...........................................................................................3

ARGUMENT.................................................................................................................4

    I.    This Court Has Subject-Matter Jurisdiction to Review Plaintiffs' Claims ........................4

        A.  8 U.S.C. § 1252(b)(9) Does Not Strip Jurisdiction over Plaintiffs' Claims .................4

        B.  8 U.S.C. § 1252(g) Does Not Strip Jurisdiction over Plaintiffs' Claims......................6

        C.  8 U.S.C. § 1252(f)(1) Is Not a Jurisdiction-Stripping Provision.................................8

    II.    Plaintiffs Sufficiently Allege Associational Standing for Members' Ongoing Injuries...............................................................................................................9

        A.  *Hunt* Element One: Plaintiffs' Members Would Have Standing .................................9

            1.  Plaintiffs' Members Have Suffered Injuries-in-Fact.............................................10

                a.  Viewpoint Discrimination .................................................................................11

                b.  Coercive Threats..................................................................................................15

                c.  Demanding Disclosure of and Public Access to Social Media Accounts .......17

                d.  Chilling Speech Plaintiffs Have A Right to Receive......................................18

            2.  Plaintiffs' Members' Injuries are Traceable Directly to the Challenged Surveillance Program ...............................................................................19

        B.  *Hunt* Element Two: Plaintiffs Seek to Protect Member Interests That Are Germane to Their Missions ............................................................................22

        C.  *Hunt* Element Three: The Participation of Individual Members is Not Required...............................................................................................................24

    III.  Plaintiffs Sufficiently Allege Pre-Enforcement Associational Standing...........................24

    IV.  Plaintiffs Sufficiently Allege Organizational Standing.....................................26

        A.  The CSP Impairs Plaintiffs' Core Missions .................................................28

1.  Organizing Members .............................................................................28

2.  Safeguarding Members' Rights to Democratic Participation................................29

3.  The Government Would Have this Court Ignore Plaintiffs' Allegations of Injuries to Plaintiffs' Missions ................................................................30

B.  The CSP Requires Plaintiffs to Involuntarily Divert Material Resources...................32

C.  Plaintiffs' Organizational Injuries are Traceable to the CSP and Can be Remedied by the Requested Relief.............................................................33

CONCLUSION ...................................................................................34

CERTIFICATE OF COMPLIANCE.............................................................35

## TABLE OF AUTHORITIES

**Cases**

*Aebisher v. Ryan*,
622 F.2d 651 (2d Cir. 1980) ...................................................................................16

*Afr. Cmtys. Together v. Lyons*,
799 F. Supp. 3d 362 (S.D.N.Y. 2025) ........................................................28, 32, 33

*Al Otro Lado v. Exec. Off. for Immigr. Rev.*,
138 F.4th 1102 (9th Cir. 2025) ..................................................................................8

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*,
651 F.3d 218 (2d Cir. 2011) ..............................................................................10, 24

*Am. Ass'n of Univ. Professors v. Rubio*,
780 F. Supp. 3d 350 (D. Mass. 2025)....................................................................7, 20

*Am. Booksellers Found. v. Dean*,
342 F.3d 91 (2d Cir. 2003) ......................................................................................16

*Am. C.L. Union v. Clapper*,
785 F.3d 787 (2d Cir. 2015) ..............................................................................13, 27

*Am. Commc'ns Ass'n, C.I.O., v. Douds*,
339 U.S. 382 (1950) .................................................................................................23

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011) ......................................................................................3

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ...........................................................................................17, 18

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024) ..............................................................................17, 18

*Artiga Carrero v. Farrelly*,
270 F. Supp. 3d 851 (D. Md. 2017)............................................................................7

*Ateres Bais Yaakov Academy of Rockland v. Town of Clarkston*,
88 F.4th 344 (2d Cir. 2023) ......................................................................................19

*Aurecchione v. Schoolman Transp. Sys., Inc.*,
426 F.3d 635 (2d Cir. 2005) ......................................................................................3

*Backpage.com, LLC v. Dart*,
   807 F.3d 229 (7th Cir. 2015) ...................................................................................16

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ..................................................................................................13

*Batalla Vidal v. Duke*,
   295 F. Supp. 3d 127 (E.D.N.Y. 2017) .......................................................................7

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................................19

*Bhd. of R. R. Trainmen v. Virginia ex rel. Va. State Bar*,
   377 U.S. 1 (1964) ....................................................................................................23

*Biden v. Texas*,
   597 U.S. 785 (2022) ..............................................................................................8, 9

*Bldg. & Const. Trades Council of Buffalo v. Downtown Dev., Inc.*,
   448 F.3d 138 (2d Cir. 2006) ...................................................................................22

*Canal A Media Holding, LLC v. United States Citizenship & Immigr. Servs.*,
   964 F.3d 1250 (11th Cir. 2020) ................................................................................5

*Carter v. HealthPort Techs., LLC*,
   822 F.3d 47 (2d Cir. 2016) .......................................................................................3

*Castañon-Nava v. DHS*,
   161 F.4th 1048 (7th Cir. 2025)..................................................................................8

*Centro de la Comunidad Hispana de Locus Valley v. Town of Oyster Bay*,
   868 F.3d 104 (2d Cir. 2017) .......................................................................27, 28, 29

*Cerame v. Slack*,
   123 F.4th 72 (2d Cir. 2024) ....................................................................................25

*Chiles v. Salazar*,
   No. 24-539 (U.S. 2026) ...........................................................................................12

*City of Lakewood v. Plain Dealer Publ'g Co.*,
   486 U.S. 750 (1988) ................................................................................................12

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
   167 F.4th 605 (2d Cir. 2026) .......................................................................28, 32, 33

iv

*Conn. Parents Union v. Russell-Tucker*,
    8 F.4th 167 (2d Cir. 2021) ................................................................................................32

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013) .............................................................................................13

*Cornelio v. Conn.*,
    32 F.4th 160 (2d Cir. 2022) ..............................................................................................17

*D.V.D. v. U.S. Dep't of Homeland Sec'y*,
    778 F. Supp. 3d 355 (D. Mass. 2025).................................................................................7

*Davis v. Goord*,
    320 F.3d 346 (2d Cir. 2003) .............................................................................................13

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ..........................................................................................................20

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ................................................................................................................7

*Diamond Alt. Energy v. EPA*,
    606 U.S. 100 (2025) ..........................................................................................................27

*Eastex, Inc. v. NLRB*,
    437 U.S. 556 (1978) ..........................................................................................................30

*Ercelik v. Hyde*,
    No. 1:25-CV-11007-AK, 2025 WL 1361543 (D. Mass. May 8, 2025) ..................................6

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ...................................................................................................*passim*

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022) ............................................................................................................8

*Greene v. City of N.Y.*,
    725 F. Supp. 3d 400 (S.D.N.Y. 2024) ...............................................................................33

*Haitian Evangelical Clergy Ass'n v. Trump*,
    789 F. Supp. 3d 255 (E.D.N.Y. 2025).................................................................................9

*Harty v. W. Point Realty, Inc.*,
    28 F.4th 435 (2d Cir. 2022) ................................................................................................3

*Hunt v. Wash. State Apple Adver. Comm'n*,
    432 U.S. 333 (1977) ...................................................................................9, 22, 24

*Iancu v. Brunetti*,
    588 U.S. 388 (2019) ...........................................................................................11

*Imperial Sovereign Ct. of Mont. v. Knudsen*,
    170 F.4th 820 (9th Cir. 2026) .............................................................................20

*In re Dow Jones & Co., Inc.*,
    842 F.2d 603 (2d Cir. 1988) ...............................................................................18

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,
    477 U.S. 274 (1986) .....................................................................................23, 24

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018) .........................................................................................5, 6

*Khalil v. President*,
    164 F.4th 259 (3d Cir. 2026) ................................................................................6

*Laird v. Tatum*,
    408 U.S. 1 (1972) .........................................................................................12, 13

*Levin v. Harleston*,
    966 F.2d 85 (2d Cir. 1992) .................................................................................13

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .....................................................................................10, 21

*Lunney v. United States*,
    319 F.3d 550 (2d Cir. 2003) .................................................................................3

*Mahdawi v. Trump*,
    136 F.4th 443 (2d Cir. 2025) ............................................................................5, 6

*Martin v. City of Struthers*,
    319 U.S. 141 (1943) ...........................................................................................18

*Matsumoto v. Labrador*,
    122 F.4th 787 (9th Cir. 2024) .............................................................................20

*Media Matters for Am. v. Paxton*,
    138 F.4th 563 (D.C. Cir. 2025) ...........................................................................12

*Moya v. DHS*,
    975 F.3d 120 (2d Cir. 2020) ..................................................................................29

*Mukantagara v. U.S. Dep't of Homeland Sec.*,
    67 F.4th 1113 (10th Cir. 2023) ................................................................................5

*Murthy v. Missouri*,
    603 U.S. 43 (2024) .............................................................................................19, 21

*N.Y.C.L. Union v. N.Y.C. Transit Auth.*,
    684 F.3d 286 (2d Cir. 2012) ...........................................................................9, 26, 27

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ...............................................................................................17

*NAACP v. Button*,
    371 U.S. 415 (1963) ...............................................................................................15

*Nat'l Org. for Marriage, Inc. v. Walsh*,
    714 F.3d 682 (2d Cir. 2013) .....................................................................................25

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) ..........................................................................................15, 16

*Nielsen v. Preap*,
    586 U.S. 392 (2019) .................................................................................................8

*NLRB v. Pier Sixty, LLC*,
    855 F.3d 115 (2d Cir. 2017) .....................................................................................31

