# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA,

COMMUNICATIONS WORKERS OF
AMERICA, *and*

AMERICAN FEDERATION OF TEACHERS,

   *Plaintiffs*,

  v.            Civil Action No. 25-cv-8566

UNITED STATES DEPARTMENT OF
STATE,

MARCO RUBIO, *in his official capacity as
Secretary of the U.S. Department of State*,

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

KRISTI NOEM, *in her official capacity as
Secretary of the U.S. Department of Homeland
Security*,

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICE,

JOSEPH B. EDLOW, *in his official capacity as
Director of U.S. Citizenship and Immigration
Service*,

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT,

TODD LYONS, *in his official capacity as
Acting Director of U.S. Immigration and
Customs Enforcement*, *and*

UNITED STATES OF AMERICA,

*Defendants*.

**[PROPOSED] SUPPLEMENTED AMENDED COMPLAINT**

1. This lawsuit seeks to enjoin an interagency federal program designed and executed primarily to surveil, intimidate, and silence noncitizens lawfully present in the United States who express views that the government disfavors (the "**Challenged Surveillance Program**").

2. The government is using the threat of immigration enforcement to suppress dissent. From the earliest days of the current administration, officials at the State Department and Department of Homeland Security have implemented the Challenged Surveillance Program on two parallel tracks.

3. *First*, the government has developed and is deploying a vast surveillance apparatus, including automated technologies and artificial intelligence ("AI"), to undertake viewpoint-based surveillance of the social media and online expressive activity of noncitizens lawfully present in the United States, with a particular focus on U.S.-based visa holders and Lawful Permanent Residents with university affiliations.

4. *Second*, the government has launched a public intimidation campaign, with explicit threats from high-ranking public officials to surveil and punish lawfully present noncitizens for speech documented online—threats that Defendants have followed with a terrifying series of viewpoint-driven immigration enforcement actions, many of which have involved immigration confinement.

5. Taken as a whole, the Challenged Surveillance Program is having its intended effect: suppressing the speech of thousands of U.S.-based visa holders, Lawful Permanent Residents, and others with immigration status, as well as their family members, friends, and

2

colleagues in the U.S. seeking to protect them. Noncitizens throughout the U.S. are deleting their social media accounts, making public accounts private, erasing past social media and online posts and interactions, changing or ceasing online expression or association involving views the government disfavors, and forgoing future posting and other protected expression, including protest attendance and political organizing that could be documented online and then surveilled by the administration. This chill extends to many U.S. citizens, who are similarly refraining from speaking out online for fear of making targets of their noncitizen family members, friends, and colleagues.

6.      Plaintiffs are labor unions whose members include thousands of people subject to the government's viewpoint-based Challenged Surveillance Program.

7.      The Challenged Surveillance Program has harmed Plaintiffs and those they represent through its powerful speech-inhibiting effects.

8.      Plaintiffs represent thousands of people whose protected speech is chilled by the threat of adverse immigration action if the government disapproves of anything they have expressed or will express. Many of Plaintiffs' members no longer express views remotely related to the topics the government disfavors, especially online where the government is watching, because the government has promised and proven that saying the wrong thing can trigger life-altering immigration consequences, particularly for U.S.-based visa holders and Lawful Permanent Residents.

9.      Plaintiffs themselves have suffered a loss of engagement because their members and associates have limited their union activity—particularly public or online union activity—for fear of retributive immigration consequences against themselves and/or their online associates. Members have ceased public affiliation with the unions, hesitated to attend union organizing

3

events, refrained from participating in union elections, and deleted, refrained from, or otherwise altered their social media and online engagement with the unions. Members have also withdrawn from leadership roles or curtailed their participation in union-related speech and protest activities; and some prospective members have opted not to join the unions at all for fear that the Challenged Surveillance Program will sweep up their expressive activities and trigger related, adverse immigration consequences against themselves or those with whom they associate. This loss of engagement has harmed the Plaintiffs' ability to further their organizational missions and impeded their ability to carry out their responsibilities, which include: recruitment, retention, and organization of union members; advocacy on behalf of union members; and the promotion of civic and political engagement among union members. These consequences have required Plaintiffs to redirect resources to compensate for these losses.

10.    The Challenged Surveillance Program violates the First Amendment and the Administrative Procedure Act. By this action, Plaintiffs seek declaratory relief that the Challenged Surveillance Program is unconstitutional and unlawful, an order setting aside the Challenged Surveillance Program as unlawful agency action, and a permanent injunction against the continued operation of the Challenged Surveillance Program and Defendants' unlawful use of the disfavored online expression it has collected.

## **DEFINITION**

11.    As used throughout this Amended Complaint, the "Challenged Surveillance Program" is the interagency federal program between the U.S. Department of Homeland Security and the U.S. Department of State whereby the government (1) surveils expressive activity documented online of millions of individuals—primarily U.S.-based visa holders and Lawful Permanent Residents—in order to detect disfavored viewpoints and to take adverse immigration

action based on those viewpoints, and (2) coerces silence by threatening to engage in such viewpoint-targeted online surveillance and related adverse immigration action.

## JURISDICTION AND VENUE

12. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the United States Constitution and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

13. This Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705–06.

14. Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because this action seeks relief against officers and agencies of the United States and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

15. **Plaintiff the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW")** is one of the largest and most diverse unions in North America, with members in the United States—including Puerto Rico—and Canada, and in virtually every sector of the U.S. economy. Central to UAW's mission is the advancement of the labor interests of its members and would-be members. Essential to this mission is meeting with and organizing members and would-be members, including by ensuring that UAW members have full freedom of speech and can participate meaningfully in decisions affecting their welfare and that of the communities in which they live.[1] UAW also participates in advocacy at all

---

[1] The UAW Constitution preamble explains that to achieve the union's labor objectives, "[t]he workers must have a voice in their own destiny and the right to participate in making decisions that affect their lives before such decisions are made." *Constitution of the United Automobile, Aerospace and Agricultural Implement Workers of America* at 10, UAW (July 2022),

levels of government for policies that promote its labor objectives and the interests and well-being of its members and urges its members to do so, as well. As such, central to UAW's mission is support for its members' full and open democratic participation, as achieved through the robust exercise of their rights to free speech.[2] UAW has nearly 1,000,000 active and retired members. Among its members are approximately 120,000 workers in higher education—graduate students, postdoctoral scientists, researchers, university staff, and faculty—at institutions across the country, including Columbia University, New York University, Cornell University, Northeastern University, Wellesley College, University of Southern California, Harvard University, University of Pennsylvania, Princeton University, and Worcester Polytechnic Institute, among many others. Although UAW does not collect citizenship information about its members, its chapters include substantial numbers of lawfully present, noncitizen members. In New York alone, such chapters include Columbia University, New York University, the New School, the Icahn School of Medicine at Mt. Sinai, Albert Einstein College of Medicine, Rockefeller University, and Weill Cornell Medical College. Many of UAW's members, including its noncitizen members, actively participate in local UAW unions, serving in leadership positions. UAW is headquartered in Detroit, Michigan.

16.    **Plaintiff Communications Workers of America ("CWA")** is a labor union and unincorporated association headquartered in Washington, D.C., representing workers in the communications and information industries, the news media, broadcast and cable television, public

---

https://uaw.org/wp-content/uploads/2024/06/Updated-2022-Constitution-6-7-24-1.pdf [https://perma.cc/J5PN-PBJZ].

[2] The UAW Constitution preamble explains that "[t]he UAW must play an active role at all levels of government to protect the lives and rights of its members and their families. . . . Union members must take seriously their responsibilities as citizens and work, through their union and individually, to realize the goals of participatory democracy and responsible and accountable government." *Id.*

service, higher education, health care, manufacturing, video games, and high tech. CWA takes an active role advocating for its members on workplace issues and other matters that impact the lives of its members and those persons it seeks to organize and represent. This role requires participation of current members and prospective members in bargaining units that CWA is organizing. As part of this mission, CWA supports its members' exercise of their rights to freedom of speech, in the workplace and elsewhere, and to have their voices heard in political discourse.[3] This includes representing members who work in higher education and on issues involving academic freedom and campus free speech. Although CWA does not collect citizenship information about its members, its local unions include substantial numbers of lawfully present, noncitizen members. In New York alone, such local unions include Local 1104 in New York that represents graduate students at Stony Brook University—part of the State University of New York—and Fordham University. Many of CWA's members, including its noncitizen members, actively participate in local CWA unions, serving in leadership positions.

17.    **Plaintiff American Federation of Teachers ("AFT")** is a national labor organization headquartered in Washington, D.C., representing over 1.8 million members, including more than 400,000 workers (more than 200,000 members) who are employed as higher education faculty, graduate students, and professional staff, primarily in research and teaching positions; federal, state, and local government employees; pre-K through 12th-grade teachers,

---

[3] The CWA Constitution, Article III, explains in relevant part that "The objects of the Union shall be: (a) To unite the workers within its jurisdiction in a single cohesive labor union for the purpose of collective effort; . . . (c) To disseminate information among the workers respecting economic, social, political and other matters affecting their lives and welfare; (d) To advance the interests of the workers by advocating the enactment of laws beneficial to them and the defeat or repeal of laws detrimental to them; (e) To do all things which may be necessary or proper to secure for the workers the enjoyment of their natural rights; (f) To fight discrimination and harassment in all its forms . . . ." *Communications Workers of America Constitution* at 1–2, CWA (Aug. 2025), https://cwa-union.org/sites/default/files/cwa-constitution.pdf [https://perma.cc/6NGY-P97Y].

early childhood educators, paraprofessionals, and other school-related personnel; as well as nurses and other healthcare professionals. AFT's mission is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for all students, their families, and their communities, in part by advancing the labor interests of its members and would-be members. Essential to this mission is defending academic freedom, free speech, and the right to assemble. AFT firmly believes that the First Amendment is fundamental to a free and democratic society, even when it protects nonviolent speech, with which it does not agree. Disagreement cannot justify the denial of basic rights. To advance its mission, AFT's core activities include community engagement, organizing, collective bargaining, and policy advocacy. Given the union's commitment to the promotion of democracy, the union's advancement of its interests requires the full democratic participation of its members through organizing and advocating, which includes attending rallies, protests, and other demonstrations where members can mobilize and influence the public on various workplace, social, and political issues.[4] AFT and its affiliates frequently coordinate public rallies and demonstrations to raise awareness of important issues impacting its members. Although AFT does not collect citizenship information about its members, its affiliates include substantial numbers of lawfully present, noncitizen members. In New York alone, AFT represents members working in higher education in

---

[4] The AFT Constitution, Article II, Sections 8 and 13, explain that AFT's objectives include (1) "[t]o support and promote the ideals of democracy as envisioned in the Constitution of the United States of America, its Bill of Rights and other Amendments, to work for passage and retention of just laws that will improve the educational climate for students, teachers and other workers in education and to encourage them to exercise their proper rights and responsibilities under these laws" and (2) "[t]o support and encourage the unification of labor and community to work together for the betterment of civil society." *2024 AFT Constitution and Bylaws* at 2, AFT (July 2024), https://www.aft.org/sites/default/files/media/documents/2024/AFTconstitution2024.pdf [https://perma.cc/9S3V-SS6S].

approximately 80 affiliates. Many of AFT's members, including noncitizen members, actively participate in AFT affiliates, serving in leadership positions.

18.    **Defendant United States Department of State (the "State Department")** is a cabinet-level department of the executive branch of the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Among other things, the State Department is responsible for the issuance of visas, which allow noncitizens to seek entry and reentry into the United States for a given purpose and duration. The State Department enforces the Challenged Surveillance Program.

19.    **Defendant Marco Rubio** is the United States Secretary of State and exercises authority over the actions of the State Department, including under 8 U.S.C. § 1104, 22 U.S.C. § 2651a(a), related regulations, and State Department policies. Defendant Rubio enforces the Challenged Surveillance Program. He is sued in his official capacity.

20.    **Defendant United States Department of Homeland Security ("DHS")** is a cabinet-level department of the executive branch of the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Among other things, DHS is responsible for the administration and enforcement of the Immigration and Nationality Act ("INA") and for promulgating regulations and issuing policies implementing the INA. DHS includes several subagencies, including United States Immigration and Customs Enforcement ("ICE") and U.S. Citizenship and Immigration Services ("USCIS").[5] DHS enforces the Challenged Surveillance Program.

---

[5]    *Operational and Support Components*, U.S. Dep't of Homeland Sec., https://www.dhs.gov/operational-and-support-components [https://perma.cc/H8B6-59GH].

21.     **Defendant Kristi Noem** is the United States Secretary of Homeland Security and exercises authority over the actions of DHS, including under 8 U.S.C. § 1103(a). Defendant Noem enforces the Challenged Surveillance Program. She is sued in her official capacity.

22.     **Defendant United States Citizenship and Immigration Services ("USCIS") is** a component of DHS and a federal agency within the meaning of 5 U.S.C. § 551(1). Among other things, USCIS is responsible for the creation, receipt, review, and adjudication of applications for myriad immigration benefits that noncitizens in the United States may seek, such as work permits, asylum, and naturalization. USCIS enforces the Challenged Surveillance Program, including by performing the challenged surveillance, engaging in the challenged campaign of coercive threats, and requiring applicants for USCIS benefits who are already lawfully present in the United States to disclose their social media accounts in order to facilitate the challenged surveillance.

23.     **Defendant Joseph B. Edlow** is the Director of USCIS and exercises authority over the actions of USCIS, including under 6 U.S.C. § 271(a)(3). Defendant Edlow enforces the Challenged Surveillance Program. He is sued in his official capacity.

24.     **Defendant U.S. Immigration and Customs Enforcement ("ICE")** is a component of DHS and a federal agency within the meaning of 5 U.S.C. § 551(1). Among other things, ICE administers INA provisions governing the deportation of noncitizens in the U.S. and immigration confinement pending deportation proceedings. ICE enforces the Challenged Surveillance Program.

25.     **Defendant Todd Lyons** is the Senior Official Performing the Duties of the Director (Acting Director) of ICE and exercises broad authority over the actions of ICE, including under 6 U.S.C. § 252(a)(3). Defendant Lyons enforces the Challenged Surveillance Program. He is sued in his official capacity.

26.     **Defendant United States of America** is responsible for the exercise of interagency action pursuant to the Challenged Surveillance Program. Defendant United States of America is included as a defendant to ensure that the relief ordered by the Court will apply government-wide.

## FACTUAL ALLEGATIONS

### I.     The Challenged Surveillance Program

#### A.     The Views the Government Disfavors

27.     As described below, the viewpoint-based Challenged Surveillance Program consists of mass surveillance and a public intimidation campaign aimed at locating and silencing views the government disfavors.

28.     As the administration and its officials have publicly stated, the ever-expanding list of views and messages targeted by the viewpoint-based Challenged Surveillance Program includes at least the following:

> a. criticism of the United States and/or bearing "hostile attitudes" towards its citizens, "culture," "civilization," government, institutions, or founding principles;[6]

---

[6] *See, e.g.*, Exec. Order No. 14161, § 1(b), 90 Fed. Reg. 8451, 8451 (Jan. 20, 2025) [hereinafter Executive Order 14161]; Stephen Miller (@StephenM), X (Jul. 29, 2025), https://x.com/StephenM/status/1950362892210934097 [https://perma.cc/D8TW-JZN6] ("This is just patently false. We have officials working continuously to identity [*sic*], revoke or deny foreigners' visas who espouse hatred for America or its people. This is a top priority. . . ."); Stephen Miller (@StephenM), X (Mar. 20, 2025), https://x.com/StephenM/status/1902884784642093119 [https://perma.cc/ZE7E-KJMY] ("If you support terrorism and hate our civilization, we will revoke your visa and deport you."); Transcript, *Marco Rubio, Secretary of State, Remarks to the Press en Route to Miami, Florida* (Mar. 28, 2025), https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3 [https://perma.cc/EEG3-L6H5]; Ken Klippenstein, *Trump Admin Spies on Social Media of Student Visa Holders* (Mar. 28, 2025), https://www.kenklippenstein.com/p/exclusive-trump-admin-spies-on-social [https://perma.cc/4YPB-MCXF]; Corey Williams & Valerie Gonzalez, *Immigrants Seeking Lawful Work and Citizenship Are Now Subject to 'Anti-Americanism' Screening*, Associated Press (Aug. 19, 2025, at 6:56 PM ET), https://apnews.com/article/immigration-uscis-antiamerican-7240aac0437487ddd5441c49a290db4c [https://perma.cc/7K9F-P2EA]; *USCIS to Consider Anti-Americanism in Immigrant Benefit Requests*, U.S. Citizenship & Immigr. Servs. (Aug. 19, 2025), https://www.uscis.gov/newsroom/news-releases/uscis-to-consider-anti-

b.  "call[ing]" for "the overthrow or replacement" of American "culture";[7]

c.  threats to "our way of life" in the United States;[8]

d.  espousing what the government deems "hateful ideology";[9]

e.  putative antisemitism, based on a definition of antisemitism whose lead drafter has repeatedly repudiated its weaponization to punish protected political speech;[10]

f.  comments the government views as "rationalizing, or making light of" Charlie Kirk's murder;[11] and

---

americanism-in-immigrant-benefit-requests [https://perma.cc/V3GB-8R2Q] ("America's benefits should not be given to those who despise the country and promote anti-American ideologies."); *DHS Strengthens Integrity in Nation's Immigration System, Returns to Commonsense Legal Immigration Levels*, U.S. Citizenship & Immigr. Servs. (Nov. 13, 2025), https://www.uscis.gov/newsroom/news-releases/dhs-strengthens-integrity-in-nations-immigration-system-returns-to-commonsense-legal-immigration [https://perma.cc/57LK-UMWL].

[7] *See, e.g.*, Exec. Order No. 14161, § 3(d), at 8453.

[8] *See, e.g.*, *infra* note 42.

[9] *See, e.g.*, Exec. Order No. 14161, § 1(a), at 8451; Rebecca Santana, *Top U.S. Immigration Official Defends Rule Targeting 'Anti-American' Views in Green Card, Visa Process*, Assoc. Press (Sep. 9, 2025, at 4:48 PM ET), https://apnews.com/article/immigration-border-citizenship-fraud-visa-30df7d1d875eb8690425bde55e2abc5d [https://perma.cc/J7EL-YZ2F] ("[USCIS Director Joseph] Edlow said the agency needs to be aware of what people applying for benefits are saying online and when that speech becomes hateful.").

[10] *See, e.g.*, Additional Measure to Combat Anti-Semitism, Exec. Order No. 14188, §§ 1–2, 90 Fed. Reg. 8847, 8847 (Jan. 29, 2025) [hereinafter Executive Order 14188]. Executive Order 14188 relied on an earlier executive order's definition of antisemitism, which includes First Amendment protected speech. *See* Exec. Order No. 13899, § 2, 84 Fed. Reg. 68779, 68779 (Dec. 11, 2019); *see also infra* ¶ 65.

[11] *See, e.g.*, Matthew Lee, *US Revokes Visas for 6 Foreigners over Charlie Kirk-Related Speech*, Assoc. Press (Oct. 14, 2025), https://apnews.com/article/trump-charlie-kirk-visas-revoked-455f43467c0c50e84d3857c1e9c81458 [https://perma.cc/V9NK-3CMN]; Christopher Landau (@DeputySecState), X (Sep. 11, 2025, at 8:20 AM), https://x.com/DeputySecState/status/1966114506116927972 [https://perma.cc/3JS9-EYKS]; Transcript, Secretary of State Marco Rubio with Gillian Turner of Fox News (Sep. 15, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/09/secretary-of-state-marco-rubio-with-gillian-turner-of-fox-news [https://perma.cc/UZ8B-2SEW]; Max Rego, *Rubio: Visa Revocations 'Underway' over Charlie Kirk Assassination Celebrations*, Hill (Sep. 16, 2025, at

g.  criticism of the Trump administration, personnel therein, or the administration's actions.[12]

29.    Moreover, the federal government has stated its intent to improperly and broadly categorize many of these disfavored views as supporting "terrorism" in order to justify taking adverse immigration actions.[13] This includes, but is not limited to, the following:

---

10:04 AM ET), https://thehill.com/homenews/administration/5505556-rubio-visa-revocations-charlie-kirk-assassination [https://archive.is/uvGTZ].

[12] *See, e.g.*, Tr. of July 18, 2025, Proceedings at 42–43, *Am. Ass'n of Univ. Professors v. Rubio*, No. CV 25-10685-WGY (D. Mass. July 18, 2025) (testimony of John Armstrong) [hereinafter "Armstrong Testimony, Second Session"]; Sam Biddle, *ICE Wants to Know if You're Posting Negative Things About It Online*, Intercept (Feb. 11, 2025, at 6:00 AM), https://theintercept.com/2025/02/11/ice-immigration-social-media-surveillance [https://perma.cc/XE5Q-NEQW] ("ICE isn't merely looking to detect direct threats of violence, but also online criticism of the agency."); Robert Mackey, *French Scientist Denied U.S. Entry After Phone Messages Critical of Trump Found*, Guardian (Mar. 19, 2025), https://www.theguardian.com/us-news/2025/mar/19/trump-musk-french-scientist-detained [https://perma.cc/8MX8-Q9TN]; Chad de Guzman, *Can Trump Deport U.S. Citizens Like Elon Musk and Zohran Mamdani?*, Time Mag. (July 4, 2025), https://time.com/7300082/trump-denaturalization-deportation-musk-mamdani-us-citizenship-history-legal-explainer [https://perma.cc/W3XV-QCRY] ("Trump's talk of deporting the two, Kagan says, 'appears to be irresponsible rhetoric designed to intimidate political opponents'"); Giselle Ruhiyyih Ewing, *Trump threatens to revoke U.S. citizenship of longtime critic Rosie O'Donnell*, Politico (July 12, 2025, at 12:12 PM ET), https://www.politico.com/news/2025/07/12/trump-revoke-citizenship-rosie-odonnell-00449920 [https://archive.is/eYvo7]; Donald J. Trump (@realDonaldTrump), TruthSocial (Jan. 20, 2026, at 1:37 AM ET), https://truthsocial.com/@realDonaldTrump/posts/115926042315145030 [https://perma.cc/Q7AL-MW22].

[13] Armstrong Testimony, Second Session, at 32; Matthew Lee, *Trump Administration Is Reviewing All 55 Million Foreigners with US Visas for any Violations*, Associated Press (Aug. 21, 2025, at 8:52 PM ET), https://apnews.com/article/trump-visas-deportations-068ad6cd5724e7248577f17592327ca4 [https://perma.cc/F6VM-3BN4]; Homeland Security (@DHSgov), X (Nov. 5, 2025, at 11:10 AM ET), https://x.com/DHSgov/status/1986103876852830539 [https://perma.cc/2A8P-4QPS]; U.S. Dep't of State (@StateDept), X (Jan. 15, 2026, at 5:23 PM ET), https://x.com/StateDept/status/2011927194658807884 [https://perma.cc/XPG3-W7QU]; Secretary Marco Rubio (@SecRubio), X (Jan. 15, 2026, at 5:26 PM ET), https://x.com/SecRubio/status/2011927886786097533 [https://perma.cc/BWZ4-PDXG].

13

a. support of Palestine, including through association with campus-affiliated protests;[14]

---

[14] *See, e.g.*, Armstrong Testimony, Second Session, at 34; *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, White House (Jan. 30, 2025), https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism [https://perma.cc/Q5NF-2HNE]; Marc Caputo, *Scoop: State Dept. to Use AI to Revoke Visas of Foreign Students Who Appear "Pro-Hamas"*, Axios (Mar. 6, 2025), https://www.axios.com/2025/03/06/state-department-ai-revoke-foreign-student-visas-hamas [https://perma.cc/B7Z7-UCNM]; Kristi Noem (@Sec_Noem), X, (Mar. 14, 2025, at 11:01 AM), https://x.com/Sec_Noem/status/1900562928849326488 [https://perma.cc/H8Q9-Q27M] ("It is a privilege to be granted a visa to live & study in the United States of America. When you advocate for violence and terrorism that privilege should be revoked and you should not be in this country."); *see also* Transcript, *Secretary of State Marco Rubio and Guyanese President Irfaan Ali at a Joint Press Availability* (Mar. 27, 2025), https://www.state.gov/secretary-of-state-marco-rubio-and-guyanese-president-irfaan-ali-at-a-joint-press-availability [https://perma.cc/9U5S-73UC] (stating that the State Department would deny visas to applicants, including those already in the U.S., who "want to participate in movements" like the ones taking place on college campuses in the wake of the October 7 attacks, and that the same logic applies to revoking the visas of visa holders in the United States: "If you . . . participate in that sort of activity, we're gonna take away your visa."); Donald J. Trump (@realDonaldTrump), TruthSocial (Mar. 10, 2025, at 1:05 PM ET), https://truthsocial.com/@realDonaldTrump/posts/114139222625284782 [https://perma.cc/KDM8-FW47] ("We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again. [Y]our presence is contrary to our national and foreign policy interests, and you are not welcome here."); Hamed Aleaziz & Nicholas Nehamas, *Under Trump, Green Card Seekers Face New Scrutiny for Views on Israel*, N.Y. Times (Apr. 25, 2025), https://www.nytimes.com/2026/04/25/us/politics/trump-green-cards-scrutiny.html [https://perma.cc/6Z66-3YQR] ("But under new guidance issued by the Trump administration, immigrants can now be denied a green card for expressing political opinions, such as participating in pro-Palestinian campus protests . . . .").

14

b. any statements broadly characterized as anti-Semitic, including criticism of Israel or the Zionist movement (such as statements critical of Israel's actions in Gaza,[15] or calling Israel an "apartheid state");[16]

c. publishing or endorsing statements calling for an arms embargo on Israel, or statements calling to limit American military aid to Israel;[17] and

d. support for perceived leftist ideas, including "anti-Americanism, anti-capitalism, and anti-Christianity," "extremism on migration, race, and gender,"

---

[15] Armstrong Testimony, Second Session, at 34. In an April 30, 2025, Substack post, Defendant Rubio specifically contrasted the new Catch-and-Revoke program with the Biden administration's immigration enforcement practices and what Secretary Rubio considered to be the Biden administration's failure to "protect our Jewish citizens and the American people at large from foreign terrorist sympathizers in their midst[,]" including on college campuses. *See* U.S. Secretary of State Marco Rubio, *100 Days of an America First State Department*, U.S. Dep't of State (Apr. 30, 2025), https://statedept.substack.com/p/100-days-of-an-america-first-state-department [https://perma.cc/SY9D-F3DQ]; Tr. of July 10, 2025, Proceedings at 110, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (D. Mass. July 10, 2025) (testimony of Peter Hatch, Assistant Director of the Office of Intelligence at ICE) [hereinafter "Hatch Testimony, Third Session"]; Tr. of July 17, 2025, Proceedings at 77, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (D. Mass. July 17, 2025) (testimony of Andre Watson, Assistant Director of the National Security Division at ICE) [hereinafter "Watson Testimony"]; Tr. of July 9, 2025, Proceedings at 45–46, *Am. Ass'n of Univ. Professors v. Rubio*, No. CV 25-10685-WGY (D. Mass. July 9, 2025) (testimony of Peter Hatch, Assistant Director of the Office of Intelligence at ICE) [hereinafter "Hatch Testimony, First Session"]; Tr. of July 9, 2025, Proceedings at 90, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (D. Mass. July 9, 2025) (testimony of Peter Hatch, Assistant Director of the Office of Intelligence at ICE) [hereinafter "Hatch Testimony, Second Session"]; Aleaziz & Nehamas, *supra* note 14 ("But under new guidance issued by the Trump administration, immigrants can now be denied a green card for expressing political opinions, such as . . . posting criticism of Israel on social media . . . .").

