UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA, *et al.*,

                   Plaintiffs,

    -against-

UNITED STATES DEPARTMENT OF STATE,
*et al.*,

               Defendants.

Index No. 25-cv-8566 (AKH)

**BRIEF OF LABOR SCHOLARS**
**AS *AMICI CURIAE***

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000

**TABLE OF CONTENTS**

PAGE NO.

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................................................1

INTEREST OF *AMICI CURIAE* ...........................................................................................2

ARGUMENT ...........................................................................................................................3

I.   FREE SPEECH HAS ALWAYS BEEN CENTRAL TO LABOR UNIONS' FIGHT FOR WORKPLACE DEMOCRACY ...........................................................................3

II.  IMMIGRATION AND CIVIL RIGHTS ARE CENTRAL TO UNIONS' ORGANIZING STRATEGY AND REPRESENTED WORKERS' INTERESTS, AND UNIONS PUSH FOR CHANGE ON THESE ISSUES AT AND BEYOND THE BARGAINING TABLE...........................................................................................9

    A.   Civil Rights ...........................................................................................10

    B.   Immigration...........................................................................................13

III. UNIONS CANNOT FUNCTION WITHOUT FREE AND OPEN COMMUNICATION WITH AND BETWEEN THEIR MEMBERS, INCLUDING ONLINE...............................................................................................................17

CONCLUSION.......................................................................................................................19

APPENDIX.............................................................................................................................22

## TABLE OF AUTHORITIES

**Cases**

*Abrams v. United States*,
250 U.S. 616 (1919)......................................................................................... 7

*Am. Ass'n of Univ. Professors v. Rubio*,
802 F.Supp.3d 120 (2025) ............................................................................... 9

*Bhd. of R.R. Trainmen v. Virginia ex rel VA. State Bar*,
377 U.S. 1 (1964)............................................................................................. 7

*Commc'ns Workers of Am. v. Beck*,
487 U.S. 735 (1988)....................................................................................... 10

*Eastex Inc. v. Nat'l Lab. Rel. Bd.*,
437 U.S. 556 (1978)......................................................................................... 9

*Elastomers v. NLRB*,
108 F.4th 252 (5th Cir. 2024) ....................................................................... 18

*Ellis v. Brotherhood of Railway*,
466 U.S. 435 (1984)....................................................................................... 17

*Gitlow v. New York,*
268 U.S. 652 (1925)......................................................................................... 7

*Hague v. CIO*,
307 U.S. 496 (1939)......................................................................................... 7

*Int'l Ass'n of Machinists v. S.B. Street*,
367 U.S. 740 (1961)....................................................................................... 10

*Int'l Union of United Auto. Aerospace and Agric. Workers of Am. v. Brock*,
477 U.S. 274 (1986)......................................................................................... 9

*Janus v. AFSCME,*
585 U.S. 878 (2018)....................................................................................... 10

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967)......................................................................................... 8

*Linn v. United Plant Guard Workers*,
383 U.S. 53 (1966)......................................................................................... 18

*President and Fellows of Harvard Coll. v. U.S Dep't Health and Hum. Servs.*,
798 F. Supp. 3d 77 (D. Mass., Sept. 3, 2025)................................................. 9

*State Emp. Bargaining Agent Coal. v. Rowland*,
    718 F.3d 126 (2d Cir. 2013).................................................................................. 3

*Sure-Tan v. NLRB*,
    467 U.S. 883 (1984)........................................................................................... 14

*Thomas v. Collins*,
    323 U.S. 516 (1945)............................................................................................. 7

*Thornhill v. Alabama*,
    310 U.S. 88 (1940)............................................................................................... 7

*Whitney v. California*,
    274 U.S. 357 (1927)............................................................................................. 7

**NLRB Cases**

*Caesars Entertainment d/b/a Rio All-Suites Hotel and Casino*,
    368 NLRB No. 143 (2019) ................................................................................ 18

*Lion Elastomers*,
    372 NLRB No. 83 (2023) .................................................................................. 18

**Statutes**

29 U.S.C. § 151................................................................................................................ 6

29 U.S.C. § 157.............................................................................................................. 17

**Filings**

Additional Br. of the Am. Fed. of Teachers as Amici Curiae,
    *Brown v. Bd. of Educ. of Topeka*,
    349 U.S. 294 (1955)........................................................................................... 12

Brief Amicus Curiae of the National Education Ass'n, et al., in Support of Respondents,
    *Arizona v. Inter Tribal Council of Ariz., Inc.*,
    570 U.S. 1 (2013)............................................................................................... 12

Brief for Cong. of Indus. Orgs as Amici Curiae,
    *Stainback v. Mo Hock Ke Lok Po*,
    336 U.S 368 (1949)............................................................................................ 15

Brief for the AFL-CIO as Amici Curiae in Support of Appellant,
    *Citizens United v. FEC*,
    558 U.S. 310 (2010)............................................................................................. 8

Brief for the AFL-CIO as Amici Curiae in Support of Petitioners,
    *Hill v. Colorado*,
        530 U.S. 703 (2000)................................................................................................. 8

Brief for the Lawyers' Committee for Civil Rights Under Law et al., as Amici Curiae in Support
    of Petitioners,
    *Crawford v. Marion Cnty. Election Bd.*,
        553 U.S. 181 (2008)............................................................................................... 12

Brief of Amici Curiae Fred T. Korematsu Center for Law and Equality et al.,
    *Perkins Coie LLP v. DOJ*,
        No. 25-5241 (Apr. 3, 2026) .................................................................................... 8

Brief. for the Cong, of Indus. Orgs. as Amicus Curiae,
    *Brown v. Bd. of Educ. of Topeka*,
        349 U.S. (1953)..................................................................................................... 12

Complaint, *L.A. Press Club v. Noem*,
    No. 25 Civ.05563 (C.D. Cal. June 18, 2025)....................................................... 8

## INTRODUCTION AND SUMMARY OF ARGUMENT

Unions have long fought not only to improve wages and working conditions, but also to defend the civil rights and civil liberties that make collective action possible.  For workers in low-wage industries, "the demand for higher wages and safe working conditions cannot be divorced from the need to address disparities in wealth, health, housing, and education that are tied to race, gender, class, geography, and immigration status."[1]

Defendants are wrong that the union plaintiffs in this case lack associational standing because they do not "seek to protect interests that are germane to each organization's purpose," inasmuch as their "organizational expertise' in workers' rights" is unrelated to "ensuring the First Amendment rights of Plaintiffs' alien members."  Dkt. No. 52 at 20, 25 (cleaned up).  Defendants are also wrong that the unions lack organizational standing because they have not explained "how members refraining from posting [content disfavored by the Trump Administration] harms their ability to effectively advocate for their [members'] interests and represent them in their workplaces."  *Id*. at 26 (cleaned up).

Defendants' mistaken arguments operate from the same flawed premise, that union members' interests in improving their wages and working conditions through unionization and collective bargaining are separable from their speech interests.  That premise is wrong for two reasons.  First, workers' abilities to speak freely on issues that matter to them and their coworkers is foundational to union organizing and advocacy.  Second, effective union representation—winning improvements on issues that matter to members—extends beyond the bargaining table to include strikes, protests, legislative advocacy, and litigation.  Moreover, these

---

[1] Kimberly M. Sánchez Ocasio & Leo Gertner, *Fighting for the Common Good: How Low-Wage Workers' Identities Are Sharping Labor Law*, YALE L. J. F., 505, 510 (2017); *see also* James Gary Pope, *Labor's Constitution of Freedom*, 106 YALE L. J. 942, 1026 (1997).

strategies to exert collective pressure cannot be implemented unilaterally by union leadership or union employees; they rely on workers' buy-in and participation.  As a result, unions and members need to engage in robust and ongoing dialogue on issues of both substance and strategy—and, in the twenty-first century, that dialogue takes place at least in part online.

This amicus brief aims to show that freedom of speech and the right of association are, and always have been, at the heart of the labor movement.  Unions have fought for free speech—theirs and workers'—as a good in itself, and they have exercised and expanded civil liberties to fight for their members' substantive priorities, including as to immigration.

This brief is organized into three sections.  It begins with a historical overview of unions' longstanding recognition that their and their members' speech and association rights are inextricably intertwined with their most fundamental goals.  Then it explains how unions' advocacy on issues that are important to workers (including immigration) occurs both at and beyond the bargaining table, and why this advocacy cannot happen without workers who are willing to speak out.  Finally, it discusses the importance of communication via social media to this advocacy.

## INTEREST OF *AMICI CURIAE*

*Amici* are 30 scholars of labor law and related topics.  Their names, titles, and academic affiliations (provided for identification purposes only) are listed in the Appendix.  All possess expertise in, and have conducted research on, labor unions and workers' rights.  As labor scholars, *amici* aim to assist this Court by offering a more complete picture of how unions operate to fulfill their missions.

## ARGUMENT

### I.    FREE SPEECH HAS ALWAYS BEEN CENTRAL TO LABOR UNIONS' FIGHT FOR WORKPLACE DEMOCRACY

The right to engage in collective action—protest and other forms of persuasion—is at the very heart of the labor movement's struggle to advance workers' political and economic interests.[2]  Unions have long situated this right in First Amendment free speech principles, in the Thirteenth Amendment's prohibition against involuntary servitude, and in the Fourteenth Amendment's guarantee of due process.[3]  That has made unions powerhouses of workers' political and civic participation—educating workers about political issues, financing campaigns, mobilizing voters and boosting turnout, advocating for policy change, and otherwise "equalizing power in the political economy and providing a countervailing voice to organized business groups."[4]  Consequently, unions have become a chief mechanism through which members of the working- and middle-classes have engaged in free speech and political organizing.[5]

---

[2] *State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 132 (2d Cir. 2013) ("The right to free association is a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society. . . .  Included in this right to free association is the right of employees to associate in unions.").

[3] Joseph Fishkin & William E. Forbath, *The Anti-Oligarchy Constitution*, 94 B.U. L. REV. 672, 691 (2014); *see also generally* James Gray Pope, *The First Amendment, the Thirteenth Amendment, and the Right to Organize in the Twenty-First Century*, 51 RUTGERS L. REV. 941 (1999); Catherine Fisk & Jessica Rutter, *Labor Protest Under the New First Amendment*, 36 BERKELEY J. EMP. & LAB. L. 277 (2015); Laura Weinrib, THE TAMING OF FREE SPEECH: AMERICA'S CIVIL LIBERTIES COMPROMISE (2016).

[4] Kate Andrias & Benjamin J. Sachs, *Constructing Countervailing Power: Law and Organizing in the Era of Political Inequality*, 130 YALE L. J. 546, 567–68 (2021); *see also* Kate Andrias, *Labour and Democracy*, OXFORD UNIV. PRESS (BRIAN LANGILLE & GILLIAN LESTER ED 2024) (reviewing this literature); Aaron J. Sojourner, *Do Unions Promote Members' Electoral Office Holding? Evidence from Correlates of State Legislatures' Occupational Shares*, ILR REVIEW Vol. 66, Issue 2, 467–86 (2013); Jasmine Kerrissey & Evan Schofer, *Union Membership and Political Participation in the United States*, 91 SOCIAL FORCES 895, 895–96 (2013); JAKE ROSENFELD, WHAT UNIONS NO LONGER DO 170, 173 (2014); Roland Zullo, *Union Cities and Voter Turnouts' in Labour and Employment Relations Association Series: Proceedings of the 58th Annual Meeting*, Boston, Massachusetts (2006) 200–02.

