UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, COMMUNICATIONS WORKERS OF AMERICA, and AMERICAN FEDERATION OF TEACHERS,

Plaintiffs,

-against-

UNITED STATES DEPARTMENT OF STATE, MARCO RUBIO, *in his official capacity as Secretary of the U.S. Department of State*, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICE, JOSEPH B. EDLOW, *in his official capacity as Director of U.S. Citizenship and Immigration Service*, UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*, and UNITED STATES OF AMERICA,

Defendants.

**OPINION AND ORDER DENYING MOTION TO DISMISS**

25 Civ. 8566 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

Plaintiffs filed this case on October 16, 2025, alleging that Defendants the U.S. Department of State ("State"), the U.S. Department of Homeland Security ("DHS"), United States Citizenship and Immigration Services ("USCIS"), Immigration and Customs Enforcement ("ICE"), the head of each agency, and the United States (collectively, the "Government") are

engaged in a coordinated program to surveil the online speech of noncitizens and to take adverse immigration actions against those who express certain viewpoints that the Government disfavors (the "Challenged Surveillance Program" or "CSP"). Plaintiffs allege that the scheme violates the First Amendment and the Administrative Procedure Act. Plaintiffs are unions who bring the claims on behalf of themselves and their members. The Government moves to dismiss the case for lack of jurisdiction, claiming that the Immigration and Nationality Act ("INA") divests the Court of subject matter jurisdiction and arguing that Plaintiffs cannot establish associational or organizational standing. For the following reasons, the motion to dismiss is denied.

## BACKGROUND

Plaintiffs are three labor unions: International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), Communications Workers of America ("CWA"), and American Federation of Teachers ("AFT"). Plaintiffs' members include local affiliates representing graduate students, postdoctoral scientists, researchers, university staff, and faculty at higher education institutions across the country, federal, state, and local government employees, and communications and other industry professionals. AC ¶¶ 15–17. Defendants are the federal agencies and department heads of those agencies who Plaintiffs allege are involved in implementing the Challenged Surveillance Program.

### I. Plaintiffs' allegations about the Challenged Surveillance Program.

As alleged by Plaintiffs, the Challenged Surveillance Program is an interagency program wherein the Government "(1) surveils expressive activity documented online of millions of individuals—primarily U.S.-based visa holders and Lawful Permanent Residents—in order to detect disfavored viewpoints and to take adverse immigration action based on those viewpoints, and (2) coerces silence by threatening to engage in such viewpoint-targeted online surveillance and related adverse immigration action." AC ¶ 11.

Plaintiffs allege that the Government, through DHS, uses artificial intelligence ("AI") to monitor the social media of noncitizens to review for expressions of disfavored viewpoints. AC ¶¶ 30–32. Disfavored viewpoints include criticism of the Trump Administration, criticism of Israel or Zionism, rationalizing or making light of Charlie Kirk's murder, or broadly "hateful ideology" that is harmful to American culture or way of life. AC ¶¶ 28–29. Plaintiffs allege that based on these social media reviews, DHS refers instances of disfavored viewpoints expression to the State Department to consider whether to take adverse immigration actions against the individual, such as revoking their visa. AC ¶ 37. The State Department then notifies DHS of the action to take, if any, and DHS then implements the adverse immigration action, including by effectuating immigration arrest, commencement of deportation proceedings, or denial of immigration benefits, through USCIS and ICE. AC ¶ 37. Plaintiffs allege that in addition to monitoring the social media of currently present immigrants, the Government also reviews the social media on all new and renewed visa applications, including visa holders seeking to re-enter the United States after international travel. AC ¶¶ 38–40. Plaintiffs allege that these policies discourage granting visas to individuals with disfavored viewpoints. AC ¶ 40.1.

Plaintiffs further allege that the CSP requires disclosure of social media for certain noncitizens. Plaintiffs allege that, effective February 2026, USCIS requires applicants for immigration benefits to submit all social media identifiers they have used during the preceding five years. AC ¶¶ 115–116.1. The requirement reaches both noncitizen applicants and the U.S.-citizen petitioners tied to their requests (such as spouses), estimated to affect more than three million people each year. AC ¶¶ 115–116.1. Plaintiffs further allege that the State Department has directed visa applicants, including students, exchange visitors, and H-1B holders and their dependents, to set their social media profiles to "public" and to maintain them as public for the duration of their stay, exposing that expression to the Government's viewpoint-based review. AC ¶¶ 128–130.