*Nnebe v. Daus*,
    644 F.3d 147 (2d Cir. 2011) ...............................................................................26, 32

*Noem v. Al Otro Lado*,
    146 S. Ct. 604 (2025).................................................................................................8

*NWDC Resistance v. Immigr. & Customs Enf't*,
    493 F. Supp. 3d 1003 (W.D. Wash. 2020) ...........................................................5, 7

*Ozturk v. Hyde*,
    136 F.4th 382 (2d Cir. 2025) ...........................................................................4, 5, 6

*Pen Am. Ctr., Inc. v. Trump*,
    448 F. Supp. 3d 309 (S.D.N.Y. 2020) .............................................................*passim*

*Pietersen v. United States Dep't of State*,
  138 F.4th 552 (D.C. Cir. 2025)......................................................................................27

*Planned Parenthood of S.C. Inc. v. Rose*,
  361 F.3d 786 (4th Cir. 2004) ........................................................................................12

*Price v. Saugerties Cent. Sch. Dist.*,
  305 F. App'x 715 (2d Cir. 2009) ...................................................................................19

*Ragin v. Harry Macklowe Real Estate Co.*,
  6 F.3d 898 (2d Cir. 1993) ..............................................................................................26

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) ....................................................................................................4, 6

*Roberts v. United States Jaycees*,
  468 U.S. 609 (1984) .......................................................................................................30

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) .......................................................................................................12

*Shelton v. Tucker*,
  364 U.S. 479 (1960) .......................................................................................................18

*Simon v. E. Ky. Welfare Rts. Org.*,
  426 U.S. 26 (1976) .........................................................................................................21

*Soule v. Conn. Ass'n of Schs., Inc.*,
  90 F.4th 34 (2d Cir. 2023)..............................................................................................12

*Stanley v. Georgia*,
  394 U.S. 557 (1969) .......................................................................................................18

*Suri v. Trump*,
  No. 25-1560, 2025 WL 1806692 (4th Cir. July 1, 2025) ................................................6

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ..................................................................................................25, 26

*Texas v. DHS*,
  123 F.4th 186 (5th Cir. 2024)...........................................................................................8

*Thomas v. Collins*,
  323 U.S. 516 (1945) .......................................................................................................30

*Three D, LLC v. NLRB*,
   629 F. App'x 33 (2d Cir. 2015) ......................................................................................31

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) .................................................................................................10, 12

*Tweed-New Haven Airport Auth. v. Tong*,
   930 F.3d 65 (2d Cir. 2019) ............................................................................................21

*United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*,
   517 U.S. 544 (1996) .......................................................................................................24

*United States v. Cotton*,
   535 U.S. 625 (2002) .........................................................................................................8

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) .......................................................................................................19

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...........................................................................................................21

*Zieper v. Metzinger*,
   474 F.3d 60 (2d Cir. 2007) ............................................................................................10

**Statutes**

8 U.S.C. § 1252(b)(9) ............................................................................................................4, 5, 7

8 U.S.C. § 1252(f)(1) ............................................................................................................4, 8, 9

8 U.S.C. § 1252(g) ................................................................................................................4, 6, 7

**Other Authorities**

Jan E. Leighley & Jonathan Nagler, *Unions, Voter Turnout, and Class Bias in the U.S. Electorate, 1964–2004*,
   69 J. Pol. 430 (2007)......................................................................................................23

*Unions Help Reduce Disparities and Strengthen our Democracy*,
   Econ. Pol'y Inst. (Apr. 23, 2021) ..................................................................................24

**INTRODUCTION**

For more than a year, Defendants ("the Government") have harmed Plaintiff-unions and their members through a program of viewpoint-discriminatory online surveillance and coercive threats designed and executed to silence views the Government disfavors (the "Challenged Surveillance Program" or "CSP"). Through the CSP, the Government has surveilled the social media and online expressive activity of *every* U.S.-based visa holder and Lawful Permanent Resident, while issuing a drumbeat of threats to weaponize immigration laws and punish noncitizens who express disfavored views. To make its threats more credible, the Government has revoked visas and targeted individuals with immigration confinement to send a message to everyone else: fall in line and speak as the Government demands, or face life-altering immigration consequences. In addition, the Government now requires every individual applying for a renewed visa or other immigration benefit to undergo the same viewpoint-based social media review—a requirement that has already harmed some of Plaintiffs' members, will imminently harm others, and is currently chilling Plaintiffs' members.

Plaintiffs are labor unions whose members have been broadly silenced, and whose work has been directly impaired, by the CSP. Plaintiffs allege facts demonstrating the scope and nature of the CSP in detail, including dozens of the Government's own statements and admissions. Plaintiffs put forward hundreds of their members who have suffered well-established First Amendment harms from the program. Plaintiffs also describe extensively the experiences of twenty-three specific individuals, spread across all three Plaintiff-organizations, each of whom provides concrete and particularized accounts of both individual harm and the climate of fear and censorship the Government has created.

The numerous abridgments of Plaintiffs' members' First Amendment rights, well pleaded in the First Amended Complaint ("FAC"), are injuries-in-fact sufficient to support associational standing. Viewpoint-discriminatory surveillance of Plaintiffs' members is *per se* unconstitutional, as is issuing coercive threats aimed at silencing disfavored speech. The CSP's chilling effect on Plaintiffs' members—which is the purpose and effect of the CSP, as Plaintiffs exhaustively document—provides yet another, classic First Amendment basis for standing. Contrary to the Government's assertions, Plaintiffs do not need to demonstrate pre-enforcement standing, because Plaintiffs' noncitizen members are *currently* enduring the CSP's system of continuous surveillance and threats and are currently experiencing at least four specific categories of First Amendment harm from it. But even if this Court were to apply the pre-enforcement standing framework (under which standing rules are even more forgiving), Plaintiffs have shown that their members will inevitably be subject to the same viewpoint discrimination when they undergo the mandatory checks that now accompany all applications for visa renewals and immigration benefits.

Plaintiffs also sufficiently plead two theories of organizational standing. Plaintiffs allege deep-cutting harms to their ability to carry out their missions—set out in their fundamental charters—to organize their members as workers and support members' full and open democratic participation. The CSP's chilling effect on organizing, recruiting, and effectively engaging with their worker members both online and offline obstructs Plaintiff-unions' work on a daily basis. Plaintiffs also allege the CSP has forced involuntary diversions of specific expenditures that were necessary and unavoidable.

The Government's motion to dismiss speaks past these allegations. The Government invokes a series of jurisdictional bars that have no application to this case. It accuses Plaintiffs of seeking relief they have never requested. It mischaracterizes the FAC as challenging specific

removal proceedings, which it does not. And it relitigates a theory of the Immigration and Nationality Act's operation that the Second Circuit has already twice rejected. While the Government seeks to recast the harm to Plaintiffs and their members as speculative and non-existent, the FAC thoroughly documents myriad concrete, particularized, and ongoing injuries directly traceable to the CSP and redressable by this Court.

Plaintiffs have Article III standing, and this Court has subject-matter jurisdiction. The Court should deny the Government's motion to dismiss.

### STANDARD OF REVIEW

When faced with a Federal Rule of Civil Procedure 12(b)(1) motion to dismiss for lack of standing based only on the complaint, as here, "the plaintiff has no evidentiary burden"; the district court need only determine whether the complaint alleges facts that "affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (internal alteration omitted) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).[1] The court "accept[s] as true all material factual allegations in the complaint" and "draw[s] all reasonable inferences in favor of the plaintiff." *Carter*, 822 F.3d at 57 (internal alteration omitted) (quoting *Lunney v. United States*, 319 F.3d 550, 554 (2d Cir. 2003)); *see also Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (noting the Second Circuit's "policy of liberal construction of complaints").

---

[1] Only where a defendant makes "a fact-based Rule 12(b)(1) motion, *proffering evidence beyond the [p]leading*" must a plaintiff "come forward with evidence of their own to controvert that presented by the defendant"; even then, "plaintiffs are entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant is immaterial." *Carter*, 822 F.3d at 57 (emphasis added); *see also Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022). Here, the government has not proffered any evidence in support of its motion.

## ARGUMENT

**I.      This Court Has Subject-Matter Jurisdiction to Review Plaintiffs' Claims**

None of the three provisions in the Immigration and Nationality Act ("INA") identified by the Government bars Plaintiffs' lawsuit. The jurisdiction-stripping provisions in both 8 U.S.C. § 1252(b)(9) and § 1252(g) apply only to a specific subset of claims that challenge removal orders or individualized immigration enforcement actions. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482–83 (1999) ("*AADC*"). They have no application to this suit, which challenges the Government's upstream program of viewpoint-discriminatory surveillance and coercion. Meanwhile, Section 1252(f)(1) is not a jurisdiction-stripping provision at all—it merely bars district and circuit courts from issuing a kind of relief that Plaintiffs do not seek.

### A.  8 U.S.C. § 1252(b)(9) Does Not Strip Jurisdiction over Plaintiffs' Claims

Section 1252(b)(9)'s channeling provision[2] is inapposite here. Plaintiffs do not challenge any removal orders or proceedings, and Plaintiffs' claims are independent from any challenges thereto.

Known as the "zipper clause," § 1252(b)(9) only channels challenges to removal orders into the immigration courts. *AADC*, 525 U.S. at 482–83. Because "the very text of § 1252(b) sets out requirements only '[w]ith respect to review of an order of removal,'" the zipper clause's applicability turns on whether "the parties in fact are challenging removal proceedings." *Ozturk v. Hyde*, 136 F.4th 382, 399 (2d Cir. 2025) (quoting 8 U.S.C. § 1252(b); *Mukantagara v. U.S. Dep't*

---

[2] Section 1252(b)(9) provides: "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by [habeas corpus or] any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact."