[16] Armstrong Testimony, Second Session, at 32–35. *See, e.g.*, Exec. Order No. 14161, § 2, at 8451–2; *DHS to Begin Screening Aliens' Social Media Activity for Antisemitism*, U.S. Citizenship & Immigr. Servs. (Apr. 9, 2025), https://www.uscis.gov/newsroom/news-releases/dhs-to-begin-screening-aliens-social-media-activity-for-antisemitism [https://perma.cc/4DQP-XGX3]; Donald J. Trump (@realDonaldTrump), TruthSocial (Mar. 10, 2025, at 1:05 PM ET), https://truthsocial.com/@realDonaldTrump/posts/114139222625284782 [https://perma.cc/KDM8-FW47] ("We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump administration will not tolerate it…"); Hatch Testimony, Second Session, at 95-96.

[17] *See* Armstrong Testimony, Second Session, at 32–35.

15

and "hostility towards those who hold traditional American views on family, religion, and morality."[18]

### B. The Government's Mass, Viewpoint-Driven Surveillance of Noncitizens' Online Expression to Locate Disfavored Views

30. The government has developed and is deploying a vast surveillance apparatus, including automated technologies and AI, to undertake viewpoint-based surveillance of expressive activity documented online of *every* visa holder[19] in the United States and other noncitizens, with a particular focus on visa holders and Lawful Permanent Residents with campus affiliations.

31. By using automated and AI systems, the government can review and process large volumes of social media and online activity at a scale previously difficult or impossible to analyze with human review alone.[20] The advanced systems available to the government are powerful

---

[18] *See* National Security Presidential Memorandum 7, *Countering Domestic Terrorism and Organized Political Violence*, White House (Sep. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence [https://perma.cc/PY3T-AWUB]; Aleaziz & Nehamas, *supra* note 14 (explaining that new training materials for USCIS officers discourage officers from granting green cards to people with a history of "endorsing, promoting or supporting anti-American views").

[19] Lee, *supra* note 11; *US Continues Visa Vetting Even After Admission, Official Says*, Reuters (Aug. 21, 2025), https://www.reuters.com/world/us/us-continues-visa-vetting-even-after-admission-official-says-2025-08-21/ [https://perma.cc/7877-WYH8]; *see infra* ¶ 129; *see also* USCIS (@USCIS), X (Apr. 29, 2025, at 9:00 AM), https://x.com/USCIS/status/1917202209193791676 [https://perma.cc/C9U3-7YL6] [hereinafter "USCIS Social Media Vetting – X post"] (suggesting that "EVERYONE should be on notice" of online ideological surveillance).

[20] *See* Matthias Pfau, *Artificial Intelligence: The New Eyes of Surveillance*, Forbes (Feb. 2, 2024, 6:15 AM ET), https://www.forbes.com/councils/forbestechcouncil/2024/02/02/artificial-intelligence-the-new-eyes-of-surveillance [https://perma.cc/TL42-9QTH]; U.S. Immigr. & Customs Enf't, Off. of Acquisition Mgmt., ICE Acquisition Manual 3006.301-90, *Sole Source Justification: Simplified Procedures for Certain Commercial Items Exceeding SAT, Including Brand Name* (2025) [hereinafter ICE Acquisition Manual 3006.301-90], https://www.documentcloud.org/documents/26173900-ice-penlink-location-data/?ref=404media.co&mode=document#document/p3 [https://perma.cc/94QQ-BS6G] ("While the data itself may exist online, Penlink's proprietary tools and structured databases are what make it possible to efficiently identify patterns, link subjects, and extract meaningful intelligence that would not be feasible through manual searches alone.").

enough to process the online activity, including social media, of all 55 million U.S. visa holders.[21] The government has acknowledged that these systems "make it possible" to perform analyses on online data "that would not be feasible through manual searches."[22]

32.   The Challenged Surveillance Program, through the State Department's "Catch and Revoke" initiative, "includes AI-assisted reviews of tens of thousands of student visa holders' social media accounts."[23]

33.   The stated goal of this initiative within the Challenged Surveillance Program is to identify ("catch") lawfully present individuals who express disfavored messages and to punish them with adverse immigration consequences, such as denial of immigration benefits and visa revocations ("revoke").[24]

---

[21] For reports corroborating the power of the government's surveillance systems, see, for example, Thomas Brewster, *ICE Just Spent Millions on Surveillance Tech Banned by Facebook*, Forbes (Sep. 18, 2025, 9:59 AM ET), https://www.forbes.com/sites/thomasbrewster/2025/09/18/ice-spends-millions-on-social-media-spy-tech-banned-by-meta-facebook/ [https://perma.cc/KTE7-9UGL]; Joseph Cox, *The A.I. Surveillance Tool DHS Uses to Detect 'Sentiment and Emotion,'* 404Media (Aug. 24, 2023, 9:04 AM), https://www.404media.co/ai-surveillance-tool-dhs-cbp-sentiment-emotion-fivecast [https://perma.cc/B838-G22T]; Amnesty Int'l, *USA/Global: Tech Made by Palantir and Babel Street Pose Surveillance Threats to Pro-Palestine Student Protestors & Migrants* (Aug. 21, 2025), https://www.amnesty.org/en/latest/news/2025/08/usa-global-tech-made-by-palantir-and-babel-street-pose-surveillance-threats-to-pro-palestine-student-protestors-migrants [https://perma.cc/TGG2-VJLH]; and Joseph Cox, *Inside ICE's Tool to Monitor Phones in Entire Neighborhoods*, 404Media (Jan. 8, 2026 at 9:00 AM ET), https://www.404media.co/inside-ices-tool-to-monitor-phones-in-entire-neighborhoods/ [https://perma.cc/8MKJ-QSUG].

[22] ICE Acquisition Manual 3006.301-90, *supra* note 20.

[23] Caputo, *supra* note 14.

[24] Cable, U.S. Dep't of State, *Catch and Revoke: National Security Through Timely Processing of Visa Systems Messages*, 25 STATE 17178 (Feb. 28, 2025), *quoted in Am. Ass'n of Univ. Professors v. Rubio*, No. CV 25-10685-WGY, 2025 WL 2777659, at *7 (D. Mass. Sep. 30, 2025) [hereinafter "Catch and Revoke Cable"].

17

34.     In support of this goal, the State Department and DHS conduct "data collection" that involves "a complete scouring of social media sites," to identify disfavored viewpoints and any expression the government chooses to characterize as "support for terrorism."[25]

35.     Within DHS, a task force of dedicated personnel leverage sophisticated, viewpoint-based online surveillance and related analytical tools that enable the widespread identification of those who express disfavored views that are documented online. The National Targeting and National Vetting Centers of U.S. Customs and Border Protection ("CBP") manage some of these tools, which DHS is using "to scour the social media histories of the estimated 1.5 million foreign students studying in the United States for potential grounds to revoke their visas."[26]

36.     The State Department and DHS are the primary implementers of the Challenged Surveillance Program, and both agencies conduct surveillance. DHS analysts surveil noncitizens' online speech to determine if they've expressed views the government does not like. Although DHS does not take action against every surveilled noncitizen, DHS forwards at least some of those reports on noncitizen expression of disfavored viewpoints to the State Department. State Department officials conduct their own initial surveillance for disfavored views, as well as additional viewpoint-driven surveillance of visa holders' online speech after receiving reports from DHS.

37.     Whether they receive the referral from DHS or identify the disfavored speech themselves, State Department officials, including senior Bureau of Consular Affairs officials and

---

[25] Lee, *supra* note 11; *see infra* ¶¶ 91–95, 111, 134; *see also infra* ¶¶ 110–116 (detailing how USCIS requires the social media handles of visa and benefit applicants).

[26] Julia Ainsley, *Inside the DHS Task Force Scouring Foreign Students' Social Media*, NBC News (Apr. 9, 2025, at 7:53 PM ET), https://www.nbcnews.com/politics/national-security/dhs-task-force-scouring-foreign-students-social-media-rcna198532 [https://perma.cc/WC64-PRSP].

Defendant Rubio, consider whether to (1) revoke the target's visa,[27] clearing the way for DHS to charge related removability and impose related immigration confinement[28] and/or (2) issue a finding that the target's presence in the United States might have "potentially serious adverse foreign policy consequences," which also enables DHS to charge related removability and impose related immigration confinement.[29] If either a visa revocation or foreign-policy-related finding results, State Department officials notify officials at DHS, who can then send federal immigration agents to effectuate an immigration arrest, commence deportation proceedings, and institute related immigration confinement.

38.    Defendants supplement this roving surveillance with mandatory social-media reviews for all lawfully present noncitizens who apply to a U.S. embassy or consulate to renew or change a visa (entry permit) needed for re-entry into the U.S. after international travel, as well as for those who apply for certain immigration benefits from USCIS, including work authorization, extensions or changes of non-immigrant status within the U.S., green cards, and citizenship.

39.    For example, the State Department performs mandatory social media review of all visa holders already present in the United States who have applied or will apply to renew their

---

[27] *See* Immigration and Nationality Act ("INA"), 8 U.S.C. § 1201(i) (defining power to revoke visas); 9 U.S. Dep't of State, *Foreign Affairs Manual* § 403.11-5B (2025), https://fam.state.gov/fam/09FAM/09FAM040311.html      [https://perma.cc/HGZ6-XBNN] (defining authority for "prudential revocations" of visas of non-immigrant visa holders in the United States); *see also infra* note 85.

[28] *See* INA, 8 U.S.C. § 1227(a)(1)(B) (deportation ground premised on consular revocation of non-immigrant visa); *id.* § 1226(a) (defining discretionary authority to confine pending deportation proceedings); *id.* § 1226(c) (defining authority for mandatory confinement pending deportation proceedings).

[29] *See id.* § 1227(a)(4)(C) (ground of deportability premised on "reasonable" finding by Secretary of State that noncitizen's "presence or activities would have potentially serious adverse foreign policy consequences for the United States"); *id.* § 1226(a) (defining discretionary authority to confine pending deportation proceedings); *id.* § 1226(c) (defining authority for mandatory confinement pending deportation proceedings); *see also infra* note 82.

visas (entry permits) to re-enter the U.S. after international travel or who request a new type of visa (entry permit) to match a change in their immigration status and enable reentry into the U.S. on that status after travel abroad. The State Department has instructed consular officers to perform "mandatory social media check[s]" on all applications for F, M, and J visas.[30] The State Department piloted this program of enhanced social media vetting by targeting individuals associated with Harvard in May 2025 and noted that the program would "be expanded over time."[31] In June, the State Department formally expanded the program to cover all F, M, and J visa applicants.[32] In December 2025, it further expanded the program to cover all applicants for H-1B and H-4 visas.[33]

40.    USCIS performs the same sort of mandatory social media check for any lawfully present individual who applies for one of the many immigration benefits that USCIS offers, including work permits and "green cards" signifying Lawful Permanent Resident status.[34]

---

[30] Cable, U.S. Dep't of State, *Action Request: Enhanced Screening and Social Media Vetting for Visa Applicants*, MRN 25 STATE 26168 (Mar. 25, 2025) [hereinafter "Mar. 25 Cable"], *reprinted in* Klippenstein, *supra* note 6.

[31] Cable, U.S. Dep't of State, *Action Request: Enhanced Vetting for All Nonimmigrant Visa Applicants Traveling to Harvard University*, 25 STATE 52014 (May 30, 2025) [hereinafter "May 30 Cable"], *attached as exhibit in* Complaint, ex. 33, *President & Fellows of Harvard Coll. v. Dep't of Homeland Sec.*, No. 1:25-CV-11472-ADB, 2025 WL 1588636 (D. Mass. June 5, 2025) [https://perma.cc/SN53-UMLL].

[32] *Announcement of Expanded Screening and Vetting for Visa Applicants*, U.S. Dep't of State (June 18, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/06/announcement-of-expanded-screening-and-vetting-for-visa-applicants [https://perma.cc/B35Q-TTY2].

[33] *Announcement of Expanded Screening and Vetting for H-1B and Dependent H-4 Visa Applicants*, U.S. Dep't of State (Dec. 3, 2025), https://travel.state.gov/content/travel/en/News/visas-news/announcement-of-expanded-screening-and-vetting-for-h-1b-and-dependent-h-4-visa-applicants.html [https://perma.cc/SFQ4-3YHP].

[34] *See infra* ¶¶ 110–116.

40.1.    For green card applications, USCIS issued further guidance in March 2026 specifying that individuals can be denied a green card for expressing political opinions on social media, such as posting criticism of Israel, as well as for participating in pro-Palestinian campus protests. To implement the guidance, USCIS has issued instructional materials "discourag[ing] officers from granting green cards to people with a history of 'endorsing, promoting or supporting anti-American views' or 'antisemitic terrorism, ideologies or groups,'" and to "weigh those factors as 'overwhelmingly negative.'" USCIS instructs officers "'to focus particularly on [noncitizens] who engaged in on-campus anti-American and antisemitic activities' after the Hamas attacks against Israel in 2023." It further provides officers with examples of "antisemitic" and "anti-American" activity that overwhelmingly weigh against granting a green card. Those examples include "a social media post showing a map of Israel with the nation's name crossed out and replaced with the word 'Palestine,'" as well as a social media post that declares "Stop Israeli Terror in Palestine."[34.1]

### C.    The Government's Campaign of Intimidation and Coercive Threats

41.    A key component of the Challenged Surveillance Program is the government's public intimidation campaign through which it acts to coerce U.S.-based visa holders and Lawful Permanent Residents to refrain from expressing disfavored views, including online. The government's effort to chill protected speech in this way is accomplished by threats that the government is watching, "never stops"[35] watching, and will punish all noncitizens in the United States who express or have expressed disfavored views that appear on social media and the internet.

---

[34.1] Aleaziz & Nehamas, *supra* note 14.

[35] USCIS Social Media Vetting – X post, *supra* note 19.

42.    Following on his repeated campaign promises, President Trump publicly promised that the early arrests of those who expressed disfavored views are the first of "many to come."[36] President Trump has warned speakers that his administration "know[s] there are more" campus-affiliated noncitizens who are speaking in ways the government does not like and promised that the government "will find, apprehend, and deport these terrorist sympathizers from our country— never to return again."[37]

43.    In creating and implementing the Challenged Surveillance Program, Defendants have followed President Trump's lead in threatening disfavored speakers.

44.    Defendant Rubio and Deputy Secretary of State Christopher Landau have explicitly and repeatedly stated that speakers of ideas disfavored by the administration will be targeted for adverse immigration action, while promising that the administration is "looking for more." For example, Deputy Secretary Landau threatened that those whom the administration views as "rationalizing[] or making light" of Charlie Kirk's assassination will be targeted and punished with visa revocations.[38]

45.    To ensure that its threats would have their intended coercive silencing effect, the administration followed through, revoking the visas of six individuals on October 14, 2025.[39] In

---

[36] Donald J. Trump (@realDonaldTrump), TruthSocial (Mar. 10, 2025, 1:05 PM ET), https://truthsocial.com/@realDonaldTrump/posts/114139222625284782 [https://perma.cc/KDM8-FW47].

[37] *Id.*

[38] Christopher Landau (@DeputySecState), X (Sep. 11, 2025), https://x.com/DeputySecState/status/1966114506116927972; Transcript, Secretary of State Marco Rubio with Gillian Turner of Fox News (Sep. 15, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/09/secretary-of-state-marco-rubio-with-gillian-turner-of-fox-news [https://perma.cc/UZ8B-2SEW] (Defendant Rubio threatening the same).

[39] Lee, *supra* note 11; *see infra* ¶ 196.

an extraordinary admission, the State Department posted a thread with examples of individuals

and disfavored online expression that prompted visa revocations, including the following[40]:





---

[40] U.S. Dep't of State (@StateDept), X (Oct. 14, 2025, at 5:55 PM), https://x.com/StateDept/status/1978218112882266594 [https://perma.cc/HB3K-VLHG]; U.S. Dep't of State (@StateDept), X (Oct. 14, 2025, at 5:55 PM), https://x.com/StateDept/status/1978218116938096683 [https://perma.cc/H4XK-PG6G]; U.S. Dep't of State (@StateDept), X (Oct. 14, 2025, at 5:55 PM), https://x.com/StateDept/status/1978218118485835886 [https://perma.cc/9HCX-TUWF]; U.S. Dep't of State (@StateDept), X (Oct. 14, 2025, at 5:55 PM), https://x.com/StateDept/status/1978218121631502497 [https://perma.cc/K8U3-Z65Y]; U.S. Dep't of State (@StateDept), X (Oct. 14, 2025, at 5:55 PM), https://x.com/StateDept/status/1978218123791614373 [https://perma.cc/6TF7-DNGK]; U.S. Dep't of State (@StateDept), X (Oct. 14, 2025, at 5:55 PM), https://x.com/StateDept/status/1978218124957696495 [https://perma.cc/A5JP-78Z5].









46.     Defendants Noem and DHS, and subunits of DHS, have also threatened speakers of ideas that the administration disfavors[41] and have repeatedly denigrated disfavored speakers while promising that noncitizens who speak in similar ways will be subject to adverse immigration actions. As USCIS stated in one characteristic threat, "EVERYONE should be on notice. If you're a guest in our country – act like it. Our robust social media vetting program to identify national security & public safety risks never stops. USCIS is on watch to find anything online that poses a threat to our nation & our way of life."[42]

---

[41] *See, e.g.*, Kristi Noem (@Sec_Noem), X (Mar. 14, 2025, at 11:01 AM), https://x.com/Sec_Noem/status/1900562928849326488 [https://perma.cc/H8Q9-Q27M] ("It is a privilege to be granted a visa to live & study in the United States of America. When you advocate for violence and terrorism that privilege should be revoked and you should not be in this country.").

[42] *See, e.g.*, USCIS Social Media Vetting – X post, *supra* note 19; U.S. Citizenship & Immigr. Servs., Facebook (Apr. 29, 2025), https://www.facebook.com/uscis/posts/everyone-should-be-on-notice-if-youre-a-guest-in-our-country-act-like-it-our-rob/1099451788894614 [https://perma.cc/RBY4-PL6K] ("USCIS is on watch to find anything online that poses a threat to our nation & our way of life. [tagging] Department of Homeland Security U.S. Department of State Immigration And Customs Enforcement (ICE)").

47.     Responding to the filing of the initial complaint in this lawsuit, Defendants doubled down on coercing silence. State Department spokesperson Tommy Pigott told NBC News that "[w]e will continue to revoke the visas" of those with disfavored views, characterizing them as putting "the safety of our citizens at risk" and "commit[ing] acts of anti-American, pro-terrorist, and antisemitic hate."[43] White House spokesperson Anna Kelly echoed that sentiment, telling *Axios* that "President Trump and his administration" would continue to use the visa program "to promote and protect the foreign affairs and national security interests of the United States." And just one day after the initial complaint in this lawsuit was filed, the State Department threatened to surveil content on Bluesky, warning the public that the social media platform Bluesky "is a great place to research visa revocations."[44]

48.     Defendant Rubio, Defendant Noem, and the Departments of State and Homeland Security, as part of the Challenged Surveillance Program, also took and promoted a series of immigration actions intended to "send a message," as Defendant Rubio put it,[45] that noncitizens in the United States should refrain from expressing certain views.

49.     These threats are intended to—and, in fact, do—exert a powerful chilling effect on speech, independent of whether the government follows through on its threats or not. Defendants'

---

[43] David Ingram, *Unions Sue Trump Administration Over Social Media 'Surveillance' Program*, NBC News (Oct. 16, 2025, at 3:22 PM EDT), https://www.nbcnews.com/tech/social-media/trump-social-media-search-surveillance-lawsuit-eff-rcna237874 [https://perma.cc/SHC9-EDYB]; Julianna Bragg, *Unions Sue Trump Over Surveillance and Allege First Amendment Breach*, Axios (Oct. 16, 2025), https://www.axios.com/2025/10/16/trump-surveillance-first-amendment-union-lawsuit [https://perma.cc/CXZ2-5J74].

[44] U.S. Dep't of State (@StateDept), X (Oct. 17, 2025, at 7:24 PM ET), https://x.com/StateDept/status/1979327784993591435 [https://perma.cc/9EUG-MVUU].

[45] Transcript, *Secretary of State Marco Rubio and Guyanese President Irfaan Ali at a Joint Press Availability* (Mar. 27, 2025), https://www.state.gov/secretary-of-state-marco-rubio-and-guyanese-president-irfaan-ali-at-a-joint-press-availability [https://perma.cc/9U5S-73UC].

string of high-profile enforcement actions only underscores that this chilling was a reasonable response to the coercive threats.

50.    The Challenged Surveillance Program's chilling effects are heightened by the uncertainty surrounding the ever-expanding categories of expression that the administration has announced will lead to adverse immigration consequences. The list often changes unpredictably, seemingly at the personal whims of President Trump and other officials.

## II.    Origins of the Challenged Surveillance Program

### A.    President Trump Began Laying the Groundwork for the Challenged Surveillance Program During His 2024 Presidential Campaign

51.    In 2023, then-candidate Trump threatened to establish viewpoint-based screening of noncitizens in the United States and impose adverse immigration consequences for speech he dislikes.

52.    Among the catalysts of candidate Trump's statements were the events of October 7, 2023, and the resulting protests on university campuses and online.

53.    In the days after the October 7 attack on Israel by Hamas, students, faculty, and members of the public began gathering on university campuses across the United States to mourn victims, discuss the events, and protest. Following Israel's military response, students, faculty, and many others alarmed by the scale and nature of the Israeli military campaign in the Gaza Strip of Palestine ("Gaza") undertook related protests, on and around campuses across the United States, to denounce that campaign and the U.S. government's support of it. In the spring of 2024, sizeable protests on university campuses around the country punctuated this movement.[46]

---

[46] *See, e.g.*, Isabella Ramirez et al., *Hundreds of Protestors Pack Campus Following Escalation of Violence in Israel & Gaza*, Columbia Spectator (Oct. 17, 2023, 5:37 PM), https://www.columbiaspectator.com/news/2023/10/12/hundreds-of-protesters-pack-campus-following-escalation-of-violence-in-israel-and-gaza    [https://perma.cc/5UQZ-PHTL];    Jay

54.     The events of October 7 and the resulting U.S.-backed Israeli military campaign in Gaza also prompted enormous amounts of debate online. Millions of people in the United States and around the world turned immediately to social media to express their views, supporting, protesting, or commenting on the developments. By October 9, 2023, the hashtag "#Palestine" amassed more than 27.8 billion views and the hashtag "#Israel" amassed more than 23 billion views on TikTok, a popular social media application.[47] By November 13, 2023, the #freepalestine hashtag was found on approximately 6 million Instagram posts and 11 million Facebook posts.[48]

55.     In response, candidate Trump began threatening that, if he were reelected, his administration would target noncitizens in the United States who express views he dislikes concerning the military campaign in Gaza. On October 16, 2023, the Trump campaign posted a graphic on X as part of its Agenda 47 platform titled the "Trump Plan to Keep Jihadists and Their Sympathizers Out of America."[49] The plan promised to "implement strong ideological screening" for visa holders and punish noncitizens in the United States who express "sympathy" for

---

Ulfelder, *Crowd Counting Consortium: An Empirical Overview of Recent Pro-Palestine Protests at U.S. Schools*, Ash. Ctr. Democratic Governance & Innovation (May 30, 2024), https://ash.harvard.edu/articles/crowd-counting-blog-an-empirical-overview-of-recent-pro-palestine-protests-at-u-s-schools [https://perma.cc/C8M3-TEHB]; Avi Holzman & Aliana Mediratta, *More than 800 Students Gather at Vigil to Remember Lives Lost in Israel*, Student Life (Oct. 13, 2023), https://www.studlife.com/news/2023/10/13/more-than-800-students-gather-at-vigil-to-remember-lives-lost-in-israel [https://perma.cc/Z9F4-BJ3H].

[47] Taylor Lorenz, *Why TikTok Videos on the Israel-Hamas War have Drawn Billions of Views*, Wash. Post (Oct. 10, 2023), https://www.washingtonpost.com/technology/2023/10/10/tiktok-hamas-israel-war-videos [https://archive.is/jPf6F].

[48] Drew Harwell, *TikTok Was Slammed for Its Pro-Palestinian Hashtags. But It's Not Alone.*, Wash. Post (Nov. 13, 2023, at 10:05 AM), https://www.washingtonpost.com/technology/2023/11/13/tiktok-facebook-instagram-gaza-hastags [https://archive.is/MXZ9r].

[49] Team Trump (@TeamTrump), X (Oct. 16, 2023, at 6:43 PM), https://x.com/TeamTrump/status/1714049524329492841 [https://perma.cc/9MB8-GH73].

"ideologies" with which Trump disagrees, including views he characterized as "pro-jihadist,"

"anti-semitic," and/or "anti-American."



56.     At a campaign event on October 28, 2023, Trump promised to "cancel the student

visas of Hamas and sympathizers on college campuses" and to deport them and any other

noncitizens involved in the protests, if re-elected: "The college campuses are being taken over and

all of the resident aliens who joined in the Pro jihadist protests this month, nobody's ever seen

anything like it. Come 2025, we will find you and we will deport you. We will deport you."[50]

---

[50] Donald J. Trump, Remarks at the Republican Jewish Coalition Summit in Las Vegas, Nevada (Oct. 28, 2023), *transcript available at* Am. Presidency Proj., Univ. of Calif. Santa Barbara, https://www.presidency.ucsb.edu/documents/remarks-the-republican-jewish-coalition-summit-las-vegas-nevada [https://perma.cc/UR5M-4XKA].

57.     Around the same time, Defendant Rubio expressed similar views. On October 15, 2023, then-Senator Rubio, referring to ongoing campus protests in support of Palestinians, stated the U.S. government should "[c]ancel the visa of every foreign national out there supporting Hamas and get them out of America."[51]

58.     As campus protests to denounce the Israeli military campaign in Gaza continued, Trump's promises of retaliation against affiliated international students increased in frequency and fervor. For example, at a donor event in May 2024, Trump said, "One thing I do is, any student that protests, I throw them out of the country . . . . You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[52]

59.     Trump's threats during his campaign extended beyond viewpoints regarding Gaza. In Nevada in December 2023, candidate Trump promised to engage in broad viewpoint-based screening of noncitizens to facilitate their removal: "I will implement strong ideological screening for all immigrants. If you hate America, if you want to abolish Israel, if you sympathize with Jihadists, then we don't want you in our country. We don't want you."[53]

---

[51]  Secretary Marco Rubio (@SecRubio), X (Oct. 15, 2023, at 4:24 PM), https://x.com/marcorubio/status/1713652113098539120 [https://perma.cc/LGD4-M4RH]. In the Fox News interview that Defendant Rubio shared within this post, he stated that "people marching at universities" were "supporters of Hamas" and "need to go." *Id*. (embedded video at 0:13–0:31); *see also* Jackson Bakich, *Rubio Demands Revoking Visas of Those Who Support Hamas*, The Floridian (Oct. 16, 2023), https://floridianpress.com/2023/10/rubio-demands-revoking-visas-of-those-who-support-hamas [https://perma.cc/2K9X-AYXC] (quoting Defendant Rubio in interview).

[52] Josh Dawsey, Karen DeYoung & Marianne LeVine, *Trump Told Donors He Will Crush Pro-Palestinian Protests, Deport Demonstrators*, Wash. Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors [https://archive.is/r0el3].

[53] Donald J. Trump, Remarks at Political Rally in Reno, Nevada (Dec. 17, 2023), *transcript available at* FactBase, RollCall, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-reno-nevada-december-17-2023 [https://perma.cc/TBR5-WP8N].

### B. President Trump Directs the Administration to Target Certain Viewpoints Shortly After His Inauguration

60. Mere hours after his inauguration on January 20, 2025, President Trump signed Executive Order No. 14161 ("Executive Order 14161"), which declares it "the policy of the United States to protect its citizens from [noncitizens] who . . . espouse hateful ideology." Exec. Order No. 14161, § 1(b), 90 Fed. Reg. 8451, 8451 (Jan. 20, 2025). Executive Order 14161 specifies that to "protect Americans," "the United States must ensure" that noncitizens living within its borders "do not bear hostile attitudes towards its citizens, culture, government, institutions, or founding principles." *Id.* § 1(b).