[5] Sánchez Ocasio & Gertner, *supra* n. 1, at 505; Pope, *supra* n. 1, at 949; Benjamin I. Sachs, *The Unbundled Union: Politics Without Collective Bargaining*, 134 YALE L. J. 148, 152 (2013); Catherine L. Fisk, *A Progressive Labor Vision of the First Amendment: Past as Prologue*, 118 COLUM. L. REV. 7, 2092 (2018) ("Labor unions are among the few civil society organizations with national reach and deep policy and political expertise at the local, state, and national levels.  They are among the few that have the ability to inform and mobilize voters and activists on economic inequality issues and to be bulwarks against erosion of constitutional democracy.").

The history of the labor movement leaves no doubt that labor unions have always engaged deeply with core political issues affecting their members' lives, both inside and outside of the workplace.  Labor unions attained national power amidst the economic instability, corporate mergers, and poor working-conditions that characterized the Second Industrial Revolution (c. 1870–1914).[6]  During this period, which followed the American Civil War, the labor movement pushed to extend the civil and political rights enshrined in the Reconstruction amendments to reach production and the marketplace, arguing that there could be no political democracy without "industrial democracy."[7]  Some labor-movement leaders even conceptualized the movement as a continuation of the struggle to abolish slavery—characterizing union strikes as the successors of slave revolts and wage theft as an iteration of involuntary servitude.[8]  The core tenet of the movement for industrial democracy was that, just as the people have a right to be heard in and to shape the policy of their government, so too do the people have the right to be heard in and to shape the policy of their workplace.[9]  Labor republicans argued that economic dependence in the workplace corrupted freedom outside it because it undermined full standing and dignity and made it impossible to exercise formal legal rights.

Early labor activism sometimes centered civil liberties—most famously, the Industrial Workers of the World's ("IWW's") "free speech fights."  During these "fights" (which were generally non-violent on the part of the IWW) members would deliver "fiery soapbox

---

[6] NELSON LICHTENSTEIN, STATE OF THE UNION: A CENTURY OF AMERICAN LABOR 6 (Rev. & Expanded Ed. 2013); Carlo Medici, *Closing Ranks: Organized Labor and Immigration*, UCLA J. POL. ECON., 2 (2025).

[7] LICHTENSTEIN, *supra* n. 6, at  6–7; Joseph Fiskin & William E. Forbath, *Wealth, Commonwealth, & the Constitution of Opportunity: A Story of Two Traditions*, BERKELEY CTR. FOR STUDY L. & SOC'Y, 42–43 (2015), https://www.law.berkeley.edu/wp-content/uploads/2015/04/Fishkin-Forbath-Constitution-of-Opportunity-CSLS-Berkeley-November-2015.pdf.

[8] Pope, *supra* n. 3, at 979–80.

[9] Cynthia Estlund, *Workplace Democracy for the Twenty-First Century? Rethinking A Norm of Worker Voice in the Wake of the Corporate Diversity Juggernaut*, 14 NEV. L. J. 309, 310 (2014).

speeches," which would inevitably be met with arrest and violent repression.[10]  After one member was arrested, another would take that member's place.  Arrests were "met by more speeches and the arrival in town of additional IWW members, followed by more arrests, followed by more speeches and more reinforcements," sometimes for weeks.[11]  This tactic was meant to claim First Amendment rights for workers: "When the police came to arrest them, the labor activist would say, 'Have you ever read the Constitution?'"[12]

From World War I through the New Deal, labor unions continued to engage in the nation's core political debates, seeking to advance a broad conception of workers' interests. They pursued workers' goals through collective organizing and mass mobilization, as well as through legislative, administrative, and other political channels.  During the Progressive Era (c. 1890-1920s) and World War I (1914–18)—periods of rapid growth of the labor movement— labor played a central role in encouraging the first state and local labor regulations, while also supporting war-time mobilization.[13]  Labor's focus was not only on improving wages but on eliminating substandard working and living conditions.  Increasingly, the labor movement also linked "[p]overty, inequality, sexual degradation, and industrial violence" as social maladies to be solved through collective and/or state action.[14]

---

[10] Ahmed A. White, *The Crime of Economic Radicalism: Criminal Syndicalism Laws and the Industrial Workers of the World, 1917-1927*, 85 OREGON L. REV. 649, 683-84 (2006); *see also* MELVYN DUBOFSKY, WE SHALL BE ALL: A HISTORY OF THE INDUSTRIAL WORKERS OF THE WORLD (1969); PHILIP S. FONER, HISTORY OF THE LABOR MOVEMENT, VOL. 9, THE T.U.E.L. TO THE END OF THE GOMPERS ERA (1991).

[11] *Id.*

[12] Catherine L. Fisk, *Is It Time For a New Free Speech Fight? Thoughts on Whether the First Amendment is a Friend or Foe of Labor*, 39 BERKELEY J. EMP. & LAB. L. 253, 255 (2017).

[13] LICHTENSTEIN, *supra* n. 6, at 9.

[14] *Id.*; *see also* Laura Weinrib, *Labor History and the Clash of Capabilities*, in THE CAPABILITIES APPROACH & LABOR LAW, 15 (Brian Langille ed. 2019).

Later, as the interwar period gave way to the Great Depression (1929–39), mass joblessness led to growing labor unrest and new industrial organizing.[15]  Unions became one of the driving forces behind the New Deal, eventually winning such victories as the 1935 Wagner Act (the National Labor Relations Act or "NLRA").  The NLRA championed industrial democracy by bringing rights to free speech and democratic participation—already foundational to American politics—into the American workplace.[16]  As the NLRA states, "[t]he inequality of bargaining power between employees who do not possess *full freedom of association* or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association[,] substantially burdens and affects the flow of commerce."[17]

Labor unions—including Plaintiffs in this case—today often use the collective bargaining process itself to protect their members' abilities to speak out on public issues without fear of retaliation.[18]  This is especially true of workers whose jobs require engagement with controversial issues, including journalists and non-profit workers represented by plaintiff Communications Workers of America ("CWA"),[19] and academic workers represented by plaintiffs American Federation of Teachers ("AFT") and UAW.[20]

---

[15] Richard B. Freeman & Kelly Hillbrich, *Do Labor Unions Have a Future in the United States?*, HARVARD LIBRARY, 3 (Rycroft ed. 2013), https://dash.harvard.edu/server/api/core/bitstreams/7312037c-c6ae-6bd4-e053-0100007fdf3b/content; James Gary Pope, *A Brief History of United States Labor and Employment Law*, in THE OXFORD INTERNATIONAL ENCYCLOPEDIA OF LEGAL HISTORY 477, 480–81 (Stanley N. Katz ed. 2009).

[16] LICHTENSTEIN, *supra* n. 6, at 20–25, 30–38, 52–53, 64.

[17] 29 U.S.C. § 151 (emphasis added).

[18] Catherine L. Fisk & Michael J. Wishnie, *The Story of Hoffman Plastic Compounds, Inc. v. NLRB: Labor Rights Without Remedies for Undocumented Immigrants*, in LABOR LAW STORIES 339 (Laura J. Cooper & Catherine L. Fisk, Eds., 2005); Kati L. Griffith & Tamara L. Lee, *Immigration Advocacy as Labor Advocacy*, 33 BERKELEY J. EMP. & LAB. L. 73 (2012).

[19] *See* Charlotte Garden, *Freeing Speech at Work: Journalists' Unions, Workplace Democracy, and Political Democracy*, in DISINFORMATION, MISINFORMATION, & DEMOCRACY (Krotoszynski, Jr., Koltay, and Garden, Eds.) (2025) (discussing examples of collectively bargained protections for journalists' speech).

[20] *See, e.g.*, WILLIAM A. HERBERT ET AL, ACADEMIC FREEDOM AND COLLECTIVE BARGAINING (2026), https://research-data.hunter.cuny.edu/ncscbhep/NationalCenter_CDAF_Academic_Freedom_and_Collective_Bargaining_Report.pdf (collecting sample academic freedom provisions from collective bargaining agreements negotiated by unions including AFT and UAW).

The existence of these provisions is a reflection of members' priorities. Unions do not have bottomless wells of bargaining-table leverage and must make choices about what terms to pursue. That they negotiate terms protecting workers against retaliation for their out-of-work speech strongly suggests that workers care about this protection. Otherwise, a rational union—subject to decertification if workers come to believe their interests would be better represented by another union or by no union at all—would have pursued different terms.

Of relevance to this case, the labor movement also has a lengthy track record of advocating in court for broad First Amendment protections, especially for dissidents and protestors. Many of the iconic Holmes and Brandeis free-speech opinions of the interwar era—including Justice Holmes's dissent in *Abrams v. United States* and Justice Brandeis's concurrence in *Whitney v. California*—arose from prosecutions of labor activists or political radicals.[21] Unions also helped to bring about the modern, more speech-protective First Amendment that emerged starting in the 1930s and 1940s. As a result, many First Amendment cases that we now regard as foundational—such as *Hague v. CIO*, *Thornhill v. Alabama*, and *Thomas v. Collins*—were litigated by unions asserting their own rights of free speech, assembly, and association, or those of their officers and members.[22]

Unions are still frequent participants in First Amendment litigation to this day. Recently, the AFT, the American Association of University Professors ("AAUP," an AFT

---

[21] *Abrams v. United States*, 250 U.S. 616 (1919) (upholding convictions under Espionage Act based on defendants' distribution of material supporting the Russian Revolution and calling for a general strike); *Whitney v. California*, 274 U.S. 357 (1927) (upholding conviction under California's Criminal Syndicalism Act for participating in and speaking at meeting of Communist Labor Party); *see also Gitlow v. New York,* 268 U.S. 652 (1925).

[22] *Hague v. CIO*, 307 U.S. 496 (1939) (holding First Amendment protected union meetings and articulating the traditional public forum doctrine); *Thornhill v. Alabama*, 310 U.S. 88 (1940) (recognizing peaceful labor picketing as protected First Amendment expression); *Thomas v. Collins,* 323 U.S. 516 (1945) (holding that requirement for union organizers to register with the state was impermissible prior restraint); *Bhd. of R.R. Trainmen v. Virginia ex rel VA. State Bar*, 377 U.S. 1 (1964) (holding that First Amendment protected union's legal referrals and recommendations that workers seek legal advice).

affiliate), and the Service Employees International Union all joined an amicus brief in support of

Perkins Coie and other large law firms identified for disfavored treatment by the Trump

Administration.[23]  To be clear, this is not a case of unions supporting their friends.  Perkins Coie,

for example, states on its website that its lawyers help their clients achieve their "business

objectives," including "to remain union free."[24]  That several prominent unions (including

plaintiff AFT) went to the aid of their *opponents'* First Amendment rights reflects the centrality

of free speech to unions' work.  The same speech-protective orientation is evident in other high-

profile First Amendment cases—including some involving speakers with whom many union

leaders and members would have vehemently disagreed.[25]

Unions representing workers engaged in teaching, journalism, and other forms of

public communication tend to be especially active in First Amendment litigation.  This group

includes all three of the plaintiffs in this case: AFT (and its affiliate, AAUP) and UAW both

represent large numbers of educators, including graduate students and university professors,

whose academic freedom is "a special concern of the First Amendment"[26]; CWA represents

journalists organized under the banner of the NewsGuild.[27]  All of these groups have recently

been extensively involved in First Amendment litigation aimed at protecting their members'

rights to work and live without fear of government retaliation for their protected speech.[28]

---

[23] Brief of Amici Curiae Fred T. Korematsu Center for Law and Equality et al., *Perkins Coie LLP v. DOJ*, No. 25-5241 (Apr. 3, 2026).