Plaintiffs additionally allege that the Government has publicly discussed the Challenged Surveillance Program and promoted its policy of targeting noncitizens for disfavored viewpoints. Plaintiffs allege, as examples, that President Donald Trump publicly promised to target noncitizens who express disfavored views (AC ¶ 42), that Secretary Rubio explicitly stated that the Government was seeking out disfavored viewpoints (AC ¶ 44), and that official Government social media accounts publicized that they revoked the visas of individuals who expressed disfavored viewpoints. AC ¶¶ 45–50. Plaintiffs allege that these statements amount to a public intimidation campaign to chill the speech of noncitizens and prevent them from expressing disfavored views. AC ¶ 156.

Plaintiffs' allegations include the example of Mahmoud Khalil, a member of UAW, who they allege was the target of viewpoint discrimination and whose immigration case has been highly publicized, including through social media posts and statements by the Government, and directly connected to his anti-Israel campus activities and online statements. AC ¶¶ 157–166. Plaintiffs allege that much of the Challenged Surveillance Program has had a specific focus on college campuses and noncitizens with campus affiliations. AC ¶¶ 30, 40.1. Plaintiffs allege that this focus was, at least in part, due to the Trump Administration's scrutiny of on-campus protests following the October 7 attack on Israel by Hamas, and other campus protest activity. AC ¶¶ 52–59.

Plaintiffs bring seven claims against the Government alleging: (1) the CSP violates the First Amendment as unconstitutional viewpoint discrimination; (2) for coercive threats in violation of the First Amendment; (3) infringement on the rights of association and anonymity; (4) infringements on the right to receive information; (5) arbitrary and capricious action in violation of the Administrative Procedure Act; (6) exceeding authority in violation of the APA; and (7) acting contrary to the law of the APA. Plaintiffs seek declaratory and injunctive relief to declare

the CSP unconstitutional and in violation of the APA, enjoining the Government from continuing to act on the CSP, and vacating final agency actions taken in implementing the CSP.

## II. Plaintiffs' allegations of organizational and associational standing.

Plaintiffs allege that the Challenged Surveillance Program has harmed both Plaintiffs themselves and their individual members.

First, Plaintiffs allege that their individual members have been harmed by the Challenged Surveillance Program because it has chilled their speech and prevented the members from engaging in online expression. Plaintiffs conducted surveys of their membership regarding the Challenged Surveillance Program. Each Plaintiff's survey results showed that significant portions of their membership were aware of the program and that many members changed their online behavior in response, including making accounts private or anonymous, deleting accounts, avoiding posting on certain topics, editing or deleting prior posts, and reducing engagement with topics or other accounts related to the disfavored views. AC ¶¶ 210–213, 225–233, 241–249. Respondents also reported changing behavior to avoid being in other's social media posts, including avoiding being photographed and attending protests. AC ¶¶ 212, 227, 243, 247. The survey respondents reported taking such actions out of fear of adverse immigration actions against themselves or loved ones by the Government. AC ¶ 214.

In addition to the survey results, Plaintiffs allege that numerous anonymous witnesses who stated that they were aware of the Challenged Surveillance Program changed their social media behavior to avoid immigration-related targeting due to their anticipated need to apply for visa renewals or changes in the future. AC ¶¶ 218–224, 234–240, 251–257. The anonymous individuals reported that, in addition to changing social media behavior, some educators changed their classroom policies and self-censored what they say to students, avoided attending protests critical of the Trump administration or expressing other disfavored viewpoints, stopped or avoided engaging in activism or organizing, and refrained from attending union events and strikes or

engaging in online union content. AC ¶¶ 218–224, 234–240, 251–257. The individuals cited in the complaint had ongoing or anticipated visa or other immigration applications or feared revocation of their visas or other legal resident statuses if they expressed disfavored viewpoints. AC ¶¶ 218–224, 234–240, 251–257. Plaintiffs further allege that some members are directly subject to the Government's mandatory social media disclosure requirements, including the requirement to submit five years of social media identifiers and, for certain visa applicants, to make their social media accounts public and keep them public while their applications are pending. AC ¶¶ 115–116, 128–130, 327–329.

Second, Plaintiffs allege that the unions themselves have suffered injury because the Challenged Surveillance Program has caused their members to limit union activity for fear of immigration retribution. AC ¶ 258. Plaintiffs allege that as a result of the Challenged Surveillance Program, members have ceased public affiliation with the unions, skipped meetings, avoided or deleted engagement with the unions on social media, withdrawn from leadership, avoided speaking out in favor of unions, declined to attend protests or strikes, and refrained from participating in union elections. AC ¶¶ 259–260. Plaintiffs allege that this loss of engagement was caused by the Challenged Surveillance Program chilling speech and that Plaintiffs have been harmed by the loss of engagement, which has limited their ability to organize and further their mission and responsibilities. AC ¶ 260. Plaintiffs allege specifically that it has impeded recruitment, member retention, organizing, advocacy, and the promotion of union values and political priorities. AC ¶ 260.