*of Homeland Sec.*, 67 F.4th 1113, 1116 (10th Cir. 2023)). Thus, "[a]s a threshold matter," the Second Circuit requires an active "order of removal" before applying the provision. *Id.*

Section 1252(b)(9)'s "channeling function has no role to play" where a plaintiff's claims merely "have a relationship to 'pending removal proceedings'"—or even "substantial substantive overlap" with a challenge to removal—as long as the claims "do not themselves challenge 'removal proceedings.'" *Ozturk*, 136 F.4th at 399, 400 (quoting *Canal A Media Holding, LLC v. United States Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1257 (11th Cir. 2020)); *see also Mahdawi v. Trump*, 136 F.4th 443, 451–52 (2d Cir. 2025). Notably, the Second Circuit has specifically cautioned against foreclosing review of collateral First Amendment claims, which demand "***rapid, prioritized review***." *Ozturk*, 136 F.4th at 401 (emphasis in original).

Plaintiffs do not challenge any removal order. Instead, Plaintiffs challenge the CSP, a program of viewpoint-based surveillance and threats designed to silence speech that is causing ongoing and independent First Amendment harm. As the Second Circuit recently reiterated, "[c]onstruing an independent constitutional challenge" to an action antecedent to removal "as necessarily implying a challenge to removal" would lead to "an 'absurd' result." *Mahdawi*, 136 F.4th at 452 (citing and quoting *Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018) (opinion of Alito, J., joined by Roberts, C.J., and Kennedy, J.)); *Ozturk*, 136 F.4th at 401. In *Ozturk* and *Mahdawi*, the Second Circuit recently held that challenges to detention—an action even more proximate to removal than the surveillance preceding it—were not barred by the zipper clause. *Ozturk*, 136 F.4th at 399–401; *Mahdawi*, 136 F.4th 451–53. Thus, the zipper clause is also inapplicable in challenges to government surveillance that precedes detention and removal, especially when the challenge is to a government policy rather than action against a specific individual. *See, e.g.*, *NWDC Resistance v. Immigr. & Customs Enf't*, 493 F. Supp. 3d 1003, 1017 (W.D. Wash. 2020)

(unconstitutional government policy); *Ercelik v. Hyde*, No. 1:25-CV-11007-AK, 2025 WL 1361543, at \*6–7 (D. Mass. May 8, 2025).[3]

The Government argues that Plaintiffs request injunctive relief that would prohibit the Government from imposing "adverse immigration consequences" in response to "disfavored expression," *see* Gov't Br. at 16, but this is a hollow man. Plaintiffs do not request any such relief. *See* FAC at 124 (Prayer for Relief). Even if they did, the Second Circuit has confirmed that defective requests for relief do not *ipso facto* strip the court of jurisdiction under the INA, so long as *any* requested relief, including declaratory judgment, remains available. *Ozturk*, 136 F.4th at 397 n.6.

### B. 8 U.S.C. § 1252(g) Does Not Strip Jurisdiction over Plaintiffs' Claims

The Government's reliance on § 1252(g) is equally unavailing. Section 1252(g) strips jurisdiction over challenges "only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *AADC*, 525 U.S. at 482 (quoting 8 U.S.C. § 1252(g)). Plaintiffs challenge none of those. "[D]ecisions to open an investigation" or "*to surveil [a] suspected violator*" are among the "many other decisions and actions" that fall outside the reach of § 1252(g). *Id.* (emphasis added). Even for challenges to action that bears some connection to commencing, adjudicating, or executing removal orders, § 1252(g) does not "sweep in any claim that can technically be said to 'arise from' the three listed actions." *Jennings* 583 U.S. at 294; *see also Ozturk*, 136 F.4th at 396 (explaining

---

[3] The Government's reliance on *Khalil v. President*, 164 F.4th 259, 279 (3d Cir. 2026) is misplaced as it squarely conflicts with Second Circuit precedent that provides for review before any removal order is issued. In *Khalil*, the Third Circuit explained that, in expanding the zipper clause's scope to sweep in cases without extant removal orders, it was adopting a minority position that was in "respect[ful] disagree[ment] with the Second and Fourth Circuits." 164 F.4th at 279 (citing *Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at \*9 (4th Cir. July 1, 2025); *Mahdawi*, 136 F.4th at 451–52; *Ozturk*, 136 F.4th at 399)).

6

that, like § 1252(b)(9), § 1252(g) does not bar jurisdiction over claims that are "independent of, or wholly collateral to, the removal process"); *cf. Artiga Carrero v. Farrelly*, 270 F. Supp. 3d 851, 878 (D. Md. 2017) (exercising jurisdiction over challenge to maintenance of arrest warrant in a database because doing so was akin to surveilling the plaintiff).

The CSP is far removed from the ambit of § 1252(g) because it is antecedent to and distinguishable from any decision to commence, adjudicate, or execute removal proceedings against an individual. Section 1252(g)'s jurisdictional bar does not apply to a challenge brought by organizational plaintiffs against an umbrella-level government policy with only an indirect connection to removal. *See, e.g.*, *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (holding § 1252(g) did not bar policy-level challenge to rescission to DACA, even though that rescission rendered DACA recipients removable); *Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 369–75 (D. Mass. 2025) (same for challenge to ideological-deportation policy).[4]

Additionally, where organizational plaintiffs challenge an immigration policy in order to "assert their own rights and the rights of the general public" and "not those of individual immigrants in removal proceedings or subject to orders of removal," such challenges fall outside the scope of § 1252(g). *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 154 (E.D.N.Y. 2017) (declining to apply § 1252(g) to claims of organization and states challenging rescission of DACA). Here, each Plaintiff asserts direct organizational injury and standing, in addition to associational standing based on injuries to its members.

---

[4] *See also D.V.D. v. U.S. Dep't of Homeland Sec'y*, 778 F. Supp. 3d 355, 376–78 (D. Mass. 2025) (same for challenge to Department of Homeland Security's third-country removals policy); *NWDC Resistance v. ICE*, 493 F. Supp. 3d 1003, 1008–11 (W.D. Wash. 2020) (same for challenge to ICE's policy of retaliating against immigrants for their protected speech).

### C.  8 U.S.C. § 1252(f)(1) Is Not a Jurisdiction-Stripping Provision

Section 1252(f)(1)[5] does not strip this Court of jurisdiction. In fact, § 1252(f)(1) is not a jurisdiction-stripping provision at all. It does not restrict a court's "power to adjudicate a case"; rather, it "deprives courts of the power to issue a specific category of remedies: those that 'enjoin or restrain the operation of'" the INA's inspection, excludability, and removability provisions. *Biden v. Texas*, 597 U.S. 785, 798 (2022) (quoting *United States v. Cotton*, 535 U.S. 625, 630 (2002) (quoting 8 U.S.C. § 1252(f)(1)); *Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (plurality op.). Here, Plaintiffs seek injunctive as well as declaratory relief, which Section 1252(f)(1) does not contemplate. Applying the *Biden v. Texas* Court's instruction that "whether the District Court had jurisdiction to enter such an injunction is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' request for declaratory relief," Section 1252(f)(1) "poses no obstacle to jurisdiction in this Court." *Id.* at 800 (quoting *Nielsen*, 586 U.S. at 402) (cleaned up).

Although the Court need not decide the issue now, Section 1252(f)(1) does not actually prohibit Plaintiffs' requested injunctive relief. By its plain text, the provision does not sweep in orders with a "collateral effect" on the operation of the INA's removal procedures. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022). Accordingly, even an injunction that would "change the outcome" of a "proceeding under a covered provision" is not enough to trigger Section 1252(f)(1). *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1125 (9th Cir. 2025), *cert. granted on other grounds sub nom.*, *Noem v. Al Otro Lado*, 146 S. Ct. 604 (2025); *see also Castañon-Nava v. DHS*, 161 F.4th 1048, 1058 (7th Cir. 2025); *Texas v. DHS*, 123 F.4th 186, 209–10 (5th Cir. 2024). Here, Plaintiffs' request for an injunction ordering the Government to desist

---

[5] This section provides: "[N]o court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1).

8

from unlawful viewpoint-based surveillance and coercive threats that silence protected expression

has nothing to do with the *operation* of removal proceedings. Thus, it does not fall under the

provision's reach.[6]

## II.    Plaintiffs Sufficiently Allege Associational Standing for Members' Ongoing Injuries

Organizational plaintiffs may establish standing to sue on behalf of their members

("associational standing") or for themselves ("organizational standing"). *See e.g.*, *N.Y.C.L. Union

v. N.Y. City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). In this case, Plaintiff-unions have

alleged sufficient facts to establish both associational and organizational standing. *See infra* Part

IV (organizational standing).[7]

To establish associational standing, an organization must allege facts sufficient to

demonstrate (1) at least one of its members would have standing to sue, (2) the interests the

organization seeks to protect are germane to its organizational purposes, and (3) neither the claims

the organization asserts nor the relief it seeks requires individual members to participate in the

lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs easily

satisfy all three prongs, and the Government does not even contest the third, Gov't Br. at 19–24.