61. Executive Order 14161 directs the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to "identify all resources that may be used to ensure that all aliens . . . who are already in the United States[] are vetted and screened to the maximum degree possible." *Id.* § 2(a)(i).

62. Executive Order 14161 also directs those officials to "recommend any actions necessary to protect the American people from the actions of foreign nationals" who "preach or call for" the "overthrow or replacement of the culture on which our constitutional Republic stands" and to recommend "any additional measures to promote a unified American identity." *Id.* § 3(d), (f).

63. Executive Order 14161 further directs the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to "[e]valuate all visa programs to ensure that they are not used by foreign nation-states or other hostile actors to harm the security, economic, political, cultural, or other national interests of the United States." *Id.* § 3(c).

31

64.     Finally, Executive Order 14161 directs the officials to "[e]valuate and adjust all existing regulations, policies, procedures, and provisions" concerning the interpretation and implementation of security-based grounds of inadmissibility that the Immigration and Nationality Act ("INA") defines. *Id.* § 3(a) (citing INA, 8 U.S.C. § 1182(a)(3), which includes speech-oriented, security-based grounds of inadmissibility).[54]

65.     On January 29, 2025, President Trump issued Executive Order No. 14188 ("Executive Order 14188") titled "Additional Measures to Combat Anti-Semitism," which declares it "the policy of the United States to . . . us[e] all available and appropriate legal tools to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." 90 Fed. Reg. 8847, § 2.[55] Executive Order 14188 relies on a 2019 executive order's controversial definition of antisemitism—whose weaponization the lead drafter of that definition now criticizes.[56] The executive order approvingly cites the definition's "Contemporary Examples of Anti-Semitism" as potential evidence of liability.[57] These examples

---

[54] *See* INA, 8 U.S.C. § 1182(a)(3)(B)(i)(VII) (provisions that can render someone inadmissible who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization"); INA, 8 U.S.C. § 1182(a)(3)(B)(i)(I) (inadmissibility based on engagement in "terrorist activity"); INA, 8 U.S.C. § 1182(a)(3)(B)(iv)(VI) (defining "engage in terrorist activity" to include "communications" constituting "material support").

[55] Notably, the terms of Executive Order 14188 contemplating civil and criminal liability for putative antisemitism apply to the expression of everyone in the United States, including U.S. citizens. *See* Exec. Order. No. 14188, §§ 2, 3(a), 3(c), 90 Fed. Reg. at 8847–48.

[56] *See* Kaity Kline, *Weaponizing Antisemitism Makes Students 'Less Safe,' Says Drafter of Definition*, NPR (Mar. 20, 2025), https://www.npr.org/2025/03/20/nx-s1-5326047/kenneth-stern-antimsietim-executive-order-free-speech [https://perma.cc/RYQ6-46UY]; Kenneth Stern, *I Drafted the Definition of Antisemitism. Right-Wing Jews are Weaponizing It.*, Guardian (Dec. 13, 2019), https://www.theguardian.com/commentisfree/2019/dec/13/antisemitism-executive-order-trump-chilling-effect [https://perma.cc/T63U-2DF7] (noting that proponents of Executive Order No. 13899 believe it covers "outrages . . . frequently led by . . . Students for Justice in Palestine, including . . . calls for 'intifada' [and] demonizing Israel").

[57] Exec. Order No. 13899, § 2(a)(ii), 84 Fed. Reg. 68779, 68779 (Dec. 11, 2019).

include First Amendment-protected speech, such as "claiming that the existence of a State of Israel is a racist endeavor" and "[d]rawing comparisons of contemporary Israeli policy to that of the Nazis," among other examples.[58]

66.    Executive Order 14188 also singles out noncitizen students and campus staff lawfully present in the United States by directing the Secretaries of State, Education, and Homeland Security to report to the President "recommendations for familiarizing institutions of higher education with the [security-based] grounds for inadmissibility . . . so that such institutions may monitor for and report activities by [noncitizen] students and staff" and that "such reports about [noncitizens] lead . . . to investigations and . . . actions to remove such [noncitizens]." *Id.* § 3(e) (citing 8 U.S.C. § 1182(a)(3)).

67.    A "Fact Sheet" appended to Executive Order 14188 explains that "President Trump has promised that the Federal Government will . . . Deport Hamas Sympathizers and Revoke Student Visas." The "Fact Sheet" quotes President Trump saying: "I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before."[59]

68.    Among other things, the administration's interpretation and application of speech-oriented, security-based inadmissibility grounds pursuant to Executive Orders 14161 and 14188 can cause the State Department (1) to deny applications and re-applications that visa holders in the

---

[58] Off. of the Special Envoy to Monitor & Combat Antisemitism, *Defining Antisemitism*, U.S. Dep't of State, https://www.state.gov/defining-antisemitism [https://perma.cc/2K4C-6HEX].

[59] *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, *supra* note 12.

United States submit[60] and (2) to revoke the visas of visa holders present in the United States.[61] Visa revocations can render someone chargeable as deportable by ICE and subject them to related immigration confinement pending deportation proceedings.[62]

### C.    The White House Directs the Department of State and DHS to Establish the Challenged Surveillance Program

69.    In the weeks after the issuance of Executive Orders 14161 and 14188, White House Deputy Chief of Staff Stephen Miller and his deputy, Adam Leason, held "somewhere between a dozen and over twenty" interagency meetings with senior officials at the State Department and DHS about creating a program to begin revoking student visas.[63]

70.    Direct, interagency meetings about the revocation of student visas occurred, as well, involving top officials from DHS and the State Department.[64]

---

[60] *See* INA, 8 U.S.C. § 1201(g) (defining parameters for non-issuance of visas, including because of concerns arising under any inadmissibility grounds defined in INA, 8 U.S.C. § 1182); 9 U.S. Dep't of State, *Foreign Affairs Manual* § 403.10-2B (2025), https://fam.state.gov/fam/09FAM/09FAM040310.html [https://perma.cc/HGZ6-XBNN] (describing grounds for refusal).

[61] *See* INA, 8 U.S.C. § 1201(i) (defining visa-revocation authority); 9 U.S. Dep't of State, *Foreign Affairs Manual* § 403.11-5B (2025), https://fam.state.gov/fam/09FAM/09FAM040310.html [https://perma.cc/HGZ6-XBNN] ("Although you usually may revoke a visa only if the individual is ineligible under INA 212(a) [8 U.S.C. § 1182(a)], or INA 214(b) [8 U.S.C. § 1184(b)], or is no longer entitled to the visa classification, the Department may revoke a visa if an ineligibility or lack of entitlement is suspected, when an individual would not meet requirements for admission, or in other situations where warranted. This is known as a 'prudential revocation.'").

[62] *See* INA, 8 U.S.C. § 1227(a)(1)(B) (deportation ground premised on consular revocation of non-immigrant visa); *id.* § 1226(a) (defining discretionary authority to confine pending deportation proceedings); *id.* § 1226(c) (defining authority for mandatory confinement pending deportation proceedings).

[63] Armstrong Testimony, Second Session, at 16, 17; Tr. of July 11, 2025, Proceedings at 42, 44, 46, 47, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685-WGY (D. Mass. July 11, 2025) (testimony of Maureen Smith, Senior Adviser in the Bureau of Consular Affairs) [hereinafter "Smith Testimony, First Session"].

[64] Armstrong Testimony, Second Session, at 19–20; *see also* Hatch Testimony, Second Session, at 106.

71.     One purpose and effect of these meetings was to implement Executive Orders 14161 and 14188 by establishing the Challenged Surveillance Program.[65]

> **D.     The State Department and DHS Launch the Challenged Surveillance Program**

72.     On March 6, 2025, *Axios* reported that the State Department had begun to implement the Challenged Surveillance Program, referring to an initiative entitled "Catch and Revoke," at the direction of Defendant Rubio, citing information obtained from "senior State Department officials."[66]

73.     The report noted that the program "includes AI-assisted reviews of tens of thousands of student visa holders' social media accounts," and that "federal officials" had already begun examining "100,000 people in the Student Exchange Visitor System."[67] (The Student and Exchange Visitor Information System, or "SEVIS," is a database of nonimmigrant visa holders maintained by ICE.)[68]

---

[65] Smith Testimony, First Session, at 42; Armstrong Testimony, Second Session, at 16–20; Watson Testimony, *supra* note 15 at 47–51; Hatch Testimony, First Session, at 72-75; *cf.* Caputo, *supra* note 14; *see also* INA 237(a)(4)(C), 8 U.S.C. § 1237(a)(4)(C) (detailing that a noncitizen is deportable if the U.S. Secretary of State has reasonable ground to believe that the noncitizen's presence or activities in the United States would have potentially serious adverse foreign-policy consequences).

[66] *See* Caputo, *supra* note 14.

[67] *Id.* The Student and Exchange Visitor Information System ("SEVIS") is a database maintained by the Student and Exchange Visitor Program ("SEVP"), which is part of the National Security Investigations Division of ICE. SEVIS is "a web-based system for maintaining information on nonimmigrant students and exchange visitors in the United States," and its "purpose" is to "track[] and monitor[] nonimmigrant students and exchange visitors." *Student & Exchange Visitor Program*, U.S. Immigr. & Customs Enf't, https://www.ice.gov/sevis [https://perma.cc/5KPB-4J6A] (captured Apr. 13, 2025); *Who is SEVP?*, U.S. Dep't of Homeland Sec. (Jan. 6, 2015), https://studyinthestates.dhs.gov/2015/01/who-sevp [https://perma.cc/U9Z4-X6XY] (captured Apr. 13, 2025). SEVP and the Department of State use SEVIS "to track and monitor schools; exchange visitor programs; and F, M and J nonimmigrants while they visit the United States and participate in the U.S. education system." *Id.*

[68] *Student & Exchange Visitor Program*, *supra* note 67; *Who is SEVP?*, *supra* note 67.

74. Around the same time, in concert with the State Department, senior leadership at ICE's Homeland Security Investigations ("HSI"), the principal investigative arm of DHS, moved to begin implementing the program within their own agency.[69]

75. To effectuate these early implementations of the Challenged Surveillance Program, top officials in the State Department and DHS created a "working group" focused on "student visa protesters and other matters." Working group members attended telephone conferences with members of the Homeland Security Council to coordinate their efforts.[70]

76. DHS's mandate under the Challenged Surveillance Program encompassed surveilling the online speech of noncitizens lawfully present in the United States and associated with or supportive of campus protests for Palestine—especially international students and other campus-affiliated visa holders or Lawful Permanent Residents—to evaluate whether they expressed the viewpoints disfavored under Executive Orders 14161 and 14188 and should suffer related, adverse immigration consequences.[71]

77. To rapidly meet the demands of the Challenged Surveillance Program, DHS officials established a "Tiger Team"—an ad hoc group of analysts within the DHS-HSI Office of Intelligence & Analysis, under the direction of Roy Stanley.[72]

78. The Tiger Team was composed of analysts from various units of HSI Office of Intelligence, including its Counterintelligence Unit, Counterterrorism Intelligence Unit, Cyber

---

[69] Watson Testimony at 66–67; Hatch Testimony, First Session, at 72–75; Hatch Testimony, Second Session, at 96.

[70] Smith Testimony, First Session, at 41–42; *see also* Armstrong Testimony, Second Session, at 16–17; Hatch Testimony, Second Session, at 96–98.

[71] Watson Testimony at 70–71; Hatch Testimony, First Session, at 74–75; *see* Hatch Testimony, Fourth Session, at 87 ("The Tiger Team was formed to look at protestors").

[72] Hatch Testimony, Second Session, at 96–97; Decl. of Unit Chief Roy M. Stanley ¶¶ 1–5, *Taal v. Trump*, No. CV 3:25-0335, ECF 30-2 (N.D.N.Y. Mar. 22, 2025) [hereinafter "Stanley Decl."].

Intelligence Unit, and Global Trade Intelligence Unit, among others.[73] It met daily to coordinate their efforts to implement the Challenged Surveillance Program.[74]

79.     The Tiger Team was responsible for developing a factual record about disfavored speakers, including through viewpoint-based online surveillance encompassing their social media.[75] HSI leadership initially provided the Tiger Team the names of thousands of individuals to be surveilled online for disfavored views.[76]

80.     To conduct their investigations, the Tiger Team reviewed speech and expression memorialized online, including on social media and other "open source[s],"[77] as well as other information to look for viewpoints disfavored under Executive Orders 14161 and 14188.[78] A target's activity or presence online was a significant subject of investigation.[79]

81.     The evaluations of individual targets were memorialized in "Reports of Analysis" ("ROAs").

---

[73] Hatch Testimony, Second Session, at 106.

[74] *Id.* at 97.

[75] *Id.* at 93–94, 119; Hatch Testimony, Third Session, at 18.

[76] Hatch Testimony, Second Session, at 107; *see also* Hatch Testimony, Third Session, at 87.

[77] Hatch Testimony, Third Session, at 54–55; *see also* Stanley Decl. ¶ 5 (defining open-source information as "unclassified information that has been published or broadcast in some manner to the general public, could be lawfully seen or observed by a casual observer, is made available at a meeting open to the public, or is obtained by visiting any place or attending any event that is open to the public.").

[78] Hatch Testimony, Third Session at 18, 21.

[79] *See id.*, at 14, 18, 49–51, 54–57, 61, 67 ; *see also* Armstrong Testimony, First Session, at 103–04 (describing the social media of visa applicants as "a goldmine of information" that is useful in vetting applicants); Stanley Decl. ¶¶ 4–5 (describing that, as part of the implementation of Executive Order 14188, which concerns putative antisemitism, "the HSI Office of Intelligence proactively reviews open-source information to identify individuals subject to the Executive Order.").

82.     These ROAs included investigation and analysis of whether targets expressed views supportive of Palestinians, anti-Israel views, alleged pro-Hamas advocacy, or alleged antisemitic views, among other disfavored views.[80]

83.     Under this early iteration of the Challenged Surveillance Program, DHS officials sent ROAs that revealed disfavored viewpoints to officials at the State Department's Bureau of Consular Affairs. In some cases, the State Department would conduct its own, additional surveillance of DHS targets, while in other cases it would simply analyze DHS's reports. Officials in the State Department would then consider the viewpoints expressed in these reports for: (1) possible revocation of the subject's visa,[81] and/or (2) issuance of a finding by Defendant Rubio of putatively antisemitic conduct that supposedly could have "potentially serious adverse foreign policy consequences" and that could predicate a related charge of deportability.[82]

---

[80] Watson Testimony at 76–77; Hatch Testimony, First Session, at 45–46; Hatch Testimony, Second Session, at 90, 94–95 (testifying that phrases such as "Hamas is right" or "Free Palestine" may be included in collection of facts on targets of government surveillance).

[81] Hatch Testimony, Second Session, at 101, 102; Armstrong Testimony, Second Session, at 13–14; Smith Testimony, First Session, at 37–38; *see also* Decl. of John Armstrong in Supp. of Defs.' Opp. to Mot. for Prelim. Inj. & TRO ¶ 4, *Taal v. Trump*, Case No. 3:25-cv-0335 (N.D.N.Y. Mar. 22, 2025), ECF No. 30-3 [hereinafter "Armstrong Decl."] (describing an HSI referral to the State Department for consideration of whether Taal's allegedly "participating in disruptive protests that created a hostile environment for Jewish students" of Cornell University had "call[ed] into question" Taal's "continued eligibility for a U.S. visa."); *see generally* INA, 8 U.S.C. § 1201(i) (defining visa-revocation authority); 9 U.S. Dep't of State Foreign Affs. Manual § 403.11-5B (2025), https://fam.state.gov/fam/09FAM/09FAM040310.html [https://perma.cc/HGZ6-XBNN] ("Although you usually may revoke a visa only if the individual is ineligible under INA 212(a) [8 U.S.C. § 1182(a)], or INA214(b) [8 U.S.C. § 1184(b)], or is no longer entitled to the visa classification, the Department may revoke a visa if an ineligibility or lack of entitlement is suspected, when an individual would not meet requirements for admission, or in other situations where warranted. This is known as a 'prudential revocation.'").

[82] INA 237(a)(4)(C), 8 U.S.C. § 1227(a)(4)(C) (premising deportability on a "reasonable" finding by the Secretary of State that a noncitizen's "presence or activities would have potentially serious adverse foreign policy consequences for the United States"); *see* Stanley Decl. ¶ 10 ("Because of Mr. Taal's conduct, HSI referred Mr. Taal's case to the U.S. Department of State, which has the authority to determine whether the [noncitizen]'s presence or activities within the United States

---

84.     If either a visa revocation or foreign-policy-related finding occurred, State Department officials notified officials at DHS, who could then send federal immigration agents to effectuate an arrest and deportation.[83]

85.     The early iteration of the Challenged Surveillance Program surveilled thousands of individuals and was used to effectuate immigration enforcement actions against Mahmoud Khalil, Badar Khan Suri, Yunseo Chung, Momodou Taal, Rümeysa Öztürk, and Mohsen Mahdawi, among others, as detailed further below.[84]

86.     For example, DHS analysts undertook viewpoint-driven online surveillance of Dr. Badar Khan Suri, a postdoctoral fellow at Georgetown University and J-1 visa holder. The ROA about him concluded: "Khan Suri appears to post pro-Palestinian content."[85]

87.     The State Department revoked Khan Suri's visa. DHS Assistant Secretary for Public Affairs Tricia McLaughlin expressly connected Khan Suri's visa revocation to his speech,

---

compromise a compelling U.S. foreign policy interest and potentially have serious adverse foreign policy consequences, as outlined in Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified at 8 U.S.C. § 1227(a)(4)(C).").

[83] Hatch Testimony, Second Session, 103–04; *see* INA, 8 U.S.C. § 1227(a)(1)(B) (deportation ground premised on consular revocation of non-immigrant visa); *id.* § 1226(a) (defining discretionary authority to confine pending deportation proceedings); *id.* § 1226(c) (defining authority for mandatory confinement pending deportation proceedings).

[84] Watson Testimony at 75–76; *see also* Hatch Testimony, Third Session, at 39–45 (discussing Rümeysa Öztürk's ROA); *id.* at 45–51 (discussing Mahmoud Khalil's ROA); *id.* at 51–59 (discussing Badar Khan Suri's ROA); *id* at 59–65 (discussing Mohsen Mahdawi's ROA); *id.* at 65–69 (discussing Yunseo Chung's ROA); Armstrong Testimony, First Session, at 111–16 (describing the memoranda in which Defendant Rubio found Khalil, Mahdawi, Chung, Khan Suri, and Öztürk to be deportable).

[85] Hatch Testimony, Third Session, at 56.

characterizing him as "actively spreading Hamas propaganda and promoting antisemitism on social media."[86] Immigration agents would later arrest him in a parking lot outside his home.[87]

88.     The DHS team constituted to run the early iteration of the Challenged Surveillance Program engaged in so much viewpoint-based online surveillance that "a normal division, a normal unit or section or group of analysts . . . operating in [HSI's] normal organizational construct couldn't handle" it.[88]

## III.    The Challenged Surveillance Program Expands

89.     Soon after the Challenged Surveillance Program was established, it began to expand within the State Department and DHS.

### A.    The Challenged Surveillance Program Expands to Visa Applicants and Re-applicants in the U.S.

90.     On March 25, 2025, Defendant Rubio sent a cable to consular officers with new instructions for "implementing Executive Order (E.O.) 14161 and E.O. 14188" (the Executive Orders detailed above).[89]

91.     "Effective immediately," the cable provides, "consular officers must refer certain student and exchange visitor (F, M, and J) visa applicants to the Fraud Prevention Unit (FPU) for a mandatory social media check as described below."

---

[86]    Homeland    Security    (@DHSgov),    X    (Apr.    30,    2025,    at    6:09    PM), https://x.com/DHSgov/status/1917702805520818545 [https://perma.cc/K67W-LGE3].

[87] *See* Aamir Jamil, *Tracking Badar Khan Suri's Legal Battle*, Hoya (Apr. 11, 2025), https://thehoya.com/news/tracking-badar-khan-suris-legal-battle    [https://perma.cc/UJ89-5T28]; ACLU of Virginia, *Khan Suri v. Trump: New Video of ACLU-VA Client Illegally Detained for Exercising    His    Free    Speech*,    YouTube    (Apr.    8,    2025), https://www.youtube.com/watch?v=Cmuptb4G3Nc [https://perma.cc/LRE9-R4N8].

[88] Hatch Testimony, Second Session, at 111.

[89] Mar. 25 Cable, *supra* note 30; Klippenstein, *supra* note 6. Smith subsequently testified that this cable constituted one of the types of policy guidance issued to implement the relevant executive orders. Smith Testimony, First Session, at 27.

92.     The March 25 Cable requires F, M, and J visa applicants who fall within one of three categories to undergo mandatory social media review:

    a.    an applicant who is otherwise eligible and for whom you have reason to believe has openly advocated for a designated foreign terrorist organization;

    b.    an applicant who was previously in the United States in F-1, M-1, or J-1 visa status between October 7, 2023, and August 31, 2024; or

    c.    an applicant whose previous SEVIS record was terminated between October 7, 2023, and the present.

93.     This means that current and former F, M, and J visa holders present in the United States are subject to viewpoint-based social media screening if they: (1) apply to renew their visas (entry permits) to re-enter the United States after international travel, or (2) apply for a new type of visa (entry permit) to match a change in their immigration status and enable reentry into the United States on that status after travel abroad.

94.     The cable explains that online posts indicating "a hostile attitude toward . . . U.S. culture (including government, institutions, or founding principles)" or "sympathy for foreign terrorist organizations" might render an applicant ineligible for a visa.[90]

95.     The March 25 Cable also authorizes consular officers to *revoke* valid visas of visa holders in the United States if new information becomes available that would render them inadmissible in Defendants' view, based on expression of viewpoints that Defendants disfavor.[91]

---

[90] Mar. 25 Cable, *supra* note 30.

[91] *Id.* ¶ 11; *see* Smith Testimony at 28–30; Prudential Revocations, 9 U.S. Dep't of State Foreign Affs. Manual § 403.11-5(B) (2025), https://fam.state.gov/fam/09FAM/09FAM040311.html [https://perma.cc/5Y2J-UB9W] ("Although you usually may revoke a visa only if the individual is ineligible under INA 212(a) [8 U.S.C. § 1182(a)], or INA 214(b) [8 U.S.C. § 1184(b)], or is no longer entitled to the visa classification, the Department may revoke a visa if an ineligibility or lack of entitlement is suspected, when an individual would not meet requirements for admission, or in other situations where warranted. This is known as a 'prudential revocation.'").

96.    As relevant here, the State Department's Foreign Affairs Manual explicitly states that "[c]ables are official records of Department of State policies, program activities, post operations, and personnel management. . . . Cables are always cleared and approved, either directly or through delegation, and carry organizational authority."[92]

### B.    Defendant Rubio Publicly Acknowledges the Ongoing Revocation of Student Visas

97.    On March 27, 2025, Defendant Rubio held a press conference in which he offered the administration's first public comments describing the administration's ongoing revocation of student visas.[93]

98.    During it, he referred to those who "enter the United States [to] be a student," but who go on to "participate in movements that are involved in doing things like vandalizing universities, harassing students, taking over buildings, creating a ruckus." "If you lie to us and get a visa and then enter the United States and with that visa participate in that sort of activity, we're going to take away your visa." He continued, "Every time I find one of these lunatics, I take away their visa."[94]

99.    He went on to threaten visa holders that if they are "doing things like . . . creating a ruckus, we're not going to give you a visa."[95]

---

[92] Cables, 5 U.S. Dep't of State Foreign Affs. Manual § 1214.2(a) (2023), https://fam.state.gov/FAM/05FAM/05FAM1210.html#M1214 [https://perma.cc/DKC2-W6LP].

[93] Transcript, Marco Rubio, Secretary of State, *Secretary of State Marco Rubio and Guyanese President Irfaan Ali at a Joint Press Availability* (Mar. 27, 2025), https://www.state.gov/secretary-of-state-marco-rubio-and-guyanese-president-irfaan-ali-at-a-joint-press-availability [https://perma.cc/6LUR-TL7J].

[94] *Id.*

[95] *Id.*

100.    The following day, on March 28, 2025, Defendant Rubio delivered remarks and took questions from the press.[96]

101.    At the March 28 press conference, when asked if all revoked student visas were "related to pro-Palestinian protests," Defendant Rubio responded: "I think there might be a few that are not . . . ."

102.    Asked if the administration's effort was confined only to student visas, Defendant Rubio responded: "I don't know actually if it's primarily student visas. It's a combination of visas. They're visitors to our country. If they're taking activities that are counter to our foreign—to our national interest, to our foreign policy, we'll revoke the visa."

103.    According to Defendant Rubio, the latter category included "people that are supportive of movements that run counter to the foreign policy of the United States" or who are "aligned" with "organizations that hate the United States Government and hate our way of life."[97]

104.    At the press conference, Defendant Rubio stated that he would not disclose the tools used by federal officials to identify visa holders for targeted deportation so that future revocations could occur: "Well, we're not going to talk about process by which we're identifying [people] because obviously we're looking for more people."[98]

C.    **The State Department Publicly Acknowledges Its "Catch and Revoke" Initiative**

105.    On April 30, 2025, the State Department's official Substack page posted an article, authored by Secretary Defendant Rubio, titled "100 Days of an America First State Department."

---

[96] Transcript, Marco Rubio, Secretary of State, *Remarks to the Press en Route to Miami, Florida* (Mar. 28, 2025), https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3 [https://perma.cc/R92F-4HT4].

[97] *Id.*

[98] *Id.*

The Article publicly named, for the first time, a "Catch-and-Revoke" initiative, which purportedly extends to all noncitizens and focuses on foreign students. Defendant Rubio specifically contrasted the new Catch-and-Revoke policy with the Biden administration's immigration enforcement practices and what Secretary Rubio considered to be the Biden administration's failure to "protect our Jewish citizens and the American people at large from foreign terrorist sympathizers in their midst," including on college campuses. Defendant Rubio referred to the administration's surveillance of "student visa holders," noting that "when we find those who have supported terrorists or otherwise abused our hospitality, their visas are instantly revoked."[99]

### D.    The Challenged Surveillance Program Expands Its Surveillance Apparatus through DHS

106.    On or about April 2025, DHS created a task force charged with systematic expansion of the Challenged Surveillance Program.

107.    In support of the Challenged Surveillance Program, the new DHS task force uses dedicated personnel leveraging sophisticated, viewpoint-based online surveillance and related analytical tools that enable the widespread identification of those who express views the administration disfavors. Upon information and belief, these tools are also used in connection with USCIS's determination of immigration benefits, including for U.S.-based visa holders and Lawful Permanent Residents with university affiliations.[100]

---

[99] Marco Rubio, *100 Days of an America First State Department*, U.S. Dep't of State (Apr. 30, 2025), https://statedept.substack.com/p/100-days-of-an-america-first-state-department [https://perma.cc/4WPE-YJXH].

[100] *See* Ainsley, *supra* note 26. On April 9, confirming the administration's viewpoint-discriminatory implementation of Executive Orders 14161 and 14188 and the existence of that new program, USCIS announced that it would deny immigration benefit requests based, in part, on "antisemitic activity on social media." *DHS to Begin Screening Aliens' Social Media Activity for Antisemitism*, *supra* note 14. The April 9 press release announced that "[t]oday," USCIS "will begin considering aliens' antisemitic activity on social media" as grounds "for denying

108.    As reported by NBC News on April 9, 2025, the National Targeting and National Vetting Centers of CBP manage some of these tools, which DHS is using to expand the Challenged Surveillance Program by enabling that program "to scour the social media histories of the estimated 1.5 million foreign students studying in the United States for potential grounds to revoke their visas."[101]

109.    On April 29, 2025, USCIS posted, listing the State Department as a co-author, an Orwellian threat: "EVERYONE should be on notice. If you're a guest in our country – act like it. Our robust social media vetting program to identify national security & public safety risks never stops. USCIS is on watch to find anything online that poses a threat to our nation & our way of life."[102]

---

immigration benefit requests. This will immediately affect aliens affiliated with educational institutions linked to antisemitic activity." The press release further stated that the new guidance would affect "aliens applying for Lawful Permanent Resident status, foreign students[,] and aliens affiliated with educational institutions linked to antisemitic activity." Articulating support for specific groups, namely "Hamas, Palestinian Islamic Jihad, Hezbollah, or Ansar Allah," were identified as paradigmatic examples of speech "USCIS will consider . . . as a negative factor . . . when adjudicating immigration benefit requests." The April 9 press release stated that the new agency policy was consistent with several executive orders, including Executive Orders 14161 and 14188. *DHS to Begin Screening Aliens' Social Media Activity for Antisemitism*, *supra* note 16.