[24] *Labor & Employment Services*, PERKINS COIE, https://perkinscoie.com/services/labor-employment, (last visited Apr. 27, 2026).

[25] *See, e.g.*, Brief for the AFL-CIO as Amici Curiae in Support of Petitioners, *Hill v. Colorado*, 530 U.S. 703 (2000) (No. 98-1856)  1999 WL 1034471; Brief for the AFL-CIO as Amici Curiae in Support of Appellant, *Citizens United v. FEC*, 558 U.S. 310 (2010) (No. 08-205) (July 31, 2009), 2009 WL 2365216; *see also* Charlotte Garden, *Unions and Campaign Finance Litigation*, 14 NEV. L.J. 364, 374 (2014) ("[L]abor's history of union litigation in campaign finance cases reveals a continuing concern with unions' rights to talk publicly about politics").

[26] *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967).

[27] *See Constitution*, NEWSGUILD COMMUNICATION WORKERS OF AMERICA (July 2023), https://newsguild.org/wp-content/uploads/2025/07/2023-TNG-Constitution.pdf.

[28] *See e.g.*, Complaint, *L.A. Press Club v. Noem*, No. 25 Civ.05563 (C.D. Cal. June 18, 2025), Dkt. No. 1 (First Amendment challenge to treatment of press reporting on anti-ICE protests brought by plaintiffs including the

II.    **IMMIGRATION AND CIVIL RIGHTS ARE CENTRAL TO UNIONS'
ORGANIZING STRATEGY AND REPRESENTED WORKERS' INTERESTS,
AND UNIONS PUSH FOR CHANGE ON THESE ISSUES AT AND BEYOND
THE BARGAINING TABLE**

Throughout and after World War II (1939–45), women, African Americans, and immigrants entered the workforce in greater numbers—changing the face not just of the workforce, but of unions too. With the Civil Rights Movement of the 1950s and 1960s, many progressive and industrial unions came to understand racial justice as inseparable from economic justice. Over time, many unions realized that civil rights and immigrants' rights were central to their organizing goals: if solidarity was weak, management could play groups of workers off each other.[29] Accordingly, these unions saw immigrant workers' interests in fair treatment at work and unions' own organizing goals as aligned, giving them powerful incentives to push for workplace equality.

Unions did not confine this advocacy on civil rights or other important issues to the bargaining table. As the Supreme Court emphasized in *Eastex Inc. v. Nat'l Lab. Rel. Bd.*, 437 U.S. 556 (1978), the Congress that enacted the NLRA "knew well enough that labor's cause often is advanced on fronts other than collective bargaining and grievance settlement within the immediate employment context."[30] Indeed, the line of cases concerning which union expenses

---

NewsGuild); *Am. Ass'n of Univ. Professors v. Rubio*, 802 F.Supp.3d 120 (D. Mass., Sept. 30, 2025) (AFT-affiliate challenge to "ideological deportation" policy); *President and Fellows of Harvard Coll. v. U.S Dep't Health and Hum. Servs.*, 798 F. Supp. 3d 77, 91 (D. Mass., Sept. 3, 2025) (discussing First Amendment challenge to agency decision to freeze "nearly $2.2 billion in federal grants" filed by plaintiffs UAW & AAUP).

[29] LICHTENSTEIN, *supra* n. 5 at 13, 73–82.

[30] To be clear, Plaintiffs do not invoke *Eastex* to establish that the advocacy at issue here is protected by Section 7 of the NLRA. *Eastex* addressed the scope of Section 7's "mutual aid or protection" clause, and the Court assumed that "at some point" political or economic advocacy may become too attenuated from employees' interests as employees to fall within that clause. The Court's reasoning is nevertheless instructive because it demonstrates that workers' collective interests extend beyond wages, hours, and the immediate bargaining relationship. Section 7 protection is not a prerequisite for standing. For example, in *Int'l Union of United Auto. Aerospace and Agric. Workers of Am. v. Brock*, 477 U.S. 274 (1986), the Court held that the union had associational standing to assert its members' statutory rights under the Trade Act of 1974, applying ordinary associational standing principles rather than requiring any connection to Section 7.

may be charged to represented workers who choose not to become full dues-paying members—including *Machinists v. Street* and *Communications Workers of America v. Beck*[31]—explicitly recognize that unions engage in activities beyond collective bargaining, including political and ideological advocacy.  The chargeable/nonchargeable distinction developed in those cases turns on the premise that some union expenditures are tied to collective bargaining, contract administration, and grievance adjustment, while others involve political, ideological, or otherwise nonrepresentational activity.[32]  As this section illustrates, unions have long mobilized themselves and their members to speak out in contexts ranging from public protest to legislative advocacy to litigation.

### A.    Civil Rights

During the twentieth century, several unions threw themselves wholeheartedly into the struggle for racial justice.  For instance, when the United States persecuted Japanese Americans and forced them into internment camps, the International Longshore and Warehouse Union ("ILWU") was one of very few organizations to stand staunchly against the racist and discriminatory imprisonment.[33]  Also, the UAW sent its chief lobbyist to Congress to advocate for civil rights legislation; helped fund the NAACP's attack on school segregation (alongside the United Packinghouse Workers and the Brotherhood of Sleeping Car Porters) and the 1955–56 Montgomery bus boycott; joined the national boycott of Woolworth stores in support of the 1960

---

[31] *Int'l Ass'n of Machinists v. S.B. Street*, 367 U.S. 740 (1961); *Commc'ns Workers of Am. v. Beck*, 487 U.S. 735 (1988).

[32] The Supreme Court's decision in *Janus v. AFSCME,* 585 U.S. 878, 912 (2018), rejecting the chargeable/nonchargeable distinction for public sector workers, only strengthens this point.  In recognizing a right of public sector employees not to contribute to union dues, the Court emphasized the political nature of public-sector bargaining, noting that, "[i]n addition to affecting how public money is spent, union speech in collective bargaining addresses many other important matters," and "unions express views on a wide range of subjects—education, child welfare, healthcare, and minority rights, to name a few."  *Id.*

[33] Peter Cole, *When America Was Overcome with Anti-Japanese Xenophobia During WWII, One Union Fought Back*, IN THESE TIMES (Nov. 23, 2015), https://inthesetimes.com/article/japanese-internment-world-war-ii-ilwu-labor-unions.

lunch-counter sit ins; contributed to bail out the freedom riders arrested in 1961 (four of whom were UAW members); and hosted Southern Christian Leadership Conference and other civil rights speakers on its radio programs, local meetings, and conventions.[34]  Likewise, the Electrical, Radio and Machinery Workers Union of America ("UE") called for an end to discrimination in housing, education, and employment; Jim Crow; and the poll tax.[35]  It also funded the defense of wrongfully accused African American men like "the Trenton Six" and pushed for passage of a federal anti-lynching law.[36]  During the 1960s, unions were instrumental to the enactment of Title VII of the Civil Rights Act of 1964.[37]

Likewise, the Civil Rights Movement recognized, in Martin Luther King, Jr.'s, words, that "the inseparable twin of racial injustice was economic injustice."[38] After all, "[w]hat good is having the right to sit at a lunch counter if you can't afford to buy a hamburger?"[39] Civil rights groups supported workers courageously seeking to better their conditions through collective action, such as the 1968 Memphis Sanitation Workers' Strike.[40]  The prominent labor and civil rights leader A. Philip Randolph, longtime president of the Brotherhood of Sleeping Car Porters, was a principal architect of the 1963 March on Washington for Jobs and Freedom.

---

[34] KEVIN BOYLE, THE UAW & THE HEYDAY OF AMERICAN LIBERALISM 1945-1968 107, 121,168 (1995).

[35] Carol Lambiase, *UE's Early Commitment to Black Lives Matter: Fighting Frame-ups, Lynching and "Legal Lynching,"* UNITED ELECTRICAL (Feb. 16, 2016), https://www.ueunion.org/es/ue-news-feature/2016/ue%E2%80%99s-early-commitment-to-black-lives-matter-fighting-frame-ups-lynching-and-

[36] *Id.*

[37] LICHTENSTEIN, *supra* n. 5 at 192.

[38] Martin Luther King Jr., *My Pilgrimage to Nonviolence*, MARTIN LUTHER KING JR. RSCH. & EDUC. INST., STANFORD UNIV., https://kinginstitute.stanford.edu/king-papers/documents/my-pilgrimage-nonviolence; *see also* Fishkin & Forbath, *supra* n. 7, at 57–58.

[39] Mike Leyba, *Elizabeth Warren's Touching Tribute to Black Lives Matter*, RESPONSIBLE WEALTH, https://www.responsiblewealth.org/elizabeth_warren_s_touching_tribute_to_black_lives_matter (last accessed April 24, 2026).

[40] U.S. Dep't of Lab., *The Workers of the Memphis Sanitation Strike (1968)*, HALL HONOR INDUCTEES, https://beta.dol.gov/about/history/hall-honor-inductees/workers-memphis-sanitation-strike-1968; LICHTENSTEIN, *supra* n. 6, at 199–200.

The UAW then helped fund the march, and UAW President Walter Reuther was standing beside MLK during the latter's famous "I have a dream" speech.[41]

Unions have also argued for participatory and inclusive democracy in litigation.[42] For example, in an amicus brief filed in *Brown v. Board of Education*, the AFT argued that desegregation was vital to its own mission, which it described as "education for democracy and democracy in education."[43] For its part, the CIO (at the time a labor federation that was separate from the AFL, and that included plaintiff UAW) wrote that school desegregation was important because it was "endeavoring to practice non-segregation and non-discrimination in the everyday functioning of union affairs" as part of its "dedicat[ion] to the maintenance and extension of our democratic rights and civil liberties."[44]

These commitments remain central to union activity today. The last few decades have seen the rise of "Bargaining for the Common Good" ("BCG"), a nationwide coalition of labor and community groups working together "to win bigger and broader demands at the bargaining table and in the streets."[45] BCG pushes for common good demands across racial justice, education, immigration, climate justice, housing, and other sectors. *See* Ex. 1. Other unions advance the economic and racial justice demands of their members through state and

---

[41] *Walter Reuther*, AFL-CIO, https://aflcio.org/about/history/labor-history-people/walter-reuther (last visited Apr. 27, 2026).

[42] *See, e.g.*, Brief for the Lawyers' Committee for Civil Rights Under Law et al., as Amici Curiae in Support of Petitioners, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) (Nos. 07-21, 07-25), 2007 WL 3407030 (brief filed on behalf of amici including SEIU and AFSCME); Brief Amicus Curiae of the National Education Ass'n, et al., in Support of Respondents, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) (No. 12-71), 2013 WL 457385.