Plaintiffs each allege that they maintain various social media accounts for the national profiles and for local affiliates, and that they use those social media accounts to communicate with and organize their membership, including sharing information about collective bargaining agreements and negotiations and organizing union events. AC ¶¶ 262–267, 277–286. Plaintiffs allege that they have observed decreased engagement with their accounts, which harms

their ability to effectively organize. AC ¶¶ 268, 270, 287, 290–291. Plaintiffs also allege that they have observed decreased engagement in union rallies, pickets, and other union activities, which has harmed their ability to organize and advance union goals. AC ¶¶ 271, 292.

Plaintiffs allege that a component of many of their local affiliates involves on-campus organizing on political activism that challenges the Trump administration and otherwise espouses views disfavored by the Government. AC ¶¶ 274–275. Plaintiffs allege that several local affiliates have reported limiting their advocacy and communications on the disfavored viewpoints in response to their members' fears about adverse immigration actions. AC ¶¶ 274–76.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(1), Plaintiffs bear the burden of alleging facts to demonstrate each element of standing. *Warth v. Seldin*, 422 U.S. 490, 517–18 (1975). A plaintiff must allege the standing requirements "with the manner and degree of evidence required at the successive stages of the litigation" such that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support a claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "For purposes of ruling on a motion to dismiss for want of standing, [the trial court] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501. Though, the Court "need not credit a complaint's conclusory statements without reference to its factual context." *Connecticut Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021).

## DISCUSSION

The Government argues that the Court lacks subject matter jurisdiction under three provisions in the INA, that Plaintiffs' lack associational standing and organizational standing. This

is not so. The Court has subject matter jurisdiction because the INA does not divest the Court of jurisdiction, and Plaintiffs have established associational and organizational standing.

## I. The INA does not divest the Court of jurisdiction over the claims.

The Government argues that three provisions of the INA divest the Court of jurisdiction over this matter: 8 U.S.C. §§ 1252(b)(9), (g), and (f)(1).

First, the Government argues that Section 1252(b)(9) precludes jurisdiction over this case because it provides an exclusive path for review of immigration court actions and thus precludes this Court from enjoining the Government from imposing adverse immigration consequences, as sought by Plaintiffs. Section 1252(b)(9) (referred to as the "zipper clause") channels challenges to removal orders through the immigration courts:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.
>
> 8 U.S.C. § 1252(b)(9)

The Government contends that any review of the challenged adverse immigration actions in this case must proceed only through challenging the individual enforcements of those immigration actions as they arise through the immigration court system. The Government argues that Plaintiffs seek to enjoin it from initiating adverse immigration actions, which is covered by the statute. However, the Government's view is contrary to dispositive rulings of the Second Circuit. In *Ozturk v. Hyde*, the Second Circuit considered the habeas petition of a noncitizen detained by the Government following her online expression of disfavored views. *Ozturk v. Hyde*, 136 F.4th 382 (2d Cir. 2025). The Second Circuit directly considered whether Section 1252(b)(9) divested the court of jurisdiction over the case and held that Section 1252(b)(9) does not provide a jurisdictional bar except "[w]ith respect to review of an order of removal under subsection

(a)(1)." *Id.* at 399. Therefore, for cases where the removal proceedings of an individual are not directly challenged, the jurisdictional bar of Section 1252(b)(9) does not apply.

The Government relies on *Khalil v. President*, 164 F.4th 259 (3d Cir. 2026), wherein the Third Circuit held that Section 1252(b)(9) precluded review of removal proceedings of a specific individual. Additionally, in July 2026, the Second Circuit issued an opinion in *Mahdawi v. Trump*, 183 F.4th 103, 114 (2d Cir. 2026), largely adopting the reasoning in *Khalil* and finding that Section 1252(b)(9) deprived the court of jurisdiction over the removal proceedings of a specific individual. However, both *Khalil* and *Mahdawi* considered whether Section 1252(b)(9) barred a specific individual's unlawful-detention claim that sought to halt removal proceedings against that individual, which are not the facts of the present case.