### A. *Hunt* Element One: Plaintiffs' Members Would Have Standing

An organization's member has standing when the member satisfies ordinary Article III

standing requirements: "(1) the [member] must have suffered an injury-in-fact—an invasion of a

---

[6] Section 1252(f)(1) also does not prevent this court from vacating any final agency action taken pursuant to the CSP. While the Supreme Court has reserved the issue, *see Biden v. Texas*, 597 U.S. at 839 (Barrett, J., dissenting) (recognizing that the Supreme Court has "avoid[ed] a position on whether § 1252(f)(1) prevents a lower court from vacating or setting aside an agency action"), every circuit to consider the issue has agreed that an Administrative Procedure Act (APA) vacatur does not "'enjoin or restrain' the Department of Homeland Security from implementing immigration laws under § 1252(f)(1). *See Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255, 269–70 (E.D.N.Y. 2025) (cleaned up) (emphasis in original) (collecting cases).
[7] The Government apparently concedes that Plaintiffs have standing to bring their APA claims, which it does not mention in its briefing.

legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the challenged conduct; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 228 (2d Cir. 2011) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Plaintiffs have sufficiently alleged that their members satisfy all three requirements, and the Government does not dispute redressability.

### 1. Plaintiffs' Members Have Suffered Injuries-in-Fact

Plaintiffs allege their members have suffered numerous injuries-in-fact. An injury-in-fact is "an invasion of a legally protected interest which is [(1)] concrete and particularized and [(2)] actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up).

The Government does not dispute that a direct abridgment of First Amendment rights constitutes injury-in-fact, or that First Amendment rights may also be violated by the chilling effect of government action that falls short of a direct prohibition against speech. Gov't. Br. at 20–23. Nor could they. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (direct abridgement); *Zieper v. Metzinger*, 474 F.3d 60, 65 (2d Cir. 2007) (chilling). The Government also does not dispute that Plaintiffs' members' speech is protected by the First Amendment. *See* Gov't. Br. at 20–23. Instead, the Government characterizes Plaintiffs' claims as raising only pre-enforcement challenges and argues Plaintiffs fail to allege a sufficiently imminent threat of prosecution. *Id.*

But for the most part, Plaintiffs are not bringing a pre-enforcement challenge. *See infra* Part III. Rather, Plaintiffs allege that their members are *currently* being surveilled and threatened under the CSP, which aims "to identify and punish noncitizens who express viewpoints disfavored by the government," FAC ¶ 307; *see id.* ¶¶ 33–34, and that their members are suffering *ongoing* injuries as a result, *id.* ¶¶ 27–29 (viewpoint-discriminatory surveillance); *id.* ¶¶ 41–50 (coercive

10

threats); *id.* ¶¶ 205–57 (additional harms to plaintiffs). Likewise, Plaintiffs have members who have already submitted applications to the Department of State to renew or change a visa (entry permit) needed for re-entry into the U.S., and/or to USCIS for immigration benefits, including work authorization, extensions or changes of non-immigrant status, Lawful Permanent Residency (i.e., Green Card), and citizenship. *See, e.g.*, *id.* ¶ 256. Thus, these members are already subject to the unconstitutional viewpoint-discriminatory surveillance that is baked into the review process for these applications, they have already been forced to make their social media accounts public, *id.* ¶¶ 121–30,[8] and they are already experiencing the chilling effects that flow from both policies, *id.* ¶ 203. All of these injuries are ongoing and give rise to Article III standing.

In the face of these allegations, the Government merely disputes (without supporting evidence) that all of Plaintiffs' members are, in fact, being surveilled under the CSP. Gov't Br. at 6–7 & n.4. But that is an improper factual challenge—at this stage, Plaintiffs' well-pleaded factual allegations are accepted as true. *See supra* Standard of Review.[9]

### a. Viewpoint Discrimination

Plaintiffs allege that the viewpoint-discriminatory nature of the CSP has caused their members two distinct injuries.

*First*, it is axiomatic that "[t]he government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). Viewpoint discrimination is presumptively unconstitutional. *Rosenberger v. Rector & Visitors of Univ. of Va.*,

---

[8] Others who intend to submit applications meet the criteria for a pre-enforcement challenge. *See infra* Part III.

[9] Moreover, Plaintiffs' allegations are amply supported by the Government's *own statements* that it is surveilling "anyone" and "EVERYONE," FAC ¶¶ 198, 19, 46; that it "will find, apprehend, and deport" any noncitizens engaged in disfavored speech, *id.* ¶¶ 42, 162; and that it is doing so in order to effectuate broad mandates that "all aliens . . . who are already in the United States[] are vetted and screened to the maximum degree possible," *id.* ¶ 61.

11

515 U.S. 819, 828–29 (1995); *see also Chiles v. Salazar*, No. 24-539, slip op. at 8–9 (U.S. 2026) ("When the government seeks . . . to dictate what particular 'opinion or perspective' individuals may express on that subject, 'the violation of the First Amendment is all the more blatant.'" (quoting *Rosenberger*, 515 U.S. at 829)). As alleged, the CSP is subjecting Plaintiffs' members to unconstitutional viewpoint discrimination, "a harm that is sufficiently particular to qualify as an actual injury for standing purposes." *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 790 (4th Cir. 2004); *see id.* (explaining that "a plaintiff claiming viewpoint discrimination" under the First Amendment "has standing to seek a level playing field"); *see also Media Matters for Am. v. Paxton*, 138 F.4th 563, 580 (D.C. Cir. 2025) (explaining that allegations that one is a "target[] of a retaliatory government investigation is a claim regarding concrete harm" and "this harm is distinct from any resulting chilling effects"). *See generally Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 46 (2d Cir. 2023) (en banc) (recognizing discriminatory treatment as "an example of a 'concrete, *de facto* injury'" (cleaned up) (quoting *TransUnion*, 594 U.S. at 425)). Indeed, the Supreme Court has held that the mere *risk* of viewpoint discrimination is an injury sufficient to provide standing to any person "subject to" a law that vests unbridled discretion in a government official over whether to permit or deny expressive activity. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988).[10]

*Second*, the CSP is harming Plaintiffs' members by chilling their speech, and "'a claim of specific present objective harm or a threat of specific future harm' to a speaker, with the effect of chilling speech, is sufficient for First Amendment standing." *Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 321 (S.D.N.Y. 2020) (quoting *Laird v. Tatum*, 408 U.S. 1, 14 (1972)); *see also*

---

[10] Standing based on viewpoint discrimination exists even where the government could deprive a successful plaintiff of *any* meaningful relief by simply withdrawing favorable treatment for others because the discrimination itself *is* an injury. *See Heckler v. Mathews*, 465 U.S. 728, 739 (1984).

*Brokamp v. James*, 66 F.4th 374, 388 (2d Cir. 2023) ("It is the present chilling effect . . . that demonstrates actual injury sufficient for standing . . . ."); *Levin v. Harleston*, 966 F.2d 85, 89–90 (2d Cir. 1992) (holding that a "chilling threat of discipline" gives rise to injury-in-fact).

Government surveillance that carries a "chilling effect" on First Amendment rights amounts to an injury-in-fact when plaintiffs are in fact surveilled, *Am. C.L. Union v. Clapper*, 785 F.3d 787, 802 (2d Cir. 2015), and the surveillance is carried out in connection with specific harmful, downstream consequences, *cf. Laird*, 408 U.S. at 13 (finding "subjective 'chill'" from government's viewpoint-neutral surveillance insufficient to demonstrate injury in fact where plaintiffs could not identify any downstream consequence of surveillance beyond "possible" "future . . . misuse"). Because the chilling effect standard is an objective (rather than subjective) one, the relevant question is whether a defendant's conduct is likely to "deter a person of ordinary firmness from the exercise of First Amendment rights." *Cooksey v. Futrell*, 721 F.3d 226, 235–36 (4th Cir. 2013) (citation omitted); *see also Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). Where, as here, the Government announces that it is surveilling an entire population for disfavored views and threatens that those who express disfavored views will be punished, the resultant (and intended) chilling is an injury in fact. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (explaining that courts must "look through forms to the substance" to enjoin "informal censorship," especially where a "record amply demonstrates that the [government] deliberately set about to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim").

The FAC sufficiently alleges that the CSP has exerted an objectively reasonable chilling effect on Plaintiffs' members. As alleged, the Government is surveilling "all aliens . . . who are already in the United States." FAC ¶ 61; *see, e.g.*, *id.* ¶¶ 46, 129, 132. The Government claims to

13

revoke visas "instantly" if its surveillance reveals anything approximating disfavored expression, and menaces it is "just getting started with tens of thousands more" revocations. *Id.* ¶¶ 105, 200. The Government has backed up these threats with real, widely publicized immigration enforcement actions, *id.* ¶¶ 156–201, and it possesses powerful automated tools that appear to make such universal, all-seeing review possible, *id.* ¶¶ 138–55. Plaintiffs' noncitizen members have every reason to believe that if they express a disfavored view, the Government will do as it promises: "find, apprehend, and deport" them. *Id.* ¶ 194. And because the CSP also sweeps up the speech of citizens and can use that speech as a basis for adverse actions against noncitizens, *id.* ¶ 151, the CSP has likewise exerted an objectively reasonable chilling effect on Plaintiffs' citizen members, who fear that their speech will implicate their noncitizen friends, family members, colleagues, and neighbors, *id.* ¶¶ 5, 148 & n.165, 214, 245.