[101] Ainsley, *supra* note 26.

[102] USCIS Social Media Vetting – X post, *supra* note 19. USCIS posted the same message on Facebook, referencing "the Department of Homeland Security U.S. Department of State Immigration And Customs Enforcement (ICE)." U.S. Citizenship & Immigr. Servs., *supra* note 42. On August 19, 2025, USCIS announced that *all applicants* for discretionary USCIS benefits will be subject to viewpoint-based online surveillance, searching for *any* expression disfavored under Executive Orders 14161 and 14188—including viewpoints the administration deems antisemitic, sympathetic to terrorism, "anti-American," or adjacent to campus protests. Williams & Gonzalez, *supra* note 6; *USCIS to Consider Anti-Americanism in Immigrant Benefit Requests*, *supra* note 6; Santana, *supra* note 9.



110.    On the same day, USCIS issued an official press release describing its "[c]ommonsense [p]olicies" for "assisting enforcement agencies in identifying and removing [noncitizens]."[103] These included "restoring robust screening and vetting capabilities," namely "social media vetting for anti-Americanism to consider social media content that indicates an alien endorsing, espousing, promoting, or supporting antisemitic terrorism, antisemitic terrorist organizations, or other antisemitic or anti-American activity as a negative factor in any USCIS discretionary analysis when adjudicating immigration benefit requests." The agency's "screening and vetting efforts since Jan. 20, 2025" included "[s]creening 3,568 subjects' social media activity."

---

[103] *First 100 Days: USCIS Delivering on Making America Safe Again*, U.S. Citizenship & Immigr. Servs. (Apr. 29, 2025), https://www.uscis.gov/newsroom/news-releases/first-100-days-uscis-delivering-on-making-america-safe-again [https://perma.cc/LTV7-SKED].

46

111.    USCIS uses the social media vetting program referenced above to search for *any* expression disfavored under Executive Orders 14161 and 14188—including viewpoints the administration deems antisemitic, sympathetic to terrorism, "anti-American," or adjacent to campus protests.[104]

112.    In Fiscal Year 2025, "USCIS completed 12,502 individual social media checks" to screen for statements on "anti-American ideologies" to determine whether a noncitizen "endorses, espouses, promotes, or supports anti-American activity" for consideration as a negative factor in the agency's discretionary analysis to adjudicate immigration benefit requests.[105]

113.    On December 22, 2025, USCIS issued another press release in which Defendant Edlow highlights increased coordination within DHS's enforcement partners under Defendant Noem's leadership to enhance screening and vetting of noncitizens.[106]

114.    USCIS further emphasized that "there is no room for aliens who espouse anti-American ideologies" and referred to a policy guidance document clarifying discretionary factors in immigration benefit requests that makes clear their efforts to deny requests based on viewpoints this administration deems as alleged national security threats "to the maximum degree."[107]

---

[104] Williams & Gonzalez, *supra* note 6; *USCIS to Consider Anti-Americanism in Immigrant Benefit Requests*, *supra* note 6; Santana, *supra* note 9.

[105] *DHS Strengthens Integrity in Nation's Immigration System, Returns to Commonsense Legal Immigration Levels*, *supra* note 6.

[106] *Making America Safe Again; U.S. Citizenship and Immigration Services End-of-Year Review Demonstrates Impact of Rigorous Immigration Crackdown*, U.S. Citizenship & Immigr. Servs. (Dec. 22, 2025), https://www.uscis.gov/newsroom/news-releases/making-america-safe-again-us-citizenship-and-immigration-services-end-of-year-review-demonstrates [https://perma.cc/EKB5-F29N].

[107] *Id.*; *PA 2025-16, Policy Alert: Clarifying Discretionary Factors in Certain Immigration Benefit Requests*, U.S. Citizenship and Immigr. Servs., (Aug. 19, 2025), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20250819-DiscretionaryFactors.pdf [https://perma.cc/3U7L-CRAS].

115.    USCIS further facilitates the Challenged Surveillance Program by requiring applicants to submit all social media identifiers they have used in the past five years—a plan that President Trump approved on February 11, 2026. The plan will apply to noncitizen applicants as well as any "individuals with ties to the immigration benefit request," which includes U.S. citizens who serve as petitioners for certain immigration benefit requests.[108]

116.    DHS's efforts to collect expansive social media identifiers will impact more than three million people applying for immigration-related benefits each year—not only visa holders but also lawful permanent residents and U.S. citizens.[109]

116.1   In March 2026, USCIS issued new guidance to carry out a directive from last August, providing that USCIS officers may deny individuals a green card for expressing political opinions on social media, such as posting criticism of Israel, or participating in pro-Palestinian campus protests. As explained above, the guidance is accompanied by instructional materials discouraging USCIS "officers from granting green cards to people with a history of 'endorsing, promoting or supporting anti-American views' or 'antisemitic terrorism, ideologies or groups,'" and to "weigh those factors as 'overwhelmingly negative.'" USCIS instructs officers "'to focus

---

[108] *See* Off. of Info. & Regul. Affs., *Notice of Office of Management and Budget Action: Generic Clearance for the Collection of Social Media Identifier(s) on Immigration Forms*, Off. of Mgmt. & Budget (Feb. 11, 2026), https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202511-1615-008 [https://perma.cc/XY9S-URP7]; Off. of Info. & Regul. Affs., *Support Statement for Generic Clearance for the Collection of Social Media Identifier(s) on Immigration Forms*, OMB Control No. 1615-NEW, Off. of Mgmt. & Budget (Feb. 10, 2026), https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202511-1615-008#:~:text=Statement_updated%2001302026%20Final-,Clean,-.docx [https://perma.cc/8F6U-2UEX].

[109] See *id.* The notice estimates that the total number of respondents will be 3,468,668. For an example of a form that would solicit social media handles from third parties, see, e.g., U.S. Citizenship and Immigr. Servs., *Proposed USCIS Form I-751: Petition to Remove Conditions on Residence*, USCIS-2025-0003-1242 (Sep. 17, 2025), https://www.regulations.gov/document/USCIS-2025-0003-1242 [https://perma.cc/S6LR-5EK2] (proposed I-751 form).

particularly on [noncitizens] who engaged in on-campus anti-American and antisemitic activities' after the Hamas attacks against Israel in 2023." It further provides officers with examples of "antisemetic" and "anti-American" activity that overwhelmingly weigh against granting a green card. Those examples include "a social media post showing a map of Israel with the nation's name crossed out and replaced with the word 'Palestine' as well as a social media post that declares 'Stop Israeli Terror in Palestine.'"[109.1]

### E.     The State Department Expands the Footprint of the Challenged Surveillance Program

117.    The State Department has likewise continued expanding the Challenged Surveillance Program's viewpoint-driven online surveillance, as well as its corresponding threats.

118.    On May 27, 2025, Secretary Rubio and the State Department issued a cable to all consular and diplomatic posts, pausing appointments for F, M, and J student visas "in preparation for an expansion of required social media screening and vetting."[110]

119.    On May 30, 2025, Defendants Rubio and the State Department issued another cable to all consular and diplomatic posts, laying out "a pilot" program of enhanced social media vetting that "will be expanded over time."[111]

120.    The May 30 cable directed officials to conduct "a complete screening of the online presence" of Harvard University's "prospective students, students, faculty, employees, contractors, guest speakers, and other visitors," purportedly "[t]o address acute concerns of violence and anti-Semitism at Harvard University."

---

[109.1] Aleaziz & Nehamas, *supra* note 14.

[110] *See, e.g.*, Associated Press, *U.S. Stops Scheduling Visa Interviews for Foreign Students*, NPR (May 28, 2025, at 1:50 AM), https://www.npr.org/2025/05/28/g-s1-69282/us-stops-visas-foreign-students [https://perma.cc/ES65-MVU4].

[111] May 30 Cable, *supra* note 31.

121.     The cable indicates that visa applicants (which includes visa holders lawfully present in the U.S. applying or reapplying for a visa) must make their social media accounts public to avoid additional adverse scrutiny. It instructs consular officers to "consider whether the lack of any online presence, or having social media accounts restricted to 'private' or with limited visibility, may be reflective of evasiveness and call into question the applicant's credibility." It instructs consular officers to "request that the applicant set all of his social media accounts to 'public,' and remind him that limited access to or visibility of social media activity could be construed as an effort to evade or hide certain activity."

122.     On June 18, 2025, the State Department issued a media note entitled, "Announcement of Expanded Screening and Vetting for Visa Applicants," announcing yet another expansion of screening applicable to all F, M, and J visa holders, including current visa holders in the U.S. applying or reapplying for a visa.[112]

123.     The announcement provided:

> Under the new guidance, we will conduct a comprehensive and thorough vetting, including online presence, of all student and exchange visitor applicants in the F, M, and J nonimmigrant classifications.
>
> To facilitate this vetting, all applicants for F, M, and J nonimmigrant visas will be instructed to adjust the privacy settings on all of their social media profiles to "public."[113]

124.     An internal cable from Defendant Rubio titled "Action Request: Expanding Screening and Vetting for FMJ Applicants" was also sent to consular officers on June 18, 2025. The cable ordered consular officers to screen all FMJ applicants, including "to identify applicants

---

[112] *Announcement of Expanded Screening and Vetting for Visa Applicants*, *supra* note 32.

[113] *Id.*

who bear hostile attitudes toward our citizens, culture, government, institutions, or founding principles."[114]

125.    In a section titled "Why Are We Doing This?" the June 18, 2025, Cable cited Executive Orders 14161 and 14188 and explained that the Executive Orders obligated the Department "to ensure that foreign nationals admitted to the United States do not bear hostile attitudes toward the citizens, culture, government, institutions, or founding principles of the United States" and do not "advocate for, aid, or support" terrorists or unspecified "other threats to U.S. national security."[115]

126.    In another section titled "Where Do I Look?" the June 18, 2025, Cable directed consular officers to review "the applicant's entire online presence—not just social media activity—using any appropriate search engines or other online resources[,]" as well as "any databases to which the consular section has access."[116]

127.    The June 18, 2025, Cable encourages consular officers to consider denying visa applications to those whose online speech indicates "political activism" or "indications of hostility toward" American culture, government, or institutions even if that speech "might not lead to an INA 212(a) ineligibility." The Cable reminds consular officers that "[a]s Secretary Rubio has said, we do not seek to import activists who will disrupt and undermine scholarly activity at U.S. universities."[117]

---

[114] Cable, U.S. Dep't of State, *Action Request: Expanding Screening and Vetting for FMJ Applicants*, 25 STATE 59756 ¶ 17 (June 18, 2025), *available at* https://www.aila.org/library/action-request-expanding-screening-and-vetting-for-fmj-applicants [https://perma.cc/GWG7-39FR].

[115] *Id*. ¶ 4.

[116] *Id*. ¶ 12.

[117] *Id*. ¶¶ 22–23.

128.    Embassies began advising applicants that they would be subject to the policy. For example, on July 20, 2025, the U.S. Embassy in New Delhi, in speaking to a news outlet, stated that all prospective students who apply for visas are required to make their social media public for initial review and maintain that public status for the duration of their stay.[118]

129.    On August 21, 2025, the State Department represented that it had expanded its "vetting" operation even further: now *all United States visa holders*, at least 55 million people, are subject to "continuous vetting" for activities including "engaging in any form of terrorist activity or providing support to a terrorist organization."[119]

130.    On December 3, 2025, the State Department announced that "an online presence review" would also be required for "all H-1B applicants and their dependents, in addition to the students and exchange visitors already subject to this review." To facilitate that "thorough vetting," "all applicants for H-1B and their dependents (H-4), F, M, and J nonimmigrant visas" were "instructed to adjust the privacy settings on all of their social media profiles to 'public.'"[120]

---

[118] Divya A, *Embassy: Students to US Should Keep Social Media Public for Visa Duration*, The Indian Express (July 20, 2025, at 7:34 AM IST), https://indianexpress.com/article/india/embassy-students-to-us-should-keep-social-media-public-for-visa-duration-10137491/ [ https://perma.cc/AR79-JUSH].

[119] Lee, *supra* note 13; *see also* Humeyra Pamuk & Bhargav Acharya, *U.S. Continues Visa Vetting Even After Admission, Official Says*, Reuters (Aug. 21, 2025, at 3:27 PM EDT), https://www.reuters.com/world/us/us-continues-visa-vetting-even-after-admission-official-says-2025-08-21/ [https://perma.cc/S6R4-XQLN].

[120] *Announcement of Expanded Screening and Vetting for H-1B and Dependent H-4 Visa Applicants*, Dep't of State (Dec. 3, 2025), https://travel.state.gov/content/travel/en/News/visas-news/announcement-of-expanded-screening-and-vetting-for-h-1b-and-dependent-h-4-visa-applicants.html [https://perma.cc/2GMW-UJHX].

131.    The State Department employees responsible for making visa-related determinations understand a wide range of protected speech and activities that express views the administration disfavors to constitute "providing support to a terrorist organization."[121]

132.    On information and belief, this "continuous vetting" facilitates application of the Challenged Surveillance Program to those already lawfully in the United States, utilizing "data collection" that includes "a complete scouring of social media sites" to identify, among other things, any expression the administration wishes to characterize as "support for terrorism."[122]

133.    Disfavored expression by a current visa holder in the United States could trigger a visa revocation and/or deportation proceeding and related immigration confinement at any time.

134.    As set forth above, State Department officials responsible for visa-revocation decisions under this program have stated that what they call "support for a terrorist organization, or terrorist activity"— which "is a reason to have a visa revoked"[123]—can include, but is not limited to:

    a.  publishing or endorsing the phrase "From the river to the sea, Palestine will be free;"[124]

    b.  publishing or endorsing statements denouncing Zionism;[125]

---

[121] *See, e.g.*, Armstrong Testimony, Second Session, at 32:3–35:25 (testifying to the kinds of statements that may "endorse or espouse" support for terrorism under the Challenged Surveillance Program, including using of the phrase, "From the river to the sea, Palestine will be free," denouncing Zionism, criticizing Israel's actions in Gaza, and calling Israel an "apartheid state" (see *infra* ¶ 120)); *id.* at 25:15-27:9 (testifying, "I cannot remember a concrete piece of guidance" provided to himself or to employees in the Visa Office on what constitutes antisemitism).

[122] Lee, *supra* note 13.

[123] Armstrong Testimony, Second Session, at 32:11–12.

[124] *Id.* at 34:2–8.

[125] *Id.* at 34:9–12.

    c.  publishing or endorsing statements sharply critical of Israel's actions in Gaza;[126]

    d.  publishing or endorsing statements calling for an arms embargo on Israel, or statements calling to limit American military aid to Israel;[127] and

    e.  publishing or endorsing statements calling Israel an "apartheid state."[128]

135.    DHS and State Department officials responsible for decisions under the program include criticism of the Trump administration's policies or actions as potential grounds for visa revocation.[129]

136.    Senior State Department officials have acknowledged serious flaws in the Challenged Surveillance Program from the beginning. For example, Deputy Assistant Secretary Stuart Wilson worried that Rümeysa Öztürk might be punished despite no evidence of antisemitism or support for terrorist organizations.[130] The State Department revoked Öztürk's visa anyway; DHS arrested, undertook immigration confinement, and pursued her deportation.[131] John Armstrong, the senior official in the Bureau for Consular Affairs, separately reported concerns that Mohsen Mahdawi might challenge the administration's program as punishing him for "actions

---

[126] *Id.* at 34:13–23.

[127] *Id.* at 34:24–35:1, 35:5–12.

[128] *Id.* at 35:13-16.

[129] *Id.* at 42:12–23; *Am. Ass'n of Univ. Professors v. Rubio*, No. 1:25-cv-10685, 2025 WL 2777659, at *45–48 (D. Mass. Sep. 30, 2025); NPR Morning Edition, *DHS Official Defends Mahmoud Khalil Arrest, but Offers Few Details on Why it Happened*, NPR (Mar. 13, 2025, at 4:18 AM ET), https://www.npr.org/transcripts/nx-s1-5326015 [https://perma.cc/8J33-LG3C].

[130] *Am. Ass'n of Univ. Professors v. Rubio*, No. 1:25-cv-10685, 2025 WL 2777659, at *26 (D. Mass. Sep. 30, 2025) (quoting Öztürk Action Memo, Ex. 250).

[131] Transcript, *Secretary of State Marco Rubio and Guyanese President Irfaan Ali at a Joint Press Availability* (Mar. 27, 2025), https://www.state.gov/secretary-of-state-marco-rubio-and-guyanese-president-irfaan-ali-at-a-joint-press-availability [https://perma.cc/9U5S-73UC].

inextricably tied to speech protected under the First Amendment."[132] The State Department terminated Mahdawi's status anyway; and federal immigration agents came to arrest him in the middle of his naturalization interview.[133]

137. Both Öztürk and Mahdawi's removal proceedings were terminated after immigration judges determined DHS failed to meet its burden of proving removability and after district courts and the Second Circuit held that the government is not likely to succeed in its motions to dismiss habeas petitions each filed, alleging that the government unlawfully retaliated against them in violation of the First and Fifth Amendments.[134]

## IV.    Automated Tools and Artificial Intelligence Enable the Challenged Surveillance Program

138. Given the Challenged Surveillance Program's expansive reach, government agents are functionally unable to *manually* scour and analyze the viewpoints of the millions of individuals currently subject to online surveillance.

---

[132] Mar. 15, 2025, Action Memo for the Secretary, Ex. 244, *quoted in Am. Ass'n of Univ. Professors v. Rubio*, 2025 WL 2777659, at *21 (D. Mass. Sep. 30, 2025).

[133] Image posted by U.S. Citizenship & Immigration Services, Facebook, *With help from USCIS, Immigration and Customs Enforcement (ICE) apprehended an alien who led pro-Hamas campus protests* (Apr. 15, 2025), https://www.facebook.com/photo/?fbid=1088752416631218&set=a.230177479155387 [https://perma.cc/P7BY-UZDJ]; *see also* Leila Fadel, Jan Johnson & Kaity Kline, *Mohsen Mahdawi—the Columbia Student Arrested at His Citizenship Appointment—Speaks*, NPR (Apr. 29, 2025), https://www.npr.org/2025/04/29/nx-s1-5377484/columbia-student-mohsen-mahdawi-citizenship-arrest [https://perma.cc/Y7WJ-VG8Y].

[134] *Mahdawi v. Trump*, 136 F.4th 443 (2d Cir. 2025); *Ozturk v. Hyde*, 136 F.4th 382 (2d Cir. 2025); *see* Petitioner-Appellee's Fed. R. App. P. 28(j) Petitioner-Appellee's Fed. R. App. P. 28(j) Letter re: Petitioner's Removal Proceeding, *Mahdawi v. Trump*, No. 25-1113 (2d Cir. Feb. 17, 2026), Dkt. No. 226.1; Petitioner-Appellee's Fed. R. App. P. 28(j) Letter re: Petitioner's Removal Proceeding, *Ozturk v. Hyde*, No. 25-1019 (2d Cir. Feb. 9, 2026), Dkt. No. 236.

139.   To operate at scale, the Challenged Surveillance Program utilizes automated and "AI-assisted reviews" of online activity,[135] which independent sources have confirmed.[136]

140.   Both the State Department and DHS, including its subcomponents ICE, HSI, and CBP, contract with technology companies that provide tools that collect, monitor, and analyze social media information.

141.   For example, both the State Department[137] and DHS, through ICE,[138] currently have licenses for ShadowDragon, an internet surveillance company that produces the tool SocialNet. DHS is forecast to continue using its ShadowDragon licenses for up to three more years.[139] According to the company's promotional material, SocialNet users can search and analyze ShadowDragon's immense trove of social data, collected from a wide variety of sources including social media platforms, chat rooms, forums, and communication tools, among others.[140] A document obtained by *404 Media* indicates sources include major tech companies and platforms,

---

[135] Caputo, *supra* note 14.

[136] Ainsley, *supra* note 26.

[137] *Contract Summary: PIID 19AQMM25P0679*, USASpending.gov (May 1, 2025), https://www.usaspending.gov/award/CONT_AWD_19AQMM25P0679_1900_-NONE-_-NONE- [https://perma.cc/SL9V-SPJJ] (detailing a $48,500 contract renewal between the Department of State and ThunderCat for the ShadowDragon software).

[138] *Contract Summary: PIID 70CMSD25FR0000110*, USASpending.gov (Sep. 6, 2025), https://www.usaspending.gov/award/CONT_AWD_70CMSD25FR0000110_7012_NNG15SC92B_8000 [https://perma.cc/JH9H-433M] (detailing a $90,354 contract between the Department of Homeland Security and ThunderCat to "procure[] ShadowDragon software" for "[o]perations and [s]upport" for ICE and "advance capabilities to search, analyze, and visualize webpages").

[139] *SocialNet Recompete*, HigherGov (June 26, 2025), https://www.highergov.com/contract-forecast/socialnet-recompete-1127341 [https://perma.cc/YM27-88WA] (forecasting a new, one-year contract bid for HSI for ShadowDragon, with two additional one-year extension options).

[140] *SocialNet: Social Media Investigation Tool*, ShadowDragon (2025), https://shadowdragon.io/socialnet [https://perma.cc/UXU4-M9SD].

including Meta (which owns Facebook and Instagram), TikTok, Twitter/X, and Bluesky.[141] In an acquisition document from 2022, ICE confirmed that ShadowDragon allowed the agency to search "100+ social networking sites," noting that "[p]ersistent access to Facebook and Twitter provided by ShadowDragon SocialNet is of the utmost importance as they are the most prominent social media platforms."[142]

142.    DHS maintains access to ONYX via CBP,[143] ICE,[144] and the Transportation Security Administration, a sibling agency within DHS.[145] According to promotional material from

---

[141] Joseph Cox, *The 200+ Sites an ICE Surveillance Contractor is Monitoring*, 404 Media (Mar. 12, 2025, at 9:00 AM), https://www.404media.co/the-200-sites-an-ice-surveillance-contractor-is-monitoring [https://perma.cc/KR8S-VZAS].

[142] Off. of Acquisition Mgmt., U.S. Immigr. & Customs Enf't, *ICE Acquisition Manual 3006.301-90: Justification for Exception to Fair Opportunity* (2022), https://www.brennancenter.org/sites/default/files/2023-10/ICE%20ShadowDragon%20Justification%20for%20Exception%20to%20Fair%20Opp..pdf [https://perma.cc/76GC-J7Q2], *reprinted in Brennan Center Files Freedom of Information Act Requests for Information on DHS's Use of Social Media Monitoring Tools*, Brennan Center (Dec. 12, 2023), https://www.brennancenter.org/our-work/research-reports/brennan-center-files-freedom-information-act-requests-information-dhss [https://perma.cc/8AUV-EPGR].

[143] *Contract Summary: PIID 70B03C25F00001217*, USASpending.gov (Sep. 29, 2025), https://www.usaspending.gov/award/CONT_AWD_70B03C25F00001217_7014_NNG15SC82B_8000 [https://perma.cc/Q5J5-UFQG] (detailing a $215,541 contract for Fivecast licenses between DHS and New Tech Solutions, Inc. for U.S. Customs and Border Protection); *Contract Summary: PIID 70B06C25F00000048*, USASpending.gov (Jan. 1, 2025), https://www.usaspending.gov/award/CONT_AWD_70B06C25F00000048_7014_NNG15SC92B_8000 [https://perma.cc/H4DW-DRE2] (detailing a $77,868 contract for ONYX licenses between DHS and Thundercat for U.S. Customs and Border Protection).

[144] *Contract Summary: PIID 70CMSD23FR0000145*, USASpending.gov (Sep. 15, 2023), https://www.usaspending.gov/award/CONT_AWD_70CMSD23FR0000145_7012_NNG15SD02B_8000 [https://perma.cc/K7CJ-S5YK] (detailing a $4.2 million contract between the Department of Homeland Security and Panamerica Computers, Inc. for ONYX subscriptions for ICE).

[145] *Contract Summary: PIID 70T02024F7554N001*, USASpending.gov (Aug. 15, 2024), https://www.usaspending.gov/award/CONT_AWD_70T02024F7554N001_7013_NNG15SD02B_8000 [https://perma.cc/RNR4-CYGG] (detailing a $1.3 million contract between the Department of Homeland Security and Panamerica Computers, Inc. for Fivecast subscriptions for the TSA).

its manufacturer Fivecast, ONYX has several AI-powered capabilities that facilitate viewpoint-based online surveillance, including the capabilities to:

    a. explore masses of digital data, including all major "news streams, search engines, social media, marketplaces, watch lists, the dark web," etc.;

    b. conduct "automated, continuous and targeted collection of multi-media data;"

    c. identify, from basic biographical details, "digital footprints" from "curated datasets" spanning numerous platforms;

    d. "track shifts in sentiment and emotion" in an individual's posted data; and

    e. "detect keywords and phrases, objects and concepts, logos and quotes, images and text in images" to identify the level of "risk" associated with a given individual.[146]

143. Both the State Department and DHS also maintain access to Babel X,[147] which, according to promotional material from its manufacturer Babel Street, has various AI-powered capabilities to facilitate viewpoint-based online surveillance, including the capability:

    a. to "identify potential threats" based on publicly-available data including "social media posts, news stories and videos, information appearing on web sites, and more;"[148]

---

[146] *Fivecast Onyx*, Fivecast (2025), https://www.fivecast.com/product-overview/fivecast-onyx [https://perma.cc/P5H4-NL2K].

[147] The State Department has a current baseline contract that ends in September 2025 that comes with the option to extend through September 2026. *See Contract Summary: PIID 19AQMM21F3789*, USASpending.gov (Sep. 26, 2021), https://www.usaspending.gov/award/CONT_AWD_19AQMM21F3789_1900_NNG15SC31B_8 000 [https://perma.cc/P5NA-FC3L]. DHS has maintained Babel X contracts since at least 2017, but does not publicly list a currently active contract. Still, DHS continues to include Babel as one of its deployed AI tools and is reportedly still in the process of providing compliance information about Babel to the Office of Management and Budget. *See United States Customs and Border Protection – AI Use Cases*, U.S. Department of Homeland Security (Feb. 2, 2024), https://www.dhs.gov/ai/use-case-inventory/cbp#deployed [https://perma.cc/K9S5-3A72].

[148] *The Honest Guide to AI for Border Security*, Babel Street (2024), https://babel-street.files.svdcdn.com/production/PDF/Babel-Street-Honest-Guide-to-AI-for-Border-Security.pdf?dm=1715977175 [https://perma.cc/K2WW-2R7Q]; *see also DHS AI Use Case Inventory 3-3-2026: DHS-185*, Elec. Frontier Found., https://www.eff.org/pages/dhs-ai-use-case-

b.  to "scour[] dozens of social media sites worldwide, along with millions of message boards, online comments, and publicly available chats;"[149]

c.  to "monitor social media" by automatically searching "across all layers of the internet, including the deep and dark web;"[150] and

d.  to conduct "persistent search[es]" that continuously monitor for any new online information about a subject even after the initial search is complete.[151]

144.   The State Department additionally has a current license for the AI-powered social media monitoring tool Skopenow,[152] and both CBP and ICE have had recurring licenses for Skopenow since 2022, with ICE's most recent contract just ending in July 2025.[153] According to the company's marketing materials, Skopenow allows users to generate a "Social Media and Online Investigative Report" on any individual that includes identifying behaviors from images and isolating online posts based on keywords.[154]

---

inventory-3-3-2026#DHS-185 [https://perma.cc/6T4U-MAFV] (generating data directly from the 2025 DHS AI Use Inventory XLSX file, available at *Artificial Intelligence Use Case Inventory Library*, U.S. Dep't of Homeland Sec., https://www.dhs.gov/publication/ai-use-case-inventory-library [https://perma.cc/E4UW-7WVU]).