[43] Additional Br. of the Am. Fed. of Teachers as Amici Curiae, *Brown v. Bd. of Educ. of Topeka*, 349 U.S. 294 (1955), 1953 WL 48692.

[44] Brief. for the Cong, of Indus. Orgs. as Amicus Curiae, *Brown v. Bd. of Educ. of Topeka*, 349 U.S.,1953 WL 78290.

[45] *About*, BARGAINING FOR THE COMMON GOOD, https://www.bargainingforthecommongood.org/about/ (last visited Apr. 24, 2026); *see also* Joseph A. McCartin et. al, *Combustible Convergence: Bargaining for the Common Good and the #RedforEd Uprisings of 2018*, LAB. STUDIES J., Vol 45(I), 103 (2020).

local policymaking and other means.[46]  In short, labor unions have always recognized that the fight for workers' rights is broader than wages and employment conditions, and unions routinely advocate for intersectional issues that affect their members' lives.

      **B.**      **Immigration**

Because "immigration affects the scale, geographical distribution, and skill composition of the labor force," immigration has always been in part a labor issue—though unions' policies on immigration issues have changed over the years, and their positions are not monolithic.[47]  Employers have sometimes hired immigrants to undercut US citizens' wage demands or as strikebreakers.[48]  This dynamic has sometimes pitted labor unions against immigrants, such as when unions advocated for the 1882 Chinese Exclusion Act and literacy tests for immigrants in the early 1900s.[49]

Today, however, the labor movement more often aims to strengthen protections for immigrant workers, making the case that leaving immigrants vulnerable to workplace abuse harms all workers.[50]  Therefore, labor organizations, including the plaintiffs in this case, advocate stronger protections for immigrant workers.  As with civil rights advocacy, this is a reflection, both, of unions' own organizing interests and the workplace-related interests of union-represented workers.  And, again, this advocacy takes place not just at bargaining tables, but also through legislative and regulatory advocacy, public protest, and litigation.[51]

---

[46] *See* Andrew Elmore, *Labor's New Localism*, 95 S. CAL. L. REV. 253 (2022); Andrew Elmore, *Confronting Structural Inequality in State Labor Law*, 83 MD. L. REV. 1192 (2024).

[47] VERNON M. BRIGGS JR., CTR. FOR IMM. STUDIES, AMERICAN UNIONISM & U.S. IMMIGRATION POLICY 1 (2001), https://cis.org/Report/American-Unionism-and-US-Immigration-Policy.

[48] Medici, *supra* n. 6, at 9.

[49] BRIGGS JR., *supra* n. 47, at 2–4.

[50] Erwin Chemerisnky et. al., *More Just Podcast, Advancing Workers' Rights,* UC BERKELEY L., at 8:25 (June 5, 2022), https://www.law.berkeley.edu/podcast-episode/advancing-workers-rights/ (Catherine Fisk speaking).

[51] AFL-CIO AMERICA'S UNIONS, WORKERS' RIGHTS ICE'D OUT 11 (2026), https://aflcio.org/sites/default/files/2026-02/FINAL%20Report%20Workers%27%20Rights%20ICE-D%20Out%20%281%29.pdf; *Immigration*, AFL-CIO, https://aflcio.org/issues/immigration (last visited Apr. 27,

Labor unions are well aware that immigration enforcement can be used to undercut organizing. Today, that can look like an employer inviting immigration enforcement to target immigrant workers who are union supporters.[52] But the government itself has at times targeted union leaders for deportation. For example, in the 1930s and 1940s, the United States tried at least four times over the course of more than a decade to deport influential union leader Harry Bridges in retribution for his successful 1934 longshoremen's strike.[53] Bridges, an Australian immigrant longshoreman, championed the slogan that "an injury to one is an injury to all."[54] Under his leadership, longshoremen's unions refused to unload cargo from a German ship until the Nazi flag was hauled down; they also refused to load war materials onto an Italian freighter during the Italian invasion of Ethiopia.[55] Bridges' union and other labor unions were instrumental in stopping his deportation, including by launching a public campaign, organizing rallies and strikes to protest the deportation attempts, and funding his legal defense—arguing that deportation for political beliefs violated free speech and was an attack on the rights of all workers.[56] Although the government's efforts to deport Bridges were unsuccessful, union leader James J. Matles and former Michigan state senator and union-ally Stanley Nowak were both temporarily stripped of their citizenship (but ultimately had it restored in separate Supreme Court proceedings).[57]

---

[52] *See, e.g.*, *Sure-Tan v. NLRB*, 467 U.S. 883 (1984) (considering the appropriate remedy after employer reported union supporters to Immigration and Naturalization Service in retaliation for unionizing).

[53] AMANDA FROST, YOU ARE NOT AMERICAN, CITIZENSHIP STRIPPING FROM DRED SCOTT TO THE DREAMERS 142–45, 150–54 (2021).

[54] *Harry A Bridges Biography*, INT'L LONGSHORE WAREHOUSE UNION, https://www.ilwu19.com/history/biography.htm (last visited Apr. 24, 2026).

[55] *Id.*

[56] *Burning Bridges: America's 20-Year Crusade to Deport Labor Leader Harry Bridges*, ILWU (Feb. 28, 2018), https://www.ilwu.org/burning-bridges-americas-20-year-crusade-to-deport-labor-leader-harry-bridges.

[57] FROST, *supra* n. 53, at 151.

Even during this time (and since), unions have fought to improve the lives of immigrant workers. For example, the CIO argued to the Supreme Court that a Hawaii statute prohibiting education in languages other than English violated the First Amendment. In a preliminary statement, the CIO described its interest in the case in terms of its members' "working conditions and living conditions":

> Many of its members in Hawaii and elsewhere are persons whose native tongue is other than English; of these and other members, many live in bilingual or multilingual communities. The Hawaiian statute, by prohibiting the teaching by anyone of any language other than English to children has and will augment existing racial, religious and nationalistic discord with a resultant serious effect upon the assimilation programs of this organization in its striving for the betterment of working conditions and living conditions for workers in this multilingual area and elsewhere.[58]

And the last several decades have only seen an even more significant rise in union organizing for pro-immigrant policies. In 2006, for instance, unions helped organize the "Day Without Immigrants" protest against a bill that would have imposed severe penalties for undocumented immigration.[59] Employers' subsequent decisions to fire employees who missed work to participate resulted in the filing of unfair labor practice charges with the NLRB. Although these charges did not yield Board decisions, the NLRB's general counsel agreed that the protestors' immigration policy goals were sufficiently related to working conditions to fall within the NLRA's ambit.[60]

---

[58] Brief for Cong. of Indus. Orgs as Amici Curiae, *Stainback v. Mo Hock Ke Lok Po*, 336 U.S 368 (1949) (No. 52) 1948 WL 47231.

[59] Teres Watanabe & Joe Matthews, *Unions Helped to Organize 'Day Without Immigrants,'* L.A. TIMES (May 3, 2006), https://www.latimes.com/archives/la-xpm-2006-may-03-me-organizers3-story.html; Dan Glaister & Ewen MacAskill, *US Counts Cost of Day Without Immigrants*, GUARDIAN (May 1, 2006, 8:13 PM), https://www.theguardian.com/world/2006/may/02/usa.topstories3.

[60] Memorandum from Ronald Meisburg to All Regional Directors, Officers in Charge, and Resident Officers (July 22, 2008), http://hr.cch.com/ELD/NLRBGC08-10.pdf. *Accord* Jayme Sophir, *EZ Industrial Solutions, LLC, Case 07-CA-193475,* Office of the General Counsel NLRB (Aug. 30, 2017), https://www.nlrb.gov/case/07-CA-193475 (reaching the same conclusion with respect to a later immigration-related protest). However, Meisburg concluded that the means pursued by the protestors—striking in order to achieve a political goal over which their employer lacked direct control—was not protected by the NLRA.

Further, in the last decade, unions have begun advocating for "sanctuary workplaces" and negotiating protections for immigrant workers.[61]  In February 2026, the AFL-CIO published a report arguing that the Trump Administration's "obsession with immigration enforcement and disregard for labor enforcement has put workers in physical and financial danger" and lambasting the decision to funnel "billions of taxpayer dollars into immigration enforcement at the expense of creating a robust economy where workers have good jobs and are protected from employer exploitation."[62]  And 19 labor organizations, including the three union plaintiffs in this case, recently filed a brief telling the stories of union members who would be harmed by President Trump's executive order purporting to end birthright citizenship.[63] (Tellingly, this brief concealed the identities of these members, presumably because they feared government retaliation.)

For practically as long as unions have existed—although their positions on immigration law over the last century have evolved and are not monolithic—they have viewed immigration policy as deeply intertwined with labor organizing.  Defendants are simply wrong that immigrants' rights advocacy is beyond unions' scope.

---

[61] *See, e.g.*, Contract Between League of Conservation Voters & Washington-Baltimore News Guild Local 32035 (Aug. 1, 2020) at *13–15 (setting out various protections for immigrant workers, including that the employer will "provide up to $1,000 per year to any employee who is seeking to change their immigration or citizenship status"); Collective Bargaining Agreement between CWA Local 1180 & Caring Across Generations (Jan. 1, 2025-Dec. 31, 2027) at *16–23 (setting out protections related to immigrant workers); Collective Bargaining Agreement between The University of Oregon & Graduate Teaching Fellows Federation, AFT Local 3544 (Nov. 11, 2019-June 15, 2022) at *68 (same).

[62] AFL-CIO, *supra* n. 51, at 1–2.

[63] Brief for 19 Labor Organizations as Amici Curiae in Support of Respondent, *Trump v. Barbara* (No. 25-365) (Feb. 24, 2026).

III.    **UNIONS CANNOT FUNCTION WITHOUT FREE AND OPEN COMMUNICATION WITH AND BETWEEN THEIR MEMBERS, INCLUDING ONLINE**

Labor unions are democratic institutions that have always been rooted in tight-knit relationships with their members.[64]  In other words, "[t]he strength of organized labor [has] always [been] about mobilizing people around ideas; it [i]sn't about protecting the right to collect dues to administer bargaining agreements."[65]

When workers cannot communicate openly with their union, the union itself suffers.  Union members who feel silenced or disaffected may no longer engage with the union or leave it altogether.[66]  The Supreme Court itself has recognized the role of community and solidarity in facilitating effective union advocacy.[67]  When union members are afraid to participate in collective actions, the union's ability to push for policy change is diminished.[68]  And, when union members feel chilled from sharing their grievances with their union, the quality of the union's representation is harmed.[69]

It is uncontroversial that Section 7 of the NLRA protects concerted activity that takes place online, including on social media.[70]  Moreover, in a 2019 decision permitting

---

[64] DAN CLAWSON, THE NEXT UPSURGE: LABOR AND THE NEW SOCIAL MOVEMENTS 22 (2003).

[65] Catherine Fisk, *The Future of Labor*, ONLABOR (Nov. 18, 2016), https://onlabor.org/the-future-of-labor/.