Here, the lawsuit does not challenge the removal proceedings of any individual, rather it challenges the constitutionality of the Challenged Surveillance Program. Thus, the case does not "aris[e] from any action taken ... to remove [him]." *Mahdawi*, 183 F.4th at 115–16 (quoting 8 U.S.C. § 1252(b)(9)). Because the challenge is not to a specific individual's removal proceedings, the prospect that the CSP may later contribute to some noncitizen's removal does not transform a challenge to the CSP into the review of an order of removal. *Ozturk*, 136 F.4th at 399 ("even if her claims have a relationship to pending removal proceedings, her claims do not themselves challenge removal proceedings and thus § 1252(b)(9)'s channeling function has no role to play.") (cleaned up). Further, this case is not one where the purpose of the "zipper clause would be wholly undone, resulting in 'the very 'piecemeal litigation' that § 1252(b)(9) is designed to prevent.' " Plaintiffs do not raise any claims regarding specific individuals and therefore create no duplicative litigation on removal proceedings. *Mahdawi*, 183 F.4th at 117 (quoting *Khalil*, 164 F.4th at 275). Rather, Plaintiffs' case improves the efficiency of such individual claims by bringing a single challenge to alleged First Amendment violations that underlie the individual claims in *Mahdawi* and *Khalil*. To the extent any relief Plaintiffs ultimately obtain would reach removal

itself, that concern is governed by Section 1252(f)(1) not by Section 1252(b)(9). Thus, Section 1252(b)(9) does not bar jurisdiction.

Second, the Government argues that Section 1252(g) strips the Court of subject matter jurisdiction. Section 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to [1] commence proceedings, [2] adjudicate cases, or [3] execute removal orders against any alien under this chapter," except through a petition for review from a final order of removal filed in a court of appeals. 8 U.S.C. § 1252(g). This argument was also rejected by the Second Circuit in *Ozturk* because the "bar on judicial review is thus cabined 'to three discrete actions': a decision 'to commence proceedings, adjudicate cases, or execute removal orders.' " *Ozturk*, 136 F.4th at 396 (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999)). Claims that are "collateral to" these three functions are not barred by Section 1252(g). *Id.* at 397. Here, the claims brought by Plaintiffs do not directly challenge the commencement, adjudication, or execution of any immigration case or removal order. Rather, this suit challenges the constitutionality of a government policy that is collateral to any active removal proceedings. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (holding that Section 1252(g) did not bar a challenge to the rescission of DACA). Therefore, the claims do not fall into the jurisdiction stripping categories of Section 1252(g).

Third, the Government argues that Section 1252(f)(1) divests the Court of subject matter jurisdiction. Section 1252(f)(1) states that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). The Government's argument is unavailing. The Supreme Court has made clear that Section 1252(f)(1) "does not deprive the lower courts of all subject matter jurisdiction over claims" but rather

"withdraws a district court's 'jurisdiction or authority' to grant a particular form of relief." *Biden v. Texas*, 597 U.S. 785, 798 (2022). Since Section 1252(f)(1) is a limitation on remedy, not a jurisdictional bar, the Court retains jurisdiction given Plaintiffs' request for declaratory relief. *Id.* at 800. Additionally, while the Court may be prevented from stopping the specific removal proceedings of individuals, see *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), the Court retains the ability to offer other injunctive relief, including the enjoining of an unlawful surveillance program that suppresses free speech.

Therefore, none of the provisions of the INA cited by the Government strip the Court of subject matter jurisdiction over this case.

**II. Plaintiffs have standing.**

Article III of the Constitution confers the federal courts with the authority to decide cases and controversies. The standing doctrine "ensure[s] that federal courts do not exceed their authority." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The "irreducible constitutional minimum" of standing contains three elements: (1) injury in fact; (2) causation; and (3) redressability. *Lujan*, 504 U.S. at 560–61 (1992). First, an injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized" and "(b) actual or imminent, not conjectural or hypothetical." *Id.* (citations omitted). Second, causation requires that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (cleaned up). Third, redressability means that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (quotation marks omitted).

"[T]he party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998). A membership organization may establish standing in two ways: organizational standing and associational standing. Associational standing allows the organization to assert the rights of its members and

organizational standing allows the organization to assert claims on its own behalf. *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998). Defendants argue that Plaintiffs lack both associational and organizational standing. For the following reasons, I hold that Plaintiffs have established both associational and organizational standing.

**A. Plaintiffs establish organizational standing.**

Plaintiffs claim organizational standing based on injury to themselves as organizations. For organizational standing, the organizational plaintiff must establish that it meets the same constitutional requirements for standing as individuals. *N.Y.C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). The Government argues that Plaintiffs fail to allege an injury-in-fact.