Although the objective standard does not require Plaintiffs to show that they have, in fact, been chilled, the FAC contains extensive allegations of the real chilling effect that the CSP has had on Plaintiffs' members. Thousands of Plaintiffs' members responded to a survey that asked about the effects the CSP has had on their online and offline behavior.[11] The survey clearly documents the aggregate chilling effect that the CSP is having across Plaintiffs' respective memberships. *Id.* ¶¶ 209–16, 225–31, 241–48. Plaintiffs' members have changed their social media activity *because of* this viewpoint-based monitoring. *Id.* ¶¶ 210–11, 214, 225–26, 228, 241–

---

[11] The FAC clearly alleges that the survey defined the CSP to include the Government's policy of surveilling noncitizens' social media and online activity based on viewpoint, FAC ¶ 207, and that the profiled members changed their behavior "as a result" of "the Trump Administration's viewpoint-driven monitoring of non-citizens' social media accounts," FAC ¶¶ 218–24, 233–40, 245, 250–57. The Government, then, is wrong to suggest there is any ambiguity in how Plaintiffs' members understood the CSP. Gov't Br. at 23 & n.13. Nor does it matter that some survey respondents reported having no knowledge of the CSP, as these respondents were asked no further questions and their responses are not included in the FAC's discussion of chilling effects. FAC ¶ 208.

43. Those changes include an array of self-censorship, online and offline: limiting access to content; editing or modifying posts; refraining from posting; reducing involvement with particular accounts, group-spaces, campaigns, or hashtags; restricting access to accounts; forgoing protests; and refraining from teaching certain topics, among others. *Id.* ¶¶ 212, 227, 243. And the speech from which Plaintiffs' members have disengaged spans the gamut of the Administration's targeted views, from criticism of the Trump Administration to support for the Palestinian people. *Id.* ¶¶ 215, 229, 246.

The FAC further includes detailed allegations about the chilling impact on twenty-three specific individuals across the three Plaintiff organizations. Each of these individuals—all visa holders (including H, J, and F visa holders) or Lawful Permanent Residents—is aware of the CSP, and the CSP has chilled each individual from expressing disfavored views. In the face of the knowledge that "even something small could get you in trouble," *id.* ¶ 238, they have gone silent: they have deleted posts or accounts, *id.* ¶¶ 219–20, 223–24, 234, 237–38, 251, 254, 257; disassociated from certain content, *id.* ¶ 255; limited third-party access to their accounts, *id.* ¶¶ 218–19, 221, 230, 236, 251–53; and refrained from posting at all, *id.* ¶¶ 218, 221–22, 230, 233–36, 250–53—all to "preserve a 'fighting chance' of avoiding adverse consequences" as individuals whose views are disfavored by the Government, *id.* ¶ 224. The experiences of these individuals exemplify the chilling effect that the CSP has had on many of Plaintiffs' members.

### b. Coercive Threats

The FAC alleges that Plaintiffs' members are also doubly injured by the Government's campaign of coercive threats. The First Amendment prohibits government officials from issuing coercive threats to suppress disfavored speech. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024), including when the government coerces would-be speakers into self-censorship. *See NAACP v. Button*, 371 U.S. 415, 435–36 (1963); *Aebisher v. Ryan*, 622 F.2d 651, 655 (2d Cir.

1980) ("Where the use of coercive power is threatened, First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech.").

When a government official makes a coercive threat, that threat creates an actionable constitutional injury regardless of the effect it has on the recipient. *Vullo*, 602 U.S. at 198; *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230–31 (7th Cir. 2015). Coercive threats cause an additional constitutional injury when they cast a chill that causes the targets of those threats to forgo expressive activity. *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 101 (2d Cir. 2003).

Here, Plaintiffs allege both kinds of coercion-induced injury-in-fact.

The FAC is replete with examples of coercive threats that the Government has issued to intimidate Plaintiffs' members' into self-censorship. *See, e.g.*, FAC ¶¶ 44–50. The Government has repeatedly stated that "EVERYONE" is subject to surveillance for any expression that the administration considers to "pose[] a threat to our nation & our way of life." *Id.* ¶¶ 46, 197, 198. It has made it clear that if the CSP finds disfavored expression, it will "continue to revoke the visas" of those speakers. *Id.* ¶¶ 47, 199–201. And it has repeatedly made public examples of noncitizens—including LPRs—whose speech transgressed the Government's preferences, trumpeting these enforcement actions and pairing them with promises to do the same thing to other noncitizens. *Id.* ¶¶ 45, 48, 156–92; *see Pen Am. Ctr., Inc.*, 448 F. Supp. 3d at 321 ("In demonstrating that Defendant would in fact punish reporters who spoke critically, Defendant made his threats of future punishment more credible, and consequently, effective."). The Government has repeatedly expanded the CSP to date, both with respect to the speech, *id.* ¶¶ 27–29, 132–35, and the noncitizen groups, *id.* ¶¶ 30, 39–40, 106–30, that it targets. It is therefore objectively reasonable for Plaintiffs' members to expect that the Government will follow through on its

16

promise to continue targeting any noncitizens whose speech it disfavors, including Lawful Permanent Residents. *Id.* ¶ 175; *contra* Gov't Br. at 23 (suggesting that LPRs have no reason to fear the CSP).

The FAC also demonstrates that the Government's coercive threats have achieved their intended chilling effect, as detailed above. Plaintiffs' members are aware of the threats, FAC ¶¶ 207–08, 218–24, 233–40, 250–57, which were directed at all noncitizens who had expressed or were considering expressing views disfavored by the Government. As a direct result of those threats, Plaintiffs' members decided to remove or limit access to their past disfavored speech and to forgo expressing the disfavored views in the future. *Id.* ¶¶ 212, 218–24, 227, 233–40, 243, 250–257.

### c. Demanding Disclosure of and Public Access to Social Media Accounts

The FAC alleges that Plaintiffs' members are injured by the requirements that they disclose their social media accounts and make publicly accessible the accounts' content when applying for a visa renewal to reenter the United States, a new type of visa, a change in immigration status, and/or applying for other immigration benefits. FAC ¶¶ 123, 115–16.

The First Amendment protects "the right to speak anonymously," *Antonyuk v. James*, 120 F.4th 941, 1003 (2d Cir. 2024), as well as the freedom to privately associate with others for expressive purposes, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). The Second Circuit has already held that "[t]o require disclosure of [social media] handles is thus to demand that applicants effectively forfeit their right to pseudonymous speech on social media," giving rise to a First Amendment injury. *Antonyuk*, 120 F.4th at 1003. The Second Circuit has invalidated requirements that force social media users to identify themselves to the government relying on this rationale. *See id.*; *Cornelio v. Conn.*, 32 F.4th 160, 170 (2d Cir. 2022). That injury occurs regardless of whether the

17

forced disclosure is to the general public or to the government only. *See Ams. for Prosperity Found.*, 594 U.S. at 616 (citing *Shelton v. Tucker*, 364 U.S. 479, 486 (1960)).

Here, the CSP's disclosure requirements have already injured some of Plaintiffs' members. FAC ¶¶ 238, 256; *see also id.* ¶¶ 213, 218, 230, 244, 250–52. For example, AFT Doe 7 is in the process of interviewing for and awaiting a decision regarding an application for a USCIS benefit. *Id.* ¶ 256. Because of the viewpoint-based surveillance they are facing under the CSP, AFT Doe 7 altered their union activities and declined to participate in "Labor Day activities." *Id.* Numerous other members will face these constitutional harms when they submit applications that trigger the disclosure requirements in the near future. *See infra* Part III.

In addition to altering their social media use, AFT members have also *refrained* from applying for USCIS immigration benefits as a result of the CSP's social media disclosure requirements. FAC ¶ 257. By deterring Plaintiffs' members from applying for benefits when they otherwise would have, the CSP's disclosure requirement inflicts an independent injury sufficient to confer standing. *Accord Antonyuk*, 120 F.4th at 977–78 (holding that a plaintiff has standing to challenge "disclosure requirements" when "enforcement of the (allegedly unlawful) requirements impairs [Plaintiff's] interest in obtaining a [gun] license by deterring him from applying").

### d. Chilling Speech Plaintiffs Have A Right to Receive

The FAC alleges that Plaintiffs' members have been injured by the CSP's unlawful interference with their right to receive information from other members. The First Amendment protects the right to receive information and ideas as a necessary counterpart to the right to speak. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (citing *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943)). Government action that interferes with an individual's right to receive information by chilling the speech of others creates "a classic First Amendment injur[y]." *Pen Am. Ctr., Inc.*, 448 F. Supp. 3d at 321; *In re Dow Jones & Co., Inc.*, 842 F.2d 603, 607 (2d Cir. 1988) (recognizing

abridgment of the right to receive as an injury-in-fact and citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976)); *cf. Price v. Saugerties Cent. Sch. Dist.*, 305 F. App'x 715, 716 (2d Cir. 2009) (identification of a specific, willing speaker is necessary to confer standing).

Plaintiffs' members—citizen and noncitizen alike—have been injured because they are unable to receive the speech of fellow noncitizen union members who have been chilled by the CSP. FAC ¶¶ 203, 239–40, 290, 292, 313, 322, 331, 340. Plaintiffs' members have a "concrete, specific connection" to their fellow noncitizen members, since they are members of the same unions. *See Murthy v. Missouri*, 603 U.S. 43, 74–75 (2024). Likewise, Plaintiffs' members have a "unique interest" in hearing fellow members' speech, *Pen Am. Ctr., Inc.*, 448 F. Supp. 3d at 321, since the missions of the organization to which they belong depend on all members participating freely and fully in both union activities and democracy writ large, FAC ¶¶ 15–17. But for the Government's conduct, Plaintiffs' noncitizen members would not have constricted their speech. *Id.* ¶¶ 211, 214, 226, 242. Thus, by chilling the speech of Plaintiffs' noncitizen members, *see supra* Subpart II.A.1, the Government has further injured Plaintiffs' members who wish to hear from those silenced members.