[149] *Social Media Threat Monitoring Improves National Security*, Babel Street: Blog, https://www.babelstreet.com/blog/social-media-threat-monitoring-improves-national-security [https://perma.cc/Z65B-EACW].

[150] *Id.*

[151] *The Honest Guide to AI for Border Security*, *supra* note 148.

[152] *Contract Summary: PIID 19AQMM21F4231*, USASpending.gov (Sep. 21, 2021), https://www.usaspending.gov/award/CONT_AWD_19AQMM21F4231_1900_NNG15SD26B_8 000 [https://perma.cc/L5P2-DW4D] (detailing a $513,251 contract between the Department of State and Thundercat for "Skopenow licenses").

[153] *Contract Summary: PIID 70CMSD24P00000081*, USASpending.gov (Aug. 1, 2024), https://www.usaspending.gov/award/CONT_AWD_70CMSD24P00000081_7012_-NONE-_-NONE- [https://perma.cc/7C2V-RLX4] (detailing a $19,500 contract between the Department of Homeland Security and Skopenow, running through July 31, 2025).

[154]    *Automated    Intelligence*,    Skopenow    (2021), https://www.documentcloud.org/documents/23131047-skopenow_2021 [https://perma.cc/N67T-HTWH].

145.    The State Department[155] and DHS, through CBP,[156] maintain licenses for Dataminr, an AI tool that "[p]rovides situational awareness of open-source social media and news reporting."[157] According to DHS, Dataminr software "enables advanced search, collection, and analysis of publicly available information through a single user interface, facilitating the collection of information regarding people, places, and things across social media platforms."[158] DHS has also issued a new contracting opportunity, estimated at $2,000,000.00 to $5,000,000.00, for access to Dataminr in 2026.[159]

146.    DHS also has a contract for NexusXplore,[160] an AI-enabled software platform that promises to "quickly analyz[e] vast amounts of open-source and social media data for security

---

[155] *Contract Summary: PIID 19AQMM25F7374*, USASpending.gov (Sep. 30, 2025), https://www.usaspending.gov/award/CONT_AWD_19AQMM25F7374_1900_19AQMM25A12 27_1900 [https://perma.cc/UF2S-9K2Z] (detailing a $2.8 million contract between the Department of State and Thundercat Technology, LLC for "Dataminr licenses").

[156] *Contract Summary: PIID 70RFP325FREH00010*, USASpending.gov (May 1, 2025), https://www.usaspending.gov/award/CONT_AWD_70RFP325FREH00010_7001_NNG15SD27 B_8000 [https://perma.cc/TAD7-X2HF] (detailing a $656,249 contract between DHS and V3Gate, LLC for "subscription services" for Dataminr).

[157] *See DHS AI Use Case Inventory 3-3-2026: DHS-183*, EFF.org, https://www.eff.org/pages/dhs-ai-use-case-inventory-3-3-2026#DHS-183 [https://perma.cc/6T4U-MAFV] (generating data directly from the 2025 DHS AI Use Inventory XLSX file available at *Artificial Intelligence Use Case Inventory Library*, U.S. Dep't of Homeland Sec., https://www.dhs.gov/publication/ai-use-case-inventory-library [https://perma.cc/E4UW-7WVU]).

[158] Acquisition Planning Forecast System, *Forecast Record No. F2026072863*, U.S. Dep't of Homeland Sec. (Feb. 18, 2026), https://apfs-cloud.dhs.gov/record/72863/public-print/ [https://perma.cc/TFL2-JS23] (detailing a CBP contract solicitation for "access to DataMinr," with an estimated solicitation release date of February 24, 2026).

[159] *Id*.

[160] *Contract Summary: PIID 70B03C26F00000066*, USASpending.gov (Dec. 23, 2025), https://www.usaspending.gov/award/CONT_AWD_70B03C26F00000066_7014_NNG15SD74B _8000 [https://perma.cc/98MF-JWZL] (detailing a $194,757 contract for "NexusXplore software licenses" between DHS and Software Information Resource Corp.).

risks to enhance U.S. national security."[161] Tools like NexusXplore are used to speed up both data collection and analysis, making it possible to monitor vast amounts of information at once.[162]

147.    DHS, through ICE, has a current license for Cobwebs, another AI-powered social media monitoring service.[163] Cobwebs was acquired by Penlink in 2023, and ICE currently holds an additional contract for similar services through Penlink.[164]

148.    As reported by 404 Media, internal documents indicate that ICE "chose Penlink [products] over its competitors because the company provides an 'all-in-one' tool for searching both masses of location data and information from social media." ICE's Penlink contract includes Tangles, a "social media monitoring product" to which ICE purchased access. Tangles is able to "detect faces in an image and then attempt to identify them; perform sentiment analysis on a target's posts [online]; and add specific social media accounts to a 'watch list.'"[165]

---

[161] *See DHS AI Use Case Inventory 3-3-2026: DHS-2538*, Elec. Frontier Found., https://www.eff.org/pages/dhs-ai-use-case-inventory-3-3-2026#DHS-2538 [https://perma.cc/6T4U-MAFV] (generating data directly from the 2025 DHS AI Use Inventory XLSX file available at *Artificial Intelligence Use Case Inventory Library*, U.S. Dep't of Homeland Sec., https://www.dhs.gov/publication/ai-use-case-inventory-library [https://perma.cc/E4UW-7WVU]).

[162] *See NexusXplore*, OSINTCombine, https://www.osintcombine.com/nexusxplore [https://perma.cc/H398-QZUX] (last visited Mar. 12, 2026).

[163] *Contract Summary: PIID 70CMSD23P00000145*, USASpending.gov (Sep. 25, 2023), https://www.usaspending.gov/award/CONT_AWD_70CMSD23P00000145_7012_-NONE-_-NONE- [https://perma.cc/29NV-TG6T] (detailing a $3.3 million contract between DHS, on behalf of ICE, and Cobwebs America).

[164] *Contract Summary: PIID 70CMSD25P00000138*, USASpending.gov (Sep. 25, 2025), https://www.usaspending.gov/award/CONT_AWD_70CMSD25P00000138_7012_-NONE-_-NONE- [https://perma.cc/RE3U-VQ2B] (detailing a $2.3 million contract between DHS, on behalf of ICE, and Pen-Link, LTD for "Cobweb[] licenses").

[165] Joseph Cox, *Inside ICE's Tool to Monitor Phones in Entire Neighborhoods*, 404 Media (Jan. 8, 2026, at 9:00 AM ET), https://www.404media.co/inside-ices-tool-to-monitor-phones-in-entire-neighborhoods/ [https://perma.cc/9GWM-JPF9].

149.     According to Penlink marketing materials, Tangles provides users with access to "automated, AI-powered open-source intelligence." The platform is able to "[u]tilize AI to automatically detect potential threats and illicit activities," "[m]onitor . . . web activity continuously," and "[p]erform in-depth analysis to uncover hidden connections."[166]

150.     Federal procurement records also reveal that ICE has entered a five-year contract with Carahsoft Technology for a license to Zignal Labs, a "social media monitoring platform" which "'leverages artificial intelligence and machine learning' to analyze over 8 billion social media posts per day, providing 'curated detection feeds' for its clients." The license will be held by Homeland Security Investigations (HSI), the intelligence unit within ICE.[167]

151.     The government is using these or other similar social media surveillance technologies, including AI-enhanced services, to monitor expression documented online of individuals lawfully present in the United States for disfavored views. On information and belief, this includes the speech of U.S. citizens, in addition to noncitizens, at least when their speech is connected to noncitizens' speech.

152.     ICE is moving to further expand its social media surveillance apparatus. In October 2025, the agency issued a Request for Information seeking private vendors to manage and staff two new teams of analysts dedicated to scouring social media platforms and other open-source, commercial, and law-enforcement data sources to generate leads and create dossiers for ICE

---

[166] *Open-Source Intelligence, Simplified*, Penlink, https://www.penlink.com/platform/open-source-intelligence/ [https://perma.cc/76Q6-FAZ6] (last visited Mar. 12, 2026).

[167] *See* Katya Schwenk, *ICE Just Spent Millions on a Social Media Surveillance AI Program*, truthout (Oct. 25, 2025) (quoting Zignal Labs, *Delivering OSINT to the Edge* (2025), https://www.documentcloud.org/documents/26194326-2025-zignal-executive-summary/), https://truthout.org/articles/ice-just-spent-millions-on-a-social-media-surveillance-ai-program/ [https://perma.cc/HFL9-QDWA].

enforcement purposes.[168] In its draft proposal, ICE states contractors will use information from "Facebook, Google+, LinkedIn, Pinterest, Tumblr, Instagram, VK, Flickr, Myspace, X (formerly Twitter), TikTok, Reddit, WhatsApp, YouTube, etc."[169] The agency notes this may include "the collection of any public messages (e.g., 'Tweets'), postings, and other media/data (e.g., photos, documents such as resumes, geocached information, etc.)."[170] Vendors are also asked to identify ways they would "utilize artificial intelligence" to aid in this surveillance.[171]

153.    By using automated and AI systems, the government can review and process large volumes of online expression that were previously difficult or impossible to analyze with human

---

[168] Dell Cameron, *ICE Wants to Build Out a 24/7 Social Media Surveillance Team*, WIRED (Oct. 3, 2025, at 9:21 AM), https://www.wired.com/story/ice-social-media-surveillance-24-7-contract [https://perma.cc/5T83-TTKH]; *Contract Opportunity: Lead Development and Open-Source Intelligence/Social Media Contract*, SAM.gov (Oct. 2, 2025), https://sam.gov/workspace/contract/opp/37b379dbed484281a12530cc01835e04/view [https://perma.cc/7UCD-CNVW].

[169] *Performance Work Statement (PWS): Enforcement and Removal Operations (ERO) Targeting Operations Division (TOD) for Lead Development and Open-Source Intelligence/Social Media Contract*, U.S. Immigr. & Customs Enf't (2025), https://s3.documentcloud.org/documents/26179462/rfi-performanceworkstatementncatc-perc-draft-20251002.pdf [https://perma.cc/97QT-KUHG], *available at Lead Development and Open-Source Intelligence/Social Media Contract*, SAM.gov (Oct. 2, 2025), https://sam.gov/workspace/contract/opp/37b379dbed484281a12530cc01835e04/view [https://perma.cc/7UCD-CNVW].

[170] *Performance Work Statement (PWS): Enforcement and Removal Operations (ERO) Targeting Operations Division (TOD) for Lead Development and Open-Source Intelligence / Social Media Contract*, U.S. Immigr. & Customs Enf't (2025), https://www.nakedcapitalism.com/wp-content/uploads/2025/11/00-ICE-RFP-specifications.pdf [https://perma.cc/ZXM8-Y8ZF].

[171] *Request for Information for the Targeting Operations Division Contract (National Criminal Analysis and Targeting Center (NCATC) and Pacific Enforcement Response Center (PERC)*, U.S. Immigr. & Customs Enf't (2025), https://s3.documentcloud.org/documents/26179463/rfi-erotodncatcandperc-20251002.pdf [https://perma.cc/5Z2J-QW9S], *available at Lead Development and Open-Source Intelligence/Social Media Contract*, SAM.gov (Oct. 2, 2025), https://sam.gov/workspace/contract/opp/37b379dbed484281a12530cc01835e04/view [https://perma.cc/7UCD-CNVW].

review alone.[172] The AI and other systems available to the government are powerful enough to robustly process the online activity including social media, of all visa holders in the U.S.[173]

154.    Importantly, AI and otherwise automated viewpoint-based online surveillance exacerbate the chilling impact of that surveillance. The government's utilization of AI and automated tools for viewpoint-driven online surveillance gives teeth to its threat to surveil "everyone" online for disfavored expression.

155.    AI and automated tools also struggle to distinguish between protected and unprotected speech, in part because AI and automated tools have difficulty discerning the nuances of language, as well as the broader context in which expression occurred,[174] and also because distinguishing protected speech from unprotected requires a nuanced legal assessment. On information and belief, these tools thus sweep in greater amounts of speech than manual review would, thereby amplifying the chilling effect.

## V.    Defendants Engaged in a Public Intimidation Campaign in Conjunction with the Development and Deployment of the Surveillance Apparatus

156.    Defendants' internal development of the surveillance apparatus of the Challenged Surveillance Program has gone hand-in-hand with a public campaign of intimidation component of the Program. Defendants have sought to coerce censorship by threatening that all noncitizens'

---

[172] *See* Matthias Pfau, *Artificial Intelligence: The New Eyes of Surveillance*, Forbes (Feb. 2, 2024, 6:15 AM ET), https://www.forbes.com/councils/forbestechcouncil/2024/02/02/artificial-intelligence-the-new-eyes-of-surveillance [https://perma.cc/WXT5-Q9QM].

[173] *See* Matthew Lee, *Trump Administration is Reviewing All 55 Million Foreigners with US Visas for Any Violations*, Assoc. Press (Aug. 21, 2025, at 8:52 PM ET), https://apnews.com/article/trump-visas-deportations-068ad6cd5724e7248577f17592327ca4 [https://perma.cc/LC5W-HU3N].

[174] *See, e.g.*, Rachel Levinson-Waldman, *"Continuous Vetting" of All Visa Holders Is Impossible, But the Threat Alone Chills Free Speech*, Brennan Ctr. for Just. (Sep. 25, 2025), https://www.brennancenter.org/our-work/research-reports/continuous-vetting-all-visa-holders-impossible-threat-alone-chills-free [https://perma.cc/AB94-P47M].

speech documented online will be surveilled for disfavored viewpoints and the possibility of related, adverse immigration consequences in order to coerce noncitizens to cease exercising their First Amendment rights. As Defendants' own statements confirm, the purpose of this campaign is to "send [a] message out"[175] and to get noncitizens to "behave"[176] by forgoing speech that the Trump administration disfavors.[177]

157.    Defendants, for instance, made a very public example out of Mahmoud Khalil. On March 8, 2025, on or about the time that the Challenged Surveillance Program was first being implemented in DHS and the State Department, federal agents arrested Mahmoud Khalil. Khalil is an Algerian citizen with lawful permanent residency in the United States; and he was recently a graduate student at Columbia University's School of International and Public Affairs, where he had been a member of Plaintiff UAW.[178]

158.    Mahmoud Khalil was subject to viewpoint-based online surveillance through the Challenged Surveillance Program. The ROA DHS produced on Khalil contained online information and social media posts, obtained by HSI analysts, discussing and documenting

---

[175] Transcript, Secretary of State Marco Rubio and Guyanese President Irfaan Ali at a Joint Press Availability (Mar. 27, 2025), https://www.state.gov/secretary-of-state-marco-rubio-and-guyanese-president-irfaan-ali-at-a-joint-press-availability [https://perma.cc/9U5S-73UC].

[176] Dawsey *et al.*, *supra* note 52.

[177] *See Am. Ass'n of Univ. Professors v. Rubio*, No. 1:25-cv-10685, 2025 WL 2777659, at *39 (D. Mass. Sep. 30, 2025) (finding that Defendants Noem and Rubio sought deliberately to "target a few [individuals] for speaking out and then use the full rigor of the [INA] . . . to have them publicly deported with the goal of tamping down pro-Palestinian student protests and terrorizing similarly situated non-citizen (and other) pro-Palestinians into silence because their views were unwelcome").

[178] *See* Adriana Florido, *Judge Rules Mahmoud Khalil Can be Deported*, NPR (Apr. 11, 2025), https://www.npr.org/2025/04/11/nx-s1-5361208/mahmoud-khalil-deported-judge-rubio-antisemitism-immigration-court [https://perma.cc/JU8R-BMGT]; Jake Offenhartz, *Immigration Agents Arrest Palestinian Activist Who Helped Lead Columbia University Protests*, Assoc. Press (Mar. 9, 2025, at 11:37 PM ET), https://apnews.com/article/columbia-university-mahmoud-khalil-ice-15014bcbb921f21a9f704d5acdcae7a8 [https://perma.cc/4TAW-LM8R].

Khalil's expressive activities supportive of Palestinians.[179] Based on these and other materials, HSI recommended that Defendant Rubio sign off on DHS's charging Khalil deportable based on his expression within the U.S., under the foreign-policy-related deportability ground, INA 237(a)(4)(C), 8 U.S.C. § 1227(a)(4)(C).[180]

159.    Defendant Rubio did so.[181] On that basis, four HSI agents arrested Khalil in the lobby of his apartment building.[182]

160.    Defendants then used Khalil's arrest to threaten others and deter them from engaging in protected expression. On March 9, 2025, Defendant Rubio posted on X a link to an AP News article describing Khalil's arrest, captioned "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported[.]"[183]

161.    On March 9, 2025, the Department of Homeland Security tweeted a statement, later attributed to DHS spokesperson Tricia McLaughlin,[184] noting that Khalil had been arrested because he "led activities aligned to Hamas" and that "ICE and the Department of State are

---

[179] Khalil ROA, Ex. 233, *cited in Am. Ass'n of Univ. Professors v. Rubio*, No. 1:25-cv-10685, 2025 WL 2777659, at *11 (D. Mass. Sep. 30, 2025).

[180] Khalil DHS Referral Letter, Ex. 242, *cited in Am. Ass'n of Univ. Professors v. Rubio*, No. 1:25-cv-10685, 2025 WL 2777659, at *11 (D. Mass. Sep. 30, 2025).

[181] Memorandum from Marco Rubio, U.S. Sec. State, to Kristi Noem, Dir., U.S. Dep't of Homeland Sec. (Mar. 2025), https://www.documentcloud.org/documents/25894225-dhs-documents-mahmoud-khalil/#document/p1 [https://perma.cc/AY64-VRU3].

[182] Tr. of July 10, 2025, Proceedings at 119, *Am. Ass'n of Univ. Professors v. Rubio*, No. 1:25-cv-10685 (D. Mass. July 10, 2025) (testimony of Amy Greer) [hereinafter "Greer Testimony"].

[183] Marco Rubio (@marcorubio), X (Mar. 9, 2025, at 6:10 PM ET), https://x.com/marcorubio/status/1898858967532441945 [https://perma.cc/RA5R-N86M].

[184] *See* Offenhartz, *supra* note 178.

committed to enforcing President Trump's executive orders and to protecting U.S. national security."[185]

162.    On March 10, 2025, President Trump posted on Truth Social threatening to conduct additional arrests of people engaged in expression supportive of Palestinians. President Trump stated that ICE "proudly" arrested Khalil because Khalil was "a Radical Foreign Pro-Hamas Student on the campus of Columbia University," and continued:

> This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. . . . We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again.[186]

---

[185]    Homeland Security (@DHSgov), X (Mar. 9, 2025, at 9:29 PM ET), https://x.com/DHSgov/status/1898908955675357314 [https://perma.cc/Y43X-JLQ6].

[186]    Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025, at 1:05 PM ET), https://truthsocial.com/@realDonaldTrump/posts/114139222625284782 [https://perma.cc/39CR-MXL2].

163.    On March 10, 2025, the White House's official X account relayed President Trump's threat in a post beginning with "SHALOM, MAHMOUD." The post contained a screenshot of President Trump's Truth Social post, as well as a faux "Wanted"-style poster with a photograph of Khalil, captioned "LED ACTIVITIES ALIGNED TO HAMAS."[187]



164.    On March 13, 2025, Deputy Secretary of DHS Troy Edgar went on national radio to explain that the administration targeted Khalil because he "put himself in the middle of the process of basically pro-Palestinian activity" and suggested that the administration maintains the right to revoke the visa of those who "go and protest."[188]

---

[187] The White House (@WhiteHouse), X (Mar. 10, 2025, at 1:34 PM ET), https://x.com/WhiteHouse/status/1899151926777749618 [https://perma.cc/U8ER-NCFL].

[188] NPR Morning Edition, *DHS Official Defends Mahmoud Khalil Arrest, but Offers Few Details on Why it Happened*, NPR (Mar. 13, 2025, at 4:18 AM ET), https://www.npr.org/transcripts/nx-s1-5326015 [https://perma.cc/8J33-LG3C].

165.    On March 16, 2025, Defendant Rubio appeared on Face the Nation and fielded questions about the arrest of Khalil.[189] Rubio threatened, "we're going to do more," suggesting that expressing any views the administration deems "pro-Hamas" and to "promote Hamas"—including online—is grounds for visa revocation.[190]

166.    More recently, on January 15, 2026, the State Department's and Marco Rubio's official X accounts celebrated the Third Circuit's ruling in Mahmoud Khalil's habeas case.[191] Conflating speech supporting Palestine with supporting terrorism, the State Department described Khalil as a "pro-Hamas activist," warning readers, "We will not allow terrorist supporters to endanger the national security of the United States."[192] Rubio amplified the State Department's post, adding, "If you sympathize with terrorists, your presence is contrary to the national and foreign policy interests of the United States. You are not welcome here."[193]

167.    The government also publicized its pursuit of Momodou Taal, a dual national of the Gambia and the United Kingdom and a doctoral student at Cornell University on an F-1 visa.

168.    The administration subjected Taal to the Challenged Surveillance Program. By surveilling Taal online, HSI classified him as "a prominent pro-Palestinian activist," noting, among other things, that he had posted in "the online magazine *Inside Higher Ed.*" expression the

---

[189] *Transcript: Secretary of State Marco Rubio on "Face the Nation with Margaret Brennan," March 16, 2025*, CBS News (Mar. 16, 2025, at 3:28 PM ET), https://www.cbsnews.com/news/marco-rubio-secretary-of-state-face-the-nation-transcript-03-16-2025 [https://perma.cc/KX62-SFER].

[190] *Id.*

[191] *See Khalil v. President, United States*, 164 F.4th 259 (3d Cir. 2026) (dismissing Khalil's habeas petition as premature).

[192] U.S. Dep't of State (@StateDept), X (Jan. 15, 2026, at 5:23 PM ET), https://x.com/StateDept/status/2011927194658807884 [https://perma.cc/TV36-DZGV].

[193] Secretary Marco Rubio (@SecRubio), X (Jan. 15, 2026, at 5:26 PM ET), https://x.com/SecRubio/status/2011927886786097533 [https://perma.cc/WT52-WMZ2].

government categorized as "antisemitic."[194] HSI referred Taal to the State Department for potential visa revocation.[195]

169.    On March 14, 2025, the State Department revoked Taal's visa, and DHS agents sought to arrest and deport him.[196] Taal sought emergency judicial protection but opted to leave the United States.[197]

170.    Defendant DHS later boasted of its targeting of Taal, including him on a list of "Those Who Have Abused the Privilege of a Student Visa," referring explicitly to the content of his X account and describing him as "unapologetic in his pro-terrorist views."[198]

171.    Upon information and belief, the administration targeted Taal to make an example of him and to deter others from expressing viewpoints, including online, that Defendants disfavor.

172.    The administration also touted its pursuit of Yunseo Chung, a Barnard student who is a Lawful Permanent Resident of the United States and immigrated from South Korea when she was seven years old. Upon information and belief, the administration chose to issue public

---

[194] Stanley Decl. ¶¶ 4, 6–7, *Taal v. Trump*, No. 3:25-cv-00335 (N.D.N.Y. Mar. 22, 2025), ECF No. 30-2.

[195] *Id.* ¶ 10.

[196] Armstrong Decl. ¶¶ 4–5, *Taal v. Trump*, No. 3:25-cv-00335 (N.D.N.Y. Mar. 22, 2025), ECF No. 30-3; Patrone Decl. ¶¶ 4–5, *Taal v. Trump*, No. 3:25-cv-00335 (N.D.N.Y. Mar. 22, 2025), ECF No. 30-1.

[197] *See* Matthew Mpoke Bigg, *Cornell Student Who Faced Deportation Says He Has Left U.S.*, N.Y. Times (Apr. 1, 2025), https://www.nytimes.com/2025/04/01/us/politics/cornell-student-momodou-taal.html [https://perma.cc/K6CA-PJXW].

[198] Press Release, *100 Days of Fighting Fake News*, U.S. Dep't of Homeland Sec. (Apr. 30, 2025), https://www.dhs.gov/news/2025/04/30/100-days-fighting-fake-news [https://perma.cc/C3W8-DHF3]; *see also* Bigg, *supra* note 197 (quoting a DHS statement regarding Taal's departure from the United States: "It is a privilege to be granted a visa to live and study in the United States of America. When you advocate for violence and terrorism, that privilege should be revoked.").

70

statements about its intention to arrest her in order to discourage others from expressing viewpoints, including online, that Defendants disfavor.

173.    Chung was subject to online surveillance through the Challenged Surveillance Program. DHS's ROA for Chung contained online information and social media posts, obtained by HSI analysts, discussing and documenting her expressive activities supportive of Palestinians.[199] Based on these and other materials, HSI recommended that Defendant Rubio enable DHS to charge her deportable based on her expression within the U.S. using the foreign-policy-related deportability ground, INA 237(a)(4)(C), 8 U.S.C. § 1227(a)(4)(C).[200]

174.    Defendant Rubio did so.[201] DHS produced an administrative arrest warrant,[202] and as Chung was "hunted by ICE,"[203] the government issued a public statement noting as a reason for charging her deportable her involvement with an on-campus protest supportive of Palestinians.[204]

175.    The government also trumpeted its arrest of Mohsen Mahdawi, a Palestinian refugee, Lawful Permanent Resident, and then-student at Columbia University's School of General Studies in order to coerce into silence others who express views the administration disfavors.

---

[199] Chung ROA, Ex. 236, *in Am. Ass'n of Univ. Professors v. Rubio*, 2025 WL 2777659, at *10 (D. Mass. Sept. 30, 2025).

[200] Chung DHS Referral Letter, Ex. 243, *quoted in Am. Ass'n of Univ. Professors v. Rubio*, 2025 WL 2777659, at *10 (D. Mass. Sept. 30, 2025).

[201] Declaration of Marina Vides, at Ex. A, *Chung v. Trump*, No. 1:25-cv-02412 (S.D.N.Y. Apr. 11, 2025), ECF No. 34 (reproducing Defendant Rubio's determination of Chung's deportability).

[202] *Id.* at Ex. B (reproducing the administrative arrest warrant).

[203] Jonah E. Bromwich & Hamed Aleaziz, *Columbia Student Hunted by ICE Sues to Prevent* ̈https://www.nytimes.com/2025/03/24/nyregion/columbia-student-ice-suit-yunseo-chung.html [https://perma.cc/TS4L-9WL2].

[204] *See* Homeland Security (@DHSgov), X (Apr. 30, 2025, at 6:09 PM ET), https://x.com/DHSgov/status/1917702792132592023 [https://perma.cc/7UQX-WRH7].

176.   The administration subjected Mahdawi to online surveillance through the Challenged Surveillance Program. DHS's ROA for Mahdawi contained online material and social media posts, obtained by HSI analysts, regarding Mahdawi's expressive activity supportive of Palestinians.[205] HSI referred the case to the State Department for Defendant Rubio to make a finding that Mahdawi's "presence or activities" in the U.S. "would have potentially serious adverse foreign policy consequences for the United States" and thereby enable DHS to charge Mahdawi deportable on that basis.