[66] *See* Cynthia Estlund, *Free Speech and Due Process in the Workplace*, 71 IND. L. J. 1, Article 4, 108 (1995) ("[T]he workplace is the location where people come together for purposive, cooperative activity and where they gain or lose much of their sense of community and of self-worth.").

[67] In *Ellis v. Brotherhood of Railway*, 466 U.S. 435 (1984), the Court treated convention and social-activity expenses as chargeable because they were sufficiently related to the union's representational functions, including collective bargaining.

[68] Natascha Elena Uhlman, *National Unions Deman Release of Detained Immigrant Workers*, IN THESE TIMES (Apr. 9, 2025), https://inthesetimes.com/article/national-unions-resist-trump-detention ("Unless members get involved, a resolution is just a piece of paper.  The petition is a tool that we need to use to unify people, but it will do us no good if the only people that sign onto it are organizations. . . .  Workers need to be in these deep conversations about what kind of world they want to have and what kind of country they want to live in." (cleaned up)); Fisk, *supra* n. 5, at 2067–68, 2092.

[69] Estlund, *supra* n. 66, at 110; Charlotte Garden, *Was it Something I Said?*, ECON. POL'Y INST. (May 5, 2022), https://www.epi.org/unequalpower/publications/free-speech-in-the-workplace/.

[70] 29 U.S.C. § 157; *see also* Jeffrey M. Hirsch, *Worker Collective Action in the Digital Age*, 117 W. VA. L. REV. 921, 935–37 (2015) (discussing NLRB decisions involving concerted activity on social media).

employers to bar the use of company email systems for protected concerted activity, the National

Labor Relations Board identified social media as an "additional avenue[] of communication" that

was available for organizing activity, which decreased workers' need for access to company

electronic resources.  Decision and Order, *Caesars Entertainment d/b/a Rio All-Suites Hotel and

Casino*, 368 NLRB No. 143 at *8 (2019).

   But organizing on social media will not be an option for workers who fear that the

federal government could expel them (or their co-workers) from the country if it dislikes what

they have to say.  As Part II of this brief showed, labor organizing speech can cover a wide range

of contentious topics.  Moreover, the NLRB and the courts have long recognized that organizing

and concerted activity can become heated; robust and open debate is essential to the process, and

labor law does not demand perfectly precise (or even wholly civil) communications in the heat of

the moment.  *See, e.g.*, *Linn v. United Plant Guard Workers*, 383 U.S. 53 (1966) (holding that

the NLRA preempts organizing-related defamation claims when plaintiff cannot show actual

malice, because "labor and management often speak bluntly and recklessly, embellishing their

respective positions with imprecatory language" (citation omitted)); *see also Lion Elastomers*,

372 NLRB No. 83 (2023), *vacated on other grounds by Lion Elastomers v. NLRB*, 108 F.4th 252

(5th Cir. 2024).  As described in Plaintiffs' complaint, immigrant workers and their families have

sometimes concluded that they must steer clear of union-related speech on social media

altogether rather than risking an exchange that could include criticism of the government; even if

they do participate, they self-censor.  *See* Dkt. No. 45 ¶¶ 209–57.

   Moreover, any suggestion that in-person labor organizing can serve as an

adequate substitute for chilled online speech is disingenuous.  Remote workers may have no

practical way to meet their co-workers in real life.  And in any event, unions are increasingly

using social media to communicate with workers, advocate for workplace and public change, and organize collective actions.[71]  Research has also suggested that union members who engage with union social media posts are more likely to also participate in its collective actions.[72]  Moreover, as the American public spends more and more of its time online and increasingly gets is news from social media sites,[73] unions' inability to converse with their members online would be a significant blow to their ability to organize and mobilize members.[74]  At bottom, unions are inhibited in their ability to undertake their core activities and achieve their mission when free speech rights are chilled, online or offline.

## CONCLUSION

For the foregoing reasons, this Court should reject the government's arguments that this case is not germane to the plaintiff-unions' purpose, and that they are not harmed when their immigrant members' speech is chilled.

---

[71] Ken Green, *Union Communications: How Labor Leaders Can Use Social Media To Connect With Members*, UNIONTRACK (Nov. 21, 2021), https://uniontrack.com/blog/union-communication-social; David Houghton & Andy Hodder, *Understanding Trade Union Usage of Social Media*, UNIV. OF BIRMINGHAM, 11 (2021) https://pure-oai.bham.ac.uk/ws/files/145542338/ntwe.12209.pdf; *see also* ORGANIZING WITH SOCIAL MEDIA, AFSCME COUNCIL 28 WFSE (2021), https://afscmeatwork.org/system/files/organizing_with_social_media_-_rise_up_2021_workshop.pdf; Charlotte Garden, *Can Labor Law Still Protect Concerted Activity?*, 99 CHI. KENT L. REV. 527, 540-550 (2024) (discussing virtual collective action in context of remote or online work); Ariana R. Levinson, *Solidarity on Social Media*, 2016 COLUM. BUS. L. REV. 303 (2016); Jeffrey M. Hirsch, *Worker Collective Action in the Digital Age*, 117 W. VA. L. REV. 921, 954 (2015).

[72] Olivia Cohen, *'It's part of the war now': Unions Increasingly Use Social Media to Boost Labor Actions*, GATEWAY JOURNALISM REV. (Dec. 21, 2023), https://gatewayjr.org/its-part-of-the-war-now-unions-increasingly-use-social-media-to-boost-labor-actions/, (citing research by Andy Hodder).

[73] *Id.*

[74] Mykaela Johnston, *The Changing Landscape of Labor Unions: Social Media*, Undergraduate Research Paper, TEXAS A&M UNIV., 19 (2025), https://oaktrust.library.tamu.edu/server/api/core/bitstreams/45c9f8d1-f5b2-4dbe-9f89-f827cff0d326/content (recording multiple unions' position that "using social media was crucial to navigating today's sociopolitical climate").

19

Dated: April 27, 2026
New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

_____
Hafsa S. Mansoor

One Rockefeller Plaza, 8th Floor
New York, New York 10020

(212) 763-5000

*Attorney for Amici Curiae*

20

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1, the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Local Civil Rule 7.1, as modified by this Court's Individual Rule 2(C).  As measured by the word processing system used to prepare it, this memorandum contains 4,121 words.


April 27, 2026                                    /s/ Hafsa S. Mansoor

## APPENDIX

Institutional affiliations of the amici listed below are provided for identification purposes only.

**Kate Andrias**
Patricia D. and R. Paul Yetter Professor of Law
Columbia Law School

**Sameer Ashar**
Clinical Professor of Law
Faculty Director, Workers and Tenants Law and Organizing Clinic
UC Irvine School of Law

**Richard Bales**
Professor of Law
Ohio Northern University

**Matthew Bodie**
Robins Kaplan Professor of Law
University of Minnesota Law School

**Sharon Block**
Professor of Practice
Executive Director, Center for Labor and a Just Economy
Harvard Law School

**Kate Bronfenbrenner**
Senior Lecturer Emerita,
Cornell Industrial and Labor Relations School

**Angela B. Cornell**
Clinical Professor of Law
Director, Labor Law Clinic
Cornell Law School

**Roberto L. Corrada**
Professor of Law
University of Denver Sturm College of Law

**Marion Crain**
Wiley B. Rutledge Professor of Law
Washington University in St. Louis

**Kenneth G. Dau-Schmidt**
Carr Professor of Labor and Employment Law
Indiana University -- Bloomington

22

**Michael C. Duff**
Director, Wefel Center for Employment Law
Professor of Law
Saint Louis University School of Law

**Andrew Elmore**
Professor of Law & Barreca Labor Relations Scholar
Boston University School of Law

**Catherine L. Fisk**
Barbara Nachtrieb Armstrong Distinguished Professor of Law
University of California, Berkeley Law

**Elizabeth Ford**
Associate Professor
Seattle University School of Law

**Ruben J. Garcia**
Ralph Denton Professor of Law
Director, Workplace Law Program
William S. Boyd School of Law

**Charlotte Garden**
Gray, Plant, Mooty, Mooty, and Bennett Professor of Law
University of Minnesota Law School

**Kate Griffith**
Professor of Labor & Employment Law
Cornell ILR School

**Hiba Hafiz**
Professor of Law & McHale Faculty Research Scholar
Boston College Law School

**Jonathan F. Harris**
Associate Professor of Law
Temple University Beasley School of Law.

**Ann C. Hodges (she/her)**
Professor of Law Emerita
University of Richmond School of Law

**Ariana R. Levinson**
Professor of Law
University of Louisville Brandeis School of Law

23

**Marcia L. McCormick**
Professor of Law
St. Louis University School of Law

**Michael M. Oswalt**
Professor of Law
Wayne State Law School

**James G. Pope**
Distinguished Professor of Law Emeritus
Rutgers Law School

**Courtlyn Roser-Jones**
Associate Professor of Law
Moritz College of Law

**Benjamin Sachs**
Kestnbaum Professor of Labor and Industry
Harvard Law School

**Joseph E. Slater**
Distinguished University Professor
Eugene N. Balk Professor of Law and Values
University of Toledo College of Law

**Alvin A. Velazquez**
Associate Professor of Law
Indiana University Maurer School of Law

**Laura Weinrib**
Fred N. Fishman Professor of Constitutional Law
Harvard Law School

**Noah D. Zatz**
Professor of Law & Labor Studies
UCLA School of Law

# Exhibit 1



# CONCRETE EXAMPLES OF BARGAINING FOR THE COMMON GOOD

## RACIAL JUSTICE · CLIMATE JUSTICE · EDUCATION

## FINANCE   ·   IMMIGRATION   ·   PUBLIC SERVICES

## PRIVATE SECTOR   ·   PRIVATIZATION







| CONCRETE EXAMPLES OF<br>**BARGAINING FOR THE COMMON GOOD** | **INTRODUCTION** |

## WHAT IS BARGAINING FOR THE COMMON GOOD?

The Bargaining for the Common Good network grew out of successful campaigns driven by unions, community groups, and racial justice organizations. Today, groups across the country are partnering around a long-term vision for the structural changes they want to see in their communities and using union bargaining as a critical moment in a broader fight for the common good. The BCG network is convened by the Action Center on Race and the Economy, the Center for Innovation in Worker Organization at Rutgers University, and the Kalmanovitz Initiative for Labor and the Working Poor at Georgetown University.

## KEY PRINCIPLES OF COMMON GOOD CAMPAIGNS

- Expand the scope of bargaining beyond wages and benefits
- Go on offense in your campaign by identifying, exposing and challenging the real bad actors
- Engage community allies as partners in issue development and the bargaining campaign
- Center racial justice in your demands
- Strengthen internal organizing, membership and member engagement
- Leverage capital in our campaigns
- The campaign doesn't end once the union settles its contract

## CONTENTS

This packet includes concrete examples of common good demands that unions and community groups have bargained for across the country.  Some of these demands have been won in bargaining or outside the negotiations table, and some have only been introduced. A few demands are listed more than once as they are tied to multiple areas of BCG work.  This is a living document as new demands are always being put forward and brought to our attention.