An organization's injury must be more than derivative of its members' injuries and must be an injury to the organization itself. *Connecticut Parents Union*, 8 F.4th at 172 ("an imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable."). The Second Circuit has established two primary routes for an organization to establish injury. First, "[a]n organization can satisfy the injury prong if it shows that the challenged action did not merely harm its 'abstract social interest' but 'perceptibly impaired' its activities." *Id.* at 173 (citation omitted). This includes allegations that the challenged action "impede[s] [the organization's] abilit[y] to carry out [its] responsibilities." *New York v. DHS*, 969 F.3d 42, 61 (2d Cir. 2020) (citing *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017)). Second, "an organization may suffer the requisite injury when it 'diverts its resources away from its [other] current activities,' or otherwise incurs 'some perceptible opportunity cost.' " *Connecticut Parents Union*, 8 F.4th at 172 (citation omitted). The Supreme Court has clarified that under the second route, an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

Here, Plaintiffs have alleged organizational standing through harm to their abilities to carry out their core responsibilities. *Afr. Cmtys. Together v. Lyons*, 799 F. Supp. 3d 362, 378 (S.D.N.Y. 2025) ("[O]nly a perceptible impairment of an organization's activities is necessary for there to be an injury in fact."). As unions, part of Plaintiffs' core responsibilities is organizing their members and advocating for the unions' goals. Plaintiffs have alleged that the CSP has prevented them from effectively carrying out these responsibilities because it has caused members to step back from union leadership roles, to remove their names from union webpages, to refrain from participating in union activities online and in-person, and to avoid completing collective bargaining surveys. AC ¶¶ 259–60, 271. Plaintiffs allege that this impedes their ability to effectively organize by preventing members from spreading their messages and raising awareness for union issues. Where a union shows that the challenged policy leads to "increased difficulty in meeting with and organizing" among its members the "policy has impeded, and will continue to impede, the organization's ability to carry out [its] responsibilit[ies]." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) (citation omitted); *see also Coal. for Indep. Tech. Research v. Rubio*, No. CV 26-815 (JEB), 2026 WL 2030770, at *9 (D.D.C. July 14, 2026) (holding that decreased engagement with organizational activities due to a similar surveillance program was sufficient to allege organizational standing).

The Government argues that the reductions in engagement reported by Plaintiffs are essentially an overreaction because the viewpoints allegedly targeted by the CSP do not directly include pro-union views. That argument misunderstands both the nature of the alleged injury and the standard governing this motion. The chilling inquiry is an objective one: the question is whether the Government's conduct would deter a person of ordinary firmness from engaging in protected activity, not whether the specific expression a member forgoes is itself among the viewpoints the Government disfavors. *See First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. ___ (2026) (slip op., at 13); *Zieper v. Metzinger*, 474 F.3d 60, 65 (2d Cir.

2007). Plaintiffs allege that the Challenged Surveillance Program monitors noncitizens' online activity indiscriminately and that their members cannot reliably predict which of their activities will be captured and attributed to a disfavored viewpoint. Specifically, the CSP impedes union activities because Plaintiffs' organizing frequently occurs alongside the advocacy the Government is alleged to target, including pro-Palestine and anti-ICE activism on college campuses. AC ¶¶ 271, 274–276, 291–292. Taken as true, these allegations make the members' retreat from union activity a foreseeable consequence of the Program rather than an overreaction untethered to it. Regardless, whether Plaintiffs' members acted reasonably in curtailing their union participation is a factual question that cannot be resolved against Plaintiffs at this stage, where the Court must accept the complaint's allegations as true and draw all reasonable inferences in Plaintiffs' favor. *Warth*, 422 U.S. at 501. The Government's argument that some members increased their engagement does not defeat standing, because at this stage Plaintiffs need only allege that the CSP perceptibly impaired Plaintiffs' activities in some material respect. *See Centro de la Comunidad Hispana de Locust Valley*, 868 F.3d at 110.

These injuries pled by Plaintiffs are also traceable to the CSP, which each Defendant enforces, and are redressable by the relief sought. The Government does not challenge these elements of standing. Therefore, Plaintiffs have established organizational standing as a basis to assert each of their claims.

**B. Plaintiffs have established associational standing.**

Having found organizational standing, Plaintiffs have sufficiently established standing at this stage and the motion to dismiss is denied on that basis. However, I also consider and find that Plaintiffs have associational standing over all but one of their claims. To establish associational standing, the organization must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Government argues that Plaintiffs cannot establish the first two prongs of this test.