### 2. Plaintiffs' Members' Injuries are Traceable Directly to the Challenged Surveillance Program

Plaintiffs' members' injuries are traceable to the CSP. At the pleading stage, the burden of proving a "causal connection between the injury and the conduct complained of" is "relatively modest." *Bennett v. Spear*, 520 U.S. 154, 167, 171 (1997). Plaintiffs need only allege that "Defendants' actions had a 'predictable effect' on" Plaintiffs' members. *Ateres Bais Yaakov Academy of Rockland v. Town of Clarkston*, 88 F.4th 344, 353 (2d Cir. 2023) (citing *Dep't of Com.*

*v. New York*, 588 U.S. 752, 768 (2019)). Plaintiffs have certainly pled more than the "*de facto* causality*"* necessary to satisfy the traceability element of Article III standing. *Id.*

Plaintiffs surpass that low bar for each of the injuries they allege. Most fundamentally, the viewpoint-based discrimination and coercive threats that Plaintiffs' members face are directly traceable to the CSP. *See supra* Subparts II.A.1.a–b. In a viewpoint-discrimination case, the fact that government action imposes "penalties for expression arguably protected by the First Amendment" is "all the trace needed" to establish standing. *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 840 (9th Cir. 2026) (citing *Matsumoto v. Labrador*, 122 F.4th 787, 799 (9th Cir. 2024)). Thus, in an analogous case, a district court held that plaintiff organizations had standing to challenge coercive threats because of the "close connection" between the "alleged chill" and the government's "announced [] intent to carry out large-scale arrests and deportations." *Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 378 (D. Mass. 2025).

Indeed, the coercion and self-censorship are not only traceable to the CSP, they are the *intended* effects of the CSP. From its inception, the CSP has targeted, on its face, views that the Government believes to be, among other things, "anti-American," FAC ¶¶ 110–11, 199, or contrary to "our way of life," *id.* ¶¶ 28, 46. And the Government has reiterated that the CSP seeks to "send th[e] message out" to noncitizens that those who "want to participate in movements" that the Government disfavors will suffer adverse consequences. *Id.* ¶ 190. Plaintiffs' members specifically allege that they were aware of the CSP and that they limited their protected expression as a direct result of it. *See supra* Subparts II.A.1.a–b.

The injury to Plaintiffs' right to anonymity is likewise traceable to the Government's conduct. Plaintiffs who submit applications for visas or immigration benefits are directly required to give up their anonymous speech rights. FAC ¶ 199. Indeed, where "the plaintiff is himself an

20

object of the action . . . at issue, there is ordinarily little question that the action" has caused their injury. *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 70 (2d Cir. 2019). The chilling effects of those requirements are traceable for the same reason. *See supra* Subpart II.A.1.

Finally, the harm to Plaintiffs' members' interests in hearing the chilled speech of their fellow union members is traceable to the CSP for the same reasons discussed with respect to viewpoint discrimination above: the Government's actions in carrying out the CSP prevented Plaintiffs' members from "hearing the . . . discussion of . . . colleagues," giving rise to "receipt-of-information injuries." *Pen Am. Ctr., Inc.*, 448 F. Supp. 3d at 321; *see id.* at 322. In such cases, it is "plain that the injuries trace to Defendant's actions." *Id.* at 322.

The government's reliance on *Murthy v. Missouri*, 603 U.S. 43 (2024), in contesting traceability is misplaced. *See* Gov't Br. at 23. *Murthy* merely expresses the "bedrock principle" that federal courts cannot adjudicate "injury that results from the independent action of some third party not before the court." *Id.* at 57 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).[12] The *Murthy* plaintiffs alleged that the government indirectly suppressed their speech through statements directed at social media companies but failed to demonstrate that the social media companies had *not* exercised their independent judgment in moderating the plaintiffs' speech, reflecting a "one-step-removed" theory not present here. *Id.* at 57. Unlike in *Murthy*, the Government in this case has not threatened third parties—it has threatened Plaintiffs' members directly, *see, e.g.*, FAC ¶¶ 34–40, and Plaintiffs' members have been chilled as a direct result, *see supra* Subpart II.A.1.b.

---

[12] Moreover, *Murthy* came before the Supreme Court on a preliminary injunction posture after the parties had taken "extensive discovery," such that the plaintiffs bore the burden of making a "clear showing" on the back of "factual evidence" that they were "'likely' to" establish each element of standing. 603 U.S. at 54, 58 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

**B.** *Hunt* **Element Two: Plaintiffs Seek to Protect Member Interests That Are Germane to Their Missions**

Plaintiffs also easily satisfy the second *Hunt* factor. It requires that organizations seek to enforce interests "germane" to their purposes. *Hunt*, 432 U.S. at 343. In general, the germaneness inquiry is "a limited" and "undemanding" one that "does not unduly confine the occasions on which associations may bring legal actions on behalf of members." *Bldg. & Const. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 147–49 (2d Cir. 2006) (internal citations omitted). The "nexus between the interests sought to be protected by the suit in question" need not be "the organization's dominant purpose"; the interests at stake need only be among the "various interests that bring its membership together." *Id.* at 148. The question is "whether an association's lawsuit would, if successful, reasonably tend to further the general interests that individual members sought to vindicate in joining the association and whether the lawsuit bears a reasonable connection to the association's knowledge and experience." *Id.* at 149.

Courts have long recognized the breadth of interests germane to labor organizations. For example, in its leading case on the germaneness inquiry, *Building & Construction Trades Council of Buffalo v. Downtown Development, Inc.*, the Second Circuit considered whether a labor organization had associational standing to pursue violations of the Resource Conservation and Recovery Act and the Clean Water Act. The district court dismissed for lack of standing on the grounds that the claims involved "members' non-occupational interests." *Id.* at 147 (internal quotation marks omitted). The Second Circuit reversed, concluding that the fact the alleged pollution might impact members at their place of work was sufficient to satisfy the germaneness inquiry. *Id.* at 148–49.

Where, as here, a government program interferes with a union's ability to organize at all, there can be no question that a challenge to that program is germane to the union's purposes.

22

Indeed, "the doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986). Plaintiffs' missions—advancing the labor interests of its members and would-be members—and their ability to pursue those missions both depend on members having full freedom of speech to participate meaningfully in union activities, as well as in broader decisions affecting their welfare and that of the communities in which they live. FAC ¶¶ 15–17. Accordingly, each union's Constitution indicates a specific commitment to "support for its members' full and open democratic participation, as achieved through the robust exercise of their rights to free speech." *Id.* ¶ 15 n.2 (quoting UAW's Constitution); *see also id.* ¶ 16 n.3 (quoting CWA's Constitution);[13] *id.* ¶ 17 n.4 (quoting AFT's Constitution).[14,15] Plaintiffs' commitments, like those of other labor unions, make union members "significantly" more likely to vote in presidential and congressional elections,[16] and have led researchers to conclude that unions

---

[13] CWA's Constitution details its aim to "disseminate information among the workers respecting economic, social, political and other matters affecting their lives and welfare," and "do all things which may be necessary or proper to secure for the workers the enjoyment of their natural rights."

[14] AFT's Constitution details its aim to "support and promote the ideals of democracy as envisioned in the Constitution of the United States of America, its Bill of Rights and other Amendments, to work for passage and retention of just laws that will improve the educational climate for students, teachers and other workers in education and to encourage them to exercise their proper rights and responsibilities under these laws."

[15] In pursuing this case, Plaintiffs follow a long tradition of unions advocating for their members' First Amendment rights and civil liberties. *See, e.g.*, *Bhd. of R. R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 5 (1964) (implicitly recognizing union's standing to challenge violations of members' "free speech, petition and assembly" rights); *see also Am. Commc'ns Ass'n, C.I.O., v. Douds*, 339 U.S. 382, 389 (1950) (implicitly recognizing union's standing to challenge alleged violations of members' "fundamental rights guaranteed by the First Amendment").

[16] Jan E. Leighley & Jonathan Nagler, *Unions, Voter Turnout, and Class Bias in the U.S. Electorate, 1964–2004*, 69 J. Pol. 430, 439 (2007).

increase civic participation and strengthen democracy.[17] Plaintiffs' respective constitutions are more than sufficient to demonstrate that this suit is germane to their interests. *Brock*, 477 U.S. at 286 (finding that UAW satisfied the germaneness requirement by reference to the goals stated in the UAW Constitution).

### C. *Hunt* Element Three: The Participation of Individual Members is Not Required

The Government does not contest that Plaintiffs satisfy the third and final *Hunt* element. Gov't Br. at 19. Nor could it. It is well established that individual members normally need not participate in a suit "when an association seeks prospective or injunctive relief" on their behalf. *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996). Moreover, First Amendment claims in which "the conduct of Defendants . . . will be the primary subject of inquiry" generally do not require individualized proof. *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 229 (2d Cir. 2011) (internal quotation marks omitted).

Because Plaintiffs challenge and seek to enjoin the CSP, the Government's unlawful conduct is the whole ballgame.

### III.    Plaintiffs Sufficiently Allege Pre-Enforcement Associational Standing

As established above, Plaintiffs have standing because their noncitizen members are already subject to the Government's ongoing and continuous program of viewpoint-discriminatory surveillance and threats. In addition, the subset of Plaintiffs' members who intend to submit applications for visa renewals or USCIS benefits would have pre-enforcement standing to challenge the additional layer of viewpoint-discriminatory (and forcibly de-anonymized) surveillance that they will encounter at that stage. FAC ¶¶ 110–16, 119–27, 130, 134.