177.   Despite the acknowledgement of John Armstrong, Senior Bureau Official in the State Department's Bureau of Consular Affairs, that "DHS/ICE/HSI has not identified . . . any indication that Mahdawi has provided material support to a foreign terrorist organization or terrorist activity," and in the face of Armstrong's observation that "a court may consider [Mahdawi's] actions inextricably tied to speech protected under the First Amendment,"[206] Defendant Rubio signed off on DHS's use of the foreign-policy-related deportability ground against him.[207]

178.   On April 14, 2025, Mahdawi attended a naturalization interview with USCIS. Minutes after passing the U.S. citizenship test and officially affirming his willingness to take the Oath of Allegiance to the United States, masked, plainclothes immigration agents arrested

---

[205] Mahdawi ROA, Ex. 235, *quoted in Am. Ass'n of Univ. Professors v. Rubio*, 2025 WL 2777659, at *17 (D. Mass. Sep. 30, 2025); Mahdawi Action Memo, Ex. 248, at 2, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685, 2025 WL 2777659 (D. Mass. Sep. 30, 2025) (noting DHS's provision of "several screenshots of social media activity as evidence of Mahdawi's involvement in anti-Semitic activity," as well as "additional open-source reporting" presumably procured by the State Department, as the basis for John Armstrong's recommendation of Determination of Deportability); *see also* Hatch Testimony, Second Session, at 61 (describing the Mahdawi ROA).

[206] Mar. 15, 2025, Action Memo for the Secretary, Ex. 244, *quoted in Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685, 2025 WL 2777659, at *21 (D. Mass. Sep. 30, 2025).

[207] *See Mahdawi v. Trump*, 781 F. Supp. 3d 214, 222 (D. Vt. 2025).

Mahdawi.[208] USCIS later boasted online about its facilitation of the arrest, characterizing Mahdawi as having led "pro-Hamas campus protests."[209]

179.    On May 9, 2025, DHS released a statement titled "Set[ting] the Record Straight on Terrorist Sympathizer and Leader of the Columbia Pro-Terrorist Riots Mohsen Mahdawi." DHS spokesperson and Assistant Secretary for Public Affairs Tricia McLaughlin described Mahdawi as "a ringleader of the Columbia pro-terrorist riot," "a terrorist sympathizer," and "a national security threat who does not belong in this country."[210]

180.    On information and belief, the administration touted its arrest of Badar Khan Suri, a postdoctoral fellow at Georgetown University and J-1 visa holder, in order to coerce into silence others who express viewpoints the administration disfavors.

181.    Khan Suri was subject to online surveillance through the Challenged Surveillance Program. The ROA DHS produced on Khan Suri included online activity and social media postings, obtained by HSI analysts, in which Khan Suri expressed pro-Palestinian views.[211] The

---

[208] *Id.*; Akela Lacy, *Palestinian Student Leader Was Called in for Citizenship Interview—Then Arrested by ICE*, Intercept (Apr. 14, 2025, at 1:03 PM), https://theintercept.com/2025/04/14/ice-columbia-student-mohsen-mahdawi-citizenship-interview [https://perma.cc/G7SM-ECJ8].

[209] U.S. Citizenship & Immigr. Servs., Facebook (Apr. 15, 2025), https://www.facebook.com/photo/?fbid=1088752416631218 [https://perma.cc/P7BY-UZDJ].

[210] Press Release, Dep't of Homeland Security, *THE REAL STORY: DHS Sets the Record Straight on Terrorist Sympathizer and Leader of the Columbia Pro-Terrorist Riots Mohsen Mahdawi*, DHS.gov (May 9, 2025), https://www.dhs.gov/news/2025/05/09/real-story-dhs-sets-record-straight-terrorist-sympathizer-and-leader-columbia-pro [https://perma.cc/C4HG-HEW6].

[211] Khan Suri Action Memo, Ex. 249, at 2, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685, 2025 WL 2777659 (D. Mass. Sep. 30, 2025) (noting "two Facebook posts by [Khan] Suri," "a 2018 article author[ed] by [Khan] Suri in the Middle East Monitor," and "Instagram photos by [Khan] Suri that DHS/ICE assesses as 'pro-Palestine content'").

ROA concluded: "Khan Suri appears to post pro-Palestinian content."[212] DHS referred Khan Suri to the State Department for visa-revocation.[213]

182.    Acting on the DHS referral, Defendant Rubio terminated Khan Suri's status.[214] Defendant Rubio determined that Khan Suri's continued presence in the United States "would have potentially serious adverse foreign policy consequences . . . based on the assessment and conclusion provided by DHS/ICE/[HSI], to which we defer."[215] Defendant Rubio further noted that one ground for his conclusion was DHS's determination "that [Khan] Suri is 'actively supporting Hamas terrorism' and 'actively spreads its propaganda and promotes antisemitism on social media.'"[216] Defendant Rubio's memo concluded with a formal request that the Department of State have "the opportunity to consult with the Department of Homeland Security on any public statements" regarding Khan Suri's status.[217]

183.    On March 17, 2025, masked immigration agents arrested Khan Suri in a parking lot outside his home.[218]

---

[212] Khan Suri ROA, Ex. 234, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685, 2025 WL 2777659 (D. Mass. Sep. 30, 2025); *see also* Hatch Testimony, Second Session, at 56 (reading the document aloud in court).

[213] Khan Suri DHS Referral Letter, Ex. 246, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685, 2025 WL 2777659 (D. Mass. Sep. 30, 2025).

[214] *See* Aamir Jamil, *Tracking Badar Khan Suri's Legal Battle*, Hoya (Apr. 11, 2025), https://thehoya.com/news/tracking-badar-khan-suris-legal-battle [https://perma.cc/HLQ7-5RL8].

[215] Khan Suri Determination of Deportability, Ex. 21, at 1-2, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685, 2025 WL 2777659 (D. Mass. Sep. 30, 2025), Dkt. No. 315.

[216] *Id.*

[217] *Id.*

[218] ACLU of Va., *Khan Suri v. Trump: New Video of ACLU-VA Client Illegally Detained for Exercising His Free Speech*, (YouTube, Apr. 8, 2025), https://www.youtube.com/watch?v=Cmuptb4G3Nc [https://perma.cc/Z3BF-ATD5].

184. Two days later, DHS Spokesperson Tricia McLaughlin warned that Khan Suri had been arrested because he "was spreading Hamas propaganda and promoting antisemitism on social media."[219]

185. The administration also made a very public example of Rümeysa Öztürk, a Tufts University graduate student and F-1 visa holder.

186. Öztürk was subject to online surveillance through the Challenged Surveillance Program. The ROA DHS produced on Öztürk contained an online op-ed in the Tufts student newspaper, obtained by HSI analysts, in which Öztürk and co-authors had criticized their University's response to student government resolutions related to the conflict in Israel and Palestine.[220] HSI referred the case to the State Department for termination of Öztürk's visa.[221]

187. Upon receipt of Öztürk's DHS referral, Stuart Wilson, the State Department's Deputy Assistant Secretary for Visa Services, noted in a memo to John Armstrong that "DHS / ICE / HSI has not . . . provided any evidence showing that Öztürk has engaged in any antisemitic

---

[219] Tricia McLaughlin (@TriciaOhio), X (Mar. 19, 2025, at 7:56 PM), https://x.com/TriciaOhio/status/1902524674291966261 [https://perma.cc/F3CM-FY5N]; Kyle Cheney & Josh Gerstein, *Trump Is Seeking to Deport Another Academic Who Is Legally In the Country, Lawsuit Says*, Politico (Mar. 19, 2025, at 10:54 PM ET), https://www.politico.com/news/2025/03/19/trump-deportation-georgetown-graduate-student-00239754 [https://perma.cc/5SEU-N7ZM].

[220] Öztürk ROA, Ex. 232, *quoted in Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685, 2025 WL 2777659, at *25 (D. Mass. Sep. 30, 2025); *see* Rümeysa Öztürk, Fatima Rahman, Genesis Perez, & Nicholas Ambeliotis, *Op-ed: Try Again, President Kumar: Renewing Calls for Tufts to Adopt March 4 TCU Senate Resolutions*, Tufts Daily (Mar. 26, 2024), https://www.tuftsdaily.com/article/2024/03/4ftk27sm6jkj [https://perma.cc/4AQY-XEMN].

[221] Öztürk DHS Referral Letter, Ex. 245, *quoted in Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685, 2025 WL 2777659, at *25-26 (D. Mass. Sep. 30, 2025).

activity or made any public statements indicating support for a terrorist organization or antisemitism generally."[222]

188.   John Armstrong revoked Öztürk's visa anyway.[223]

189.   On March 25, 2025, Öztürk was stopped on the street by masked, plainclothes immigration agents. She was handcuffed and forcibly loaded into an unmarked SUV. Chilling images of Öztürk's daylight abduction were captured by a security camera.[224]

 

---

[222] Öztürk Action Memo, Ex. 250, at 2, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685, 2025 WL 2777659 (D. Mass. Sep. 30, 2025); *see also Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685, 2025 WL 2777659, at *26 (D. Mass. Sep. 30, 2025) (quoting the memo).

[223] *See* Armstrong Testimony, Second Session, at 57-65 (describing the revocation process).

[224] *See* Giulia McDonnell Nieto del Rio & Mike Damiano, *Tufts PhD Student Detained by Masked Immigration Authorities on Somerville Street Sent to Detention Facility in Louisiana*, Bos. Globe (Mar. 26, 2025, at 5:21 PM), https://www.bostonglobe.com/2025/03/26/metro/tufts-student-detailed-by-immigration-officials [https://perma.cc/FLR2-GWNL].

190.    When asked about Öztürk's arrest, Secretary Rubio affirmed that Öztürk was being punished for her speech, namely the op-ed she authored for *The Tufts Daily*.[225] Secretary Rubio emphasized that he wanted to "send th[e] message out" that students who sympathize with and "want to participate in movements" like the one Öztürk and her co-authors wrote about would have their visas revoked.[226]

191.    A DHS spokesperson, asked to comment on Öztürk's arrest, told ABC News, in part: "DHS and ICE investigations found Öztürk engaged in activities in support of Hamas, a foreign terrorist organization that relishes the killing of Americans. A visa is a privilege not a right. Glorifying and supporting terrorists who kill Americans is grounds for visa issuance to be terminated."[227] An immigration judge later determined that DHS lacked legal grounds to deport Öztürk.[228]

192.    Together, these actions illustrate the administration's intent to "send a message," as Defendant Rubio put it,[229] to visa holders and Lawful Permanent Residents supportive of Palestinians that they should refrain from expressing those views or suffer similar consequences.

---

[225] Rümeysa Öztürk, Fatima Rahman, Genesis Perez, & Nicholas Ambeliotis, *Op-ed: Try Again, President Kumar: Renewing Calls for Tufts to Adopt March 4 TCU Senate Resolutions*, Tufts Daily (Mar. 26, 2024), https://www.tuftsdaily.com/article/2024/03/4ftk27sm6jkj [https://perma.cc/4AQY-XEMN].

[226] *See* Joint Press Availability, *supra* note 93.

[227] Luke Barr, *Tufts PhD Student Taken Into Custody and Visa 'Terminated,' School Says*, ABC 7 (Mar. 27, 2025), https://abc7.com/post/tufts-phd-student-taken-custody-immigration-authorities-had-visa-terminated-school-says/16089984 [https://perma.cc/YGT5-V32J].

[228] *See* Fed. R. App. P. 28(j) Letter Re: Petitioner's Removal Proceedings, *Ozturk v. Hyde*, 136 F.4th 283 (2d Cir. 2025) (No. 25-1019), https://live-awp-vermont.pantheonsite.io/app/uploads/2026/02/2026-02-09-Petitioner-28j-Letter-Regarding-IJ-Decision.pdf [https://perma.cc/Z5UH-RCVK] (advising the Second Circuit that the immigration court has held that the Department of Homeland Security failed to meet its burden of proving Öztürk's removability). Note that the immigration court's opinion is not in the public record. *Id.*

[229] *See* Joint Press Availability, *supra* note 93.

193.    Beyond threats tied to individual cases, Defendants continue to offer a drumbeat of coercive statements aimed at those who might seek to speak contrary to the administration's wishes.

194.    As detailed above, Defendants have warned speakers that there are "many [visa revocations] to come," that the administration "will find, apprehend, and deport these terrorist sympathizers from our country—never to return again," that the administration is "looking for more" targets, and that "EVERYONE should be on notice" because "[o]ur robust social media vetting program to identify [targets] never stops."[230]

195.    In the wake of the murder of Charlie Kirk, Deputy Secretary of State Christopher Landeau threatened that any visa holder whom the administration views as "rationalizing[] or making light" of the event will be targeted and punished with visa revocations.[231]

196.    On October 14, 2025, the State Department announced visa revocations of six individuals who spoke in disfavored ways about Charlie Kirk, warning that the Department "continues to identify visa holders who celebrated" the event.[232]

197.    On October 17, 2025, the State Department warned the public that Bluesky, a social media platform popular with liberal users,[233] "is a great place to research visa revocations."[234]

198.    On November 5, 2025, the Department of Homeland Security reiterated:

---

[230] *See supra* ¶¶ 42–46.

[231] *See supra* ¶ 44.

[232] *See supra* ¶ 45; U.S. Dep't of State (@StateDept), X (Oct. 14, 2025, at 5:55 PM), https://x.com/StateDept/status/1978218112882266594 [https://perma.cc/HB3K-VLHG].

[233] Galen Stocking, Regina Widjaya, Luxuan Wang & Naomi Forman-Katz, *Bluesky Has Caught On With Many News Influencers, But X Remains Popular*, Pew Research Ctr. (May 29, 2025), https://www.pewresearch.org/short-reads/2025/05/29/bluesky-has-caught-on-with-many-news-influencers-but-x-remains-popular/ [https://perma.cc/N5X2-DDVW].

[234] U.S. Dep't of State (@StateDept), *supra* note 44.

There is no room in the United States for the rest of the world's terrorist sympathizers, and we are under no obligation to admit them or let them stay here. @Sec_Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-American and anti-Semitic violence and terrorism – think again [sic].[235]

199.    On November 13, 2025, U.S. Citizenship & Immigration Service reminded the public that "USCIS is implementing rigorous screening and vetting protocols," and that:

USCIS is reviewing aliens' use of social media and other statements for anti-American ideologies to determine whether an alien endorses, espouses, promotes, or supports anti-American activity and considering it as a negative factor in any USCIS discretionary analysis when adjudicating immigration benefit requests. In FY25, USCIS completed 12,502 individual social media checks.[236]

200.    On November 18, 2025, apparently referring to the Challenged Surveillance Program and its viewpoint-based surveillance, Deputy Chief of Staff Stephen Miller announced on Newsmax that under "the highest standard of vetting that [has] ever [been] put into place in new visas, including foreign student visas . . . [t]he State Department has revoked tens of thousands of visas and they're just getting started with tens of thousands more."[237]

---

[235] U.S. Dep't of Homeland Sec. (@DHSgov), X (Nov. 5, 2025, at 11:10 AM ET), https://x.com/DHSgov/status/1986103876852830539 [https://perma.cc/2A8P-4QPS].

[236] *DHS Strengthens Integrity in Nation's Immigration System, Returns to Commonsense Legal Immigration Levels*, U.S. Citizenship & Immigr. Servs. (Nov. 13, 2025), https://www.uscis.gov/newsroom/news-releases/dhs-strengthens-integrity-in-nations-immigration-system-returns-to-commonsense-legal-immigration [https://perma.cc/PT83-K7GN].

[237] Newsmax, *Trump 'Fought Like a Warrior to Bring Costs Down': Stephen Miller Explains Trump's Economic Policies*, at 8:37 (YouTube, Nov. 18, 2025), https://www.youtube.com/watch?v=m8q8DV1XQmc&t=424s [https://perma.cc/V63U-JBYL].

201.    On February 16, 2026, Secretary Rubio again warned the public that visitors to the country, including "student[s]," "journalist[s]," and "tourist[s]," who "undertake activities that are against the national interest" of the United States would have their visa revoked.[238]

## VI.    The Challenged Surveillance Program Is Harming Plaintiffs and Those They Represent

202.    The administration's repressive message has come across loud and clear to Plaintiffs' members. Out of fear that viewpoint-driven online surveillance will cause Defendants to impose adverse immigration consequences against them or others in their lives, members of Plaintiffs UAW, CWA, and AFT have restricted their online and in-person speech and expressive activity, including in their interactions with Plaintiff organizations.

203.    Plaintiff organizations have also sustained direct harm as a result of the Challenged Surveillance Program. Member reticence to speak or otherwise engage with Plaintiff organizations because of the Challenged Surveillance Program prevents Plaintiff organizations from receiving the speech of otherwise-willing speakers and directly impedes Plaintiffs' ability to fulfill their missions of representing members and their interests. As a result, Plaintiffs have diverted resources from other activities to engaging with, protecting, and representing chilled members.

204.    Plaintiff organizations and their members have also sustained direct harm because the government's threats are directed to all visa holders, including Plaintiffs' members, and, upon information and belief, Defendants have surveilled Plaintiffs and/or their members and have required, and will continue to require, Plaintiffs' members to forfeit their rights to anonymous speech.

---

[238] Transcript, Secretary of State Marco Rubio and Hungarian Prime Minister Viktor Orban at a Joint Press Availability (Feb. 16, 2026), https://www.state.gov/releases/office-of-the-spokesperson/2026/02/secretary-of-state-marco-rubioand-hungarian-prime-minister-viktor-orban-at-a-joint-press-availability [https://perma.cc/GDH5-ED6B].

### A.    The Challenged Surveillance Program Is Silencing Plaintiffs' Members

205.    As detailed below, Plaintiffs' members are among those whose speech the Challenged Surveillance Program has been chilling. Plaintiffs' members have scrubbed their past online posts and/or interactions (undertaken while living in the United States) and have forgone or changed current online expression in response to the Challenged Surveillance Program.

206.    Each plaintiff union conducted a survey of its membership about the Challenged Surveillance Program and how, if at all, the respondent members had changed their online expression in response to it. Many UAW, CWA, and AFT members responded, and these survey results confirmed Plaintiffs' understanding that their members have been and continue to be broadly harmed by the Challenged Surveillance Program.

207.    The survey defined the Challenged Surveillance Program (which it referred to as "Viewpoint-Driven Monitoring of Non-Citizens' Social Media") as follows:

> U.S. government monitoring or surveillance of social media for speech or activity that the government considers to be:
>
> - Critical of the Trump administration, its personnel, and/or its policies and practices
>
> - Critical of the Israeli government or expressing support for the Palestinian people
>
> - Reflecting "hostile attitudes toward [U.S.] citizens, culture, government, institutions, or founding principles"
>
> - Calling for the "overthrow or replacement of the culture on which our constitutional Republic stands"
>
> - Espousing "hateful ideology"
>
> - Calling for "sectarian violence"
>
> - Reflecting support for threats to "national security
>
> - Reflecting support for putative "terrorism"

81

208.   In the survey, Respondents were first asked whether they were aware of the Trump administration's viewpoint-driven monitoring of noncitizens' social media prior to taking the survey. Respondents who reported that they were not previously aware were shown no other questions and are not included in any of the results discussed below.

1. *UAW Members*

209.   Over 1,000 UAW members, both students and others, responded to the survey.

210.   Of the 770 UAW survey respondents who had prior knowledge of the Challenged Surveillance Program, 471 (61.2%) reported that they had changed their social media activity as a result.

211.   Notably, this number was significantly higher among noncitizens. Of the 257 respondents who reported that they were noncitizens, 217 (84.4%) reported changing their social media in response to the Challenged Surveillance Program. This included 193 of 222 F- and J-visa holders (86.9%), 20 of 23 Lawful Permanent Residents (86.9%), and 2 of 5 H-visa holders (40%). Of the 217 noncitizen respondents who reported changing their social media activity, all but six (97.2%) reported that they had changed their social media activity because they were "afraid that the Trump administration would engage in immigration-related scrutiny or targeting" against them personally.

212.   UAW survey respondents reported taking numerous steps to protect themselves and their social media content from the Challenged Surveillance Program. For example, they reported limiting access to content (215 individuals); editing or modifying posts (125 individuals); removing posts (178 individuals); unfollowing (169 individuals), opting against following (186 individuals), or reducing engagement with an account, group-space, campaign, or hashtag (287 individuals); making public social media accounts private (124 individuals); restricting access to

content (108 individuals); changing social media accounts to decouple them from their identity (87 individuals); and even deleting social media accounts entirely (122 individuals). Nearly half of the 770 individuals surveyed reported that they had refrained from posting on social media one or more times in response to the Challenged Surveillance Program (384 individuals). Respondents also reported that the Challenged Surveillance Program caused them to alter their non-social-media online activities (202 individuals) and to change their willingness to appear in photos or videos that others could post online (313 individuals).

213.    Of the 27 UAW survey respondents who reported making a private social media account public in response to the Challenged Surveillance Program, 22 (81.4%) reported doing so "because [they] believed [they] could face adverse government action otherwise." Of these 27 individuals, 26 (96.3%) reported that they had also taken steps to limit access to their expression on social media.

214.    Among those who reported changing their social media activity, 453 individuals reported that they did so because they were "afraid that the Trump administration would engage in immigration-related scrutiny or targeting" against them or against their associates, including significant others, family members, colleagues, and classmates. Of these 453 respondents, 275 (60.7%) stated that they were suppressing their online expression and activity because they were afraid the Trump administration would scrutinize or target noncitizen international students in their lives.

215.    UAW survey respondents reported that the changes they had made to their social media activity reached numerous types of content, including, most commonly, criticism of the Trump administration, its personnel, or its policies (416 individuals); and criticism of the Israeli government or expressions of support for the Palestinian people (394 individuals). Many UAW

survey respondents also stated that they had altered their online and offline union activity as a result of the Challenged Surveillance Program. Although some members—especially U.S. citizen members—reported that the policy galvanized them to become *more* involved in union activities, dozens of others reported that the policy had caused them to reduce their involvement with union activities. Many such respondents mentioned that they would no longer attend union rallies or union-led protests or would obscure their identities when present.

216.   Other UAW respondents—especially noncitizen respondents—reported taking steps to avoid being affiliated or associated online with the union due to the Challenged Surveillance Program. Members reported having refrained from all of the following: contacting representatives, signing onto public statements, sharing union posts online, including their names on union-related documents, meeting minutes, webpages, promotional materials, and emails (sometimes instead using pseudonyms), joining union-related group chats, and accepting co-author credit for a union-related paper. One UAW member reported leaving a leadership role. UAW has reported that some of its supporters recently declined to vote in an NLRB-conducted election for fear of being surveilled.

217.   UAW members and survey respondents also report that Defendants' viewpoint-based surveillance and promises to retaliate against those who speak in ways they disfavor have chilled their First Amendment protected speech in a variety of additional ways, including the following exemplars.

218.   One UAW respondent with F-visa status, UAW Doe 1, is aware that "the Trump administration is engaged in viewpoint-driven monitoring of non-citizens' social media accounts," and they changed their social media activity "as a result" of that viewpoint-driven monitoring because they were "afraid that the Trump administration would engage in immigration-related

scrutiny or targeting against" them personally and against their associates. Specifically, this respondent limited access to their content or specific posts, edited or modified one or more posts, refrained from posting one or more times, and reduced involvement with one or more accounts/group-spaces/campaigns/hashtags, and restricted access to one or more accounts. They took these steps in connection with content that involved "criticism of the Trump administration, its personnel, and/or its policies and practices," "criticism of the Israeli government or expressions of support for the Palestinian people," and other topics. In the foreseeable future, this person anticipates both applying to a consulate to extend, renew, or change a visa and submitting an application to USCIS for one of the immigration benefits it administers. The viewpoint-based surveillance also caused them to alter their union activities. Specifically, they did not feel comfortable working with the union to create a social media post about their experience and worried about sharing union updates on their social media pages. This person also made a private social media account public because they believe they could face adverse government action for maintaining a private account.

219. One UAW respondent with J-visa status, UAW Doe 2, is aware that "the Trump administration is engaged in viewpoint-driven monitoring of non-citizens' social media accounts," and they changed their social media activity "as a result" of that viewpoint-driven monitoring because they were "afraid that the Trump administration would engage in immigration-related scrutiny or targeting against" them personally. Specifically, this respondent limited access to their content or specific posts, deleted one or more accounts, and restricted access to one or more accounts. They took these steps in connection with content that involved "criticism of the Trump administration, its personnel, and/or its policies and practices" and other topics. This person anticipates applying to a consulate to extend, renew, or change a visa in the foreseeable future. The

viewpoint-based surveillance caused them to alter their union activities, including "attending or organizing protests," and "appearing in photos or videos that others could post online, including on social media" because they do not want to be linked to any events that could risk losing their immigration and/or visa status. This person fears adverse government action based on their social media activity.

220.    One UAW respondent with Lawful Permanent Resident status, UAW Doe 3, is aware that "the Trump administration is engaged in viewpoint-driven monitoring of non-citizens' social media accounts," and they have changed their social media activity "as a result" of that viewpoint-driven monitoring because they are "afraid that the Trump administration would engage in immigration-related scrutiny or targeting against" them personally and against their associates. Specifically, this respondent has deleted one or more of their accounts. They took this step in connection with content that involved "criticism of the Trump administration, its personnel, and/or its policies and practices," "criticism of the Israeli government or expressions of support for the Palestinian people," and other topics. This person anticipates submitting an application to USCIS for one of the immigration benefits it administers in the foreseeable future. The viewpoint-based surveillance also caused them to alter their union activities. They are not participating in union activities due to the surveillance and declined to attach their name to a union-related publication. The Challenged Surveillance Program has also changed their willingness to attend or organize protests, affiliate with student groups or organizations, and affiliate with given academic or professional groups or organizations.

221.    One UAW respondent with H-visa status, UAW Doe 4, is aware that "the Trump administration is engaged in viewpoint-driven monitoring of non-citizens' social media accounts," and they have changed their social media activity "as a result" of that viewpoint-driven monitoring

because they are "afraid that the Trump administration would engage in immigration-related scrutiny or targeting against" them personally and against their associates. Specifically, this respondent has limited access to their content or specific posts, edited or modified one or more posts, removed one or more posts, refrained from posting, made a public account private, and reduced their involvement or interaction with one or more accounts, group-spaces, campaigns, and/or hashtags. They took these steps in connection with content that involved "criticism of the Trump administration, its personnel, and/or its policies and practices," "criticism of the Israeli government or expressions of support for the Palestinian people," and other topics. This person anticipates both submitting an application to USCIS for one of the immigration benefits it administers and applying to extend, renew, or change a visa in the foreseeable future. The Challenged Surveillance Program has also changed their willingness to attend or organize protests and to appear in photos or videos that others could post online, including on social media.

222.    One active UAW member with F-visa status, UAW Doe 5, is aware of the Trump administration's policy of viewpoint-driven surveillance of noncitizens' social media and online activity. Doe 5 has refrained from posting and creating political analysis about several political topics, including Charlie Kirk, ICE, abortion, and healthcare. They also unfollowed people from Gaza who were providing on-the-ground updates, removed posts about a Palestinian-American historian and pro-Palestinian organizing, and un-liked all of their tweets about Palestine. UAW Doe 5 changed their social media activity as a result of their fear that Defendants would not renew their visa stamp to seek re-entry into the United States because they commonly express support for Palestinian human rights on social media. Their entry visa is expired and the fear of a denial based on their social media has forced them to stay in the United States until the duration of their immigration status, resulting in missed professional opportunities to advance their career. UAW

Doe 5 expressed that the re-vetting of visa renewals (entry permits) is on the minds of several other UAW members in the current moment—especially given the lack of clarity on which social media accounts will be scrutinized and the expansive time period that includes accounts from the last five years.

223.    Another active UAW member with F-visa status, UAW Doe 6, is aware of the Trump administration's policy of viewpoint-driven surveillance of noncitizens' social media and online activity. They scrubbed their social media of anything related to Palestine or gender identity in March 2025 before they traveled outside the United States, motivated specifically by Defendants' detention of Mahmoud Khalil and other graduate students, as well as by the Trump administration's policy generally. They have also deleted photos from protests, stopped reposting union-related content, and stopped promoting fundraisers for organizations like Doctors Without Borders or the Red Cross to support Palestine-related donations because of what they perceive as Defendants' "intensified" surveillance of social media and online activity. They have reduced their online engagement by approximately 75 percent to avoid being targeted by Defendants. Muting their support for social justice causes that are deeply important to them has made them feel "terrible." UAW Doe 6 is fearful of applying to change their F-visa immigration status to Optional Practical Training ("OPT") status after their near-approaching graduation date because of USCIS scrutinizing their social media handles. They fear getting a denial and are already making plans to carefully re-examine their social media accounts leading up to their OPT application.