These sectors and issues are covered in this packet, but others are being developed as this movement grows:

- Racial Justice
- Education
- Immigration
- Private Sector
- Housing
- Climate Justice
- Finance
- Public Services
- Privatization



**1**

**CONCRETE EXAMPLES OF**
**BARGAINING FOR THE COMMON GOOD**                    **RACIAL JUSTICE**

**1. Linguistic and Cultural Competency.**  We demand that teachers may, as part of their professional development, attend community-based trainings based on the specific linguistic and cultural needs of the community.
**--Lake County Federation of Teachers, AFT Local 504**

**2. Diverse Staffing.** We demand that the District recruit, hire and assign staff proportionately in terms of racial minorities to total employees in every department, school and at every level of operation within Seattle Public Schools.
**--Seattle Education Association, SEA/WEA/NEA**

**3. Racial Justice Equity Teams.** We demand that educational assistants be given paid time to attend racial equity trainings and the opportunity to join their building's Equity Team.
**--Saint Paul  Federation of Educators, AFT Local 28/NEA**

**4. Defund Campus Police.** We demand a 50% reduction of the University's Division of Public Safety's budget and a reallocation of the funds to community based justice initiatives. DPS must also cease the use of lethal weapons.
--**Graduate Employees Union - University of Michigan, AFT 3550**

**5. Reallocate Money from Police.** Los Angeles must shift the astronomical amount of money devoted to policing to other public needs such as housing and public health.
**--United Teachers Los Angeles, NEA/CTA/AFT**

**6. Ban the Box.** We demand that the company remove any questions pertaining to a potential employee's criminal record from employment applications.
**--Minnesota Property Services Union, SEIU Local 26**

**7.  End Unwarranted Searches.** We demand that the school district stop subjugating students to metal detector screenings and locker checks without cause.
**--United Teachers Los Angeles, NEA/CTA/AFT**

**8. Diversity Training.** We demand that teacher orientation include components on diversity, and that all teachers be required to attend a diversity training during the school year.
**--Wichita Federation of Teachers, AFT Local 725**

**9. Invest in Community Jobs Pipelines.** We demand that the city work with the union to create apprenticeship and job training opportunities, partner with local educational institutions, and form hiring programs designed to bring low-income, minority, and disadvantaged community members into the workforce.
**--Southern California Public Service Workers, SEIU Local 721**

**10. Community Schools.** The school district and the union will work together to establish community schools, which will feature expanded services for the community and community input in school governing decisions.
**--Chicago Teachers Union, AFT Local 1**



<table>
<tr><td>CONCRETE EXAMPLES OF<br>**BARGAINING FOR THE COMMON GOOD**</td><td>**RACIAL JUSTICE**</td></tr>
</table>

**11. Restorative Practices.** We demand that the discipline plan include restorative practices with meaningful training and support as well as social-emotional training and equity support practices.
>> **--Denver Classroom Teachers Association, DCTA/CEA/NEA**

**12. Pay for Work on Diversity.** We demand that that university hire unionized graduate students, with benefits, to work on Diversity, Equity, and Inclusion initiatives, rather than do the work as a volunteer.
> **--University of Michigan Graduate Employees Organization, AFT Local 3550**

**13**. **Expand In-State Tuition Options.** We demand that the university grant in-state tuition of all graduates of state high schools, regardless of immigration status.
>> **--Oregon State Employees Union, SEIU Local 503**

**14. No Militarized Police at Protests.** We demand that the university prohibit the use of riot police, SWAT, or excessive police forces during non-violent student and worker actions.
>> **--University of California Service Employees, AFSCME Local 3299**

**15. Implement Affirmative Action.** The school district will work with the union to develop plans to recruit, employ, and promote individuals who are inadequately represented among the school district's workforce.
> **--Oakland Education Association, NEA/CTA**

**16. Stem the School to Prison Pipeline.** We demand that the school system work with teachers to pilot disciplinary practices that serve as alternatives to strictly punitive measures, including restorative justice methods.
>> **--Saint Paul Federation of Educators,  AFT Local 28/NEA**

**17. Divest from Private Prisons and Detention.** We demand that employees be allowed to reduce their share of pension fund contributions until the university no longer invests in private prisons or detention centers.
> **--University of California Service Employees, AFSCME Local 3299**

**18. Black Lives Matter.** We demand an end to zero-tolerance discipline measures that disproportionately affect minority children, implementation of restorative justice in schools, hire and support more black teachers, and mandate black history/ethnic studies in K-12.
> **--New Jersey Education Association, NJEA/NEA**

**19. Restorative Practices.** We demand that the District and the Association, with the involvement of community stakeholders, work together to develop and implement restorative practices. Participating school sites shall be provided all necessary supports, training, professional development, staffing, release time, materials, and all other resources necessary.
> **--San Diego Education Association, SDEA/CTA/NEA**



**20. Cut Law Enforcement Ties**. We demand that UM cut all ties with police including the Ann Arbor Police Department and Immigration and Customs Enforcement.
> **--Graduate Employees Union - University of Michigan, AFT 3550**

**21. Reform Municipal Justice System.** We demand that the county reform its criminal justice system to prioritize education, early intervention, treatment, and rehabilitation instead of strictly punitive measures.
> **--San Diego County Employees, SEIU Local 221, Invest in San Diego Families**

**22. Remittances to Somalia**. We demand that US Bank restart remittances to Somalia, allowing its many Somali immigrant workers to send money to their families.
> **--Minnesota Property Services Union, SEIU Local 26**

**23. Black Lives Matter.** We demand that the Board endorse and encourage teachers and students to participate in the Black Lives Matter Week of Action in Schools. The thirteen guiding principles of the Black Lives Matter movement highlighted during this week are a means of challenging the insidious legacy of institutionalized racism and oppression that has plagued the United States since its founding.
> **--Prince George's County Educators' Association, PGCEA/MSEA/NEA**

**24. No ICE Collaboration.** We demand that the university not collaborate with ICE, insist that ICE produce a valid warrant before entering university premises, not impose additional requirements for work authorization, and not participate with any federal worker registry.
> **--University of California Service Employees, AFSCME Local 3299**

**25. Provide Immigration Resources.** We demand that the school district provide immigration-related trainings and other resources for students and staff, as well as establish a $1 million immigration legal defense fund.
> **--United Teachers Los Angeles, NEA/CTA/AFT**

**26. Limited Police Intervention.** We demand that the university limit the offenses which can lead to an arrest by campus police, and the circumstances that cause members of the U.C. system to be turned over to outside police.
> **--University of California Service Employees, AFSCME Local 3299**



## CONCRETE EXAMPLES OF
## BARGAINING FOR THE COMMON GOOD

## CLIMATE JUSTICE

**1. Green Spaces on Campus.** We demand that the District create a plan to provide adequate green space for student physical activity.

> **--United Teachers of Los Angeles, NEA/CTA/AFT**

**2. Green work environment**. We demand the company provide a safe and healthy workplace for employees and use materials that contribute to a healthy and sustainable ecological environment

> **--SEIU Local 26**

**3. Free School Transportation.** We demand that the District provide free bus passes to low-income students.

> **--Chicago Teachers Union, AFT Local 1**

**4. Environmental Impact.** We demand that the city issue a report on the impact a contract will have on the local economy and the environment prior to entering into the contract.

> **--Southern California Public Service Workers, SEIU Local 721**

**5. End Fossil Fuel Subsidies.** We demand that the city and state stop providing subsidies to companies that rely on fossil fuels as a core component of their business model.

> **--Florida Public Services Union, SEIU Local 8**

**5. Eco-Friendly Commuting.** We demand that the city increase the amount of available time off to employees who bike, carpool, or use public transit to get to work.

> **--Florida Public Services Union, SEIU Local 8**

**7. Green Transit.** We demand that the Canada Post transition the fleet to 100% renewable energy and retrofit Canada Post buildings for energy efficiency.

> **--Canadian Postal Workers Union**

**8. Incentivize Mass Transit.** We demand that the state make mass transit passes available for purchase at pre-tax rates for employees and residents.

> **--Oregon State Employees Union, SEIU Local 503**

**9. Green Public Infrastructure.** Municipal unions could bargain for cities to green their infrastructure through renewable energy and higher efficiency standards.

> **--Saqib Bhatti and Stephen Lerner, "Labor Must Take on Capital" in Jacobin**

**10. Vacancies to Community Gardens.** We demand that the city transform vacant publicly owned land to community gardens.

> **--Florida Public Services Union, SEIU Local 8**

**11. Tax Fossil Fuels.** We demand that the state institute a higher tax on oil production, gas production, and motor fuels to fund public education.

> **--Oklahoma Education Association, statewide initiative**

**BCG**

# CONCRETE EXAMPLES OF
# BARGAINING FOR THE COMMON GOOD

## EDUCATION

**1**. **Community Schools.** We demand that by June 30, 2018, the District, in collaboration with the Community Schools Implementation Team (CSIT) and school communities, shall designate 20 schools in high-need areas to engage a Community Schools transformation process. The District shall allocate $10 million each year and any school that is designated as a Community School is to be protected from reconstitution, new charter co-location, or renewed charter co-location.

> **--United Teachers Los Angeles, NEA/CTA /AFT**

**2. Immigration.** We demand that CPS will be a Sanctuary School District and specifically what that means for how they will protect students who are vulnerable to discriminatory and punitive immigration policies

> **--Chicago Teachers Union, AFT Local 1**

**3. Living Wage for All.**  We demand that the University set a $15/hour wage floor in our state's public universities for classified employees and employees of university contractors.

> **--Oregon University System, SEIU Local 503**

**4. Proper Training.** We demand that the university properly train campus police on the university's sanctuary policies, reporting of incidents involving undocumented community members, de-escalation intervention techniques, and restorative justice.

> **--University of California Service Employees, AFSCME Local 3299**

**5. Healthy Food.** We demand the creation of healthier lunch and breakfast options for Howard County students and equity in county-wide access to healthy food in schools.

> **--Howard County Education Association, HCEA/MSEA/NEA**

**6. A Better School Day.**  We demand art, music, world languages, and physical education for all students. We also propose increasing the number of counselors, librarians, nurses, social workers, playground instructors, restorative justice coordinators, and school psychologists.

> **--Chicago Teachers Union, AFT Local 1**

**7. Tuition Equity.**  We demand that all in-state high school students, regardless of their citizenship status, be granted an exemption from non-resident tuition and fees.

> **--Oregon University System, SEIU Local 503**

**8. Divest from Private Prisons and Detention.** We demand that employees be allowed to reduce their share of pension fund contributions until the university no longer invests in private prisons or detention centers.

> **--University of California Service Employees, AFSCME Local 3299**

**9. Shield Students from Foreclosures.** We demand that the school district divest from banks that foreclose on students and their families during the school year.