**1. Plaintiffs' members would have standing to sue in their own right.**

To establish associational standing, "an organization need not include the names of its injured members at the pleading stage, it must make specific allegations establishing that at least one identified member has standing." *Nat'l Org. for Women-New York City v. United States Dep't of Def.*, 755 F. Supp. 3d 350, 362 (S.D.N.Y. 2024). At this stage, an organization should be "specific—even if 'naming names' and submitting individual affidavits is not required." *Faculty, Alumni, and Students Opposed to Racial Preferences v. New York Univ.*, 11 F.4th 68, 76 (2d Cir. 2021).

As a threshold matter, the Government argues that Plaintiffs' case is a pre-enforcement challenge, and that Plaintiffs fail to allege a sufficiently imminent threat of prosecution to assert a pre-enforcement challenge. In the context of a pre-enforcement challenge, the test for standing considers whether the plaintiff has (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) that the intended conduct is "arguably proscribed by" the challenged regulation; and (3) that "there exists a credible threat of prosecution thereunder" that is "sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59, 161–63 (2014). However, Plaintiffs contend that their claims allege an ongoing surveillance apparatus that is presently chilling speech, and therefore the pre-enforcement framework does not apply. I agree. Plaintiffs' allegations are of an ongoing surveillance program that is actively chilling the speech of their members and otherwise causing harm, which is a present injury, not a pre-enforcement challenge. "It is well-established that 'First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech.' " *Zieper*, 474 F.3d at 65 (2d Cir. 2007) (citing *Aebisher v. Ryan*, 622 F.2d 651,

655 (2d Cir. 1980)). Such challenges to government behavior that is actively chilling speech does not amount to a pre-enforcement challenge. *See id.*; *Am. C.L. Union v. Clapper*, 785 F.3d 787, 800–03 (2d Cir. 2015) (finding standing for an ongoing alleged government surveillance program without engagement in pre-enforcement analysis).

The Government also argues that Plaintiffs' complaint lacks "specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Under *Murthy v. Missouri*, standing "is not dispensed in gross" and a plaintiff must "demonstrate standing for each claim" it presses "against each defendant, and for each form of relief" sought. 603 U.S. 43, 61 (2024); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[O]ur standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press."). Therefore, Plaintiffs must demonstrate associational standing for each of their claims.

**a. Plaintiffs allege standing to support their viewpoint discrimination claims.**

First, Plaintiffs support their viewpoint discrimination claims by arguing that the Challenged Surveillance Program subjects their noncitizen members to ongoing, viewpoint-based surveillance of their online expression and that chilling effect is a concrete injury sufficient to confer standing. The Government argues that Plaintiffs allege no more than a generalized, subjective fear of surveillance that is too speculative to establish injury, and that the complaint fails to plausibly allege that their members are in fact subject to the surveillance they challenge.

Generally, a plaintiff's subjective fear of surveillance from a government program is too speculative to confer standing. *See Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm"); *Clapper v. Amnesty International USA*, 568 U.S. 398, 418 (2013) ("subjective fear of surveillance does not give rise to standing"). However, the chilling effect of a government policy

on speech can itself be an injury when the plaintiffs are surveilled. *ACLU v. Clapper*, 785 F.3d at 802. In such surveillance cases, standing from chilling effects is based on an objective standard. *Cooksey v. Futrell*, 721 F.3d 226, 235–36 (4th Cir. 2013) (defining the objective standard based on whether the conduct is likely to "deter a person of ordinary firmness from the exercise of First Amendment rights").

Under this framework, Plaintiffs have alleged viewpoint discrimination based on their allegations that their members are undergoing active surveillance and the objectively chilling effects of the CSP. Plaintiffs have alleged that through the CSP the Government is monitoring speech of noncitizens and engaging in viewpoint discrimination based on certain disfavored viewpoints. Such viewpoint discrimination is presumptively unconstitutional. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995). Plaintiffs allege that this surveillance is ongoing and that Plaintiffs' members, who include noncitizens, are included within the scope of the alleged surveillance. AC ¶¶ 6, 11, 30.