---

[17] *Unions Help Reduce Disparities and Strengthen our Democracy*, Econ. Pol'y Inst. (Apr. 23, 2021), https://www.epi.org/publication/unions-help-reduce-disparities-and-strengthen-our-democracy [https://perma.cc/5L9X-KX5M].

Pre-enforcement standing for First Amendment claims is assessed under "relaxed standing and ripeness rules," *Cerame v. Slack*, 123 F.4th 72, 81 (2d Cir. 2024) (citing *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013)), and requires a plaintiff to allege only "an intention to engage in a course of conduct" that is "arguably affected with a constitutional interest," and is "arguably proscribed by" the challenged regulation, creating a "credible threat" that the challenged regulation will be enforced against them, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 162 (2014) (internal quotation marks omitted). Courts evaluate whether there is a credible threat of enforcement by reference to "the presumption that the government intends to enforce its laws, the recency of the applicable regulation, the general extent of enforcement against similar conduct, and whether there has been any specific disavowal of enforcement against a plaintiff or his conduct." *Cerame*, 123 F.4th at 85.

Here, many of Plaintiffs' members who intend to submit applications for visa renewals or USCIS benefits in the near future have historically spoken online about topics that the CSP targets for viewpoint-discriminatory surveillance, and they would continue doing so if not for the CSP. For example, UAW Does 1, 2, 3, and 4, CWA Does 2, 3, and 4, and AFT Does 2 and 4 all responded that they expect to submit visa or USCIS applications in the near future and that the prospect of facing the Government's viewpoint-based surveillance of their social media activity caused them to restrict, delete, or forgo speech that included "criticism of the Trump administration, its personnel, and/or its policies and practices." FAC ¶¶ 218–21, 234–36, 251, 253. Similarly, UAW Does 1, 3, 4, 5, 6, and 7, CWA Does 2, 3, and 4, and AFT Does 2 and 4 likewise expect to submit applications and have therefore restricted, deleted, or forgone speech that criticized Israel or could be construed as supportive of Palestine. *Id.* ¶¶ 218, 220–24, 234–36, 251,

253. This speech more than "arguably" falls within the ambit of the CSP. *Susan B. Anthony List*, 573 U.S. at 159, 162; FAC ¶¶ 111, 124–27.

Plaintiffs thus allege a credible threat that if their members resume speaking on the disfavored topics, the Government will search for and find that speech in the course of evaluating the applications that Plaintiffs' members would like to submit. There is no reason to doubt that the Government will follow through with the additional, mandatory surveillance it has already been conducting and trumpeting; the CSP is a recent development, arising only in the last year. In just one year, the Government has admitted to checking more than 12,000 social media accounts through the mandatory-review portions of the CSP. FAC ¶ 112. The Government has also announced clear plans to expand these aspects of the CSP. *Id.* ¶¶ 28 & n.6, 39, 118–19, 199–200.

Because Plaintiffs also satisfy traceability and redressability and *Hunt* elements two and three for the same reasons discussed above, *see supra* Subparts II.A.2, II.B, II.C, Plaintiffs have also sufficiently alleged pre-enforcement associational standing.

## IV.    Plaintiffs Sufficiently Allege Organizational Standing

Plaintiffs also have organizational standing to challenge the CSP. To establish "organizational" standing, organizations must "meet the same standing test that applies to individuals." *N.Y.C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) ("*NYCLU*") (alterations and quotation marks omitted); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024). The general rules of causation and redressability govern, and injury-in-fact is determined by any "perceptible impairment" of the plaintiff's "activities." *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (quoting *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993)). The Government does not contest causation or redressability, arguing only that Plaintiffs fail to demonstrate injury-in-fact. Gov't Br. at 25–27.

26

Plaintiffs' detailed factual allegations satisfy two well-established theories of injury-in-fact for organizational standing. First, Plaintiffs allege that the CSP is inhibiting core aspects of their missions. Second, Plaintiffs allege that the CSP has forced them involuntarily to expend resources to counter and alleviate its effects. Both theories of organizational injury are widely recognized in this Circuit. *See, e.g.*, *NYCLU*, 648 F.3d at 295 (impeding organization in carrying out its responsibilities); *Centro de la Comunidad Hispana de Locus Valley v. Town of Oyster Bay*, 868 F.3d 104, 110–11 (2d Cir. 2017) ("*Oyster Bay*") (diversion of resources).[18]

The Government ignores Plaintiffs' detailed allegations and asserts that Plaintiffs lack a "personal stake" in this litigation. Gov't Br. at 2. But that argument is difficult to square with the scores of allegations demonstrating how the CSP both interferes with Plaintiffs' missions and depletes their resources, as set forth below. Through the CSP, the Government has engaged in unlawful viewpoint-discriminatory surveillance of thousands of Plaintiffs' members, promised to weaponize immigration law to punish them for their speech, and mandated that any applying for immigration benefits be subjected to the same regime. The CSP has thus caused Plaintiffs to respond out of necessity, and it has caused Plaintiffs' members to take entirely predictable steps

---

[18] Although the Government does not challenge traceability and redressability, the FAC also meets those requirements. "When [a] plaintiff is not the object of a government regulation" then "causation and redressability often depend on how regulated third parties not before the court will act in response to the government regulation or judicial relief"; standing will be found when the effects of the government action on third parties are "predictable" rather than "speculative." *Diamond Alt. Energy v. EPA*, 606 U.S. 100, 112 (2025) (quoting *All. for Hippocratic Med.*, 602 U.S. at 383). Here, the Government is alleged to be responsible for Plaintiffs' organizational injuries, *cf. Am. C.L. Union v. Clapper*, 785 F.3d 787, 802–03 (2d Cir. 2015) (chill-based injuries traceable to the government when it surveilled plaintiffs and collected their metadata), and the relief Plaintiffs seek will stop or significantly constrain the unlawful coercion and surveillance of their members that both stands in the way of their missions and continues to drain their resources, *see Pietersen v. U.S. Dep't of State*, 138 F.4th 552, 559 (D.C. Cir. 2025) (redressability satisfied where declaratory relief would invalidate guidance regarding visa issuance, even where there is no guarantee that State will then issue plaintiff a visa).

back from union activities and exercising their rights to democratic participation, impeding Plaintiffs' ability to carry out their missions.

## A. The CSP Impairs Plaintiffs' Core Missions

"[O]nly a perceptible impairment of an organization's activities is necessary for there to be an injury in fact." *Afr. Cmtys. Together v. Lyons*, 799 F. Supp. 3d 362, 378 (S.D.N.Y. 2025) (internal quotation marks omitted); *see also Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 618 (2d Cir. 2026) (affirming that a perceptible impairment to "core business activities" continues to give rise to organizational standing post-*All. for Hippocratic Med.*). Plaintiffs are labor unions that pursue their members' interests both within and outside the workplace. For each Plaintiff organization, that means explicit commitments—set out in their fundamental charters—to both organizing their members as workers and advocating for members' rights to democratic participation. FAC ¶¶ 15–17 & nn.2-4. The CSP has perceptibly impaired both core activities.

### 1. Organizing Members

Plaintiffs UAW, CWA, and AFT allege that the CSP and its objective chilling effects have fundamentally impaired their ability to organize, represent, recruit, and engage meaningfully with their members. *Id.* ¶ 260.

First, the CSP is causing Plaintiffs' members to disengage with Plaintiff-unions. Member disengagement is precisely the kind of "perceptible impairment" of core organizational function that establishes organizational standing. *See Oyster Bay*, 868 F.3d at 110. Here, Plaintiffs' members have stepped back from union leadership roles, requested the removal of their names from union webpages, refrained from participating in both online and in-person union activities, and avoided completing bargaining surveys "for fear that those expressive activities will be swept up" in the CSP and trigger adverse immigration consequences. FAC ¶¶ 259–60; *id.* ¶¶ 215–16,

28

219–21, 271 (UAW); *id.* ¶¶ 227, 231, 233, 235–36 (CWA); *id.* ¶¶ 243, 247, 250, 252–55, 292 (AFT). At least one Manhattan-based UAW local affiliate has seen a decrease in attendance by noncitizen members at union rallies, pickets, and other actions because members fear photographs from the action could be posted online and swept up by the CSP, especially if the action concerns a topic disfavored by the Administration, including pro-Palestine, anti-ICE, or pro-LGBTQ+ advocacy. *Id.* ¶ 271; *see Oyster Bay*, 868 F.3d at 110. Because the CSP has impeded Plaintiffs' ability to associate with their members, FAC ¶ 290, it has directly reduced Plaintiffs' "efficiency and success" in executing their central missions of organizing members, *Moya v. DHS*, 975 F.3d 120, 130 (2d Cir. 2020).

Second, by chilling Plaintiffs' members' speech, the CSP has frustrated Plaintiffs' ability to adequately represent their members' labor interests. All three Plaintiff organizations rely on their members' speech about issues that matter to them in order to effectively advocate for their interests and represent them in their workplaces—core organizational missions. FAC ¶ 273 (UAW); *id.* ¶ 282 (CWA); *id.* ¶ 288 (AFT). Because the CSP has made members reluctant to speak online and offline, *id.* ¶¶ 210–16, 218–20, 222–24, 268–70, 276 (UAW); *id.* ¶¶ 225–27, 229, 231, 233–37 (CWA); *id.* ¶¶ 241–44, 247–48, 250, 252–53 (AFT), Plaintiffs cannot represent the full range of their members' interests nor advocate collectively on their behalf, *id.* ¶ 273, thus directly and "perceptibly impair[ing]" Plaintiffs' core labor-advocacy functions, *All. for Hippocratic Med.*, 602 U.S. at 395.