224.    Another UAW member with F-1-visa status, UAW Doe 7, learned of the Trump administration's viewpoint-driven online surveillance—including its purported use of AI systems to conduct monitoring—through the news. They changed their social media activity out of a concern that they would be subject to immigration consequences. Specifically, UAW Doe 7 un-

liked posts on Instagram, including posts by Palestinian-led news sources and posts from their local union about campus encampments. UAW Doe 7 also unfollowed accounts on Instagram they believed might trigger scrutiny, including accounts associated with Students for Justice in Palestine. UAW Doe 7 further deleted posts on Twitter about events on Palestine, even though their Twitter account is set to private and does not list UAW Doe 7's real name. The goal was to preserve a "fighting chance" of avoiding adverse consequences, including possible visa revocation and deportation. In addition, UAW Doe 7 worked with their local union to remove the union's own posts about encampments that included pictures of identifiable individuals. UAW Doe 7 also reports that four individuals reached out to UAW Doe 7 without sharing their names to express concerns about participating in UAW Doe 7's local union for fear that participating in the union could expose them to adverse immigration consequences. This person is weighing the risks of renewing their entry visa, which is set to expire this year. They are concerned about potential denial after disclosing their social media handles and expressed their fears of living in the United States despite "following all the laws," especially after originally coming to the United States because of its "commitment to free speech" before the Challenged Surveillance Program existed.

224.1 Another UAW member with F-visa status, UAW Doe 8, is aware of the Trump administration's policy of viewpoint-driven surveillance of noncitizens' social media and online activity. This member previously posted social media messages supportive of Palestine, as well an op-ed urging solidarity with Palestine. They have considered applying for a green card but have thus far declined to do so because they fear being detained during a USCIS interview or having their green card application denied based on their expressions of support for Palestine.

2.  *CWA Members*

225.    CWA members also responded to a survey that asked about the Challenged Surveillance Program and answered how, if at all, they had changed their online expression and activity in response to it. Of the 126 CWA survey respondents who were aware of Challenged Surveillance Program, 41 (32.5%) reported that they had changed their social media activity as a result.

226.    Of the CWA respondents who reported that they were not U.S. citizens, 44.4% (4 of 9) reported changing their social media activity as a result of the Challenged Surveillance Program. One such respondent was a Lawful Permanent Resident, two were H-visa holders, and one was a J-visa holder. Each reported changing their social media activity "because [they] were afraid that the Trump administration would engage in immigration-related scrutiny or targeting" against them personally.

227.    CWA survey respondents reported taking various steps to protect themselves and their social media content from the Challenged Surveillance Program, including limiting access to content (20 individuals); editing or modifying posts (8 individuals); removing posts (14 individuals); unfollowing (12 individuals), opting against following (13 individuals), or reducing engagement with an account, group-space, campaign, or hashtag (23 individuals); making public social media accounts private (10 individuals); restricting access to content (11 individuals); changing social media accounts to decouple them from their identity (9 individuals); and even deleting social media accounts entirely (16 individuals). Of the 41 CWA respondents who reported changing their social media activity, 33 (80.5%) reported that they had refrained from posting one or more times in response to the Challenged Surveillance Program. Respondents also reported that the Challenged Surveillance Program caused them to alter their non-social-media online activities

(23 individuals) and to change their willingness to appear in photos or videos that others could post online (35 individuals).

228. Of the CWA respondents who reported taking steps to restrict access to their social media content, 78% (32 individuals) reported taking such steps for content involving criticism of the Trump administration or its policies, while 63.4% (26 individuals) reported taking such steps for content involving criticism of the Israeli government.

229. Of the 223 total CWA respondents, 48 (21.5%) also reported that social media accounts they had previously relied upon for information had stopped or reduced posting content critical of the Trump administration, critical of the Israeli government or in support of the Palestinian people, or related to labor organizing, worker justice, and other social-justice movements since the new Trump administration took office (and the Challenged Surveillance Program began).

230. One CWA respondent reported that they made a private social media account public in response to the Challenged Surveillance Program, and that they did so because they "believed [they] could face adverse government action otherwise." This respondent also reported taking steps to limit access to their social media content, refraining from posting and engaging in certain ways online.

231. Twelve CWA respondents reported that the Trump administration's viewpoint-driven monitoring of noncitizens' social media had caused them to "change or reduce [their] participation in union activities" online and offline. These changes included reducing how often they post online about union activities or labor organizing and reducing participation in or obscuring their identity at public demonstrations, given risks not only of unwanted in-person

91

identification but also of being photographed or recorded and then having that content end up online, including on others' social media.

232.    CWA members, including survey respondents, also report that Defendants' viewpoint-based surveillance and promises to retaliate against those who speak in ways they disfavor have chilled their First Amendment protected speech in a variety of additional ways, including the following exemplars.

233.    One active CWA member with an F-visa status, CWA Doe 1, was aware of the Trump administration's viewpoint-driven monitoring of non-citizens' social media and knew that many of their friends who are on F1 visas have ceased posting about their support for Palestine since the beginning of the Trump administration and the initiation of the Challenged Surveillance Program. The Trump administration's "viewpoint-driven monitoring of non-citizens' social media caused [them] to change or reduce [their] participation in union activities," and they do not speak about Palestine due to that viewpoint-driven monitoring. The viewpoint-based surveillance has also caused them to alter their union activities, including attending or organizing protests and "appearing in photos or videos that others could post online, including on social media."

234.    One active CWA member with J-visa status, CWA Doe 2, was aware of "the Trump administration's viewpoint-driven monitoring of non-citizens' social media" and changed their social media activity "as a result" of that viewpoint-driven monitoring because they were "afraid that the Trump administration would engage in immigration-related scrutiny or targeting against" them personally and against their associates. Specifically, they refrained from posting one or more times, opted against following one or more accounts/group-spaces/campaigns/hashtags, and deleted one or more accounts. They took these steps in connection with content that involved "criticism of the Trump administration, its personnel, and/or its policies and practices," "criticism

of the Israeli government or expressions of support for the Palestinian people," "labor-organizing and/or worker justice," and other topics. They anticipated applying to USCIS for one of the immigration benefits it administers.

235.    One active CWA member with Lawful Permanent Resident status, CWA Doe 3, was aware of "the Trump administration's viewpoint-driven monitoring of non-citizens' social media" and changed their social media activity "as a result" of that viewpoint-driven monitoring because they were "afraid that the Trump administration would engage in immigration-related scrutiny or targeting against" them personally and against their associates. Specifically, this respondent removed one or more posts, refrained from posting one or more times, and unfollowed and opted against following one or more accounts/group-spaces/campaigns/hashtags. They took these steps in connection with content that involved "criticism of the Trump administration, its personnel, and/or its policies and practices," "criticism of the Israeli government or expressions of support for the Palestinian people," and other topics. They anticipated applying to USCIS for one of the immigration benefits it administers. The viewpoint-based surveillance had caused them to alter their union activities and their non-social-media activity, including attending or organizing protests and "appearing in photos or videos that others could post online, including on social media."

236.    One active CWA member with H-visa status, CWA Doe 4, was aware of "the Trump administration's viewpoint-driven monitoring of non-citizens' social media" and changed their social media activity "as a result" of that viewpoint-driven monitoring because they were "afraid that the Trump administration would engage in immigration-related scrutiny or targeting against" them personally. Specifically, they limited access to their content or specific posts, refrained from posting one or more times, and reduced involvement with one or more

93

accounts/group-spaces/campaigns/hashtags. They took these steps in connection with content that involved "criticism of the Trump administration, its personnel, and/or its policies and practices," "criticism of the Israeli government or expressions of support for the Palestinian people," "[their] union or any other unions," "labor-organizing and/or worker justice," "union-related activities," and other topics. This person anticipated applying to a consulate to extend, renew, or change a visa in the foreseeable future. The viewpoint-based surveillance had caused them to alter their union activities and their non-social-media activity, including attending or organizing protests, and "affiliating with given academic or professional groups or organizations."

237.   One active CWA member with F-visa status, CWA Doe 5, was aware of the Trump administration's policy of viewpoint-driven surveillance of noncitizens' social media and online activity. To CWA Doe 5, "nothing" related to Palestine "feels safe to interact with" online anymore because of the Trump administration's policy. They unliked prior posts and deleted posts they had made about Defendants' detention of Mahmoud Khalil, and they asked the union to remove any of its social media content that featured their face because of the Trump administration's policy. CWA Doe 5 also does not feel safe attending protests on campus in support of Palestine. They have stopped attending these protests for fear of being surveilled and identified online by the government and having their visa status revoked, stating, "you never know who is filming what and where their filming is going" to end up.

238.   An active CWA member with Lawful Permanent Resident status, CWA Doe 6, was aware of the Trump administration's policy of viewpoint-driven surveillance of noncitizens' social media and online activity. They deleted their X account because it was not feasible to go back into prior posts to vet the large scale of content with the disfavored viewpoints. CWA Doe 6 changed their Instagram account from public to private and reduced the amount they posted about anything

94

on Instagram after Defendants started detaining student protestors in March 2025 because "even something small could get you in trouble." They specifically deleted previous posts about Israel and Palestine from their archives because of the Challenged Surveillance Program. They also do not share any Instagram stories that could be perceived as political nor write posts with their political commentary on Palestine after seeing how Rumeysa Öztürk's op-ed online was used to trigger detention and deportation. CWA Doe 6's career and field of work is linked to building an online portfolio on social media. CWA Doe 6 expressed how being forced to delete their X account and making their Instagram account private—on which they had a large number of followers— has impacted their employment prospects and the ability to network with others in their field. CWA Doe 6 has also refrained from teaching topics on Palestine to their students and took them out of their usual curriculum for fear that their lectures would create online exposures that the Defendants could use to trigger adverse immigration consequences. CWA Doe 6 has also stopped organizing and attending protests on campus related to Palestine solidarity because of the fear of being doxed online and Defendants using that to revoke their Lawful Permanent Resident status. They are also concerned about a potential denial of their citizenship application and subsequently facing deportation because of needing to disclose their social media handles to USCIS as part of the application process.

239.    An active CWA member with F status, CWA Doe 7, was aware of the Trump administration's policy of viewpoint-driven surveillance of noncitizens' social media and online activity. They silenced themselves and "barely" posted about Palestine anymore because of the Trump administration's policy, something they used to do "plenty." For example, CWA Doe 7 has stopped re-posting calls to action on social media related to Palestinian rights advocacy because it is "too risky." Faculty members even advised CWA Doe 7 to not post anything on Palestine

solidarity for fear of adverse immigration-related consequences. CWA Doe 7 has purposefully not renewed their expired entry-permit visa and has decided to not leave the United States for any international travel until the end of the validity of their immigration status—stating that it would be "basically impossible to get another [entry permit] visa" if they received a denial based on disclosing their social media handles. CWA Doe 7 reported they would post online more if the Challenged Surveillance Program did not exist.

240.    Another active CWA member with F-visa status, CWA Doe 8, was aware of the Trump administration's policy of viewpoint-driven surveillance of noncitizens' social media and online activity. They changed their X profile from public to private based on President Trump's Executive Orders to avoid creating "any further risk" that Defendants target them for immigration consequences. They self-censored online comments they would otherwise have publicly made for fear of falsely being labeled a "terrorist" based on Defendants' association of any Palestinian rights advocacy with this label. When attending protests and rallies, CWA Doe 8 has taken precautions to conceal their identity for fear of being surveilled and identified online. CWA Doe 8 would mobilize more publicly for Palestinian rights advocacy if the Challenged Surveillance Program did not exist.

### 3. *AFT Members*

241.    Over 1,600 individuals, both students and others, whom AFT represents, responded to a survey about the Challenged Surveillance Program. Of the 1,655 respondents, 1,008 (60.9%) were aware of the Challenged Surveillance Program, and 332 of those 1,008 respondents (32.9%) reported changing their social media activity in response to it.

242.    This percentage was substantially higher among noncitizen respondents. Of the 54 respondents who reported that they were not U.S. citizens, 43 (79.6%) reported that they had

changed their social media activity in response to the Challenged Surveillance Program. This included 100% (9 of 9) of respondents with H-visas, 81.8% (9 of 11) of respondents with F-visas, and 73.3% (22 of 30) of respondents who were Lawful Permanent Residents. Each of these 43 noncitizen respondents reported that they had changed their social media activity because they were "afraid that the Trump administration would engage in immigration-related scrutiny or targeting" against them personally. Many also reported that they were afraid the Trump administration would engage in immigration-related scrutiny or targeting of others in their lives.

243.    AFT survey respondents reported taking numerous steps to protect themselves and their social media content from the Challenged Surveillance Program. Respondents reported limiting access to content (154 individuals); editing or modifying posts (95 individuals); removing posts (111 individuals); unfollowing (119 individuals), opting against following (111 individuals), or reducing engagement with an account, group-space, campaign, or hashtag (164 individuals); making public social media accounts private (79 individuals); restricting access to content (87 individuals); changing social media accounts to decouple them from their identity (44 individuals); and even deleting social media accounts entirely (89 individuals). The most common action respondents reported taking was refraining from posting online (274 individuals). Respondents also reported that the Challenged Surveillance Program caused them to alter their non-social-media online activities (163 individuals) and to change their willingness to appear in photos or videos that others could post online (222 individuals).

244.    Of the 8 AFT survey respondents who reported making a private social media account public in response to the Challenged Surveillance Program, 5 (62.5%) reported doing so "because [they] believed [they] could face adverse government action otherwise." All 8 of these

individuals reported that they had also taken steps to limit access to their online content and expression.

245.    Among those who reported changing their social media activity in response to the Challenged Surveillance Program, at least 270 individuals (81.3%) reported that they did so because they were "afraid that the Trump administration would engage in immigration-related scrutiny or targeting" against them or against their associates, including significant others, family members, colleagues, and classmates. Of these 270 respondents, 122 (45.2%) stated that they were suppressing their online expression and activity because they were afraid the Trump administration would scrutinize or target noncitizen international students in their lives.

246.    AFT survey respondents reported that the changes they had made to their social media activity reached numerous types of content, including, most commonly, criticism of the Trump administration, its personnel, or its policies (269 individuals, 81.0%); and criticism of the Israeli government or expressions of support for the Palestinian people (188 individuals, 56.6%).

247.    Many AFT survey respondents (82) also stated that they had altered their online and offline union activity as a result of the Challenged Surveillance Program. Although some members—especially U.S. citizen members—reported that the program galvanized them to become *more* involved in union activities, dozens of others reported that the program had caused them to reduce their involvement with union activities and union communications, including online. Several respondents mentioned that they did not or would not attend union rallies or union-led protests, including actions taken on Labor Day and in concert with the No Kings organization.

248.    Other AFT respondents reported that they had attended fewer union meetings (including online meetings), responded to fewer union communications, refrained from accepting a role as a union representative, refrained from participating in preparations for strike activity and

98

picketing—including deciding not to serve as a picket captain—refrained from following the union and posting comments, refrained from attending union meetings, and reduced the amount of content they share about union-related activities.

249. AFT members, including survey respondents, also report that Defendants' viewpoint-based surveillance and promises to retaliate against those who speak in ways they disfavor have chilled their First Amendment protected speech in a variety of additional ways, including the following exemplars.

250. One active AFT member with F-visa status, AFT Doe 1, is aware of "the Trump administration's viewpoint-driven monitoring of non-citizens' social media" and has changed their social media activity "as a result" of that viewpoint-driven monitoring because they were "afraid that the Trump administration would engage in immigration-related scrutiny or targeting against" them personally and against their associates. Specifically, this respondent has refrained from posting one or more times, unfollowed one or more accounts/group-spaces/campaigns/hashtags, and deleted some previous direct messages. They took these steps in connection with content that involved "criticism of the Israeli government or expressions of support for the Palestinian people." This respondent also anticipates applying to extend, renew, or change their visa. They have "refrained from going to some union meetings" as a result of the Trump administration's viewpoint-driven surveillance, writing: "I'm afraid of my participation causing problems for me in the future." They also made a private social media account public because they believed they could face adverse government action otherwise.

251. One active AFT member with H-visa status, AFT Doe 2, is aware of "the Trump administration's viewpoint-driven monitoring of non-citizens' social media" and has changed their social media activity "as a result" of that viewpoint-driven monitoring because they were "afraid

that the Trump administration would engage in immigration-related scrutiny or targeting against" them personally and against their associates. Specifically, this respondent removed one or more posts, refrained from posting one or more times, reduced involvement with and unfollowed one or more accounts/group-spaces/campaigns/hashtags, deleted one or more accounts, and restricted access to one or more accounts. They took these steps in connection with content that involved "criticism of the Trump administration, its personnel, and/or its policies and practices" and "criticism of the Israeli government or expressions of support for the Palestinian people," as well as other topics. This respondent also anticipates applying to extend, renew, or change their visa and submitting an application to USCIS for one of the immigration benefits it administers. This person also made a private social media account public "because [they] believed [they] could face adverse government action otherwise."

252.    Another active AFT member with H-visa status, AFT Doe 3, is aware of "the Trump administration's viewpoint-driven monitoring of non-citizens' social media" and has changed their social media activity "as a result" of that viewpoint-driven monitoring because they were "afraid that the Trump administration would engage in immigration-related scrutiny or targeting against" them personally and against their associates. Specifically, this respondent limited access to their content or specific posts, edited or modified posts, removed one or more posts, refrained from posting one or more times, and reduced involvement with, unfollowed, and refrained from following one or more accounts/group-spaces/campaigns/hashtags. They took these steps in connection with content that involved "[their] union or any other unions," "labor-organizing and/or worker justice," "union-related activities," and other topics. This person anticipates applying to extend, renew, or change their visa and submitting an application to USCIS for one of the immigration benefits it administers. They also made a private social media account

100

public "because [they] believed [they] could face adverse government action otherwise," and the viewpoint-based surveillance has also caused them to alter their union activities and their non-social-media activity, including attending or organizing protests, "appearing in photos or videos that others could post online, including on social media," and "affiliating with given academic or professional groups and organizations."

253. One active AFT member with Lawful Permanent Resident status, AFT Doe 4, is aware of "the Trump administration's viewpoint-driven monitoring of non-citizens' social media" and has changed their social media activity "as a result" of that viewpoint-driven monitoring because they were "afraid that the Trump administration would engage in immigration-related scrutiny or targeting against" them personally and against their associates. Specifically, this respondent limited access to their content or specific posts, refrained from posting one or more times, reduced involvement with one or more accounts/group-spaces/campaigns/hashtags, and restricted access to one or more accounts. They took these steps in connection with content that involved "criticism of the Trump administration, its personnel, and/or its policies and practices," "criticism of the Israeli government or expressions of support for the Palestinian people," " [their] union or any other unions," "labor-organizing and/or worker justice," "union-related activities," and other topics. This person anticipates applying to USCIS for one of the immigration benefits it administers. The viewpoint-based surveillance has also caused them to alter their union activities and their non-social-media activity, including attending or organizing protests and "appearing in photos or videos that others could post online, including on social media." They are "afraid to participate in union rallies because government agents could target" them.

254. Another active AFT member with Lawful Permanent Resident status, AFT Doe 5, is aware of the Trump administration's policy of viewpoint-driven surveillance of noncitizens'

101

social media and online activity, and they anticipate submitting an application to USCIS for one of the immigration benefits it administers. They have only a LinkedIn account and no other social media, and they deleted a post that "could have been considered problematic." The viewpoint-based surveillance has also caused them to alter their union activities and their non-social-media activity, including attending or organizing protests and "appearing in photos or videos that others could post online, including on social media." During AFT's last preparation to strike, they were "advised not to serve as a picket captain" and instead to "do more 'background' service."

255. Another active AFT member with Lawful Permanent Resident status, AFT Doe 6, is aware of the Trump administration's policy of viewpoint-driven surveillance of noncitizens' social media and online activity, and has changed their social media activity "as a result" of that viewpoint-driven monitoring because they were "afraid that the Trump administration would engage in immigration-related scrutiny or targeting against" them personally. Specifically, AFT Doe 6 has "stopped using social media" altogether in response to the Trump administration's policy, including by "deleting one or more of [their] accounts." They took these steps so as to disassociate themselves from content that involved "criticism of the Trump administration, its personnel, and/or its policies and practices" and other topics. The viewpoint-based surveillance also caused them to alter their union activities and their non-social-media activity, including attending or organizing protests, "appearing in photos or videos that others could post online, including on social media," and affiliating with given student, academic, and professional groups or organizations. They do "not feel safe attending union demonstrations" anymore, including actions planned for "No Kings Day."

256. Another retiree AFT member with Lawful Permanent Resident status, AFT Doe 7, is aware of the Trump administration's policy of viewpoint-driven surveillance of noncitizens'

social media and online activity. The viewpoint-based surveillance has caused them to alter their union activities and their non-social-media activity, including that they "did not participate in Labor Day activities." This person anticipates interviewing for or is otherwise awaiting a decision regarding an application to USCIS for one of the immigration benefits it administers.

257.    An active AFT member with Lawful Permanent Resident status, AFT Doe 8, is aware of the Trump administration's policy of viewpoint-driven surveillance of noncitizens' social media and online activity. As an educator focused on academic research on international law and human rights, Defendants' policy has had a "serious chilling effect" on their First Amendment-protected speech. AFT Doe 8 does not allow students to film or record their class because they fear it will lead to online exposures of their noncitizen status and disfavored political viewpoints, thereby enabling the government to surveil and target them. This fear has impacted their ability to teach and connect with their students because they now purposely avoid sharing any personal details about their noncitizen status and background—a strategy they previously used to foster cross-cultural understanding and competency in the classroom. The Challenged Surveillance Program has also motivated the member to scrub their social media accounts. They deleted photos of themself on Facebook and asked their friends to do the same due to the Trump administration's policy. They recently deleted their X account, which they used for their career to network and connect with other academics to discuss international relations, such on the topic of Israel-Palestine. On Instagram, they now only share "stories," which automatically disappear after twenty-four hours, rather than posts, which remain visible indefinitely, out of fear of the administration's viewpoint-driven surveillance. And they now wear masks when attending rallies so they cannot be identified online for the government to surveil their viewpoints and revoke their Lawful Permanent Resident status. AFT Doe 8 also fears applying for citizenship because of

USCIS potentially requiring them to disclose social media handles as a negative discretionary factor in their application. One of the main fears is losing their Lawful Permanent Resident status and being potentially separated from their U.S.-citizen family members as a result of the Challenged Surveillance Program.

> **B.    The Challenged Surveillance Program Frustrates Plaintiffs' Ability to Organize, Represent, and Recruit Members.**

258.    Plaintiffs themselves have suffered injury because their members and associates have limited their union activity for fear of retributive immigration consequences against themselves and/or their associates.

259.    Members have ceased public affiliation with the unions, skipped union meetings, and deleted past social media and online engagements that related to union activities.

260.    Members have also withdrawn from leadership roles, curtailed their participation in union-related speech and protest activities, and even refrained from participating in union elections and completing bargaining surveys for fear that those expressive activities will be swept up in the Challenged Surveillance Program and will trigger adverse immigration consequences against them and/or their associates. This loss of engagement has harmed the Plaintiff-unions' ability to further their organizational missions and impeded their ability to carry out their responsibilities, which include: recruitment, retention, organization, and representation of members; advocacy on behalf of members; and the promotion of civic and political engagement amongst members.

261.    Plaintiffs UAW, CWA, and AFT also fulfill these responsibilities by actively maintaining social media accounts and webpages at the international, national, local, and individual unit levels. Plaintiffs rely on those accounts and webpages to further their missions by connecting with, organizing, representing, educating, and recruiting members. But Plaintiffs'

social media and online outreach are less effective when their members are coerced by the government to cancel their own social media accounts and otherwise limit their online activity, as reported above.

### 1. Plaintiff UAW

262.    Plaintiff UAW maintains social media accounts for the international union on Facebook,[239] Instagram,[240] TikTok,[241] YouTube,[242] X,[243] Bluesky,[244] Threads,[245] Reddit,[246] and LinkedIn.[247]

263.    Plaintiff UAW relies on its social media accounts to associate with and organize its membership. It uses its social media accounts to inform members about the union's latest actions, initiatives, and organizing goals; advertise trainings, meetings, and other events to members; provide members with resources; mobilize members for political and issue-based campaigns related to the union's goals; and provide updates to membership on ongoing bargaining negotiations and legislative campaigns.

---

[239] *UAW International Union*, Facebook, https://www.facebook.com/uaw.union [https://perma.cc/7WZ4-EXGQ].

[240] UAW International Union (@uaw.union), Instagram, https://www.instagram.com/uaw.union [https://perma.cc/V76A-VA4U].

[241] UAW International Union (@uawunion), TikTok, https://www.tiktok.com/@uawunion [https://perma.cc/6EH2-HPXG].

[242] UAW (@uawunion), YouTube, https://www.youtube.com/@uawunion [https://perma.cc/7DFK-9DFX].

[243] UAW (@UAW), X, https://x.com/UAW [https://perma.cc/KZ2C-UCRE].

[244] UAW (@uaw.org), Bluesky, https://bsky.app/profile/uaw.org [https://perma.cc/H85M-FS8J].

[245] UAW International Union (@uaw.union), Threads, https://www.threads.com/@uaw.union [https://perma.cc/7P3Y-CPTV].

[246] UAWUnion (u/UAWUnion), Reddit, https://www.reddit.com/user/UAWUnion [https://perma.cc/A6S2-8TWB].

[247] International Union, UAW (@uawinternational), LinkedIn, https://www.linkedin.com/company/uawinternational [https://perma.cc/BMD7-LMEJ].

264.    Plaintiff UAW also uses social media to organize potential future members and aid them in efforts to form a union.

265.    Many UAW local affiliates—including those that represent graduate students, post-docs, and faculty—also maintain their own separate but affiliated social media accounts and webpages to communicate with and organize membership. UAW International strongly encourages this practice and provides trainings to local union leadership on how to effectively use social-media accounts to connect with members.

266.    These local affiliates use their social-media accounts and websites to share: information about any collective-bargaining agreements in place, updates during negotiations of a new collective-bargaining agreement, information about local representatives (such as local officers and worksite stewards), information about how to join or get involved in the union, information about union actions, events, teach-ins, and trainings, and any campaigns that the local is running or in which it is involved.

267.    UAW members follow UAW-affiliated accounts on social media. The members not only rely on UAW's social media accounts for union updates and resources, but they also use the accounts as communication channels to organize union-related campaigns, discuss bargaining negotiations, opine on union actions and priorities, and collaborate both internally and with other locals.

268.    Plaintiff UAW and its local affiliates also maintain webpages to share information about their organizing mission, to engage with members, and to publicize recent developments. Traditionally, this web content has relied on real UAW members, including quotes and photographs of real UAW members engaged in activities core to the union's mission. In response to the Challenged Surveillance Program, noncitizen UAW members, including those in leadership

106

and steward roles, have requested that their names and images be removed from UAW-affiliated websites. Other members have declined to be featured on the website or have declined roles that would be public-facing and involve public recognition, including through the website.

269.    When Plaintiff UAW is engaged in a specific organizing campaign—especially at a higher-education facility—it often creates campaign-specific websites and social media accounts to support that campaign. Management of these websites and accounts generally transitions to the local chapter once the union becomes established. These campaign websites often rely heavily on individual testimonials, narratives, and images of workers at the organizing facility, which UAW believes are especially effective at communicating the goals of the organizing campaign and galvanizing support for unionization efforts.