> **--Saint Paul Federation of Teachers, AFT Local 28/NEA**



**10. Educate the Whole Child.** We demand a well-rounded pre-K through grade 12 curricula which includes physical activity, appreciating or creating art and music, learning new languages, learning how things work by creating science experiments, solving mathematics problems with multiple approaches, reading fiction and non-fiction books, and more.
      **--Manchester Education Association, MEA/NEANH/NEA**

**11. Universal Pre-Kindergarten.**  We demand that the district maintain and expand the Pre-K program for 4 year-olds by committing to spend at least $6 million per school year to ensure that waiting lists for the program are reduced.
      **--Saint Paul Minnesota Federation of Teachers, AFT Local 28/NEA**

**12. Child and Parent Safety.**  We demand that the district provide adequate crossing guard staffing for every elementary and middle school in the city.
       **--Fix LA Coalition in Los Angeles, California**

**13. Free School Transportation.**  We demand that the district provide free bus cards to low-income students.
      **--Chicago Teachers Union, AFT Local 1**

**14. Smaller Class Sizes.**  We demand that the district allocate funding for smaller K-12 class sizes, with extra class-size reductions for high poverty schools and for K-3 in all schools.
      **--Washington Education Association, statewide initiative, NEA**

**15. Limit Standardized Testing.**  We demand that the district significantly reduce the number and duration of standardized tests and ban tests entirely for students prior to the 3rd grade.
      **--Chicago Teachers Union, AFT Local 1**

**16. Linguistic and Cultural Competency.**  We demand that teachers may, as part of their professional development, attend community-based trainings based on the specific linguistic and cultural needs of the community.
       **--Lake County Federation of Teachers, AFL Local 504**

**17. No Militarized Police at Protests.** We demand that the university prohibit the use of riot police, SWAT, or excessive police forces during non-violent student and worker actions.
      **--University of California Service Employees, AFSCME Local 3299**

 **18. Equity.** We demand equitable funding and a school budget that does not negatively impact our students or MTEA members and an end of the privatization of Milwaukee Public Schools.
       **--Milwaukee Teachers' Education Association, MTEA/WEAC/NEA**

**19. Racial Justice Equity Teams.** We demand that educational assistants be given paid time to attend racial equity trainings and the opportunity to join their building's Equity Team.
      **--Saint Paul Minnesota Federation of Teachers,  AFT Local 28/NEA**



## CONCRETE EXAMPLES OF
# BARGAINING FOR THE COMMON GOOD

# EDUCATION

**20.  Recess**. We demand that all K-5 students have at least 30 minutes of recess per day.
> **--Seattle Education Association, SEA/WEA/NEA**

**21. Diversity Training.** We demand that teacher orientation include components on diversity, and that all teachers be required to attend a diversity training during the school year.
> **--Wichita Federation of Teachers, AFT Local 725**

**22. Improve Police Oversight.** We demand that the university include more students and campus worker representatives on the campus police review board and broaden the board's investigatory scope.
> **--University of California Service Employees, AFSCME Local 3299**

**23. Pay for Work on Diversity.** We demand that that university hire unionized graduate students, with benefits, to work on Diversity, Equity, and Inclusion initiatives, rather than do the work as a volunteer.
> **--University of Michigan Graduate Employees Organization, AFT Local 3550**

**24. Privatization: Charter Schools.** We demand increased oversight, transparency, and accountability for charter schools in relation to fiscal, educational, and socio-emotional impacts on SFUSD students.
> **--United Educators of San Francisco, AFT/CFT #61, NEA/CTA**

**25. Stem the School to Prison Pipeline.** We demand that the school system work with teachers to pilot disciplinary practices that serve as alternatives to strictly punitive measures, including restorative justice methods.
> **--Saint Paul Federation of Teachers, AFT Local 28/NEA**

**26. End Unwarranted Searches.** We demand that the school district stop subjugating students to metal detector screenings and locker checks without cause.
> **--United Teachers Los Angeles, NEA/CTA /AFT**

**27. No ICE Collaboration.** We demand that the university not collaborate with ICE, insist that ICE produce a valid warrant before entering university premises, not impose additional requirements for work authorization, and not participate with any federal worker registry.
> **--University of California Service Employees, AFSCME Local 3299**

**28. Include Community Input.** We demand that the district include parents in curriculum and testing decisions and incorporate bilingual education into all curriculums.
> **--Pasco Association of Educators, NEA/WEA**

**29. Provide Immigration Resources.** We demand that the school district provide immigration-related trainings and other resources for students and staff, as well as establish a $1 million immigration legal defense fund.
> **--United Teachers Los Angeles, NEA/CTA /AFT**



**30. Implement Affirmative Action.** The school district will work with the union to develop plans to recruit, employ, and promote individuals who are inadequately represented among the school district's workforce.
--Oakland Education Association, NEA/CTA

**31. Community Schools.** The school district and the union will work together to establish community schools, which will feature expanded social services for the community and community input in school governing decisions.
**--Chicago Teachers Union, AFT Local 1**

**32. Ban the Box.** We demand that the company remove any questions pertaining to a potential employee's criminal record from employment applications.
**--University of California Service Employees, AFSCME Local 3299**

**33. Expand Green Spaces.** We demand that the district expand green spaces on district campuses.
**--United Teachers Los Angeles, NEA/CTA/AFT**

**34. Establish Targeted Hiring Programs.** We demand that the university create a targeted hiring program designed to hire disadvantaged citizens and adopt fair chance hiring and background check policies.
**--University of California Service Employees, AFSCME Local 3299**

**35. English Language Learners.** Ensures that CPS will increase the staffing of English Learner Program Coordinators beginning next school year.
**--Chicago Teachers Union, AFT Local 1**

**36. In-Source University Employment.** We demand that the university stop contracting out work that would otherwise be performed by the bargaining unit and begin in-sourcing all work that is currently contracted out.
**--University of California Service Employees, AFSCME Local 3299**

**37. Divest from Koch Industries.** We demand that the district no longer purchase products made by companies owned by Koch Industries.
**--Minneapolis Federation of Teachers, AFT Local 59/EdMN/NEA**

**38. Hold Charter Schools Accountable.** We demand that the district require more transparency and accountability from charter schools in the district and discuss with the union when determining a charter authorization, re-authorization, or school co-location.
**--United Teachers Los Angeles, NEA/CTA/AFT**

**39. More time for Lunch and Recess.** We demand that Elementary and Middle School students have an appropriate and healthy amount of time for lunch and recess.
**--Seattle Education Association, NEA/WEA**



## CONCRETE EXAMPLES OF
# BARGAINING FOR THE COMMON GOOD

# FINANCE

**1. Hold Wall Street Accountable.** We demand that the state investigate banks that have engaged in fraudulent practices and boycott them until the money lost is paid back.
>> **--Oregon State Employees Union, SEIU Local 503**

**2. Shield Students from Foreclosures.** We demand that the school district divest from banks that foreclose on students and their families during the school year.
>> **--Saint Paul Federation of Teachers, AFT Local 28/NEA**

**3. Ensure Property Maintenance.** We demand that the city enforce existing ordinances that ensure banks maintain the properties they foreclose on and penalize banks that do not.
>> **--Southern California Public Service Workers, SEIU Local 721**

**4. Divest from Private Prisons.** We demand lower pension fund contributions from workers until the employer fully divests from banks that fund private prisons or detention centers.
>> **--University of California Service Employees, AFSCME 3299**

**5. End Predatory Banking.** The Committee for Better Banks is organizing bank workers to demand fairer sales goals and end predatory practices.
>> **--Committee for Better Banks, CWA Union**

**6. Remittances to Somalia.** We demand that US Bank restart remittances to Somalia, allowing its many Somali immigrant workers to send money to their families.
>> **--Minnesota Property Services Union, SEIU Local 26**

**7. Disclose Wall Street Fees.** We demand that the city disclose the fees it pays Wall Street and use every tool at its disposal to negotiate better terms on its financial transactions.
>> **--Southern California Public Service Workers, SEIU Local 721**

**8. Establish Public Banks.** Public sector employees can push for the creation of public banks that perform the same functions that private banks perform at a lower cost.
>> **--Saqib Bhatti and Stephen Lerner, "Labor Must Take on Capital" in Jacobin**

**9. Local Micro-Currencies.** We demand that the municipality creates its own micro-currency, which can only be spent at local businesses. This currency would comprise a small portion of every public employee's paycheck.
>> **--Florida Public Services Union, SEIU Local 8**



## CONCRETE EXAMPLES OF
## BARGAINING FOR THE COMMON GOOD

## IMMIGRATION

**1**. **No ICE Collaboration.** We demand that the university not collaborate with ICE, insist that ICE produce a valid warrant before entering university premises, not impose additional requirements for work authorization, and not participate with any federal worker registry.

    **--University of California Service Employees, AFSCME Local 3299**

**2**. **Immigration Resources.** We demand that the district provide immigration-related trainings and resources for students and staff, and create a $1 million legal defense fund.

    **--United Teachers Los Angeles, NEA/CTA/AFT**

**3**. **Job Retention.** We demand that the hotel allow DACA and TPS employees to retain their jobs and seniority if they return within five years after being forced to leave their job.

    **--Las Vegas Culinary Employees, UNITE HERE Local 226**

**4**. **Remittances to Somalia.** We demand that US Bank restart remittances to Somalia, allowing its many Somali immigrant workers to send money to their families.

    **--Minnesota Property Services Union, SEIU Local 26**

**5**. **Proper Training.** We demand that the university properly train campus police on the university's sanctuary policies, reporting of incidents involving undocumented community members, de-escalation intervention techniques, and restorative justice.

    **--University of California Service Employees, AFSCME Local 3299**

**6**. **Expand In-State Tuition.** We demand that the university grant in-state tuition for all graduates of state high schools, regardless of immigration status.

    **--Oregon State Employees Union, SEIU Local 503**

**7**. **Protect Immigrant Families.** We demand that the county create an Office of Refugee and Immigrant Services, expand county medical services to immigrant families, and implement a legal protection fund for immigrants facing deportation.

    **--San Diego County Employees, SEIU 221, Invest in San Diego Families**

**8**. **Divest from ICE Collaborators.** We demand that the university system sever all ties with companies doing business with ICE.

    **--University of California Service Employees, AFSCME Local 3299**

**9**. **No ICE on Campus.** We demand that the university disinvite ICE from campus career fairs.

    **--Rutgers United Students Against Sweatshops, Rutgers One Coalition**

**10**. **Education Resources.** We demand that the  employer will provide funding for English as a Second Language classes, and allow employees to attend classes during work hours.

    **--Georgetown University Cafeteria and Parking Lot Workers, Unite Here Local 23**

**11**

## CONCRETE EXAMPLES OF
## BARGAINING FOR THE COMMON GOOD

## PUBLIC SERVICES

**1**. **Employee Input.** We demand that the state establish pilot improvement teams for three selected public services. Employees critical to those services will be able to provide input on the design and implementation of any proposed improvements, and employees will receive a portion of any cost-savings that occur because of those improvements.
  **--California Service Employees, SEIU Local 1000**

**2. Professional Development.** We demand that the city establish career academies that train civil service employees, so they may better serve their community and grow professionally.
  **--Southern California Public Service Workers, SEIU Local 721**

**3. Boost Staffing.** We demand that the state hire enough civil servants to meet the state's needs. All departments below 90% staffing levels will increase staff by 10% each year, and all departments will be at 95% staffing levels within two years of the contract's signing.