Plaintiffs have also alleged that the CSP has created a chilling effect that is objectively reasonable. Plaintiffs allege that the Government has extensively publicized the CSP, through public statements and social media posts that make clear that noncitizens who post disfavored views will be targeted by the Government for removal. AC ¶¶ 46, 61, 129, 132, 156–201. This threat of adverse immigration consequences, under a government whose harsh immigration crackdowns has been heavily publicized and reported on, is certainly enough to "deter a person of ordinary firmness from the exercise of First Amendment rights." *Cooksey*, 721 F.3d at 236. It is objectively reasonable that noncitizens would to limit their expression of disfavored viewpoints under the CSP given the credible threat of adverse immigration action from the Government. And Plaintiffs have alleged that their members have, in fact, been chilled as they allege that members have limited their speech or otherwise changed their behavior because of the

CSP. AC ¶¶ 212, 227, 243. This is sufficient to allege an objectively reasonable chill to establish standing to support the viewpoint discrimination claims.

**b. Plaintiffs allege standing to support their association and anonymity claims.**

Plaintiffs have also alleged that their members have already been subjected to mandatory social media disclosure and requirements that their social media accounts are public. Plaintiffs allege that under the CSP, applicants for certain immigration benefits must disclose all the social media identifiers they have used during the preceding five years or maintain public social media accounts. AC ¶¶ 115, 128–130. The Second Circuit has held that "[t]o require disclosure of [social media] handles is thus to demand that applicants effectively forfeit their right to pseudonymous speech on social media" which constitutes a First Amendment violation. *Antonyuk v. James*, 120 F.4th 941, 1003 (2d Cir. 2024).

Specifically, Plaintiffs allege that CWA Doe 6, a lawful permanent resident, has a naturalization application pending before USCIS and is therefore subject to the requirement that benefits applicants disclose all social media identifiers used in the preceding five years. AC ¶¶ 115, 238. In response to that demand and the attendant risk of adverse immigration consequences, CWA Doe 6 deleted one social media account, set another to private, and removed prior posts expressing disfavored viewpoints. AC ¶ 238. Under *First Choice*, the government's demand for disclosure inflicts a present First Amendment injury "when it is made and for as long as it remains outstanding," irrespective of whether it is ever enforced. *First Choice*, 608 U.S. ___ (2026) (slip op., at 12-13).

This is sufficient to show that at least one of Plaintiffs' members has been actively injured by the alleged CSP. Taking all the allegations in the complaint as true, the demand to Plaintiffs' members of social media disclosure, combined with the threat of adverse immigration action is an objectively reasonable chill. *First Choice*, 608 U.S. ___ (2026) (slip op., at 15) ("An

objectively reasonable recipient of a demand like that would be induced, as well, to trim its protected advocacy knowing it now stands in the government's crosshairs."); *Virginia v. American Booksellers Assn., Inc.*, 484 U.S. 383, 393 (1988) (self-censorship in response to a "well-founded fear that the law will be enforced against them" is an injury in fact "that can be realized even without an actual prosecution").

These allegations are sufficient to meet the first prong of the associational standing test for the association and anonymity claims.

**c. Plaintiffs have standing to assert their coercive threat claims.**

Plaintiffs also make claims that the Government is engaged in a campaign of coercive threats to suppress disfavored speech, which is prohibited by the First Amendment. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024); *Aebisher v. Ryan*, 622 F.2d 651, 655 (2d Cir. 1980) ("Where the use of coercive power is threatened, First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech."). Plaintiffs contend that the Government's public statements, threatening adverse immigration actions against any individual who expresses disfavored views, create an actionable injury when the threat is made, regardless of the effect on the recipient, and cause an injury when they chill the speech of the recipient. *Vullo*, 602 U.S. at 198; *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 101 (2d Cir. 2003).

The Government statements that Plaintiffs allege are statements made on social media accounts or otherwise to the general public, not to any specific individual. To state a claim for coercive threats, "a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Vullo*, 602 U.S. at 191. The test is an "objective inquiry" that considers whether "a reasonable person would perceive the official's communication as coercive."

*Id.* It follows that Plaintiffs can establish an injury to members based on their members reasonably understanding the Government's statements to convey a threat.

Here, while the statements alleged by Plaintiffs are not specifically targeted at certain individuals, the number, severity, and high-profile examples of action upon those threats are such that a reasonable person would perceive the communication as coercive. AC ¶¶ 156–201. Plaintiffs allege that the Government has made repeated threats that any noncitizen who expresses disfavored views will be subject to adverse immigration consequences and has publicized the high-profile examples of the Government taking such adverse immigration actions against individuals who express disfavored views. AC ¶¶ 42, 44, 46, 157–94, 198–200. In response to this rhetoric, it is reasonable that Plaintiffs' members would, and did, limit their public speech on disfavored viewpoints. That Plaintiffs do not allege that a specific member has received personalized threats does not diminish this injury. As alleged, the purpose of the CSP is to intimidate noncitizens in order to suppress their speech and limit expression of disfavored views. At this stage, this is sufficient to establish associational standing to challenge coercive threats.