### 2.  Safeguarding Members' Rights to Democratic Participation

The CSP's chilling effects on members have likewise impeded Plaintiffs' ability to support their members' right to participate in democracy and political discourse more broadly—another core organizational mission. Courts have long recognized that unions' missions often include vindicating the civil liberties and constitutional rights of their members, including members' First

Amendment rights and their ability to participate freely in political discourse. *See Thomas v. Collins*, 323 U.S. 516, 531–32 (1945); *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565–67 (1978); *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). Plaintiffs UAW, CWA, and AFT are labor unions with founding charters that reflect a commitment to defend their members' rights to free expression and participation in democratic society FAC ¶¶ 15–17 & nn.2–4; *see also* Subpart II.B, *supra* (excerpting from Plaintiffs' constitutions). While the Government attempts to cabin Plaintiffs' missions and core activities to a myopic definition of "labor" activities, Gov't Br. at 26, Plaintiffs' respective organizational missions specifically include supporting "members' full and open democratic participation, FAC ¶ 15 n.1, the "exercise of [members'] rights to freedom of speech," *id.* ¶ 16, and "the ideals of democracy," *id.* ¶ 16 n.4, including free speech, *see also* Subpart II.B, *supra*.

To take but one example, a UAW local affiliate—the Graduate Student Organizing Committee (GSOC) at NYU—displayed UAW branding within the campus encampment for Palestine rights solidarity, making it a locus of both pro-labor and pro-Palestine activism. FAC ¶ 274. GSOC has also engaged in ICE-related activism. *Id*. GSOC's work exemplifies the ways Plaintiffs work to facilitate members' political expression. The CSP has dramatically impaired Plaintiffs' ability to facilitate political expression, as evidenced by Plaintiffs' allegations that nearly a thousand individuals across all three Plaintiff organizations reported having altered, limited, or altogether ceased First Amendment-protected online speech because of the CSP. *Id.* ¶ 210 (UAW); *id.* ¶ 225 (CWA); *id.* ¶ 241 (AFT).

### 3. The Government Would Have this Court Ignore Plaintiffs' Allegations of Injuries to Plaintiffs' Missions

The Government fundamentally misconstrues the burden Plaintiffs bear at this stage. It argues, without any support, that Plaintiffs have not really suffered any organizational harm

because "Plaintiffs have numerous potential means through which to engage with their members" such as public, semi-public, and private social media channels. Gov't Br. at 26 n.15. That argument might appropriately be vetted at summary judgment, but it is premature now, and wrong in any case.

Social media, of course, is a "key medium of communication among coworkers and a tool for organization in the modern era." *NLRB v. Pier Sixty, LLC*, 855 F.3d 115, 129 (2d Cir. 2017); *see also Three D, LLC v. NLRB*, 629 F. App'x 33, 37 (2d Cir. 2015). As set forth in the FAC, all three Plaintiffs rely heavily on social media and online platforms to organize and support members. FAC ¶¶ 262–69; 277–81; 283–87. They use their websites and social media accounts for all manner of traditional union organizing, including "to create forums for members to discuss bargaining," *id.* ¶ 279, "to communicate with and organize membership," *id.* ¶ 286, and to "mobilize members for political and issue-based campaigns related to the union's goals," *id.* ¶ 263.

The CSP has upended Plaintiffs' ability to use online communications to organize members, making members reluctant to use these essential channels and chilling association with the unions themselves for fear of being affiliated with disfavored viewpoints. *Id.* ¶¶ 210–16, 218–20, 222–24, 268–70, 276 (UAW); *id.* ¶¶ 225–27, 229, 231, 233–37 (CWA); *id.* ¶¶ 241–44, 247–48, 250, 252–53 (AFT). Because Plaintiffs' members have altered their behavior and limited their interactions on social media in response to the CSP, Plaintiffs' ability to communicate with, organize, and mobilize members via the UAW, CWA, and AFT social media accounts has diminished and has therefore harmed Plaintiffs' ability to associate with their members and fulfill their missions. *Id.* ¶ 290. The Government's conduct impairs Plaintiffs' ability to recruit their members, impedes Plaintiffs' ability to represent their members, and threatens members' civil liberties, the protection of which is core to each organization's mission, FAC ¶¶ 9, 209–57, 260–

61, 265–66, 291–92. The CSP has thereby caused more than a "perceptible impairment" to Plaintiffs' organizational missions; it has frustrated them directly. *See Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 174–75 (2d Cir. 2021) (holding the "perceptible impairment" inquiry focuses on "the involuntary and material impacts on core activities by which the organizational mission has historically been carried out"). That injury is sufficient to confer Article III standing.

### B. The CSP Requires Plaintiffs to Involuntarily Divert Material Resources

An organization can also show it has suffered injury-in-fact where it must expend or reallocate resources because the defendant's action has disrupted the organization's core operations. *All. for Hippocratic Med.*, 602 U.S. at 395 (direct expenditures); *see Afr. Cmtys. Together*, 799 F. Supp. 3d at 380 (resource reallocation). Injury also exists when there "is an increased demand for an organization's services," *Conn. Parents Union*, 8 F.4th at 173–74. Even "scant" evidence of an opportunity cost will suffice, *Nnebe v. Daus*, 644 F.3d 147, 156–57 (2d Cir. 2011), as long as the organization is not an advocacy organization that has simply pivoted its focus to advocate against the challenged policy, *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 618–19 (2d Cir. 2026).

Here, Plaintiffs explicitly allege that each has been forced to expend new resources or divert resources away from other core union activities to protect members from and adequately advise them of the risks of the Government's surveillance program. FAC ¶ 293 (UAW: hiring a new immigration attorney, affiliates reallocating "substantial staff time" away from bargaining and direct member counselling, and toward responding to the CSP); *id.* ¶ 294 (CWA: reallocating resources normally reserved for bargaining and direct member counselling towards responding to member concerns about the CSP); *id.* ¶ 295 (AFT: hiring a third party to conduct trainings for members on their online presence, spending staff time developing back-to-campus resources).

32

These are not discretionary or strategic choices to engage in activist expenditures like the medical associations in *All. for Hippocratic Med.*, who expended money to advocate against FDA policies simply because the associations disagreed with those policies. 602 U.S. at 934; *see also CoreLogic*, 167 F.4th at 619.[19] In this case, the Government's actions interfered with Plaintiffs' ability to provide direct services to their members, making their expenditures necessary to ameliorate operational burdens. Put differently, Plaintiffs are not "spend[ing] [their] way into standing," *All. for Hippocratic Med.*, 602 U.S. at 294, because they disagree with the CSP; they are being forced to redirect resources away from core operations because the program has chilled their members' participation in the very activities the unions exist to facilitate and promote. These are precisely the type of operational trade-offs and involuntary depletions of resources that this Court has properly recognized as cognizable injuries to establish organizational standing. *Afr. Cmtys. Together*, 799 F. Supp. at 380, 381–82; *Greene v. City of N.Y.*, 725 F. Supp. 3d 400, 423–25 (S.D.N.Y. 2024).

The Government's argument that Plaintiffs pleaded *no* facts that the expenditures were "involuntary or that they materially impacted Plaintiff's core activities," Gov't Br. at 27, simply ignores the factual allegations reiterated above and below.

### C. Plaintiffs' Organizational Injuries are Traceable to the CSP and Can be Remedied by the Requested Relief

The Government does not contest the final two prongs of the organizational standing analysis, nor could it. Plaintiffs' organizational injuries are directly traceable to the CSP and fully redressable by the relief sought because noncitizen members will resume speaking if the CSP is enjoined, FAC ¶¶ 28–40, 209–57, 313, 322, 331, 340, the impairment of Plaintiffs' core missions

---

[19] Thus, for instance, while Plaintiffs are expending resources to litigate this challenge, Plaintiffs do not rely on that diversion of resources to demonstrate their standing.

will be alleviated, *id.* ¶¶ 289–92, and Plaintiffs will no longer have to divert resources to respond to the CSP, *id.* ¶¶ 293–295. Plaintiffs, as organizations, thus satisfy all three elements of the Article III standing inquiry.

## CONCLUSION

For the foregoing reasons, the Court should deny the Government's motion to dismiss.

Dated: April 22, 2026

/s/ *Sadaf Hasan*
MUSLIM ADVOCATES
Sadaf Hasan[*]
Collin Poirot
1032 15th Street N.W. # 362
Washington, D.C. 20005
(202) 655-2969
sadaf@muslimadvocates.org
collin@muslimadvocates.org

/s/ *David Greene*
ELECTRONIC FRONTIER FOUNDATION
David Greene
Sophia Cope
Elizabeth Femia
Saira Hussain
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
davidg@eff.org
sophia@eff.org
lfemia@eff.org
saira@eff.org

Respectfully submitted,

/s/ *John Langford*
MEDIA FREEDOM & INFORMATION
    ACCESS CLINIC
Anthony Cosentino, *student*
Nick Jones, *student*
Raymond Perez, *student*
Tess Solomon, *student*
Grace Chisholm, *student*
Stacy Livingston
John Langford
P.O. Box 208215
New Haven, CT 06511
(203) 432-2366
stacy.livingston@ylsclinics.org
john.langford@ylsclinics.org

[*]*Pro hac vice* application forthcoming

34

35

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Local Civil Rule 7.1, as modified by this Court's Individual Rule 2(C). As measured by the word processing system used to prepare it, this memorandum contains 11,078 words.