270.    One local affiliate has begun deleting or archiving posts that include people's faces and anonymizing the names of individual members quoted on various pages to protect them against retaliation because of the Challenged Surveillance Program. These moves impeded the affiliate's and UAW's advocacy goals.

271.    Similar member concerns have bled into and impeded offline union activities. At least one Manhattan-based UAW local affiliate has seen a decrease in attendance by noncitizen members at union rallies, pickets, and other actions because members fear photographs from the action could be posted online and swept up by the Challenged Surveillance Program, especially if the action concerns a topic disfavored by the administration, including pro-Palestine, anti-ICE, or pro-LGBTQ+ advocacy.

272.    Plaintiff UAW and its local affiliates also use online communications channels to conduct and facilitate intra-union conversations. Through these channels, Plaintiff UAW and its local chapters build consensus, make group decisions, campaign for elected office within the

union, spread information about organizing efforts, and determine which positions to take as an organization. Some of these channels are private, others are semi-public, and still others are public.

273.    Plaintiff UAW relies on members' speech about the issues that matter to them in order to effectively advocate for their interests and represent them in their workplaces. When members silence themselves, the union's ability to achieve its core functions suffers.

274.    At least some UAW local affiliates consider advocacy on political and social justice issues integral to their core mission of member protection, and thus engage in public action and speech on those issues. For example, one local affiliate previously focused on activism in support of Palestine, including by displaying UAW branding within the campus encampment, and making it a locus of both pro-labor and pro-Palestine activism. As another example, the bylaws of the NYU Graduate Student Organizing Committee ("GSOC"), a unit of UAW Local 7902, include a "Commitment to Social and Economic Justice" and provide for a standing Political Solidarity Committee.[248] GSOC has also engaged in ICE-related activism and substantial public advocacy on behalf of its members' rights to engage in pro-Palestine speech and activism.

275.    Because some of GSOC's work involves advocacy on issues disfavored by the administration, noncitizen GSOC members have started to refrain from engaging with GSOC social media posts because they fear being swept up by the Challenged Surveillance Program. While this is especially true for GSOC posts concerning pro-Palestine, anti-ICE, or other political actions or advocacy, some noncitizen members have refrained entirely from engaging with the union's social media accounts due to concern that any association with the union's online activities

---

[248] Graduate Student Organizing Committee, *GSOCUAW Local 2110 Bylaws*, GSOC-UAW Local 7902, https://makingabetternyu.org/bylaws/ [https://perma.cc/AT6B-2JKA].

will put them in the crosshairs of the Trump administration and the Challenged Surveillance Program. This harms the union's ability to communicate with its members.

276. In response to its noncitizen members' fears of government surveillance, GSOC itself has also begun self-censoring by altering some of the language it uses in online communications and by narrowing certain public statements or event advertisements concerning political matters it believes are disfavored by the current administration.

### *2. Plaintiff CWA*

277. Plaintiff CWA maintains social media accounts for the national union on Facebook,[249] Bluesky,[250] Instagram,[251] TikTok,[252] X,[253] YouTube,[254] Threads,[255] and LinkedIn.[256]

278. CWA as a national union relies on social media accounts to associate with and mobilize its membership, as well as organize non-member workers to become prospective members. It uses its social media accounts to communicate updates to its members and to mobilize its members for political and legislative campaigns relevant to the union's mission.

---

[249] *Communications Workers of America*, Facebook, https://www.facebook.com/CWAUnion [https://perma.cc/S768-WF8E].

[250] CWA (@cwaunion.bsky.social), Bluesky, https://bsky.app/profile/cwaunion.bsky.social [https://perma.cc/88EK-YDBM].

[251] *Communications Workers* (@cwaunion), Instagram, https://www.instagram.com/cwaunion [https://perma.cc/C6CN-62XS].

[252] CWA (@cwaunion), TikTok, https://www.tiktok.com/@cwaunion [https://perma.cc/G3J4-ZBBW].

[253] CWA (@CWAUnion), X, https://x.com/CWAUnion [https://perma.cc/LG6W-BLTC].

[254] *Communications Workers of America* (@cwaunion), YouTube, https://www.youtube.com/@cwaunion [https://perma.cc/SQ6H-3M5R].

[255] *Communications Workers* (@cwaunion), Threads, https://www.threads.com/@cwaunion [https://perma.cc/NEU4-4R2G].

[256] *Communications Workers of America* (@cwaunion), LinkedIn, https://www.linkedin.com/company/cwaunion [https://perma.cc/S9MS-8AX6].

279.    CWA also uses social media to create forums for members to discuss bargaining and other issues relevant to the union. CWA actively monitors these forums to understand the issues that are important to members and tailor the CWA campaigns and negotiations conducted on behalf of members in response.

280.    CWA locals maintain their own separate, but affiliated, social media accounts to communicate with and organize membership. CWA locals post information about campaigns, bargaining negotiations, and trainings on these accounts, and some even use the accounts to organize direct actions like strikes.

281.    CWA members follow the CWA-affiliated accounts on social media and rely on those accounts to receive union updates and resources, discuss bargaining negotiations, and organize and collaborate both internally and with other locals. CWA members also use the accounts as communication channels to uplift issues of concern to their local union's leadership and to the national union.

282.    Plaintiff CWA relies on members' speech about the issues that matter to them in order to effectively advocate for their interests and represent them in their workplaces. When members silence themselves, the union's ability to achieve its core functions suffers.

### 3. Plaintiff AFT

283.    Plaintiff AFT also maintains social media accounts for the national union, including accounts on X,[257] Instagram,[258] Facebook,[259] BlueSky,[260] YouTube,[261] Threads,[262] and LinkedIn.[263] AFT actively uses its social media platforms to communicate with, associate with, and organize its membership. AFT's social media accounts serve as a key channel for promoting the interests of its members.

284.    AFT relies on its social media accounts to reach a wide audience to organize collective action around its mission. Through social media, AFT provides timely updates on its initiatives and campaigns while engaging its members and the public on emerging issues and events.

285.    In addition to its organizing and advocacy content, AFT's social media accounts link members to educational resources, such as trainings, webinars, and written guidance, that support members' professional growth, union involvement, and ability to manage issues that affect their work and welfare.

---

[257] AFT (@AFTunion), X, https://x.com/AFTunion [https://perma.cc/R9WF-2N6D].

[258] AFT (@aftunion), Instagram, https://www.instagram.com/aftunion [https://perma.cc/P6Z7-F52V].

[259] *AFT*, Facebook, https://www.facebook.com/AFTunion [https://perma.cc/JWC7-MSNJ].

[260] AFT (@aft.org), Bluesky, https://bsky.app/profile/aft.org [https://perma.cc/976W-TXYZ].

[261] AFT (@aftvideos), YouTube, https://www.youtube.com/user/AFTHQ [https://perma.cc/KYJ2-4LVE].

[262] AFT (@aftunion), Threads, https://www.threads.com/@aftunion [https://perma.cc/EBS6-7R39].

[263] AFT (@aft), LinkedIn, https://www.linkedin.com/company/aft [https://perma.cc/C7SE-9CMT].

286.    Many AFT locals also maintain their own separate, but affiliated, social media accounts to communicate with and organize membership. AFT locals use their social media accounts to share information about union initiatives, contract negotiations, organizing efforts, and political activities.

287.    Plaintiff AFT and its locals also maintain webpages to share information about their organizing mission, to engage and provide resources to members, and to publicize union initiatives, campaigns, and recent developments. AFT's and its locals' websites typically post the names of their union officers online to keep members and the public informed about their leadership. In response to the Challenged Surveillance Program, at least one AFT affiliate has removed the names of its union officers because some of the leaders are lawfully present noncitizens.

288.    Plaintiff AFT relies on members' speech about the issues that matter to them in order to effectively advocate for their interests and represent them in their workplaces. When members silence themselves, the union's ability to achieve its core functions suffers.

### 4.    *Plaintiffs UAW, CWA, and AFT*

289.    The Challenged Surveillance Program has frustrated UAW's, CWA's, and AFT's missions by decreasing member engagement with the unions.

290.    Because Plaintiffs' members have altered their behavior and limited their interactions on social media in response to the Challenged Surveillance Program, Plaintiffs' ability to communicate with, organize, and mobilize members via the UAW, CWA, and AFT social media accounts has diminished. This has harmed Plaintiffs' ability to associate with their members and fulfill their missions.

291.    Furthermore, Plaintiffs' members report unwillingness to appear on union webpages or on union social media posts for fear of being identified in connection with the Challenged Surveillance Program. This damages Plaintiffs' recruiting and outreach efforts, further obstructing their missions to increase the breadth and quality of union representation.

292.    Decreases in offline member engagement resulting from the Challenged Surveillance Program directly harm Plaintiffs' abilities to carry out their missions as labor unions, as well. As detailed above, Plaintiffs' noncitizen members have also been chilled from participating more broadly in union activity protected by the First Amendment for fear that engaging in protests, union elections, labor organizing, or political organizing could be seen as engaging in speech or activity disfavored by the administration. Decreased member engagement, online and offline, makes it more difficult for Plaintiffs to represent their members. Plaintiff labor unions cannot as effectively represent their constituents when members do not attend events, do not vote, and do not communicate with the unions.

293.    As a result of these challenges, Plaintiffs have also diverted resources from other union activities to sustain engagement, allay member fears, and protect members from the Challenged Surveillance Program. For instance, Plaintiff UAW has retained an immigration attorney to resolve immigration-specific issues that union members previously had not faced. At least one UAW local affiliate and one UAW graduate student union have diverted resources and substantial staff time to create resources for noncitizen members in response to E.O. 14161 and E.O. 14188 and concerns about the Challenged Surveillance Program, including resources on protecting social media accounts for members who need to re-enter the U.S. after traveling internationally. Responding to these concerns has diverted resources away from other important union activities, including preparation for bargaining and direct member counseling.

294.    Plaintiff CWA has likewise diverted resources away from its usual course of services in order to protect its noncitizen members. Responding to member concerns related to the Challenged Surveillance Program has diverted resources away from other important union activities, including preparation for bargaining and direct member counseling.

295.    Likewise, Plaintiff AFT has had to divert monetary and human-capital resources away from its usual course of services to the protection of union members on student visas. In July 2025, AFT engaged a third-party organization to conduct trainings for noncitizen union members on protecting and modifying their online presence in order to return from travel abroad without interference. Further, AFT has recently provided a back-to-campus resource for members in higher education through its AFT Higher Education website; the resource advised noncitizen members of the steps they should take as they prepared to return to campuses after the summer. That resource included information regarding the U.S. State Department's new policy on vetting social media accounts for F-1, J-1, and M-1 visa holders.[264]

### C.    The Challenged Surveillance Program Is Broadly Chilling Speech

296.    In summary, the Challenged Surveillance Program targets and suppresses expressive activity documented online along two parallel tracks. Through the Challenged Surveillance Program, Defendants and their agents monitor for disfavored online expression, primarily of lawfully present noncitizens, and impose adverse immigration consequences based on that disfavored expression. And by loudly proclaiming that they are watching noncitizens online and will impose adverse immigration consequences against them if they detect disfavored

---

[264] *Returning to Campus for International Faculty, Staff and Students*, AFT (2025), https://www.aft.org/featured-resources/defending-higher-education-in-2025 [https://perma.cc/8ZHT-DPGE] (advising members that the government "is now scrutinizing" the "public and private online content" of both first time and returning visa applicants).

expression, Defendants and their agents also coerce would-be speakers into silence. The chilling effects of the Challenged Surveillance Program have already had dramatic effects that extend well beyond the Plaintiffs in this case.

297.    In April, the *Harvard Crimson* faced a flurry of requests from international students to remove their articles, bylines, and quotes from the online publication.[265] The same was true for some student newspapers and magazines in the University of California system, which agreed to remove entire articles and to scrub names from articles written by international students, even though editors believed that "removing a byline weakens a story's credibility."[266] Plaintiffs UAW and AFT, whose missions include encouraging and supporting the democratic participation and free speech rights of its members, have members in local unions at both Harvard University and in the University of California system.

298.    According to reports, Division I coaches are advising current international players to scrub and consider deleting their social media accounts.[267] Plaintiff labor unions, whose mission includes encouraging and supporting the democratic participation and free speech rights of its members, have members in local unions at Division I universities.

---

[265] Xavier Martinez, *Fearing Trump's Visa Crackdown, College Students Race to Scrub Op-Eds*, Wall St. J. (Apr. 23, 2025, at 9:00 PM ET), https://www.wsj.com/us-news/education/trump-student-visas-newspaper-op-eds-61595294 [https://perma.cc/8U5Z-RZ8K].

[266] Emewodesh Eshete, *Fearing Deportation, International Students Go Silent at California's Universities*, CalMatters (Aug. 8, 2025), https://calmatters.org/education/2025/08/international-students-california-universities [https://perma.cc/9RHD-XN5U].

[267] Michael Rothstein & Dan Murphy, *Coaches & International Athletes Grapple with U.S. Visa Uncertainties*, ESPN (June 4, 2025, at 7:00 AM ET), https://www.espn.com/college-sports/story/_/id/45442114/ncaa-athletes-visas-trump-immigration [https://perma.cc/87GY-W6M8].

299.    As suggested by reports, noncitizen students are broadly scrubbing their social media accounts "of anything even remotely controversial."[268] Plaintiff labor unions, whose mission includes encouraging and supporting the democratic participation and free speech rights of their members, have student members across the country.

300.    The scrubbing extends beyond visa holders, with reports suggesting Lawful Permanent Residents feel compelled to scrub their social media speech as well.[269]

301.    On August 8, 2025, *Cal Matters* reported that international students within the University of California system, which includes members of Plaintiffs UAW and AFT, had made extensive changes—including "scrubbing their social media posts and limiting their political activism" in response to the environment of fear created by the Challenged Surveillance Program.[270] According to the article, the international students interviewed were too afraid even to have their names used in the article, "due to fears of being identified and having their status revoked for speaking publicly."[271]

302.    Tools that help users censor their own online speech by removing posts to which the administration might object have flourished in the shadow of the viewpoint-driven surveillance program.

303.    For example, Redact.dev allows users to delete posts, direct messages, photos, videos, and even likes, and provides the ability to delete by "keyword, sentiment, content type,

---

[268] Julia Shapero, *Trump Social Media Screenings Stun Students*, Hill (July 24, 2025, at 5:54 PM ET), https://thehill.com/newsletters/technology/5419203-trump-social-media-screenings-stun-students [https://perma.cc/XQ6K-UT2Q].

[269] NPR Morning Edition, *'Citizenship Won't Save You': Free Speech Advocates Say Student Arrests Should Worry All*, NPR (Apr. 8, 2025, at 5:00 AM ET), https://www.npr.org/transcripts/nx-s1-5349472 [https://perma.cc/ZAY2-GFTL].

[270] *See* Eshete, *supra* note 266.

[271] *Id.*

and more" across thirty or more social media platforms.[272] The company expressly offers its product to people who are seeking to remove "overly political" content from their social media accounts, noting that "[u]nder the new rules," content like attending a protest, statements that "critiqued some foreign policy, or shared some activist content" could "trigger investigations, delays or denial of your entry to the U.S."[273] According to Washington Post reporting, the company has grown 15 percent month over month in 2025.[274] Redact.dev's CEO confirmed that the Trump administration's viewpoint-driven online surveillance has "greatly accelerated" the company's growth.[275] He reports, "Basically, our understanding is that people are using this to clean up any political takes that they have, whatsoever. Anything that can be seen as inflammatory, really kind of quelling freedom of speech."[276]

## CLAIMS FOR RELIEF

### FIRST CLAIM
**(Viewpoint Discrimination in Violation of the First Amendment, U.S. Const., amend. I)**

304.    Plaintiffs incorporate and reallege all other paragraphs in this amended complaint as if fully set forth herein.

---

[272] *Redact*, https://redact.dev [https://perma.cc/A37X-YDSQ].

[273] Redacto, *U.S. Social Media Screening Mandate for Student Visa Applicants*, Redact (June 19, 2025), https://redact.dev/blog/social-media-mandate-us-visa-applicants [https://perma.cc/56ZB-XHD2].

[274] Sammy Westfall, *To Study in the U.S. Under Trump, International Students Scrub Their Accounts*, Wash. Post (July 9, 2025), https://www.washingtonpost.com/world/2025/07/09/international-students-visas-trump-social-media-online-vetting [https://perma.cc/K99X-PZMD].

[275] Lexi Lonas Cochran, *International Students Look to Cleanse Social Media Amid New Trump Visa Policy*, The Hill (July 24, 2025, at 6:00 AM ET), https://thehill.com/homenews/education/5416107-international-students-trump-visas-immigration-crackdown-social-media [https://perma.cc/GD3A-KYPM].

[276] *Id.*

305. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

306. The First Amendment prohibits the government from discriminating against expression based on its viewpoint—that is, the specific motivating ideology, opinion, or perspective of the speaker.

307. The Challenged Surveillance Program is carried out to identify and punish noncitizens who express viewpoints disfavored by the government. Defendants seek and have sought to punish political and ideological expression by noncitizens on a number of topics, including criticism of the United States, criticism of the Trump administration, criticism of the state of Israel, and support for Palestine.

308. Plaintiffs and their affected members are aware of the Challenged Surveillance Program and have curtailed their expression in response to it.

309. The speech and individuals targeted by the Challenged Surveillance Program are protected by the First Amendment.

310. No legitimate compelling government interest justifies Defendants' actions, and they are not appropriately tailored to achieving any legitimate and compelling governmental interest.

311. Defendants' actions have a chilling effect on Plaintiffs' and their members, deterring the exercise of First Amendment protected expression.

312. Defendants' violation of Plaintiffs' and their members' right to freedom of expression has caused, and absent relief will continue to cause, Plaintiffs and their members to suffer undue and actual hardship and irreparable injury.

313.    Plaintiffs and their members will resume their expression, including social media and online activity, if the Program is enjoined.

314.    Plaintiffs have no adequate remedy at law to correct the continuing deprivations of their constitutional liberties.

## SECOND CLAIM
**(Coercive Threats in Violation of the First Amendment, U.S. Const., amend. I)**

315.    Plaintiffs incorporate and reallege all other paragraphs in this amended complaint as if fully set forth herein.

316.    The First Amendment prohibits the government from discriminating against expression based on viewpoint—that is, the specific motivating ideology, opinion, or perspective of the speaker.

317.    Core to protecting the freedoms of the First Amendment is the long recognized "principle that a government official cannot do indirectly what she is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024).

318.    Defendants wield significant regulatory and enforcement authority over Plaintiffs' members. Defendants' statements and publications about the Challenged Surveillance Program—including, but not limited to, their statements about the viewpoint-based nature of the program and the menacing trumpeting of the accompanying punishment for those caught—collectively amount to a coercive threat to use their authority to surveil and punish noncitizens because of their disfavored views. Defendants' actions in furtherance of the Challenged Surveillance Program, as well as the Challenged Surveillance Program's targets' reactions, evidence the coercive nature of Defendants' actions.

319.    Defendants' statements about the Challenged Surveillance Program are reasonably understood to constitute threats to impose adverse immigration consequences, including visa

119

denial or revocation, detention, and deportation, against noncitizens who express disfavored views on a number of topics, including criticism of the United States, criticism of the Trump administration, criticism of the state of Israel, and support for Palestine.

320.    Plaintiffs and their affected members are aware of the coercive threats component of the Challenged Surveillance Program, which targets them, and have curtailed their First Amendment protected expression in response to it.

321.    Defendants' violation of Plaintiffs' members' right to freedom of expression has caused, and absent relief will continue to cause, Plaintiffs and their members to suffer undue and actual hardship and irreparable injury.

322.    Plaintiffs and their members will resume their protected expression, including social-media and online activity, if the Defendants' actions are enjoined.

323.    Plaintiffs have no adequate remedy at law to correct the continuing deprivations of their members' constitutional liberties that are central to their missions.

**THIRD CLAIM**
**(Infringing on the Rights of Association and Anonymity in Violation of the First Amendment, U.S. Const., amend. I)**

324.    Plaintiffs incorporate and reallege all other paragraphs in this amended complaint as if fully set forth herein.

325.    The First Amendment freedom of speech includes the rights to associate anonymously and to speak anonymously.

326.    The Challenged Surveillance Program requires millions of visa holders already lawfully present in the United States to make their social media accounts public, at least for the duration of the processes to apply for, or renew, visa and entry permit applications. Those processes can take anywhere from weeks to months, requiring applicants to keep their profiles public for long periods of time.

327. The mandatory requirement that social media accounts be made public poses a distinct harm to Plaintiffs' First Amendment-protected expression because of the inevitability that their social media accounts will be reviewed under the Challenged Surveillance Program. Plaintiffs' members' expression is specifically chilled by the mandatory disclosure requirement and the Challenged Surveillance Program's resulting surveillance and threat of surveillance.

328. The requirement that applicants make their accounts public and maintain them as public for weeks on end is overbroad and sweeping on its face, and it is not narrowly tailored to serve a compelling government interest.

329. By requiring visa re-applicants lawfully present in the United States to make their social media profiles public and by considering a refusal to do so a negative factor, Defendants violate the First Amendment.

330. Defendants' violation of Plaintiffs' members' First Amendment rights has caused, and absent relief will continue to cause, Plaintiffs and their members to suffer undue and actual hardship and irreparable injury.

331. Plaintiffs and their members will resume their protected expression, including social-media and online activity, if the Defendants are enjoined from requiring already-lawfully-present visa applicants and re-applicants to make their social media profiles public and from considering a refusal to do so a negative factor, and if the Challenged Surveillance Program is enjoined.

332. Plaintiffs have no adequate remedy at law to correct the continuing deprivations of their members' constitutional liberties that are central to their missions.

**FOURTH CLAIM**
**(Infringing on the Right to Receive Information in Violation of the First Amendment, U.S. Const., amend. I)**

333. Plaintiffs incorporate and reallege all other paragraphs in this amended complaint as if fully set forth herein.

334. The First Amendment freedom of speech protects the right to receive information and ideas and prohibits the government from burdening the ability to receive speech from willing speakers.

335. Prior to Defendants' implementation of the Challenged Surveillance Program, Plaintiffs and their members received information from willing speakers who are lawfully present noncitizens on a number of topics, including criticism of the United States, criticism of the Trump administration, criticism of the state of Israel, and support for Palestine.

336. The Challenged Surveillance Program and Defendants' coercive threats describing the program have chilled the protected speech of Plaintiffs' members—including U.S.-based visa holders and Lawful Permanent Residents with university affiliations—on a number of topics, including criticism of the United States, criticism of the Trump administration, criticism of the state of Israel, and support for Palestine. Defendants' actions have deprived Plaintiffs and other of Plaintiffs' members of a valuable source of information and the ability to hear specific perspectives on a number of topics.

337. The Challenged Surveillance Program unconstitutionally burdens the Plaintiffs' and their members' First Amendment right to receive information from lawfully present noncitizens.

338. No legitimate compelling government interest justifies Defendants' actions, and they are not appropriately tailored to achieving any legitimate compelling governmental interest.

339. Defendants' violation of Plaintiffs and their members' right to freedom of expression (inclusive of the right to receive information and ideas) has caused, and absent relief will continue to cause, Plaintiffs and their members to suffer undue and actual hardship and irreparable injury.

340. Plaintiffs' members will resume their protected expression, including social media and online activity, if Defendants' coercive threats and the Challenged Surveillance Program are enjoined, which will directly redress Defendants' violation of Plaintiffs' and their members' First Amendment right to receive information from lawfully present noncitizens.

341. Plaintiffs have no adequate remedy at law to correct the continuing deprivations of their constitutional liberties.

**FIFTH CLAIM**
**(Arbitrary and Capricious Action in Violation of the Administrative Procedure Act)**

342. Plaintiffs incorporate and reallege all other paragraphs in this amended complaint as if fully set forth herein.

343. The APA empowers courts to "hold unlawful and set aside" agency action that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

344. The Challenged Surveillance Program is final agency action that is reviewable under 5 U.S.C. §§ 704 and 706 because there is no other adequate remedy, it marks the consummation of the agencies' decision-making processes and imposes binding legal consequences.

345. Defendants' enforcement of the Challenged Surveillance Program is arbitrary and capricious, in that: Defendants have given no legitimate explanation for their conduct, which constitutes a change in agency policy; have relied on factors Congress has not intended them to consider; have failed to consider alternative options; have not considered important aspects of the

123

problem they purport to want to remedy; and their actions are not justified by the evidence before them.

346. Defendants have offered no legitimate interest in carrying out the Challenged Surveillance Program. Defendants' rationales for their final agency action have been discriminatory, pretextual, or unsupported by evidence available to them.

347. The Challenged Surveillance Program will continue injuring plaintiffs absent judicial relief.

## SIXTH CLAIM
### (Exceeding Authority in Violation of the Administrative Procedure Act)

348. Plaintiffs incorporate and reallege all other paragraphs in this amended complaint as if fully set forth herein.

349. The APA empowers courts to "hold unlawful and set aside" agency action taken in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

350. The Challenged Surveillance Program is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

351. No statute authorizes the Challenged Surveillance Program and Defendants therefore exceed statutory authority.

352. The Challenged Surveillance Program will continue injuring plaintiffs absent judicial relief.

## SEVENTH CLAIM
### (Contrary to Law in Violation of the Administrative Procedure Act)

353. Plaintiffs incorporate and reallege all other paragraphs in this amended complaint as if fully set forth herein.

354.    The APA empowers courts to "hold unlawful and set aside" agency action that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

355.    The Challenged Surveillance Program is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

356.    The Challenged Surveillance Program is contrary to a constitutional right because it violates the First Amendment.

357.    The Challenged Surveillance Program will continue injuring Plaintiffs absent judicial relief.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

A.    Declare that the Challenged Surveillance Program and Defendants' actions to implement it are unconstitutional and/or unlawful because they violate the First Amendment and the APA;

B.    Enjoin Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing the Challenged Surveillance Program—including, without limitation, through viewpoint-based investigation and surveillance, as well as through the issuance of coercive threats to employ the program aimed at silencing disfavored views;

C.    Enjoin Defendants, their agents, and anyone acting in concert or participation with Defendants from relying on or using all records of individuals created through the Challenged Surveillance Program and its unlawful viewpoint-based surveillance and to further purge those records;

D.    Enjoin Defendants, their agents, and anyone acting in concert or participation with Defendants from conducting viewpoint-based surveillance in furtherance of Executive Orders Nos. 14161 and 14188;

E.    Vacate any final agency action implementing the Challenged Surveillance Program;

F.    To the extent Defendants rely on any statutory authority to conduct viewpoint-based surveillance, declare that those provisions violate the First Amendment as applied, and enjoin Defendants from applying those provisions;

G.    Award Plaintiffs reasonable costs and attorneys' fees incurred in this action; and

125

H.    Grant such other and further relief as the Court may deem just and proper.


Dated: April 29, 2026                     Respectfully Submitted,


/s/ Sadaf Hasan                           /s/ John Langford
MUSLIM ADVOCATES                          MEDIA FREEDOM & INFORMATION
Sadaf Hasan*                                 ACCESS CLINIC
Collin Poirot                             Anthony Cosentino, *student*
1032 15th Street N.W. # 362               Nick Jones, *student*
Washington, D.C. 20005                    Raymond Perez, *student*
(202) 655-2969                            Tess Solomon, *student*
sadaf@muslimadvocates.org                 Grace Chisholm, *student*
collin@muslimadvocates.org                Stacy Livingston
                                          John Langford
/s/ David Greene                          P.O. Box 208215
ELECTRONIC FRONTIER FOUNDATION            New Haven, CT 06511
David Greene                              (203) 432-2366
Sophia Cope                               stacy.livingston@ylsclinics.org
Elizabeth Femia                           john.langford@ylsclinics.org
Saira Hussain
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
davidg@eff.org
sophia@eff.org
lfemia@eff.org
saira@eff.org

*Pro hac vice* application forthcoming


                                          *Counsel for Plaintiffs*

126