  **--Oregon Service Employees, SEIU Local 503**

**4. Restore Public Services.** We demand that the city restore all public services to pre-recession levels within three years of the contract's signing.
  **--Southern California Public Service Workers, SEIU Local 721**

**5. Expand Mental Health Services.** We demand that the county expand mental health services and fully fund Psychiatric Emergency Response Teams.
  **--San Diego County Employees, SEIU 221, Invest in San Diego Families**

**6. Improve Public Parks.** We demand that the city double its spending on parks and form a committee with the union and its partners to address revenue solutions, including increased taxation and distribution flexibility on high-end developments.
  **--Southern California Public Service Workers, SEIU Local 721**

**7. Ensure Enrollment in State Programs.** We demand that the county provide resources to ensure that all qualifying county residents are enrolled in the state's CalFresh, CalWorks, and MediCal programs.
  **--San Diego County Employees, SEIU 221, Invest in San Diego Families**

**8. Increase Hiring.** We demand that the city restore at least 5,000 positions that have been lost because of post-recession austerity measures.
  **--Southern California Public Service Workers, SEIU Local 721**

**9. Criminal Justice Reform.** We demand that the county use existing state funding to support restorative justice and recidivism-reduction trainings for justice system employees, and job access programs for individuals with a criminal record.    **--San Diego County Employees, SEIU 221, Invest in San Diego Families**

**10. Stop Unauthorized Incarcerations.** We demand that the county eliminate unauthorized incarcerations and releases that occur because of short-staffing in county jails.
  **--San Diego County Employees, SEIU 221, Invest in San Diego Families**

CONCRETE EXAMPLES OF
**BARGAINING FOR THE COMMON GOOD**

**PUBLIC SERVICES**

**11**. **Invest in Community Jobs Pipelines.** We demand that the city work with the union to create apprenticeship and job training opportunities, partner with local educational institutions, and form hiring programs designed to bring low-income, minority, and disadvantaged community members into the workforce.
>    **--Southern California Public Service Workers, SEIU Local 721**

**12. Expand Pre-Trial Services.** We demand that the county expand pre-trial services so that every individual booked and jailed in San Diego county can have an evaluation and assessment within 24 hours of their booking.
>    **--San Diego County Employees, SEIU 221, Invest in San Diego Families**

**13. Reduce Traffic Injuries.** We demand that the city provide adequate crossing guard staffing at elementary and middle schools to prevent injuries that could have been prevented by the presence of a crossing guard.
>    **--Southern California Public Service Workers, SEIU Local 721**

**14. Protect Immigrant Families.** We demand that the county create an Office of Refugee and Immigrant Services, expand county medical services to immigrant families, and implement a legal protection fund for immigrants facing deportation.
>    **--San Diego County Employees, SEIU 221, Invest in San Diego Families**

**15. Reasonable Scheduling.** We demand that the city withdraw its bargaining proposal for mandatory night shifts and arbitrary scheduling for service workers.
>    **--Southern California Public Service Workers, SEIU Local 721**

**16. Improve Child Development.** We demand the state improve the lives of children by increasing funding for foster care, childcare, after-school programs, in-state tuition subsidies, and visitation centers. We demand the state reduce caseloads for childcare workers, allowing them to focus on the children that need the most attention.
>    **--Massachusetts Human Service Workers and Educators, SEIU 509**

**17. Fund Child Safety.** We demand that the city hire more child safety workers and give them more manageable caseloads, less paperwork, and more job flexibility.
>    **--Southern California Public Service Workers, SEIU Local 721**



**13**

## CONCRETE EXAMPLES OF
# BARGAINING FOR THE COMMON GOOD
## PRIVATE SECTOR

**1. Ban the Box.** We demand that the company remove any questions pertaining to a potential employee's criminal record from employment applications.

> **--Minnesota Property Services Union, SEIU Local 26**

**2. End Predatory Banking.** The Committee for Better Banks is organizing bank workers to demand fairer sales goals and end predatory practices.

> **--Committee for Better Banks, CWA Union**

**3. Stop Privatization.** We demand that the dialysis and pediatric units remain in our hospitals and are not outsourced to for-profit institutions.

> **--Christ Hospital and Bayonne Medical Center Employees, HPAE Locals 5186 & 5185**

**4. No Metro for Supremacists.** We demand that WMATA withdraw its plans to provide private train cars for attendees of the "Unite the Right" rally in Washington, DC.

> **--Washington DC Area Transit Workers, ATU Local 689**

**5. Safe Staffing Levels.** We demand that the hospital employ enough nurses to ensure patient safety, quality patient care, and manageable nurse caseloads.

> **--Hackensack Meridian Health Workers, HPAE Local 5030**

**6. Immigration Protections.** We demand that the hotel deny ICE access to the building without a judicial warrant and allow DACA and TPS employees to retain their jobs and seniority if they return within five years.

> **--Las Vegas Culinary Employees, UNITE HERE Local 226**

**7. Remittances to Somalia.** We demand that US Bank restart remittances to Somalia, allowing its many Somali immigrant workers to send money to their families.

> **--Minnesota Property Services Union, SEIU Local 26**

**8. Blocking Medical Debt Collectors.** We demand that the hospital not sell any of its patients' medical debt to third-party debt-collection agencies.

> **--Health Professionals and Allied Employees**

**9. Sexual Harassment Protections.** We demand that the hotel provide panic buttons to housekeepers and ban guests who have displayed abusive behavior from finishing their stay or returning to the hotel.

> **--Las Vegas Culinary Employees, UNITE HERE Local 226**

**10. Prayer Time.** We demand that the employer allow Muslim employees to attend daily prayers during breaks without clocking out, and reinstate workers fired for this reason.

> **--Hertz Employees Union, Teamsters Local 117**



## CONCRETE EXAMPLES OF
# BARGAINING FOR THE COMMON GOOD

# PRIVATIZATION

**1. Public Contractor Database.** We demand that the city require contractors to make their records pertaining to city services publicly available, and that the city create an online database of all contracted services and their associated costs.
**--Southern California Public Service Workers, SEIU Local 721**

**2. In-Source University Employment.** We demand that the university stop contracting out work that would otherwise be performed by the bargaining unit and begin in-sourcing all work that is currently contracted out.
**--University of California Service Employees, AFSCME Local 3299**

**3. Environmental Impact.** We demand that the city issue a report on the impact a contract will have on the local economy and the environment prior to entering into the contract.
**--Southern California Public Service Workers, SEIU Local 721**

**4. Reduce Childcare Cost.** We demand that the university stop contracting out the university's childcare centers, reduce waiting lists at its childcare centers, and bring the costs of university childcare to no more than 10% of the state's median costs.
**--Washington Education Employees, SEIU Local 925**

**5. No Employee Displacement**. We demand that no employee be laid-off, demoted, or displaced because of contracting and that the union have the right to review all proposed contracts that affect bargaining unit work**.**
**--Southern California Public Service Workers, SEIU Local 721**

**6. Hold Charter Schools Accountable.** We demand that the district require more transparency and accountability from charter schools in the district and discuss with the union when determining a charter authorization, re-authorization, or school co-location.
**--United Teachers Los Angeles, NEA/CTA/AFT**

**7. Improve Oversight and Accountability.** We demand that the city increase oversight of its contractors, ensuring that contractors are providing the full services agreed to, at the quality agreed to, at the price agreed to, and are not violating any applicable laws.
**--Southern California Public Service Workers, SEIU Local 721**

**8. Charter Neutrality.** We demand that the district require all charter schools it authorizes to remain neutral if their employees attempt to unionize.
**--Chicago Teachers Union, AFT Local 1**

**9. Contracting Transparency.** We demand that the state be more transparent when contracting out services, and never contract out any service that could be provided by state employees at equal or lesser cost.
**--Oregon Service Employees, SEIU Local 503**

**10. Strong Labor Standards for Contractors**. We demand that the county ensure that all contracted employees are paid a livable wage with access to essential benefits.
**--San Diego County Employees, SEIU Local 221, Invest in San Diego Families**

BCG
BARGAINING FOR THE COMMON GOOD

## CONCRETE EXAMPLES OF
## BARGAINING FOR THE COMMON GOOD

## HOUSING

1. **Homeless Students.** We demand that the UW to negotiate over a solution to the problem of homeless UW students, who are forced to rely on shelters, cars and other temporary shelter.
    **--U District Alliance, SEIU 925**

2. **Support for Unhoused and Underhoused Students.** We demand that the district offer services for homeless and extremely rent burdened students and families, develop unused district land into affordable housing, and lobby for better housing legislation.
    **--United Teachers of Los Angeles, NEA/CTA/AFT**

3. **No Foreclosures During School Year.**  We demand that the District cease all business with banks that foreclose on families with school-aged children during the school year.
    **--Saint Paul Minnesota Federation of Teachers,  AFT Local 28/NEA**

4. **Homelessness Services.** We demand the city invest in residential beds, affordable housing, and resources to prevent homelessness and provide dignity to the homeless population.
    **--San Diego County Employees, SEIU Local 221, Invest in San Diego Families**

5. **Affordable Housing.** We demand that the city will restore its affordable housing budget to pre-recession levels, require Ellis Act evictors to pay their tenants the difference in affordable housing rates and market rates for two years, and put a windfall tax for properties that are bought and quickly flipped on the ballot.
    **--Southern California Public Service Workers, SEIU Local 721**

6. **Funding Housing.** We demand the Board ensure that the city use TIF funds and revenue from real estate transfer taxes, a corporate head tax, and a millionaire's tax to fund affordable family housing units within the enrollment boundary of the Sustainable Community Schools and to fully fund section 8 voucher programs and expand Air-BnB housing rehabilitation to properly house 15,000 homeless students by 2020.
    **--Chicago Teachers Union, AFT Local 1**

7. **Affordable Housing.** A requirement that developer payments for affordable housing in the U District Upzone be prioritized for building affordable housing in the same neighborhood.
    **--U District Alliance, SEIU 925**



## CONCRETE EXAMPLES OF
# BARGAINING FOR THE COMMON GOOD

## COVID-19

**1. Paid Time Off.** The state must implement additional paid sick days for all workers in Boston and throughout Massachusetts, including those not covered by existing FMLA laws.
> **--Boston Teachers Union, AFT**

**2. No-cost testing.** We demand testing protocols that place no economic burden on individuals and families in need.
> **--Chicago Teachers Union, AFT Local 1**

**3. No Evictions or Foreclosures.** The state must enact a moratorium on evictions and foreclosures during the COVID-19 emergency.
> **--Boston Teachers Union, AFT**

**4. Economic relief.** We demand debt forgiveness, suspended rent and mortgage payments, suspended eviction court and utility shut-offs.
> **--United Teachers of Los Angeles, NEA/CTA/AFT**

**5. Emergency Housing.** We demand that Hennepin County provide immediate day shelter for people who are experiencing homelessness and rely on public libraries.
> **--Hennepin County Clerical and Related**, **AFSCME 2822**

**6. Internet.** Comcast must make the Internet Essentials program free for families until 60 days after students can return to school, increase download and upload speeds so families can work and learn from home simultaneously, and open residential hotspots to the public
> **--Philadelphia Federation of Teachers, AFT Local 3; Baltimore Teachers Union**

**7. Child Care Support.** We demand the city provide a weekly disaster stipend for the city's working parents to stay home with their children without losing pay.
> **--United Teachers of Los Angeles, NEA/CTA/AFT**

**8. Public Services.** Expedite all new applications for public assistance. Emphasize that applications must be done by phone or online. Waive all face-to-face interviews or do them by phone.
> **--Hennepin County Clerical and Related, AFSCME 2822**