**d. Plaintiffs cannot establish associational standing for their right to receive claims.**

Plaintiffs also allege a First Amendment injury due to the violation of their right to receive information from other members. Government action that chills the speech of an individual can interfere with another person's right to receive information, creating a "classic First Amendment injur[y]." *Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 321 (S.D.N.Y. 2020). To establish standing for a right to receive claim, "the listener [must have] a concrete, specific connection to the speaker." *Murthy*, 603 U.S. at 74–75.

Plaintiffs claim that their members have such a specific connection with the speakers because they have an interest in hearing the speech of fellow union members to organize and communicate effectively. However, Plaintiffs' allegations on this point are too general and

broad to support standing, as the allegations they cite in the complaint do not actually allege that any member was harmed by the failure of another member to speak on a specific issue. AC ¶¶ 203, 229, 239–40, 290, 292, 313, 322, 331, 340. This is insufficient to allege associational standing on a right to receive theory. However, I decline to dismiss these claims because Plaintiffs have established organizational standing that extends to these claims at this stage.

**2. The interests Plaintiffs seek to protect are germane to their organizational missions.**

To establish associational standing, Plaintiffs must also demonstrate that "the interests it seeks to protect are germane to the organization's purpose." *Hunt*, 432 U.S. at 343. The Government argues that Plaintiffs' interests in protecting their members' rights to organizing, advocacy, and free speech are too general to satisfy the germaneness requirement.

The Second Circuit has held "that the 'germaneness' requirement of *Hunt* should be read in accordance with the 'modest yet important' goal 'of preventing litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care.'" *Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006) (citing *Humane Society of the United States v. Hodel*, 840 F.2d 45, 57 (D.C. Cir. 1988)). Thus, "[t]he proper inquiry at the pleading stage is thus a limited one: A court must determine whether an association's lawsuit would, if successful, reasonably tend to further the general interests that individual members sought to vindicate in joining the association and whether the lawsuit bears a reasonable connection to the association's knowledge and experience." *Id.*

The standard articulated by the Second Circuit for germaneness is "undemanding" and recognizes the breadth of interests that labor organizations can pursue on behalf of their members. *Id.* at 148. Here, Plaintiffs satisfy that standard. Plaintiffs allege that the Challenged Surveillance Program interferes with the unions' ability to organize and effectively communicate

with their members, and Plaintiffs have alleged that the CSP has caused members to reduce their engagement with the unions or union activities, both online and in-person. Plaintiffs also allege that for many of their local affiliates, advocacy on issues beyond core labor issues is important to their membership, including speaking out on issues of social justice. AC ¶¶ 274–276; Br. of Labor Scholars as Amici Curiae at 9–11. "[T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986).

Germaneness under *Hunt* requires only a "reasonable connection" between the suit and "the association's knowledge and experience." *Bldg. & Const. Trades Council*, 448 F.3d at 149. The freedom of Plaintiffs' members to speak, associate, and appear publicly is not incidental to union work, but rather is the mechanism through which unions recruit, organize, communicate, and bargain. A program alleged to silence members and drive them from the unions' rolls therefore strikes at the unions' representational function itself, which is the "grounds that bring [their] membership together." *Id.* at 148; *see Brock*, 477 U.S. at 290. Therefore, Plaintiffs have met the second prong and shown that the interests Plaintiffs seek to protect are germane to their purposes.

**3. The claim does not require the participation of individual members.**

The third *Hunt* factor requires that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. The parties do not dispute that this prong is satisfied, and I agree. It is well established that individual members need not participate "when an association seeks prospective or injunctive relief" on their behalf. *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996). Here, Plaintiffs seek declaratory and injunctive relief to enjoin the CSP, the individual members need not participate, and the third prong is satisfied. With all three prongs satisfied, Plaintiffs have established associational standing.

## CONCLUSION

For the aforementioned reasons, Plaintiffs have organizational and associational standing, and the Court has subject matter jurisdiction. Therefore, the Government's motion to dismiss is denied. Defendants shall file their Answer by October 16, 2026. The parties shall appear for a status conference on October 21, 2026 at 11 a.m. The parties shall submit their joint case management plan one day before the conference. The Clerk of Court shall terminate ECF Nos. 43, 51, 70.

SO ORDERED.

Dated: October 1, 2026
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge